**No. CIV-22-376-JFH-KEW**

---

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

---

**MICHAEL D. MAGNESS,**

**Petitioner,**

**-vs-**

**LUKE PETTIGREW,**

**Respondent.**

---

**RESPONSE IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS**

---

**GENTNER F. DRUMMOND
ATTORNEY GENERAL OF OKLAHOMA**

**KEELEY L. MILLER, OBA # 18389
ASSISTANT ATTORNEY GENERAL**

**313 NE 21ˢᵗ Street
Oklahoma City, Oklahoma 73105
(405) 521-3921
(405) 522-4534 (FAX)**

**ATTORNEYS FOR RESPONDENT**

---

**MARCH 3, 2023**

# TABLE OF CONTENTS

**PAGE**

**STANDARD OF REVIEW** ...................................................................................4

**STATEMENT OF THE FACTS** ..........................................................................7

**PROPOSITION I**

THE DECISION OF THE OCCA TO DENY PETITIONER'S SUFFICIENCY OF THE EVIDENCE CLAIM AS IT WAS RAISED ON DIRECT APPEAL WAS NOT CONTRARY TO, OR AN UNREASONABLE APPLICATION OF, FEDERAL LAW, NOR WAS IT AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE STATE COURT RECORD. PETITIONER IS NOT OTHERWISE ENTITLED TO RELIEF ON HIS SUFFICIENCY OF THE EVIDENCE CLAIM AS HE RAISES IT TO THIS COURT.................................................................9

**PROPOSITION II**

PETITIONER'S CLAIM THAT THE TRIAL COURT ERRED UNDER STATE LAW IN ADMITTING EVIDENCE OF OTHER CRIMES FAILS TO RAISE AN ISSUE PROPER FOR FEDERAL HABEAS REVIEW ........................................................22

**PROPOSITION III**

THE DECISION OF THE OCCA THAT THE STATE HAD AUTHORITY TO PROSECUTE THE DEFENDANT FOR THE MURDER OF HIS WIFE WAS NOT CONTRARY TO, OR AN UNREASONABLE APPLICATION OF, FEDERAL LAW, NOR WAS IT AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE STATE COURT RECORD ...............................33

**PROPOSITION IV**

THE DECISION OF THE OCCA THAT APPELLATE COUNSEL WAS NOT INEFFECTIVE WAS NOT CONTRARY TO, OR AN UNREASONABLE APPLICATION OF, FEDERAL LAW, NOR WAS IT AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE STATE COURT RECORD..................................................37

i

**PROPOSITION V**

  **THE OCCA'S DETERMINATION THAT THERE WAS NO ACCUMULATION OF ERROR WAS NOT CONTRARY TO, OR AN UNREASONABLE APPLICATION OF, FEDERAL LAW, NOR WAS IT AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE STATE COURT RECORD**.......................................................**84**

**PROPOSITION VI**

  **PETITIONER'S GROUND NINE IS NOT COGNIZABLE IN A HABEAS PROCEEDING**.........................................**86**

**PROPOSITION VII**

  **PETITIONER'S CLAIM OF JUDICIAL BIAS AS RAISED IN HIS GROUND FOUR IS PROCEDURALLY BARRED**...............................**87**

**PROPOSITION VIII**

  **PETITIONER'S GROUNDS SIX AND SEVEN ARE PROCEDURALLY BARRED**.......................................**91**

**PROPOSITION IX**

  **PETITIONER'S GROUNDS TWO AND THREE ARE PROCEDURALLY BARRED**.......................................**97**

**CONCLUSION** ..............................................................**101**

**CERTIFICATE OF SERVICE** ............................................**102**

# TABLE OF AUTHORITIES

## CASES

### FEDERAL CASES

*Anderson v. Harless*,
   459 U.S. 4 (1982)..................................................................................... 27

*Bacon v. Klee*,
   No. 15-2491, 2016 WL 7009108 (6th Cir. Nov. 30, 2016).............................. 50, 51

*Beavers v. Saffle*,
   216 F.3d 918 (10th Cir. 2000)...................................................................... 86

*Benshoof v. Tavanello*,
   No. 10-6207, 398 Fed. Appx. 365 (10th Cir. Oct. 13, 2010) ................................ 87

*Berger v. United States*,
   255 U.S. 22, 41 S. Ct. 230, 65 L. Ed. 481 (1921)............................................. 80, 81

*Bixler v. Foster*,
   596 F.3d 751 (10th Cir. 2010)...................................................................... 76

*Black v. Workman*,
   682 F.3d 880 (10th Cir. 2012)........................................................................ 3

*Bracy v. Gramley*,
   520 U.S. 899 (1997).................................................................................. 76

*Bradshaw v. Richey*,
   546 U.S. 74 (2005)................................................................................. 27, 31, 33

*Brinlee v. Crisp*,
   608 F.2d 839 (10th Cir. 1979)...................................................................... 28

*Brown v. Davenport*,
   142 S. Ct. 1510 (2022) ............................................................................... 35

*Brumfield v. Cain*,
   576 U.S. 305 (2015).................................................................................... 6

*Burks v. United States*,
   437 U.S. 1, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978).......................................... 14

*Burt v. Titlow,*
  571 U.S. 12 (2013) ............................................................................... 7

*Bush v. Carpenter,*
  926 F.3d 644 (10th Cir. 2019) ............................................................. 85

*Byrd v. Workman,*
  645 F.3d 1159 (10th Cir. 2011) ........................................................ 6, 42

*Cannon v. Mullin,*
  383 F.3d 1152 (10th Cir. 2004) ........................................................... 93

*Carey v. Musladin,*
  549 U.S. 70 (2006) ......................................................................... 35, 36

*Cargle v. Mullin,*
  317 F.3d 1196 (10th Cir. 2003) ................................................. 43, 82, 83

*Cavazos v. Smith,*
  565 U.S. 1 (2011) ........................................................................... 13, 17

*Coleman v. Johnson,*
  566 U.S. 650 (2012) ............................................................... 15, 17, 19

*Coleman v. Thompson,*
  501 U.S. 722 (1991) ................................................................. Passim

*Cone v. Bell,*
  556 U.S. 449 (2009) ............................................................................ 10

*Crawley v. Dinwiddie,*
  584 F.3d 916 (10th Cir. 2009) ............................................................. 42

*Cuesta-Rodriguez v. Carpenter,*
  916 F.3d 885 (10th Cir. 2019) ............................................. 11, 83, 85, 86

*Cullen v. Pinholster,*
  563 U.S. 170 (2011) ............................................................................. 3

*Darden v. Wainwright,*
  477 U.S. 168 (1986) ............................................................................ 52

*Davila v. Davis,*
  137 S. Ct. 2058 (2017) ............................................................. 88, 92, 99

*Davis v. Schnurr*,
  No. 19-3123, 785 Fed. Appx. 519 (10th Cir. Aug. 20, 2019) ................................ 95

*Donnelly v. DeChristoforo*,
  416 U.S. 637 (1974) ...................................................................................... 52

*Duckett v. Mullin*,
  306 F.3d 982 (10th Cir. 2002) ...................................................................... 28

*Edwards v. Carpenter*,
  529 U.S. 446 (2000) .................................................................... 3, 94, 95, 96

*English v. Cody*,
  146 F.3d 1257 (10th Cir. 1998) .................................................................... 93

*Estelle v. McGuire*,
  502 U.S. 62 (1991) ................................................................................. Passim

*Fairchild v. Trammell*,
  784 F.3d 702 (10th Cir. 2015) ...................................................................... 93

*Fairchild v. Workman*,
  579 F.3d 1134 (10th Cir. 2009) ...................................................... 89, 92, 99

*Fox v. Ward*,
  200 F.3d 1286 (10th Cir. 2000) .................................................................... 28

*Grant v. Royal*,
  886 F.3d 874 (10th Cir. 2018) ............................................................... Passim

*Grant v. Trammell*,
  727 F.3d 1006 (10th Cir. 2013) ................................................................. 5, 6

*Grubbs v. Hannigan*,
  982 F.2d 1483 (10th Cir. 1993) .................................................................... 19

*Hall v. Bellmon*,
  935 F.2d 1106 (10th Cir. 1991) .................................................................... 58

*Hancock v. Trammell*,
  798 F.3d 1002 (10th Cir. 2015) ...................................................................... 7

*Harrington v. Richter*,
  562 U.S. 86 (2011) ................................................................................. Passim

*Hickman v. Spears*,
    160 F.3d 1269 (10th Cir. 1998) ................................................................. 100

*Holland v. Allbaugh*,
    824 F.3d 1222 (10th Cir. 2016) ................................................................. 32

*Hooks v. Workman*,
    689 F.3d 1148 (10th Cir. 2012) ........................................................ Passim

*House v. Hatch*,
    527 F.3d 1010 (10th Cir. 2008) ........................................................ 35, 85

*Ives v. Boone*,
    No. 02-6397, 101 Fed. Appx. 274 (10th Cir. June 7, 2004) .................... 28

*Jackson v. Virginia*,
    443 U.S. 307 (1979) .......................................................................... Passim

*Johnson v. Carpenter*,
    918 F.3d 895 (10th Cir. 2019) .......................................................... Passim

*Jones v. Gibson*,
    206 F.3d 946 (10th Cir. 2000) ................................................................. 95

*Knighton v. Mullin*,
    293 F.3d 1165 (10th Cir. 2002) ................................................................. 32

*Knowles v. Mirzayance*,
    556 U.S. 111 (2009) ................................................................................. 41

*Leatherwood v. Allbaugh*,
    861 F.3d 1034 (10th Cir. 2017) ................................................................. 80

*Liteky v. United States*,
    510 U.S. 540 (1994) .............................................................. 77, 78, 79, 81

*Lockhart v. Nelson*,
    488 U.S. 33, 109 S. Ct. 285, 102 L. Ed. 2d 265 (1988)..................... 14, 18

*Lott v. Trammell*,
    705 F.3d 1167 (10th Cir. 2013) ................................................................. 32

*Lowery v. Bryant*,
    No. 18-6158, 760 Fed. Appx. 617 (10th Cir. Jan. 15, 2019) ........ 90, 97, 101

*Magar v. Parker*,
   490 F.3d 816 (10th Cir. 2007) .................................................................... 90, 96, 100

*Marshall v. Rodgers*,
   569 U.S. 58 (2013) ....................................................................................................... 5

*McDaniel v. Brown*,
   558 U.S. 120 (2010) ...................................................................................... 14, 18, 22

*McGirt v. Oklahoma*,
   140 S. Ct. 2452 (2020) .......................................................................... 34, 35, 37, 82

*Medlock v. Ward*,
   200 F.3d 1314 (10th Cir. 2000) ............................................................................. 96

*Murray v. Carrier*,
   529 U.S. 446 (2000) ................................................................................................. 94

*Odum v. Boone*,
   62 F.3d 327 (10th Cir. 1995) ...................................................................... 89, 92, 99

*Oklahoma v. Castro-Huerta*,
   142 S. Ct. 2486 (2022) ...................................................................................... Passim

*Parker v. Scott*,
   394 F.3d 1302 (10th Cir. 2005) ............................................................................. 86

*Prendergast v. Clements*,
   699 F.3d 1182 (10th Cir. 2012) ............................................................................. 27

*Revilla v. Gibson*,
   283 F.3d 1203 (10th Cir. 2002) ................................................................. 27, 28, 33

*Ryder ex rel. Ryder v. Warrior*,
   810 F.3d 724 (10th Cir. 2016) ................................................................................. 6

*Schlup v. Delo*,
   513 U.S. 298 (1995) ................................................................................... 90, 97, 101

*Schriro v. Landrigan*,
   550 U.S. 465 (2007) ................................................................................................... 5

*Sellers v. Ward,*
    135 F.3d 1333 (10th Cir. 1998)........................................................... 87

*Sherrill v. Hargett,*
    184 F.3d 1172 (10th Cir. 1999)............................................... 89, 92, 99

*Simpson v. Carter,*
    912 F.3d 542 (10th Cir. 2018)........................................................... 93

*Smallwood v. Gibson,*
    191 F.3d 1257 (10th Cir. 1999)........................................................... 95

*Smith v. Dinwiddie,*
    510 F.3d 1180 (10th Cir. 2007)...................................................... 5, 85

*Smith v. Robbins,*
    528 U.S. 259 (2000).............................................................. Passim

*Smith v. Workman,*
    550 F.3d 1258 (10th Cir. 2008)............................................... 89, 92, 99

*Steele v. Young,*
    11 F.3d 1518 (10th Cir. 1993)....................................... 87, 89, 96, 100

*Strickland v. Washington,*
    466 U.S. 668 (1984).............................................................. 39, 40, 41

*Taylor v. Workman,*
    554 F.3d 879 (10th Cir. 2009)...................................................... 18, 81

*Thornburg v. Mullin,*
    422 F.3d 1113 (10th Cir. 2005)...................................................... 53, 69

*Torres v. Mullin,*
    317 F.3d 1145 (10th Cir. 2003)........................................................... 15

*Trevino v. Thaler,*
    569 U.S. 413 (2013)........................................................................... 94

*United States v. Antelope,*
    430 U.S. 641 (1977).................................................................. 37, 82

*United States v. Blackwell,*
    694 F.2d 1325 (D.C.Cir.1982)........................................................... 46

*United States v. Bowen*,
  527 F.3d 1065 (10th Cir. 2008) ........................................................ 22

*United States v. Cooley*,
  1 F.3d 985 (10th Cir. 1993) ........................................................ 79, 80

*United States v. Cordova*,
  25 F.4th 817 (10th Cir. 2022) ................................................ 21, 22, 44

*United States v. Crawford*,
  707 F.2d 447 (10th Cir.1983) ........................................................ 46

*United States v. Gambino-Zavala*,
  539 F.3d 1221 (10th Cir. 2008) ........................................................ 76

*United States v. Lampley*,
  127 F.3d 1231 (10th Cir. 1997) .......................................... 11, 22, 43

*United States v. Langford*,
  641 F.3d 1195 (10th Cir. 2011) ........................................................ 37

*United States v. McBratney*,
  104 U.S. 621 (1882) ................................................................ 34, 37

*United States v. Mendoza*,
  468 F.3d 1256 (10th Cir. 2006) ........................................................ 77

*United States v. Nickl*,
  427 F.3d 1286 (10th Cir. 2005) .................................................... 76, 77

*United States v. Santtini*,
  963 F.2d 585 (3d Cir. 1992) ...................................................... 48, 50

*United States v. Serrano*,
  406 F.3d 1208 (10th Cir. 2005) ............................................ 46, 47, 48

*United States v. Smith*,
  997 F.2d 674 (10th Cir.1993) ........................................................ 46

*United States v. Williams*,
  923 F.2d 1397 (10th Cir. 1990) .................................................... 21, 43

*United States v. Winder*,
  557 F.3d 1129 (10th Cir. 2009) .................................................... 20, 43

ix

*Virginia v. LeBlanc,*
   __ U.S. __, 137 S. Ct. 1726 (2017) ........................................................ 4

*Webb v. Texas,*
   409 U.S. 95 (1972) ........................................................................... 46

*Welch v. Workman,*
   639 F.3d 980 (10th Cir. 2011) .............................................................. 41

*White Mountain Apache Tribe v. Bracker,*
   448 U.S. 136 (1980) .......................................................................... 36

*White v. Woodall,*
   572 U.S. 415 (2014) ........................................................................ 5, 6

*Whitely v. Farris,*
   No. 18-6085, 793 Fed. Appx. 680 (10th Cir. Oct. 23, 2019) ................................ 48

*Wilcox v. Ford,*
   813 F.2d 1140 (11th Cir. 1987) .......................................................... 50, 51

*Williams v. Trammell,*
   782 F.3d 1184 (10th Cir. 2015) ............................................................. 40

*Williams v. Workman,*
   No. 09-CV-0164-JHP-TLW, 2012 WL 5197674 (N.D. Okla. Oct. 19, 2012) ..................... 68

*Wilson v. Sirmons,*
   536 F.3d 1064 (10th Cir. 2008) ............................................................. 32

*Wingfield v. Massie,*
   122 F.3d 1329 (10th Cir. 1997) ............................................................. 15

*Withrow v. Larkin,*
   421 U.S 35 (1975) ........................................................................... 76

*Wood v. Allen,*
   558 U.S. 290 (2010) .......................................................................... 7

*Wood v. Carpenter,*
   907 F.3d 1279 (10th Cir. 2018) ........................................................ Passim

*Woods v. Etherton*,
     578 U.S. 113 (2016) ................................................................... **4**

*Yarborough v. Alvarado*,
     541 U.S. 652 (2004) ................................................................... **6**

*Zafiro v. United States*,
     506 U.S. 534 (1993) ........................................................... **18, 81**

## STATE CASES

*Allen v. State*,
     862 P.2d 487 (Okla. Crim. App. 1993) .................................. **30**

*Andrew v. State*,
     2007 OK CR 23, 164 P.3d 176 .................................... **24, 30, 31**

*Arganbright v. State*,
     328 P.3d 1212 (Okla. Crim. App. 2014) ............................... **61**

*Ashton v. State*,
     400 P.3d 887 (Okla. Crim. App. 2017) ................................. **46**

*Battenfield v. State*,
     1998 OK CR 8, 953 P.2d 1123 .............................................. **10**

*Bench v. State*,
     431 P.3d 929 (Okla. Crim. App. 2018) ................................. **65**

*Brown v. State*,
     871 P.2d 56 (Okla. Crim. App. 1994) ................................... **64**

*Brown v. State*,
     1997 OK CR 1, 933 P.2d 316 ................................................ **34**

*Burks v. State*,
     594 P.2d 771 (Okla. Crim. App. 1979) ................................. **38**

*Carter v. State*,
     879 P.2d 1234 (Okla. Crim. App. 1994) .......................... **76, 80**

*Clark v. State*,
     625 P.2d 119 (Okla. Crim. App. 1981) ................................. **66**

*Davis v. State*,
   103 P.3d 70 (Okla. Crim. App. 2004) ...................................................... 66

*Davis v. State*,
   268 P.3d 86 (Okla. Crim. App. 2011) ...................................................... 94

*Davis v. State*,
   419 P.3d 271 (Okla. Crim. App. 2018) .................................................... 69

*Easlick v. State*,
   90 P.3d 556 (Okla. Crim. App. 2004) ............................................... 21, 43

*Fisher v. State*,
   206 P.3d 607 (Okla. Crim. App. 2009) .................................................... 94

*Fitzgerald v. State*,
   972 P.2d 1157 (Okla. Crim. App. 1998) .................................................. 76

*Fowler v. State*,
   1995 OK CR 29, 896 P.2d 566 ................................................... 88, 92, 98

*Frederick v. State*,
   37 P.3d 908 (Okla. Crim. App. 2001) ...................................................... 66

*Frye v. State*,
   606 P.2d 599 (Okla. Crim. App. 1980) .................................................... 29

*Fuston v. State*,
   470 P.3d 306 (Okla. Crim. App. 2020) .............................................. 22, 43

*Goforth v. State*,
   1982 OK CR 48, 644 P.2d 114 ................................................................ 34

*Hammon v. State*,
   999 P.2d 1082 (Okla. Crim. App. 2000) ................................................. 61

*Holtzclaw v. State*,
   2019 OK CR 17, 448 P.3d 1134 ........................................... 11, 13, 20, 23

*Jiminez v. State*,
   144 P.3d 903 (Okla. Crim. App. 2006) .................................................... 94

*Jones v. State*,
   128 P.3d 521 (Okla. Crim. App. 2006) .................................................... 94

*Jones v. State*,
    772 P.2d 922 (Okla. Crim. App. 1989) ................................................................ 38

*Kirkwood v. State*,
    2018 OK CR 9, 421 P.3d 314 ................................................................... 24, 28

*Lamar v. State*,
    419 P.3d 283 (Okla. Crim. App. 2018) ................................................... Passim

*Logan v. State*,
    2013 OK CR 2, 293 P.3d 969 ................................................. 39, 88, 91, 98

*Mack v. State*,
    188 P.3d 1284 (Okla. Crim. App. 2008) ...................................... 60, 62, 65

*Mahdavi v. State*,
    478 P.3d 449 (Okla. Crim. App. 2020) ................................................... Passim

*Matthews v. State*,
    2002 OK CR 16, 45 P.3d 907 ................................................................. 26, 29

*McCarty v. State*,
    1999 OK CR 24, 989 P.2d 990 ........................................................ 88, 92, 98

*Moore v. State*,
    2019 OK CR 12, 443 P.3d 579 ...................................................................... 23

*Myers v. State*,
    133 P.3d 312 (Okla. Crim. App. 2006) ......................................................... 68

*Neloms v. State*,
    2012 OK CR 7, 274 P.3d 161 ................................................................. 38, 84

*Newman v. State*,
    2020 OK CR 14, 466 P.3d 574 ................................................................. 11, 65

*Parker v. State*,
    2021 OK CR 17, 495 P.3d 653 ...................................................................... 34

*Romano v. State*,
    909 P.2d 92 (Okla. Crim. App. 1995) ........................................................... 59

*Roy v. State*,
    152 P.3d 217 (Okla. Crim. App. 2006) ................................................. Passim

*Smith v. State*,
   878 P.2d 375 (Okla. Crim. App. 1994) ...................................................... 96

*Spuehler v. State*,
   709 P.2d 202 (Okla. Crim. App. 1985) ...................................................... 21

*Stacy v. State*,
   155 P.2d 736 (Okla. Crim. App. 1945) ...................................................... 78

*State ex rel. Smith v. Neuwirth*,
   2014 OK CR 16, 337 P.3d 763 ......................................................... 38, 84

*Stemple v. State*,
   2000 OK CR 4, 994 P.2d 61 ........................................................... 24, 29

*Stouffer v. State*,
   147 P.3d 245 (Okla. Crim. App. 2006) ...................................................... 79

*Tryon v. State*,
   423 P.3d 617 (Okla. Crim. App. 2018) .................................................. 56, 81

*Walker v. State*,
   1992 OK CR 10, 826 P.2d 1002 .................................................... 88, 92, 98

*Welch v. State*,
   2 P.3d 356 (Okla. Crim. App. 2000) ............................................... 58, 60, 76

*White v. State*,
   2019 OK CR 2, 437 P.3d 1061 ............................................................ 11

*Williams v. State*,
   188 P.3d 208 (Okla. Crim. App. 2008) .................................................. 67, 68

*Williamson v. State*,
   422 P.3d 752 (Okla. Crim. App. 2018) .................................................. 30, 46

*Woodruff v. State*,
   846 P.2d 1124 (Okla. Crim. App. 1993) .......................................... 60, 62, 65

*Young v. State*,
   12 P.3d 20 (Okla. Crim. App. 2000) ................................................... 55, 56

*Zamarripa v. State*,
   2022 OK CR 10, 514 P.3d 470 ........................................................ 83, 84

## FEDERAL STATUTES

**12 O.S.2021, § 2404** ........................................................................... **23**

**21 O.S.Supp.2012, § 701.7** ........................................................... **11, 16**

**28 U.S.C. § 2254** ...................................................................... **Passim**

## STATE STATUTES

**Okla. Stat. tit. 21 § 888** .................................................................... **61**

**Okla. Stat. tit. 22, § 1086** .......................................................... **96, 99**

**Okla. Stat. tit. 21 § 1111** .................................................................. **61**

**Okla. Stat. tit. 21, § 1123** ................................................................ **61**

**Okla. Stat. tit. 22, § 2002** ............................................................... **66**

**Okla. Stat. tit. 12, § 2404** ...............................................................**28**

## RULES

**Rule 3.11,** *Rules of the Oklahoma Court of Criminal Appeals,*
  *Title 22, Ch. 18, App.* ......................................................... **93, 94**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

MICHAEL D. MAGNESS,         )
                                      )

          **Petitioner,**         )
                                      )

**v.**                            )       **Case No. CIV-22-376-JFH-KEW**
                                      )

**LUKE PETTIGREW,**         )
                                      )

          **Respondent.**        )

## RESPONSE IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS

The Attorney General of the State of Oklahoma, Gentner F. Drummond, appearing on behalf of the above-named Respondent, in response to the Petition for a Writ of Habeas Corpus on file herein shows the Court as follows:

1.      Petitioner, Michael D. Magness, an inmate in the custody of the Oklahoma Department of Corrections, appearing *pro se*, has filed with this Court a petition seeking federal habeas corpus relief.

2.      Petitioner is currently incarcerated pursuant to a Judgment and Sentence entered in the District Court of Okfuskee County, Case No. CF-2015-59, after Petitioner was found guilty of Murder in the First Degree and was sentenced to life imprisonment without the possibility of parole. Prior to trial, Petitioner entered a plea of guilty to Possession of Child Pornography, and a plea of no contest to Second Degree Arson and False Claim for Insurance. Petitioner does not challenge those convictions in this case.

3.      Petitioner filed a direct appeal of his convictions in the Oklahoma Court of Criminal Appeals (hereinafter "OCCA"), Case No. F-2018-1250. On April 15, 2021, the OCCA affirmed the Judgment and Sentence. Petitioner's direct appeal brief is attached as Exhibit 1.  The State's

direct appeal response brief is attached as Exhibit 2.  The OCCA's Summary Opinion is attached as Exhibit 3.

4.      On June 28, 2022, Petitioner filed an Application for Post-Conviction Relief and brief in support in Okfuskee County District Court. The state district court denied relief on July 7, 2022. On August 22, 2022, Petitioner appealed the state district court's decision to the OCCA in Case No. PC-2022-719. On September 13, 2022, the OCCA remanded the case to the state district court for a proper order. Petitioner's Application for Post-Conviction Relief and brief in support are attached as Exhibit 4. The state district court's Order of July 7, 2022, is attached as Exhibit 5. Petitioner's Petition in Error in Case No. PC-2022-719 is attached as Exhibit 6. The OCCA's Order Remanding Matter to the District Court of Okfuskee County for Proper Order is attached as Exhibit 7.

After the case was remanded, Petitioner filed an Amended Brief in Support of Application for Post-Conviction Relief in the state district court on September 19, 2022. On October 5, 2022, the state district court entered an order in compliance with the OCCA's remand order, denying Petitioner's amended application and brief. On November 7, 2022, Petitioner appealed the state district court's October 5th order to the OCCA in Case No. PC-2022-967. The OCCA affirmed the denial of post-conviction relief on December 13, 2022. Petitioner's Amended Brief in Support of Application for Post-Conviction Relief is attached as Exhibit 8. The state district court's Order of October 5, 2022, is attached as Exhibit 9. Petitioner's Petition in Error in Case No. PC-2022-967 is attached as Exhibit 10. The OCCA's Order Affirming Denial of Post-Conviction Relief is attached as Exhibit 11.

5.      The petition is timely.

6.      With the exception of his assertions of cause for his failure to raise Grounds Six and Seven on direct appeal, Petitioner has exhausted his state court remedies as to the grounds presented in this petition.  Respondent does not waive exhaustion.  As shown below, Petitioner's unexhausted assertion of cause would be procedurally defaulted if he returned to state court to exhaust it, and it cannot serve as cause to overcome the procedural default of Petitioner's Grounds Six and Seven. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).

7.      No evidentiary hearing is required.  Petitioner has failed to show that a factual basis for the claims was not made in state court **and** that the facts underlying the claims would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offenses.  *See Cullen v. Pinholster*, 563 U.S. 170, 185 (2011) (holding that evidence introduced in federal court has no bearing on § 2254(d)(1) review, and "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitations of § 2254(d)(1) on the record that was before that state court"); *Black v. Workman*, 682 F.3d 880, 895 (10th Cir. 2012) ("[T]he Supreme Court decided in *Cullen v. Pinholster* . . . that even if a federal-court evidentiary hearing is not barred by § 2254(e)(2), the evidence so obtained is inadmissible in reviewing a claim adjudicated on the merits in state court.").

8.      Respondent has attached the relevant documents necessary for an adjudication of this matter as exhibits and the relevant portions of the original record and the transcripts are attached as Exhibits 12 and 13, respectively. Transcripts of the hearing on the State's notice of intent to introduce evidence of other crimes or bad acts, held on February 28, 2018, the eight-volume jury trial (Tr. I-VIII), and the sentencing proceeding, as well as the five-volume original record (O.R. I-V), are being filed conventionally, along with the trial exhibits. Transcripts of

Petitioner's preliminary hearing, Petitioner's formal arraignment of March 9, 2016, a hearing on Petitioner's motion to sever and motion in *limine* of May 31, 2017, the hearing on Petitioner's plea of guilty to the charge of Possession of Child Pornography held on June 12, 2017, hearings on motions for continuance of January 3, 2018, and April 26, 2018, a status conference hearing on July 11, 2018, and other various motions hearings dated May 18, 2016, and April 5, 2017, are available, but not relevant to the issues presented.

## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act, hereinafter referred to as the AEDPA, a petition for writ of habeas corpus will not be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Woods v. Etherton*, 578 U.S. 113, 116-17 (2016) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). This is intended to be a difficult standard to meet. *Richter*, 562 U.S. at 102. "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). *See also Virginia v. LeBlanc*, __ U.S. __, 137 S. Ct. 1726, 1729 (2017) ("A proper respect for AEDPA's high bar for habeas relief avoids unnecessarily 'disturb[ing] the State's significant interest in repose for concluded litigation,

4

den[ying] society the right to punish some admitted offenders, and intrud[ing] on state sovereignty to a degree matched by few exercises of federal judicial authority.'" (quoting *Richter*, 562 U.S. at 103) (alterations in original)); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold.").

For purposes of Section 2254(d)(1), "clearly established Federal law" consists of "the holdings, as opposed to the dicta" of Supreme Court decisions. *White v. Woodall*, 572 U.S. 415, 419 (2014) (alteration and internal quote omitted). "The only federal law that can be clearly established for purposes of Smith's § 2254(d) appeal is Supreme Court precedent interpreting the Constitution." *Smith v. Dinwiddie*, 510 F.3d 1180, 1186 (10th Cir. 2007). "'The absence of clearly established federal law is dispositive under § 2254(d)(1)' and results in the denial of habeas relief." *Grant v. Royal*, 886 F.3d 874, 889 (10th Cir. 2018) (citation omitted). "[I]f a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision." *Woodall*, 572 U.S. at 426 (internal quote omitted). "[A] state-court decision is an unreasonable application of . . . clearly established [Supreme Court] precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." *Woodall*, 572 U.S. at 426. Reversal under the AEDPA is allowed "only if a state court's decision is contrary to a Supreme Court decision, and 'circuit precedent may [not] be used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule.'" *Grant v. Trammell*, 727 F.3d 1006, 1020 (10th Cir. 2013) (quoting *Marshall v. Rodgers,* 569 U.S. 58, 64 (2013)).

The specificity of the governing legal rule determines the scope of reasonableness in its application. "[E]valuating whether a rule application was unreasonable requires considering the

rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes

in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "[I]f a habeas

court must extend a rationale before it can apply to the facts at hand, then by definition the rationale

was not clearly established at the time of the state-court decision."  *Woodall*, 572 U.S. at 426

(internal quote omitted).  "[R]elief is available under § 2254(d)(1)'s unreasonable-application

clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts

that there could be no fairminded disagreement on the question."  *Id.*, 572 U.S. at 427 (internal

quote omitted).

Habeas review of factual determinations under Section 2254(d)(2) is "even narrower."

*Ryder ex rel. Ryder v. Warrior*, 810 F.3d 724, 739 (10th Cir. 2016).  The Tenth Circuit has described

habeas review under Section 2254(d)(2) as "'a daunting standard—one that will be satisfied in

relatively few cases.'"  *Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011) (citation omitted).

The AEDPA requires that federal courts give "substantial deference" to the State trial court's

factual findings.  *Brumfield v. Cain*, 576 U.S. 305, 314 (2015).  For purposes of Section 2254(d)(2),

"an imperfect or even an incorrect determination of the facts isn't enough . . . [a] determination

must be *unreasonable*."  *Grant*, 727 F.3d at 1024 (emphasis in original).  "If reasonable minds

reviewing the record might disagree about the finding in question, on habeas review that does not

suffice to supersede the trial court's determination."  *Id.* (internal quotation and alterations

omitted).  *See also Ryder*, 810 F.3d at 739 (if reasonable minds might differ on the correct finding,

on habeas review the court "must defer to the state court decision").

A petitioner who alleges a state court made an unreasonable determination of the facts

under Section 2254(d)(2), carries the burden of proof.

> AEDPA instructs that, when a federal habeas petitioner challenges
> the factual basis for a prior state-court decision rejecting a claim, the

> federal court may overturn the state court's decision only if it was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  The prisoner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." § 2254(e)(1).

*Burt v. Titlow*, 571 U.S. 12, 18 (2013); *see also Hancock v. Trammell*, 798 F.3d 1002, 1012 (10th Cir. 2015) (petitioner bears the burden of showing an unreasonable determination of fact and that the disposition was based on a factually mistaken view of the record).  Further, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Titlow*, 571 U.S. at 18 (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).

With this standard of review in mind, Respondent addresses Petitioner's propositions of error below.

## STATEMENT OF THE FACTS

The OCCA set forth the relevant facts in its Opinion on direct appeal. Such facts are presumed to be correct under the AEDPA. 28 U.S.C. § 2254(e)(1). Those facts are as follows:

> [Petitioner] shot his wife, Beth Magness, in the early morning hours of March 15, 2015. [Petitioner] planned the murder in advance, arranging an alibi by staying overnight with his friends, the Crouch family. He was the beneficiary of Beth's $250,000 life insurance policy, and intended to use the money to rescue his failing restaurant business. In addition, [Petitioner] had been unfaithful to Beth in the past, and in the months before her death he attempted to begin a relationship with a teenage girl. [Petitioner] occasionally told friends that he was a sociopath. They assumed he was joking.

> Sometime between 1:30 and 3:00 a.m. on March 15, Beth was shot in her left eye with [Petitioner's] .9mm Glock pistol. The gun was not found at the scene. Shortly after the crime, [Petitioner] told Beth's father that she had been shot by a .9mm bullet; he said he assumed this because he suspected police would discover she was shot with his gun. [Petitioner] told officers that, on the 14th, he had taken the gun from his truck into the house, took a round out of the

chamber, put the gun in its case, and place[d] it in the gun cabinet. The gun cabinet was the only thing in the house that was disturbed: the cabinet was open and the guns were gone.

A block away from [Petitioner's] house, between 1:30 and 2:00 a.m. on March 15th, Rhonda Hill saw a dark four-door sedan back into a vacant driveway. [Petitioner] drove a dark green four-door sedan. She could not identify the man who got out, but her description is consistent with [Petitioner]. He walked across the street and between two houses, heading in the direction of [Petitioner's] backyard. Shortly thereafter, another neighbor heard a single shot. Within twenty minutes, Hill saw that the car was gone. The soggy grass in [Petitioner's] backyard held vague footprint impressions leading out the gate in the direction of Hill's house. Although [Petitioner] described them as cowboy boot prints, they were too indistinct for crime scene experts to identify with a particular type of shoe.

[Petitioner], Beth, and their two young sons began March 14th by celebrating Pi Day. A planned event with friends fell through. [Petitioner] and the boys spent the day and evening at the home of friends, Dustin and April Crouch, and their family, leaving Beth at home. He explained that she was tired. Beth suffered from serious clinical depression. After an evening of hamburgers and movies, everyone was in bed close to midnight. This was the first night [Petitioner's] son, who was being weaned, had been away from his mother, and he was fussy. April saw [Petitioner] and the baby on her couch between 1:00 and 1:30 a.m. and went to sleep herself. She awoke about 3:30 or 4:00 a.m. to the baby's cries; he and [Petitioner] were in the kitchen. Dustin and April both slept heavily that night and believed [Petitioner] could have left the house and returned without their knowledge.

Over the next few hours everyone got up, ate breakfast, and dispersed. [Petitioner] and the baby stopped by the restaurant to pick up lunch for Beth and headed home. A friend, Dane Lyon, met [Petitioner] at the house. [Petitioner] asked Lyon to wait while he went in. [Petitioner] saw Beth lying supine near the back door in a pool of blood. He later told officers and friends that he knew she was dead because her eye was bulging out. Lyon went in to check Beth's body for a pulse. Neither Lyon, the responding officers, nor the medical examiner saw the bulging eye [Petitioner] described.

[Petitioner] and Beth had moved to Okemah in 2011 so [Petitioner] could help his grandfather with the family ranch. When [Petitioner] took over the ranch it was debt-free, with over 200 head

8

of cattle in good condition. His grandfather died in 2013. By the time of the murder, the land, fences, and animals were in poor condition, there was very little money left, and he had sold almost all the cattle.

Starting in 2014, [Petitioner] put most of the money from the ranch and cattle sales into a restaurant he leased in Okemah. [Petitioner] took out an agricultural loan in March 2014 but used the bulk of that money to open the restaurant. It never broke even. He kept it going with infusions from his own personal accounts, other outside sources, and cattle sales. After April 2014, he was consistently behind on the payroll taxes. In August, he arranged to lease his grandfather's farmhouse, saying he planned to renovate and sublease it. He took out an insurance policy on it in late August, and the house burned down on September 7 – the day [Petitioner] and a friend went to Wisconsin. [Petitioner] had been at the house in the early morning hours of September 7, just before the fire started. [Petitioner] used the insurance money to fund the restaurant for a few months, but it was gone by Christmas. By the end of February 2015, there was almost no money in [Petitioner's] various accounts, the restaurant was in debt, he owed back taxes, and the first loan payment was due. Before Beth's death he unsuccessfully sought another loan.

Exhibit 3 at 2-5. Additional facts will be presented as they relate to the individual propositions of error.

## ARGUMENT AND AUTHORITY

## PROPOSITION I

**THE DECISION OF THE OCCA TO DENY PETITIONER'S SUFFICIENCY OF THE EVIDENCE CLAIM AS IT WAS RAISED ON DIRECT APPEAL WAS NOT CONTRARY TO, OR AN UNREASONABLE APPLICATION OF, FEDERAL LAW, NOR WAS IT AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE STATE COURT RECORD. PETITIONER IS NOT OTHERWISE ENTITLED TO RELIEF ON HIS SUFFICIENCY OF THE EVIDENCE CLAIM AS HE RAISES IT TO THIS COURT.**

**(In response to Petitioner's Ground One.)**

In his Ground One, Petitioner claims the State's evidence was insufficient to prove he was guilty beyond a reasonable doubt of murder in the first degree. Doc. 1 at 3-7.[1] Petitioner raised a sufficiency of the evidence argument on direct appeal, and the OCCA denied it on the merits (Exhibit 1 at 37-40; Exhibit 3 at 5-10). The OCCA's decision to deny Petitioner relief on his sufficiency of the evidence claim as it was raised on direct appeal was neither contrary to, nor an unreasonable application of, federal law, nor was it an unreasonable determination of the facts in light of the state court record.

Petitioner's claim of insufficient evidence in his petition to this Court raises different points of evidence from those raised on direct appeal to argue the State's proof was insufficient. Doc. 1 at 3-7. Petitioner raised this claim for the first time in his post-conviction proceedings (Exhibit 4 at 2, 9-13; Exhibit 8 at 1-5; Exhibit 10 at 3). In raising this claim in his post-conviction proceedings, Petitioner acknowledged appellate counsel "raised the general issue of insufficiency of evidence in the direct appeal; however, they failed to raise the issue of compounding inference, as well as many of the points made below." (Exhibit 8 at 2; *see also* Exhibit 10 at 3). The OCCA found the claim barred under the doctrine of *res judicata* (Exhibit 11 at 2 ("This claim was presented and raised on direct appeal. *Magness v. State*, No. F-2018-1250 (Okl.Cr. April 15, 2021). This bars reconsideration of this proposition in post-conviction. *See Battenfield v. State*, 1998 OK CR 8, ¶ 4, 953 P.2d 1123, 1125 (issues previously raised are barred by the doctrine of *res judicata*).")). Thus, while the OCCA's adjudication of his sufficiency of the evidence claim on direct appeal is entitled to deference under Section 2254(d), to the extent he raised a different claim on post-conviction, and the OCCA did not review it, that claim is reviewed *de novo*. *See Cone v. Bell*, 556 U.S. 449,

---

[1] Respondent's citation to the page numbers of Petitioner's petition refers to the electronically-stamped page numbers.

466 (2009) ("When a state court declines to review the merits of a petitioner's claim on the ground that it has done so already, it creates no bar to federal habeas review."); *Cuesta-Rodriguez v. Carpenter*, 916 F.3d 885, 898 (10th Cir. 2019) ("Claims that the state court didn't adjudicate on the merits, we review *de novo*."). However, even on *de novo* review, this Court views "the evidence and the inferences therefrom in the light most favorable to the government, to determine if a reasonable jury could find beyond a reasonable doubt that the defendant was guilty." *United States v. Lampley*, 127 F.3d 1231, 1240 (10th Cir. 1997). Whether reviewed under Section 2254(d) deference or *de novo*, Petitioner is not entitled to habeas relief on his sufficiency of the evidence claim.

### A.    Direct Appeal

The OCCA rejected Petitioner's claim on direct appeal that the evidence was insufficient to sustain his conviction for murder in the first degree as follows:

> To sustain a conviction for first degree murder, the State had to show that Appellant unlawfully caused the death of a human with malice aforethought. 21 O.S.Supp.2012, § 701.7(A); OUJI-CR 2d 4-61 (2019 Supp.). [Petitioner] argues that the State failed to prove he caused Beth's death. When reviewing a claim of insufficient evidence, we take the evidence in the light most favorable to the State, and determine whether any rational trier of fact could find the elements of the crime beyond a reasonable doubt *Holtzclaw v. State*, 2019 OK CR 17, ¶ 11, 448 P.3d 1134, 1142. Jurors decide the credibility of each witness, and we accept a jury's verdict, even where the evidence conflicts, when evidence supports the jury's findings. *Newman v. State*, 2020 OK CR 14, ¶ 8, 466 P.3d 574, 580. We accept all reasonable inferences and credibility choices that may support the verdict. *Id.* Rather than view each piece of evidence singly, we consider the evidence as a whole, as jurors do. *White v. State*, 2019 OK CR 2, ¶ 11, 437 P.3d 1061, 1066. The State presented its case through circumstantial evidence.

> **The gun.** The victim was shot with [Petitioner's] .9mm Glock. The gun was not left at the scene and was never recovered. [Petitioner] told police that, the morning before the murder, he put the gun in the house, in a case, locked in a gun safe, in a closet. The wooden gun

case was secured with a lock attached to a hasp. The hasp on the cabinet had always been broken and [Petitioner] used a wire or screw to fasten it. The night of the crime, the screw was removed. The cabinet door was hanging open, with the lock still attached. [Petitioner's] rifles, shotgun, and the Glock case (with fired cartridges) were gone. Fishermen found [Petitioner's] long guns and the Glock's case a few days later in the Deep Fork River which is near the home of the Crouch family.

The Magness family owned ranch property nearby and [Petitioner] was familiar with the area. Particles consistent with gunshot residue were found on [Petitioner's] pants.

**The scene.** Valuables including electronics and the victim's purse were found at the scene. There were several vehicles parked in the driveway with the keys in the ignition. Only the guns were missing: nothing else in the house was disturbed. There was no sign of forced entry. The victim lay in a large pool of blood on the floor near the back door, and evidence suggested she fell back immediately after being shot. A single line of shoeprints led through the back yard and out the gate, in the direction of a car which was briefly parked in the block behind [Petitioner's] house. The shoeprints were too indistinct to measure or identify.

**Appellant's statements.** The victim was shot with a single .9mm round in her left eye. [Petitioner] told friends and police that, when he found her, her eye was bulging out. He insisted that this showed she had died as the result of blunt force trauma or a single shot; he said he recognized it from his own experiences putting down animals on the ranch. When Lyons (who saw the victim immediately after [Petitioner] found her), the responding officers, and the medical examiner saw Beth's body, her eye was in its socket. The medical examiner testified that, when a person is shot in the head, the eye may bulge out at the time of the shot, but that the eye will recede into its socket within minutes. The only time [Petitioner] could have seen the victim's eye as he described it was at the time she was shot. Before police told [Petitioner] what the weapon was, he told the victim's father that she had been shot with a .9mm, and that he believed police would find his gun had been used. He told friends and the police that there might be gunshot residue on his pants. While [Petitioner] claimed he had been at the Crouch home all night, both April and Dustin agreed that he could have left and returned while they were asleep.

**Appellant's motive.** [Petitioner] was in severe financial trouble. At the time of the crime, he owed a large sum as an annual

loan payment on the restaurant, and had no money to pay it. The restaurant itself was losing money. He had not paid the payroll taxes for the last quarter of 2014, and the first 2015 taxes were due. He had sold all but a few of the extended family's cattle, and the family ranching business was almost moribund. In the week preceding Beth's death, [Petitioner] tried and failed to borrow several thousand dollars from two different sources. [Petitioner] had a $250,000 life insurance policy for Beth. He had already received insurance money from the burned family home, which he had used to prop up the failing restaurant several months before. [Petitioner] had talked intermittently to friends about the money he could get from Beth's life insurance since 2011. [Petitioner] contacted the insurance company shortly after her death. When the company refused to pay after he was arrested, he asked the secondary beneficiary, Beth's father, to accept the money and sign it over to him.

[Petitioner] complained to friends that Beth, who was clinically depressed, did not have sex with him. He often slept on the couch. While Beth helped at the restaurant, [Petitioner] was the sole source of income for the family. Beth was often unable to engage in housework or childcare duties. In 2011, [Petitioner] had said that because he was an extrovert and Beth was an introvert, they'd see how it went, but he considered the marriage to have an expiration date of 2015. At the same time, he told other friends that he would not leave Beth because his family did not get divorced. In the months before the murder, [Petitioner] attempted unsuccessfully to begin an inappropriate relationship with a teenage girl.

In summary, the victim was shot with [Petitioner'] gun. His description of Beth's physical condition matched the time she was shot, not her condition when she was found. Nothing in the house was taken except the guns. [Petitioner] had no alibi for the time of the crime. He had a significant financial motive, as well as a more personal one.

Jurors heard all the testimony [Petitioner] discussed on appeal. They had the opportunity to see and hear the witnesses and view the physical evidence. An appellate court's task is to determine whether evidence supported the jury's verdict, not to substitute its own judgment for that of the jury. *Cavazos v. Smith*, 565 U.S. 1, 2 (2011). Jurors made inferences and credibility choices reasonably supported by the evidence. Taking the evidence in the light most favorable to the State, any rational trier of fact could find beyond a reasonable doubt that [Petitioner] murdered the victim. *Holtzclaw*, 2019 OK CR 17, ¶ 13, 448 P.3d at 1142. This proposition is denied.

(Exhibit 3 at 5-10).  The factual findings made by the OCCA in this matter are presumed correct and Petitioner has not rebutted those findings by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1) (providing that "a determination of a factual issue made by a State court shall be presumed correct" and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence"); *Hooks v. Workman*, 689 F.3d 1148, 1163 (10th Cir. 2012) ("factual findings of the state court are presumed correct unless the applicant rebuts that presumption by 'clear and convincing evidence'" (quoting 28 U.S.C. § 2254(e)(1)).

The governing standard for evaluating sufficiency of the evidence claims was set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 318 (1979).  In *Jackson*, the Supreme Court stated that a reviewing court's critical inquiry was to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.  *Jackson*, 443 U.S. at 318. The reviewing court does not determine "whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt."  *Id.* at 319 (emphasis in original).  Instead, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt."  *Id.*  Further, in the case of *McDaniel v. Brown*, 558 U.S. 120 (2010), the United States Supreme Court reasoned:

> Because reversal for insufficiency of the evidence is equivalent to a judgment of acquittal, such a reversal bars a retrial.  See *Burks v. United States*, 437 U.S. 1, 18, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978). To "make the analogy complete" between a reversal for insufficiency of the evidence and the trial court's granting a judgment of acquittal, [*Lockhart v. Nelson*, 488 U.S. 33, 42, 109 S. Ct. 285, 102 L. Ed. 2d 265 (1988)], "a reviewing court must consider all of the evidence admitted by the trial court," regardless whether that evidence was admitted erroneously, *id.*, at 41, 109 S. Ct. 285.

*McDaniel*, 558 U.S. at 131.

In the context of habeas corpus review, the AEDPA adds a second layer of deference to the *Jackson* standard. In *Coleman v. Johnson*, 566 U.S. 650 (2012), the United States Supreme Court stated as follows:

> We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, it is the responsibility of the jury - not the court - to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. And second, on habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable.

*Johnson*, 566 U.S. at 651 (internal quotation marks and citations omitted).

In this case, the OCCA correctly applied the *Jackson* standard to find the evidence sufficient to prove Petitioner guilty of murder in the first degree (Exhibit 3 at 6, 10). The evidence presented at trial clearly demonstrates the OCCA did not make an unreasonable determination of the facts in light of the evidence presented at trial and its decision affirming the verdict was not contrary to, or an unreasonable application of, *Jackson*.

This Court looks to Oklahoma law for the elements of the offense of first degree murder. *Jackson*, 443 U.S. at 324 n.16. *See also Torres v. Mullin*, 317 F.3d 1145, 1152 (10th Cir. 2003) ("In considering the OCCA's application of the *Jackson* sufficiency of the evidence standard, we apply Oklahoma law regarding the substantive elements of the offense."); *Wingfield v. Massie*, 122 F.3d 1329, 1332 (10th Cir. 1997) ("In applying the *Jackson* standard, we look to Oklahoma law to determine the 'substantive elements' of the relevant criminal offense.").

In this case, the jury was correctly instructed that in order to convict Petitioner of first degree murder, the State had to prove the following elements beyond a reasonable doubt

First, the death of a human;

Second, the death was unlawful;

Third, the death was caused by the defendant;

Fourth, the death was caused with malice aforethought.

(O.R. V 793). Okla. Stat. tit. 21, § 701.7(A). Petitioner claims the evidence was insufficient to prove the third element: that he caused his wife's death.

As found by the OCCA, the State presented evidence that going back to 2011, Petitioner had been talking about killing Beth Magness so that he could collect the insurance money from the policy he had placed on her (Tr. IV 18). The State also presented evidence that the K-Bar, Petitioner's restaurant, was consistently failing, and that Petitioner had previously burned down his grandfather's house and collected insurance money on it in a failed attempt to cover his losses (Tr. IV 144-45, 215-16).

Petitioner had also long talked about wanting to get out of his marriage, that it had an "expiration date" of 2015 (Tr. IV 19). The State presented evidence that Petitioner took out an insurance policy which would pay out $250,000 if Beth[2] were to die (Tr. IV 185). The State also presented evidence that the person who killed Beth entered the house without forcing entry, shot and killed her, accessed Petitioner's gun case by removing a loose pin in the hasp of the door (without otherwise attempting to force entry first), took five of Petitioner's guns (including a Glock .9mm), and then left. Finally, The State presented evidence that the gun used to kill Beth was a Glock .9mm (Tr. V 151-53), and that Petitioner, after the murder, told investigators and friends the he witnessed Beth's left eye "bulged" or "popped out" (State's Ex. 118 at 21:01:01, 21:01:38; Tr. VI 119-22), something that expert testimony later confirmed could have only happened a few

---

[2] Consistent with the OCCA's opinion, Respondent will refer to the victim by her first name, Beth.

16

seconds or minutes after the shot (Tr. VI 107). This was more than sufficient evidence by which any reasonable juror could find Petitioner killed Beth Magness beyond a reasonable doubt.

None of the evidence cited by Petitioner on direct appeal refutes any of the evidence mentioned above. At best, he simply argues the jury should have made different weight and credibility determinations. However, like a federal court, the OCCA refuses to "substitute its own judgment for that of the jury." (Exhibit 3 at 10 (citing *Cavazos v. Smith*, 565 U.S. 1, 2 (2011))). *See also Johnson*, 566 U.S. at 651 (reiterating that "'it is the responsibility of the jury – not the court – to decide what conclusions should be drawn from the evidence admitted at trial'" (quoting *Cavazos*, 565 U.S. at 2)).

First, Petitioner points to the fact that the couple's parents were unaware of their marriage difficulties and that Petitioner told the Crouches that he would not give up on or divorce Beth, despite her significant struggles (Exhibit 1 at 37-38). But the jury also heard evidence that Beth was extremely introverted, and did not tell her parents about the significant financial difficulties her family was facing (Tr. II 65, 104-05; Tr. IV 10). And the jury heard evidence that Petitioner complained to others that his wife was not giving him sex, and was actively seeking a relationship with K.C., a sixteen-year-old girl (Tr. II 108, 182; Tr. IV 86, 90, 100). The jury here could have reasonably concluded that the marriage difficulties were, in fact, real. *Coleman*, 566 U.S. at 651.

Petitioner also claims that while some witnesses testified he was unemotional or unfazed by Beth's death, others testified that he was in shock and displayed emotion later (Exhibit 1 at 38). In making this argument, Petitioner explicitly acknowledges that the jury had conflicting evidence before it. His implicit point is that with conflicting evidence before it, the jury could not find him guilty beyond a reasonable doubt. But this is not the law. Juries are explicitly entrusted with the task of resolving conflicts in the evidence. *See Jackson*, 443 U.S. at 326 ("a federal habeas court

17

faced with a record of historical facts that supports conflicting inferences must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution").

The same is true of Petitioner's reference to the prior inconsistent statements the Crouches made in 2015 indicating that they did not believe Petitioner could have left without them noticing (Exhibit 1 at 39). Both testified at trial that upon further reflection they then believed that Petitioner could have left without them noticing (Tr. II 121, 159, 189, 216). But the jury was made well aware of these prior inconsistent statements and were properly instructed on how to evaluate them (O.R. V 776). "Juries are presumed to follow their instructions." *Taylor v. Workman*, 554 F.3d 879, 893 (10th Cir. 2009) (citing *Zafiro v. United States*, 506 U.S. 534, 540-41 (1993)). Petitioner's complaint that it was not unusual for him to spend the night at the Crouch home on that night or any other night misses the point (Exhibit 1 at 38). In fact, the State's theory at trial largely rested on the methodical steps Petitioner took to make it appear as if nothing was out of the ordinary. Petitioner's brag to Ms. Crouch, describing exactly how he would sneak into (or potentially out of) the Crouch home (Tr. II 114-15), stands in opposition to his argument on direct appeal that "*no* evidence was presented that [he] ever left the Crouch home that night" (Exhibit 1 at 39 (emphasis in original)).

Petitioner's complaints about the lack of cell phone location data, blood, DNA, or fingerprint evidence fail as well because evidence that Petitioner thinks the State should have presented does not affect whether the evidence the State *actually* presented was sufficient. *McDaniel*, 558 U.S. at 131 (stating that "'a reviewing court must consider all of the evidence *admitted* by the trial court'" (quoting *Lockhart v. Nelson*, 488 U.S. 33, 41 (1988))).

Petitioner also pointed on direct appeal to the evidence indicating that his Glock .9mm was the weapon used to kill Beth as the "most potent evidence" but argues that there was no evidence he pulled the trigger that night and that he never admitted his involvement (Exhibit 1 at 40). While Petitioner never directly admitted responsibility, he admitted to having direct knowledge of something that only the killer could have seen – Beth's left eye bulge out of its socket after Petitioner shot her (Tr. VI 107, 119-22). This critical fact also differentiates Petitioner from his proposed alternative suspects, neither of whom Petitioner claims had any direct knowledge or did any incriminating things beyond Caleb Phillips's initial misstatement to police about his visit to the Magness house during the day of March 14, 2015, well before the murder, for which there is no evidence of his involvement (Tr. VI 45-46).

This Court does not re-weigh or reconsider evidence on habeas review.  *See Jackson*, 443 U.S. at 319 (emphasizing the deference owed to the trier of fact).  Rather, this Court accepts the jury's resolution of the evidence "as long as it is within the bounds of reason." *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir. 1993).  Based on the evidence reflected in the record, there is no question that a rational trier of fact could have found beyond a reasonable doubt that Petitioner was guilty of murder in the first degree. *Jackson*, 443 U.S. at 319.  As a result, this Court cannot conclude that the OCCA's decision upholding the jury's guilty verdict was based on an unreasonable determination of the facts, or was contrary to, or an unreasonable application of, *Jackson*. *Johnson*, 566 U.S. at 651.

### B.     Post-Conviction

As he did in his post-conviction proceedings, Petitioner claims in his petition to this Court that the evidence was insufficient to sustain his conviction for first degree murder because 1) the State failed to present any non-circumstantial evidence; 2) the testimony of his "alibi" witnesses

changed after the prosecution told them there was video evidence showing Petitioner outside on the night of the murder, and even then, they only admitted it was possible he might have left their house; 3) the suspect seen by a witness was only seen walking toward the crime scene, and was not seen going inside, and a witness originally described the gunshot as coming from the opposite direction of the crime scene; 4) the missing guns and ammunition indicated a burglary-gone-wrong, and the State's evidence that he dumped them near the home of his alibi witnesses was not "plausible"; and 5) the State claimed multiple times that the murder weapon was identified as belonging to Petitioner "despite the State's forensics expert clearly stating that the murder bullet could not be matched to Petitioner's stolen gun." Doc. 1 at 4-6.[3] Even under *de novo* review, the evidence, viewed "in the light most favorable to the prosecution," was such that "any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *Jackson*, 443 U.S. at 318.

First, the OCCA acknowledged that "[t]he State presented its case through circumstantial evidence," and still rejected Petitioner's sufficiency of the evidence challenge after considering "the evidence in the light most favorable to the State, and determin[ing] whether any rational trier of fact could find the elements of the crime beyond a reasonable doubt." (Exhibit 3 at 6, 10 (citing *Holtzclaw v. State*, 448 P.3d 1134, 1142 (Okla. Crim. App. 2019), which in turn correctly stated the *Jackson* standard)). Further, neither this Court nor the OCCA differentiate in the weight to be afforded direct or circumstantial evidence. *See United States v. Winder*, 557 F.3d 1129, 1137 (10th

---

[3] Petitioner also claims in his petition that the evidence was insufficient based on the description of the suspect and the suspect's car, and the boot print found in the back yard which did not match any owned by Petitioner. Doc. 1 at 4-5. Petitioner raised these two points in his sufficiency of the evidence claim on direct appeal, and they were thus considered by the OCCA in its decision to deny him relief on direct appeal (Exhibit 1 at 39 n.64; Exhibit 3 at 5-10). Those claims will not be addressed again in this section.

Cir. 2009) ("In considering whether the Government's evidence is sufficient to support the jury's verdict, we remain mindful that circumstantial evidence is entitled to the 'same weight' as direct evidence." (citation omitted)); *Easlick v. State*, 90 P.3d 556, 557 (Okla. Crim. App. 2004) ("There is no difference in the weight given circumstantial evidence or direct evidence."). Whether the evidence is entirely circumstantial, entirely direct, or a combination of both, the OCCA, and the federal courts, review sufficiency of the evidence claims under the same *Jackson* standard: "[W]hether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original). *See United States v. Williams*, 923 F.2d 1397, 1402 (10th Cir. 1990) (relying on *Jackson* and further stating that "[t]he evidence supporting a conviction must be substantial, raising more than a mere suspicion of guilt, although the evidence can be wholly circumstantial" (citation omitted)); *Easlick*, 90 P.3d at 559 (holding that "in the future, we will review sufficiency of evidence issues under the *Spuehler*[4] standard, regardless of whether the evidence is wholly circumstantial or whether it is based in whole or in part on direct evidence"). Whether the evidence supporting Petitioner's conviction was entirely circumstantial, or a combination of direct and circumstantial, taken "in the light most favorable to the State," it was sufficient to allow "any rational trier of fact [to] find beyond a reasonable doubt that [Petitioner] murdered the victim." (Exhibit 3 at 10).

With the remaining claims in his first ground, Petitioner essentially asks this Court to reweigh the evidence against him. Doc. 1 at 4-7. However, a reviewing court on appeal "neither reweigh[s] the evidence nor redetermine[s] the credibility of the witnesses." *United States v.*

---

[4] *See Spuehler v. State*, 709 P.2d 202, 203-04 (Okla. Crim. App. 1985) (quoting the standard set out in *Jackson* and applying it to the appellant's sufficiency of the evidence claim).

*Cordova*, 25 F.4th 817, 825 (10th Cir. 2022) (citing *United States v. Bowen*, 527 F.3d 1065, 1076 (10th Cir. 2008)). *See also Fuston v. State*, 470 P.3d 306, 327-28 (Okla. Crim. App. 2020) ("In reviewing sufficiency of the evidence claims, this Court does not reweigh conflicting evidence or second-guess the decision of the fact-finder; we accept all reasonable inferences and credibility choices that tend to support the verdict."). Instead, even on *de novo* review, this Court views "the evidence and the inferences therefrom in the light most favorable to the government, to determine if a reasonable jury could find beyond a reasonable doubt that the defendant was guilty." *Lampley*, 127 F.3d at 1240. And in making that determination, this Court reviews "'all of the evidence admitted by the trial court,' regardless of whether the evidence was erroneously admitted." *McDaniel*, 558 U.S. at 131 (citation omitted). Petitioner's request for this Court to reweigh the evidence against him should be denied. *Cordova*, 25 F.4th at 825. Even on *de novo* review, the evidence is sufficient to sustain Petitioner's conviction for first degree murder. *Lampley*, 127 F.3d at 1240. *See also Jackson*, 443 U.S. at 319.

### C.      Conclusion

Whether applying Section 2254(d) deference to the OCCA's decision on direct appeal denying Petitioner's claim of insufficient evidence, or reviewing *de novo* Petitioner's claim that the evidence was insufficient but is essentially nothing more than a request to reweigh the evidence, Petitioner's Ground One must be denied.

<u>**PROPOSITION II**</u>

**PETITIONER'S CLAIM THAT THE TRIAL COURT ERRED UNDER STATE LAW IN ADMITTING EVIDENCE OF OTHER CRIMES FAILS TO RAISE AN ISSUE PROPER FOR FEDERAL HABEAS REVIEW.**

**(In partial response to Petitioner's Ground Four.)**

Within his Ground Four, Petitioner claims the trial court abused its discretion in admitting allegedly improper other crimes and bad acts evidence. Doc. 1 at 17-23. Petitioner raised this claim on direct appeal, and the OCCA denied it on the merits (Exhibit 1 at 41-48; Exhibit 3 at 10-16).[5] Petitioner's challenge to the admission of evidence presents no basis for federal habeas corpus relief and must be denied by this Court.

On direct appeal, the OCCA denied Petitioner's claim concerning the admission of other crimes and bad acts as follows:

> [Petitioner] was charged, in other counts, with arson and a variety of crimes concerning his relationship with a teenager. These counts were severed. However, at trial the State introduced evidence of infidelity and of the facts underlying the arson charge to show motive and common scheme or plan.[2] [Petitioner] vigorously objected to this evidence, preserving this issue for trial [sic], and we review for abuse of discretion. *Moore v. State*, 2019 OK CR 12, ¶ 14, 443 P.3d 579, 583. An abuse of discretion is any unreasonable or arbitrary action made without proper consideration of the relevant facts and law, also described as a clearly erroneous conclusion and judgment, clearly against the logic and effect of the facts. *Holtzclaw*, 2019 OK CR 17, ¶ 66, 448 P.3d at 1154.
>
> [2] As [Petitioner] notes, the State also presented evidence of dubious financial transactions which could have been characterized as fraud or embezzlement; the trial court allowed evidence of the activity, but not those characterizations. [Petitioner] does not develop claims based on this evidence and we do not discuss it further, except to note that there was no error in its admission.
>
> While a defendant should be convicted based on evidence of the charged crime, evidence of other crimes may be admissible to show, among other things, motive. 12 O.S.2021, § 2404(B). The evidence must be probative of a disputed issue, with a connection

---

[5] The main focus of Petitioner's Ground Four is that the trial court was biased against him, citing not only the trial court's rulings but also the judge's facial expressions and general demeanor. Doc. 1 at 17-23. Because his Ground Four arguably encompasses the claim that the trial court abused its discretion in admitting other crimes and bad acts evidence, as the claim was raised on direct appeal, Respondent shows the claim is one of state law not cognizable in this proceeding. Respondent shows in its Proposition V that Petitioner's judicial bias claim is procedurally barred.

between the crimes; it must be necessary to support the State's burden; the State must prove the other crime or bad act by clear and convincing evidence; its probative value must outweigh its prejudicial effect; and the trial court must instruct jurors on the limited use of the testimony. *Kirkwood v. State*, 2018 OK CR 9, ¶ 5, 421 P.3d 314, 316. The jury here was properly instructed both at the time of the disputed testimony and at the close of evidence.

**Arson.** The State argued that [Petitioner's] need for his wife's life insurance money was his primary motive for murder. To support this, the State presented extensive evidence of [Petitioner's] dire financial situation, with particular focus on the consistently unprofitable restaurant venture. [Petitioner] had used insurance proceeds to pay restaurant debts before. Evidence of past insurance claims may be relevant to show motive. *Stemple v. State*, 2000 OK CR 4, ¶ 50, 994 P.2d 61, 72. In August 2014, he persuaded his uncle to let him lease his deceased grandfather's farmhouse. He took out an insurance policy on the house in late August. On September 7, the house burned to the ground. [Petitioner] was at the house between 1:30 and 3:30 a.m. that morning, and thus had the opportunity to start the fire. Before it was discovered, he left for a planned trip to Wisconsin. The local volunteer fire chief called him to ask whether he had insurance on the house. When [Petitioner] said he did not, the chief did not call the fire inspector. Of course, [Petitioner] had insured the house; the insurance inspector, arriving later, was unable to determine the cause of the fire. [Petitioner] received $126,000 from the policy, and used it to pay the restaurant back taxes and expenses. Before the fire, [Petitioner] joked with friends that he would be a successful arsonist because he would not remove any furniture or valuables before setting a fire. Afterwards, he commented that if people thought that was a lot of money, they should see the policy he had for Beth. As early as 2011, he told Kimberly Simmons that he perhaps could burn down his house with his wife and son inside, to collect the insurance money.

**Infidelity.** The State argued that a secondary motive was [Petitioner's] sexual interest in women other than his wife. Evidence of a close personal relationship, where intimate details of a marriage are shared, may be relevant to show motive. *Andrew v. State*, 2007 OK CR 23, ¶ 52, 164 P.3d 176, 192, *overruled on other grounds by Williamson v. State*, 2018 OK CR 15, 422 P.3d 752. The State offered evidence that [Petitioner] began an inappropriate relationship with a teenage girl. There were some problems at her home, and [Petitioner] and Beth let her stay with them for several months. During that time, she and [Petitioner] became close friends, and this continued after she moved back home. She worked for him

24

at the restaurant. [Petitioner] frequently gave her back rubs. They discussed their respective (separate) sex lives. At one point, [Petitioner] told her he was available to have sex with her, if she would like that. The young woman described the conversation, and some of the interactions, as "awkward." Shortly before Beth's death, [Petitioner] said he planned to move to a house near the Crouch home. After Beth's death, [Petitioner] suggested K.C. move there with him, to help him take care of his children.

The State also offered testimony from Kimberly Simmons, a friend from Wisconsin. Simmons briefly lived with [Petitioner] and Beth in Wisconsin in 2011, before they moved to Okemah. After she moved in, [Petitioner] suggested that she might want to join them in a polygamous relationship. He warned her not to raise the subject with Beth, saying he would do so. The relationship progressed from flirting to physical contact and culminated in sexual intercourse. Simmons helped them move to Okemah before returning to Wisconsin. They had one final intimate visit in Wisconsin, then the relationship dwindled and died. [Petitioner] had told Simmons that his marriage had an expiration date, and she had hoped that in 2015 he would leave his wife and rejoin her. [Petitioner] also told Simmons that people in Okemah were stupid and he could get away with anything there. Although [Petitioner] characterizes this testimony as "tacked on" to engender prejudice, the record shows it was vital to the State's argument. Simmons' evidence showed both that [Petitioner] was willing and able to cheat on his wife, and that he had talked about insurance and arson for several years.

All this went to [Petitioner's] motives for murder. Recognizing the potential for unfair prejudice, the trial court limited the State to presenting the facts as shown by [Petitioner's] words and actions. The court explicitly prohibited any mention of actual crimes: arson, adultery, etc. [Petitioner] appears to completely misunderstand the trial court's rulings. He argues that the trial court focused on the labels of the crimes, without considering whether the evidence was relevant, admissible, or unfairly prejudicial. Nothing could be further from the truth.

In several rulings, the trial court reviewed the nature of the evidence and specifically found that it was relevant to show motive. However, the court prohibited both (a) characterization of [Petitioner's] actions as specific crimes, such as "arson", and (b) any opinion testimony suggesting that [Petitioner] had in fact committed a crime through those actions. For instance, the State could set forth the facts surrounding the house fire and insurance. But the State could not ask a witness to draw a conclusion that [Petitioner] set the

fire. The State could ask K.C. what [Petitioner] said to her and what he did; restaurant employees could testify as to what they saw at work and if it made them uncomfortable; but they could not draw conclusions from those actions. This emphasis on [Petitioner's] words and deeds negates [Petitioner's] argument that the evidence merely showed he was a bad person. The testimony at issue showed not, as [Petitioner] argues, that he was the *kind of person* who would betray his marriage; it showed that [Petitioner] *did in fact* betray his marriage. He was not the *kind of person* who might profit from an insurance claim; he *did in fact* profit from an insurance claim. That is not, as [Petitioner] claims, improper character evidence.

This evidence was logically connected to the motive for the charged crime – sex and money – and necessary to the State's burden of proof; it was proved by clear and convincing evidence; and its probative value was not substantially outweighed by the danger of unfair prejudice. *Matthews v. State*, 2002 OK CR 16, ¶ 40, 45 P.3d 907, 921. The trial court did not abuse its discretion in admitting this evidence. This proposition is denied.

(Exhibit 3 at 10-16). The factual findings made by the OCCA in this matter are presumed correct and Petitioner has not rebutted those findings by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Hooks*, 689 F.3d at 1163.

"[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Section 2254(a) provides:

The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court *only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States*.

28 U.S.C. § 2254(a) (emphasis added). On direct appeal, Petitioner's claim to the OCCA rested entirely on state law; he made no allegation whatsoever that the trial court's rulings denied any federal or constitutional law (Exhibit 1 at 41-49). If Petitioner's claim in his petition to this Court

alleged these rulings violated his federal constitutional rights, it would be unexhausted because Petitioner's state-law claim in state court would be insufficient to put the OCCA on notice of a federal constitutional claim. *See Anderson v. Harless*, 459 U.S. 4, 6 (1982) (stating that to exhaust a claim, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made[;]" rather, the petitioner "must have 'fairly presented' to the state courts the 'substance' of his federal habeas corpus claim" (citations omitted)); *Prendergast v. Clements*, 699 F.3d 1182, 1184 (10th Cir. 2012) (stating that "the crucial inquiry" in determining whether a federal claim has been fairly presented to the state courts "is whether the 'substance' of the petitioner's claim has been presented to the state courts in a manner sufficient to put the courts on notice of the federal constitutional claim" (citation omitted)). However, even in his petition to this Court, Petitioner claims only that the trial court abused its discretion in admitting the evidence; he again makes no claim that the admission of the evidence denied him any federal constitutional right. Doc. 1 at 17-23. That Petitioner has never alleged anything but a violation of state law is fatal to his claim on federal habeas review. *Estelle*, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions."). Because the OCCA found the evidence admissible under state law, this should end this Court's inquiry, and it should deny Petitioner's claim in this regard. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (noting that the Court has "repeatedly held that a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus").

Nevertheless, Respondent also recognizes that this Court holds that where "no particular constitutional guarantees are implicated, . . . evidentiary objections [which] merely raise questions of state law . . . are cognizable only if the alleged error was 'so grossly prejudicial [that it] fatally infected the trial and denied the fundamental fairness that is the essence of due process.'" *Revilla*

*v. Gibson*, 283 F.3d 1203, 1212 (10th Cir. 2002) (quoting *Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000)). *See also Ives v. Boone*, No. 02-6397, 101 Fed. Appx. 274, 283 (10th Cir. June 7, 2004) (unpublished) (stating that rulings on the admission of testimony are state law evidentiary matters generally unreviewable on habeas unless "'they render the trial so fundamentally unfair as to constitute a denial of federal constitutional rights'" (quoting *Brinlee v. Crisp*, 608 F.2d 839, 850 (10th Cir. 1979))). "Because a fundamental-fairness analysis is not subject to clearly definable legal elements, when engaged in such an endeavor [this Court] must tread gingerly and exercise considerable self-restraint." *Duckett v. Mullin*, 306 F.3d 982, 999 (10th Cir. 2002) (quotation marks, alterations, and citation omitted). *See also Ives*, 101 Fed. Appx. at 283 (quoting *Duckett*, 306 F.3d at 999). Petitioner cannot show that any of the evidence challenged in this ground was improperly admitted under state law, much less that its admission rendered his trial fundamentally unfair, and habeas relief must be denied. *Revilla*, 283 F.3d at 1212.

Under Oklahoma law, evidence of crimes or bad acts other than the crimes charged are inadmissible to prove the character of a person in order to show action in conformity therewith." Okla. Stat. tit. 12, § 2404(B). "It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." Okla. Stat. tit. 12, § 2404(B). To be admissible:

> Evidence of other crimes must be (a) probative of a disputed issue in the charged crime; (b) there must be a visible connection between the crimes; (c) the evidence must be necessary to support the State's burden of proof; (d) proof of the evidence must be clear and convincing; (e) the probative value of the evidence must outweigh its prejudicial effect; and (f) the trial court must instruct jurors on the limited use of the testimony at the time it is given and during final instructions.

*Kirkwood v. State*, 421 P.3d 314, 317 (Okla. Crim. App. 2018).

As found by the OCCA, the challenged evidence was properly admitted at trial. The State filed the statutorily-mandated notices of its intent to offer the evidence at trial (O.R. II 253-54, 262-63, 312-14, 321-23), and on February 28, 2018, the trial court held a hearing on the State's notices (O.R. II 355). At the conclusion of the hearing, the trial court allowed the State to present evidence concerning the fire at the farmhouse and Petitioner's extramarital affairs, but forbade the use of the terms "arson" or "adultery" (O.R. II 355-56). During the trial, the trial court provided contemporaneous limiting instructions for the allegations of arson and adultery (Tr. III 212-13; Tr. IV 52-53), as well as a limiting instruction in the closing instructions (O.R. V 784). While the record does show that the trial court focused on the criminal nature of the alleged bad acts, the trial court was simply limiting the potential prejudicial impact of the evidence by preventing the use of terms like "arson" and "adultery". This demonstrates the trial court's careful guarding of the fairness of Petitioner's trial, not that it mistakenly believed only crimes could constitute bad acts (Exhibit 1 at 42).

On direct appeal, Petitioner first complained that the evidence of arson and fraud should not have been admitted because it was irrelevant and its probative value was substantially outweighed by prejudice (Exhibit 1 at 44). On the contrary, the evidence was relevant and highly probative to prove Petitioner's motive.

Evidence of crimes other than the crimes charged can be relevant to prove motive. *Matthews v. State*, 45 P.3d 907, 921 (Okla. Crim. App. 2002). "Where evidence of an offense is used to prove absence of mistake or accident or identity of the accused, similarity of offenses would often be necessary for the offenses to be relevant. However, the other crime need not be similar to the crime charged to be probative of motive." *Frye v. State*, 606 P.2d 599, 603 (Okla. Crim. App. 1980). Further, in *Stemple v. State*, 994 P.2d 61, 71 (Okla. Crim. App. 2000), the

OCCA held that evidence of prior potentially false insurance claims was relevant to show knowledge of the insurance claim process and corroborated the testimony of other witnesses which indicated the appellant told them about past insurance scams.

The evidence in this case of Petitioner's arson and insurance fraud in order to pay taxes and losses at the restaurant demonstrated his motive, after finding that the $126,000 was not sufficient to make the restaurant solvent, to kill Beth and use the larger $250,000 insurance policy he had on her to remedy the situation (Tr. IV 119-20, 145-47). And like *Stemple*, it also demonstrated his familiarity with the insurance claim process and corroborated testimony from Ms. Simmons indicating that Petitioner had already thought out the process of killing Beth and his child via arson and then collecting the insurance money (Tr. IV 17-18).

On direct appeal, Petitioner also challenged testimony from K.C. and Ms. Simmons. However, evidence of Petitioner's sexual interest in other women was relevant and highly probative of his motive in this case. *See Andrew v. State*, 164 P.3d 176, 192 (Okla. Crim. App. 2007) (noting that the OCCA "has allowed evidence of an affair for the purpose of establishing motive"), *overruled in part on other grounds by Williamson v. State*, 422 P.3d 752, 762 & n.1 (Okla. Crim. App. 2018); *Allen v. State*, 862 P.2d 487, 491 (Okla. Crim. App. 1993) (holding that evidence of the appellant's affair that ended six months before the murder of his wife was relevant to show motive where the relationship remained close and "the most intimate sexual problems" in the appellant's marriage were discussed).

K.C.'s testimony that Petitioner was seeking a sexual relationship with her prior to Beth's death and continued to seek a relationship after her death was relevant to prove Petitioner's motive, especially in light of Petitioner's repeated complaints to friends (and K.C.) that Beth was not giving him sex often enough (Tr. II 108, 182; Tr. IV 90). By killing Beth, who, according to Petitioner,

30

was caring for neither him nor his children as he would have liked, Petitioner could open a more permanent space in his house for K.C., who could do both. Although such a relationship, had it come to fruition, may have been improper, K.C.'s testimony was necessary to explain Petitioner's motive. K.C.'s testimony went to the disputed issue of the state of Petitioner's marriage, it had a visible connection to the motive of the crime as shown by both Petitioner's pre-crime (seeking a closer relationship with her) and post-crime conduct (actively trying to convince her to move back in with him) toward her, and its probative value in explaining Petitioner's motive outweighed any prejudicial impact it may have had.

The same is true of Ms. Simmons, whose testimony was central to Petitioner's motive. Although Petitioner's affair with Ms. Simmons ended in 2011, he shared many intimate details with her, that he had premeditated multiple ways of killing his wife, including his desire to kill her for insurance money, and that his relationship with his wife had an end date of 2015, both of which came to fruition (Tr. IV 16-19). *See Andrew*, 164 P.3d at 191-92 (finding evidence of the appellant's affair that ended four years prior to the murder was relevant to prove her motive – her hatred of the victim and her wish that he were dead).

As found by the OCCA, evidence of the arson and Petitioner's infidelity "was logically connected to the motive for the charged crime – sex and money – and necessary to the State's burden of proof; it was proved by clear and convincing evidence; and its probative value was not substantially outweighed by the danger of unfair prejudice." (Exhibit 3 at 16). This Court is bound by the OCCA's decision that the evidence was properly admitted under state law. *Bradshaw*, 546 U.S. at 76. Further, under the facts of his case, Petitioner's due process rights were also not violated by the admission of this evidence.

In *Knighton v. Mullin*, 293 F.3d 1165, 1171 (10th Cir. 2002), the Tenth Circuit found the admission of other crimes evidence did not result in a deprivation of due process because it was relevant to explain the facts, establish the petitioner's intent and motive, and assist the jury in making a factual determination of petitioner's role in the charged crimes. Similarly, in *Holland v. Allbaugh*, 824 F.3d 1222, 1228 (10th Cir. 2016), the petitioner challenged the unobjected-to admission of evidence suggesting he was a racist and Nazi sympathizer. The OCCA found the admission of the evidence posed no due process violation. *Id.*, 824 F.3d at 1230. The Tenth Circuit agreed, holding:

> Given the relevance of the statements to the charges and the debateability of their prejudicial impact in light of all of the evidence, Holland cannot show the OCCA was wrong in concluding their admission did not render his trial "fundamentally unfair." *See Lott v. Trammell*, 705 F.3d 1167, 1193–94 (10th Cir. 2013) ("[A] review of the state court record indicates that [defendant]'s trial was not rendered fundamentally unfair by the admission of the [potentially prejudicial] evidence. . . . [T]he prosecution's evidence of [defendant]'s guilt . . . was overwhelming."); *cf. Wilson v. Sirmons*, 536 F.3d 1064, 1115 (10th Cir. 2008) (finding that no violation of due process occurred in a capital case, in part because gruesome photographs were relevant and probative). And, more importantly, he cannot show that no fairminded jurist could agree with the OCCA's decision.

*Id.*  A similar result is warranted here.

This Court's review in a collateral habeas proceeding is limited only to whether the admission of the alleged other crimes evidence "considered in light of the entire record . . . resulted in a fundamentally unfair trial," and not merely whether other crimes evidence was improperly admitted at trial. *Knighton*, 293 F.3d at 1172. This is precisely the analysis that the OCCA engaged in when reviewing Petitioner's claim, finding the evidence was relevant and probative to prove Petitioner's motive, and its probative value was not substantially outweighed by the danger of unfair prejudice (Exhibit 3 at 16). Further, as also noted by the OCCA, the trial court took pains to

lessen the brunt of the evidence by prohibiting "both (a) characterization of [Petitioner's] actions as specific crimes, such as 'arson', and (b) any opinion testimony suggesting that [Petitioner] had in fact committed a crime through those actions." (Exhibit 3 at 15).

Because Petitioner's claim that the trial court erred in admitting evidence of other crimes or bad acts rests only on state law, this Court should deny his claim as not cognizable in a federal habeas proceedings. *Estelle*, 502 U.S. at 67-68. *See also Bradshaw*, 546 U.S. at 76. Nevertheless, Respondent has also shown that there was no error under state law in the admission of the challenged evidence, much less one that was so "'grossly prejudicial'" that it "'fatally infected the trial and denied the fundamental fairness that is the essence of due process.'" *Revilla*, 283 F.3d at 1212 (citation omitted). For these reasons, this Court should deny habeas relief on Petitioner's Ground Four as it was presented to the OCCA on direct appeal.

## PROPOSITION III

**THE DECISION OF THE OCCA THAT THE STATE HAD AUTHORITY TO PROSECUTE THE DEFENDANT FOR THE MURDER OF HIS WIFE WAS NOT CONTRARY TO, OR AN UNREASONABLE APPLICATION OF, FEDERAL LAW, NOR WAS IT AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE STATE COURT RECORD.**

**(In response to Petitioner's Ground Five.)**

In his Ground Five, Petitioner claims his due process and equal protection rights were violated by the State of Oklahoma's prosecution of him because the crime was allegedly committed within the boundaries of the Muscogee (Creek) Nation. Doc. 1 at 23-25. Petitioner concedes that neither he nor his victim is an Indian. Doc. 1 at 24. Petitioner raised this claim in his post-conviction proceedings, and the OCCA denied it on the merits (Exhibit 4 at 4, 23-26; Exhibit

6; Exhibit 8 at 14-17; Exhibit 10 at 5; Exhibit 11 at 3-4).[6] The OCCA's decision was neither contrary to, nor an unreasonable application of, federal law, nor was it an unreasonable determination of the facts in light of the state court record.

The OCCA rejected Petitioner's claim that the State of Oklahoma lacked jurisdiction to prosecute him for murder in the first degree in this case as follows:

> In Proposition Four Petitioner asserts that the District Court lacks subject matter jurisdiction because the alleged offense occurred within the boundaries of the Muskogee/Creek Nation. *See McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020). This claim is without merit. Petitioner concedes that he is not of Indian descent and nor is the victim. Federal jurisdiction over offenses committed within Indian country does not extend to crimes committed by non-Indians against non-Indians, which are subject to state jurisdiction. *Goforth v. State*, 1982 OK CR 48, ¶ 5, 644 P.2d 114, 116 (citing *United States v. McBratney*, 104 U.S. 621 (1882)). Therefore, fundamental to Petitioner's claim that state jurisdiction is preempted by federal statute is a determination of whether both the Petitioner and the victim are Indian. *See Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2499 (2022).
>
> The District Court determined that Petitioner failed to establish that he or the victim is Indian. The defendant has the "burden to prove his is an Indian by producing *prima facie* evidence that he has some Indian blood and that he was recognized as an Indian by a tribe or the federal government." *Parker v. State*, 2021 OK CR 17, ¶ 32, 495 P.3d 653, 654. We agree Petitioner failed to make this showing. Petitioner's unsupported assertions are not sufficient to warrant relief. *See Brown v. State*, 1997 OK CR 1, ¶ 33, 933 P.2d 316, 324-25.

(Exhibit 11 at 3-4).  The factual findings made by the OCCA in this matter are presumed correct and Petitioner has not rebutted those findings by clear and convincing evidence. *See* 28 U.S.C.

---

[6] The OCCA affirmed Petitioner's conviction and sentence on direct appeal on April 15, 2021 (Exhibit 3 at 1). Therefore, Petitioner's conviction was not final until after the Supreme Court decided *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020), on July 9, 2020.

§ 2254(e)(1); *Hooks*, 689 F.3d at 1163. Indeed, Petitioner again acknowledges to this Court that neither he nor his victim is Indian. Doc. 1 at 24.

In his fifth ground, Petitioner has failed to identify any Supreme Court law holding that the State of Oklahoma lacks authority to prosecute crimes committed by a non-Indian against a non-Indian within its borders.[7] Petitioner seemingly acknowledges that the Supreme Court has decided this issue against him in *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486 (2022), stating that he is "aware of the recent SCOTUS ruling regarding non-native petitioners" but "wishes to preserve" his argument "for the record in the event the current ruling is overturned." Doc. 1 at 23. The absence of any Supreme Court law to support his argument and his acknowledgment that the Supreme Court law is against him, are fatal to Petitioner's claim. *See House*, 527 F.3d at 1018 ("The absence of clearly established federal law is dispositive under § 2254(d)(1)."). *See also Grant*, 886 F.3d at 889 ("'The absence of clearly established federal law is dispositive under § 2254(d)(1)' and results in the denial of habeas relief." (citation omitted)). Given the absence of any holding by the Supreme Court that the State of Oklahoma lacks prosecutorial authority over crimes committed by and against non-Indians, "it cannot be said that [the OCCA] 'unreasonabl[y]

---

[7] To the extent Petitioner attempts to rely on the Supreme Court's decision in *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020), *McGirt* does not clearly establish that federal prosecutorial authority under the Major Crimes Act ("MCA") is exclusive of state authority, especially where neither the defendant nor the victim is Indian. *See House v. Hatch*, 527 F.3d 1010, 1015 (10th Cir. 2008) (reiterating that for Supreme Court holdings to act as "clearly established federal law," they "must be construed narrowly and consist only of something akin to on-point holdings" (citing *Carey v. Musladin*, 549 U.S. 70 (2006)). On this issue, the State points only to the Supreme Court's decision in *Castro-Huerta*, handed down after *McGirt*, wherein the Supreme Court held that "the Federal government and the State have concurrent jurisdiction to prosecute crimes committed by non-Indians against Indians in Indian country." *Id.*, 142 S. Ct. at 2491. Nor does *McGirt* clearly establish that a state prosecution in violation of the MCA is redressable on habeas review. *See Brown v. Davenport*, 142 S. Ct. 1510, 1521 & n.1 (2022). However, it is unnecessary to resolve either of these questions given the OCCA's decision which is fully in accord with *Castro-Huerta*, as set forth above.

appli[ed] clearly established Federal law'" in denying Petitioner's claim. *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (quoting Section 2254(d)(1)). Because the OCCA's denial of Petitioner's claim was fully in accord with the Supreme Court's decision in *Castro-Huerta*, Petitioner's claim must be denied.

In *Castro-Huerta*, the Supreme Court held that "the Federal Government and the State have concurrent jurisdiction to prosecute crimes committed by non-Indians against Indians in Indian country." *Castro-Huerta*, 142 S. Ct. at 2491. In reaching this conclusion, the Court stated emphatically as follows:

> [T]he default is that States may exercise criminal jurisdiction within their territory. States do not need a permission slip from Congress to exercise their sovereign authority. In other words, the default is that States have criminal jurisdiction in Indian country unless that jurisdiction is *preempted*. In the dissent's view, by contrast, the default is that States do *not* have criminal jurisdiction in Indian country unless Congress specifically *provides* it. The dissent's view is inconsistent with the Constitution's structure, the States' inherent sovereignty, and the Court's precedents.

*Castro-Huerta*, 142 S. Ct. at 2503 (citation omitted, emphases in original). Lest there be any confusion, the Court specifically rejected the claim raised by petitioner, that Oklahoma's Enabling Act preempts its authority to prosecute, and said again:

> The dissent incorrectly seeks to characterize various aspects of the Court's decision as dicta. To be clear, the Court today holds that Indian country within a State's territory is part of a State, not separate from a State. Therefore, a State has jurisdiction to prosecute crimes committed in Indian country unless state jurisdiction is preempted. With respect to crimes committed by non-Indians against Indians in Indian country, the Court today further holds that the General Crimes Act does not preempt the State's authority to prosecute; that Public Law 280 does not preempt the State's authority to prosecute; that no principle of tribal self-government [pursuant to *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142-143 (1980),] preempts the State's authority to prosecute; that the cited treaties do not preempt Oklahoma's authority to prosecute; and that the Oklahoma Enabling Act does not preempt Oklahoma's authority to prosecute (indeed, it solidifies the State's presumptive sovereign authority to prosecute).

*Id.* at 2504.

As the Court found in *Castro-Huerta*, the Oklahoma Enabling Act contains no express language carving out any exception to the State's jurisdiction "'throughout the whole of the territory within its limits,'" including Indian country. *Id.*, 142 S. Ct. at 2503 (quoting *McBratney*, 104 U.S. at 623-24). Indeed, the Court explicitly found that "the Oklahoma Enabling Act contains no such clear language" displacing State prosecutorial authority. *Id.* at 2503-04.

"The states possess exclusive criminal jurisdiction over crimes occurring in Indian country if there is neither an Indian victim, nor an Indian perpetrator." *United States v. Langford*, 641 F.3d 1195, 1197 (10th Cir. 2011). Because Petitioner makes no claim that he is an Indian, the State properly exercised its authority to prosecute him for his crime, regardless of where he committed it. *Castro-Huerta*, 142 S. Ct. at 2503-04. *See also McGirt*, 140 S. Ct. at 2460 ("nothing we might say today could unsettle Oklahoma's authority to try non-Indians for crimes against non-Indians" in Indian country); *United States v. Antelope*, 430 U.S. 641, 643 n.2 (1977) ("a non-Indian charged with committing crimes against other non-Indians in Indian country is subject to prosecution under state law"). Petitioner cannot show that the OCCA's decision to deny his claim that the State of Oklahoma lacked authority to prosecute him, a non-Indian, for the murder of his wife, also a non-Indian, was contrary to, or an unreasonable application of, federal law, nor was it an unreasonable determination of the facts in light of the state court record. This Court should deny Petitioner's request for habeas relief on his Ground Five.

## PROPOSITION IV

**THE DECISION OF THE OCCA THAT APPELLATE COUNSEL WAS NOT INEFFECTIVE WAS NOT CONTRARY TO, OR AN UNREASONABLE APPLICATION OF, FEDERAL LAW, NOR WAS IT AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE STATE COURT RECORD.**

**(In response to Petitioner's Ground Eight.)**

In his Ground Eight, Petitioner claims appellate counsel was ineffective for failing to: 1) "adequately raise the issue of insufficiency of the evidence as outlined in Ground One;" 2) "raise the issue of Mrs. Reilly's [a previous prosecutor] misconduct as outlined in Ground Two;" 3) "raise the issue of the Trial Prosecutor's misconducts as outlined in Ground Three;" 4) "fully raise the issue of Trial Court's abuse of discretion (beyond a few of the Burk's[8] [sic] issues) as outlined in Ground Four;" 5) "raise the issue of jurisdiction in Ground Five;" and 6) "raise the issue of overall cumulative error as outlined in Ground Ten (Petitioner does not complain of Appellate Counsel's failure to claim ineffective assistance of Trial Counsel, as that would be improper for direct appeal, but the errors outlined in Ground 7 themselves should have gone to the issue of cumulative error)." Doc. 1 at 35. Petitioner raised this claim for the first time in his post-conviction proceedings (Exhibit 4 at 6-7, 30-32; Exhibit 8 at 21-22; Exhibit 10 at 6).  The OCCA denied Petitioner's claim on the merits (Exhibit 11 at 4-6).  Its decision is neither contrary to, nor an unreasonable application of, federal law, nor is it an unreasonable determination of the facts in light of the state court record.

The OCCA rejected the above claims of ineffective assistance of appellate counsel as follows:

> We review the District Court's determination [denying post-conviction relief] for an abuse of discretion. *State ex rel. Smith v. Neuwirth*, 2014 OK CR 16, ¶ 12, 337 P.3d 763, 766. An abuse of discretion is any unreasonable or arbitrary action taken without proper consideration of the facts and law pertaining to the matter at issue or a clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented. *Neloms v. State*, 2012 OK CR 7, ¶ 35, 274 P.3d 161, 170. . . .
>
> In Proposition Seven, Petitioner claims ineffective assistance of appellate counsel. Claims of ineffective assistance of appellate counsel may be raised for the first time on post-conviction

---

[8] *See Burks v. State*, 594 P.2d 771 (Okla. Crim. App. 1979) (setting forth the procedure to be followed when the State intends to introduce evidence of other crimes), *overruled in part on other grounds by Jones v. State*, 772 P.2d 922 (Okla. Crim. App. 1989).

as it is usually a first opportunity to allege and argue the issue. As set forth in *Logan v. State*, 2013 OK CR 2, ¶ 5, 293 P.3d 969, 973, post-conviction claims of ineffective assistance of appellate counsel are reviewed under the standard for ineffective assistance of counsel set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Smith v. Robbins*, 528 U.S. 259, 289 (2000) ("[Petitioner] must satisfy both prongs of the *Strickland* test in order to prevail on his claim of ineffective assistance of appellate counsel."). Under *Strickland*, a petitioner must show both (1) deficient performance, by demonstrating that his counsel's conduct was objectively unreasonable, and (2) resulting prejudice, by demonstrating a reasonable probability that, but for counsel's unprofessional error, the result of the proceedings would have been different. *Strickland*, 466 U.S. at 687-89. We recognize that "[a] court considering a claim of ineffective assistance of counsel must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 689).

We set forth in *Logan* that in reviewing a claim of ineffective assistance of appellate counsel under *Strickland*, a court must look to the merits of the issues that appellate counsel failed to raise. *Logan*, 2013 OK CR 2, ¶¶ 5-7, 293 P.3d at 973-74. Only an examination of the merits of any omitted issues will reveal whether appellate counsel's performance was deficient and also whether the failure to raise the omitted issue on appeal prejudiced the defendant; i.e., whether there is a reasonable probability that raising the omitted issue would have resulted in a different outcome in the defendant's direct appeal. *Id.* We find no merit in the claim that Petitioner was denied effective assistance of appellate counsel as alleged in his post-conviction application. . . .

As Petitioner has failed to establish that he is entitled to post-conviction relief, the order of the District Court of Okfuskee County in Case No. CF-2015-59, denying Petitioner's application for post-conviction relief is **AFFIRMED**.

(Exhibit 11 at 1-2, 4-7 (emphasis in original)). The factual findings made by the OCCA in this

matter are presumed correct and Petitioner has not rebutted those findings by clear and convincing

evidence. *See* 28 U.S.C. § 2254(e)(1); *Hooks*, 689 F.3d at 1163.

The OCCA denied Petitioner's claim that appellate counsel was ineffective on the merits,

making it subject to Section 2254(d) deference. "When a federal claim has been presented to a

state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99. Petitioner is unable to overcome that presumption concerning his appellate counsel claim. "Thus, the deferential standards of § 2254(d) apply" to Petitioner's claim of ineffective assistance of appellate counsel. *Williams v. Trammell*, 782 F.3d 1184, 1202 (10th Cir. 2015). The OCCA's decision that appellate counsel was not ineffective was not contrary to, or an unreasonable application of, *Strickland v. Washington*, 466 U.S. 668 (1984), nor was it an unreasonable determination of the facts in light of the state court record.

To prevail on a claim of ineffective assistance of appellate counsel, Petitioner must establish deficient performance and prejudice, as required by *Strickland*. *Smith v. Robbins*, 528 U.S. 259, 289 (2000). In order for a defendant to prevail on a claim of ineffective assistance of counsel under *Strickland*, he must identify acts or omissions that "show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. The reviewing court must apply "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (citation omitted). Even if errors are identified, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing of one." *Id.* at 697. Because *Strickland* is a general standard, the state court had "'even more latitude to reasonably determine that a

40

defendant has not satisfied the standard.'" *Welch v. Workman*, 639 F.3d 980, 1010 (10th Cir. 2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

The *Strickland* standard set forth above was designed to be difficult to meet, even under *de novo* review. *Richter*, 562 U.S. at 102. The *Richter* Court went on to reason:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 562 U.S. at 105 (internal citations and quotation marks omitted). With respect to the prejudice prong of *Strickland*, the Court also clarified that:

> In assessing prejudice under *Strickland*, *the question is not* whether a court can be certain counsel's performance had no effect on the outcome or *whether it is possible a reasonable doubt might have been established if counsel acted differently*.   Instead, *Strickland* asks whether it is *reasonably likely* the result would have been different.  *This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case.  The likelihood of a different result must be substantial, not just conceivable.*

*Richter*, 562 U.S. at 111-12 (internal citations and quotation marks omitted) (emphasis added).

Thus, this Court must "determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Richter*, 562 U.S. at 102. Even a strong case for relief on *de novo* review

41

does not necessitate a finding that the state court's decision was unreasonable. *Id.* The purpose of Section 2254(d) is to preserve the authority of federal courts to issue a writ of habeas corpus only in cases in which there is no possibility that fairminded jurists could disagree that the state court's decision conflicts with the Supreme Court's precedents. *Id.* Where, as here, a petitioner raises a *Strickland* claim in a federal habeas corpus proceeding, his challenge is all the greater because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.* at 105 (citations omitted). "In other words, when assessing a state prisoner's ineffective-assistance-of-counsel claims on habeas review, '[this Court] defer[s] to the state court's determination that counsel's performance was not deficient, and, further, defer[s] to the attorney's decision in how best to represent a client.'" *Byrd*, 645 F.3d at 1168 (quoting *Crawley v. Dinwiddie*, 584 F.3d 916, 922 (10th Cir. 2009)).

"When considering a claim of ineffective assistance of appellate counsel for failure to raise an issue, [the reviewing court] look[s] to the merits of the omitted issue. The omitted issue's merits determine both deficient performance and prejudice." *Wood v. Carpenter*, 907 F.3d 1279, 1304 (10th Cir. 2018) (citation omitted). "[A] court cannot find ineffective assistance of appellate counsel unless there is 'a reasonable probability the omitted claim would have resulted in relief' on direct appeal, because there can be neither deficient performance nor prejudice 'if the underlying issue was not valid.'" *Johnson v. Carpenter*, 918 F.3d 895, 900 (10th Cir. 2019) (citations and alterations omitted). Respondent addresses each allegation of ineffective assistance of appellate counsel in turn and shows them to be without merit.

### A.  Ground One

Petitioner claims appellate counsel was ineffective for failing to raise on direct appeal the sufficiency of the evidence claim he set out in Ground One. However, Respondent demonstrated

in its Proposition I that even under a *de novo* review, the sufficiency of the evidence claim which Petitioner claims his appellate counsel should have raised is without merit. *Lampley*, 127 F.3d at 1240. *See also Jackson*, 443 U.S. at 319. "[I]f the issue is meritless, its omission will not constitute deficient performance." *Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003).

Had appellate counsel raised Petitioner's sufficiency of the evidence claim on direct appeal, the OCCA would have correctly rejected Petitioner's challenge to his conviction on the basis that it was supported by circumstantial evidence. *See Easlick*, 90 P.3d at 557 (Okla. Crim. App. 2004) ("There is no difference in the weight given circumstantial evidence or direct evidence."); *see also Winder*, 557 F.3d at 1137 ("remain[ing] mindful that circumstantial evidence is entitled to the 'same weight' as direct evidence" (citation omitted)). Whether entirely circumstantial, entirely direct, or a combination of both, the OCCA properly reviewed the sufficiency of the evidence supporting Petitioner's conviction under the same *Jackson* standard: "[W]hether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original). *See Easlick*, 90 P.3d at 559 (holding that "in the future, we will review sufficiency of evidence issues under the *Spuehler* standard, regardless of whether the evidence is wholly circumstantial or whether it is based in whole or in part on direct evidence"); *see also Williams*, 923 F.2d at 1402 (relying on *Jackson* and further stating that "[t]he evidence supporting a conviction must be substantial, raising more than a mere suspicion of guilt, although the evidence can be wholly circumstantial" (citation omitted)).

The OCCA would also have rightly declined Petitioner's invitation in his Ground One to reweigh the evidence against him. Doc. 1 at 4-7. *See Fuston*, 470 P.3d at 327-28 ("In reviewing sufficiency of the evidence claims, this Court does not reweigh conflicting evidence or second-

guess the decision of the fact-finder; we accept all reasonable inferences and credibility choices that tend to support the verdict."); *see also Cordova*, 25 F.4th at 825 (stating that a reviewing court on appeal "neither reweigh[s] the evidence nor redetermine[s] the credibility of the witnesses").

As demonstrated in Respondent's Proposition I, under the *Jackson* standard, whether the evidence supporting Petitioner's conviction was entirely circumstantial, or a combination of direct and circumstantial, it was sufficient to allow "any rational trier of fact [to] find beyond a reasonable doubt that [Petitioner] murdered the victim." (Exhibit 3 at 10). The OCCA would not have reached any different decision had appellate counsel raised the sufficiency claim as Petitioner raises it to this Court. Petitioner cannot show a reasonable probability of a different result had appellate counsel raised the sufficiency of the evidence claim on direct appeal as Petitioner now claims it should have been raised. Appellate counsel was not ineffective. *Smith*, 528 U.S. at 289; *Johnson*, 918 F.3d at 900; *Wood*, 907 F.3d at 1304.

**B.  Ground Two**

Petitioner next claims appellate counsel was ineffective for failing to raise a claim on direct appeal concerning "Pre-Trial Prosecutorial Witness Tampering" as set out in Petitioner's Ground Two. Any claim raised by appellate counsel in this regard would have been properly denied by the OCCA on direct appeal, and appellate counsel was not ineffective. *Smith*, 528 U.S. at 289; *Johnson*, 918 F.3d at 900; *Wood*, 907 F.3d at 1304.

The night Beth was murdered, Petitioner purported to stay the night at the Crouch home. April Crouch testified that because Petitioner was at their house when she went to bed that night and when she got up the next morning, she assumed he had been there all night; however, she testified that upon reflection, she believed it was possible Petitioner could have left their home in the night without her hearing him (Tr. II 121, 159). Ms. Crouch conceded that prior to preliminary

44

hearing, her "statement to law enforcement was [Petitioner] could not have left [their] house without [her] knowing about it[.]" (Tr. II 168-69). Dustin Crouch testified similarly: because Petitioner was there when he went to bed and when he got up, he *thought* Petitioner had been at their home through the night, but he did not *know* that (Tr. II 189).

On cross-examination, defense counsel asked Mr. Crouch if Agent Kurt Titsworth with the Oklahoma State Bureau of Investigation ("OSBI") told him he had a video of Petitioner out during the night (Tr. II 207). Mr. Crouch testified that "[i]t wasn't ever Agent Titsworth that told me that," rather, "[Petitioner] had mentioned it first when I heard about it after he'd been arrested and said that it wasn't admissible in court. I asked Maxey Reilly [a previous prosecutor on the case], and she confirmed that there was a video but she could not show it to me." (Tr. II 207). Mr. Crouch also testified that Ms. Reilly told him that Petitioner had taken out a life insurance policy on him (Tr. II 208). Mr. Crouch agreed that something like that might "[p]ossibly" "turn a friend against a friend[.]" (Tr. II 209). On redirect, Mr. Crouch reiterated that it was Petitioner who told him about a video of him but that it would not be allowed in court (Tr. II 217). Mr. Crouch also testified he was testifying at Petitioner's trial because the State had subpoenaed him to be there (Tr. II 215). Petitioner had been Mr. Crouch's lifelong friend, and there was nothing that any prosecutor – current or former – could have said that would make him lie about the events (Tr. II 215-16). Mr. Crouch testified that what he told the jury was the truth about what he recalled (Tr. II 216).

Agent Titsworth testified that in his investigation, he found no insurance policy on Mr. Crouch taken out by Petitioner, and found no video of Petitioner out on the night of Beth's murder (Tr. VII 115-16).

Petitioner now claims Ms. Reilly's statements to Mr. Crouch about the existence of the video and a life insurance policy caused Mr. Crouch and Ms. Crouch to "doubt their own memory

45

and modify their testimony to include a possibility that Petitioner could have left their residence." Doc. 1 at 10. "[T]he government cannot substantially interfere with a defense witness's decision to testify." *United States v. Serrano*, 406 F.3d 1208, 1215 (10ᵗʰ Cir. 2005). *See also Ashton v. State*, 400 P.3d 887, 897 (Okla. Crim. App. 2017) (citing *Webb v. Texas*, 409 U.S. 95, 97-98 (1972)), *overruled in part on other grounds by Williamson v. State*, 422 P.3d 752, 762 & n.1 (Okla. Crim. App. 2018). The Tenth Circuit expounded on this as follows:

> In *Webb* . . . , the Supreme Court held a trial judge's "lengthy and intimidating warning" and "threatening remarks" effectively caused the defendant's only witness not to testify in violation of the Due Process Clause. Therefore, a judge's admonition to a witness can violate *Webb* if it is threatening and employs coercive language. *United States v. Smith*, 997 F.2d 674, 680 (10ᵗʰ Cir.1993). Courts have applied *Webb* to prosecutors, *United States v. Crawford*, 707 F.2d 447, 449 (10ᵗʰ Cir.1983), and to the joint conduct of the district judge and prosecutor. *United States v. Blackwell*, 694 F.2d 1325, 1333-35 (D.C.Cir.1982).

*Serrano*, 406 F.3d at 1215-16. *See also Ashton*, 400 P.3d at 897-98. "The due process analysis *Webb* dictates must be conducted on a case-by-case basis." *Serrano*, 406 F.3d at 1216. Applying *Webb* and its progeny to Petitioner's claim, it is clear the claim is without merit and would have been denied had appellate counsel raised it on direct appeal.

As an initial matter, it was Petitioner, and not any government actor, who first told Mr. Crouch there was a video showing Petitioner out during the night of Beth's murder, but Petitioner told him the video was not admissible in court (Tr. II 207). Further, it is clear on this record that any misstatement by Ms. Reilly to Mr. Crouch as to the existence of the video or the insurance policy did not substantially interfere with the testimony of either Mr. Crouch or Ms. Crouch.

"The dispositive question in each case is whether the government actor's interference with a witness's decision to testify was 'substantial.'" *Serrano*, 406 F.3d at 1216. "Interference is substantial when the government actor actively discourages a witness from testifying through

threats of prosecution, intimidation, or coercive badgering." *Id.* First, there is no evidence that Ms. Crouch had any knowledge that Ms. Reilly had told Mr. Crouch anything about a video or insurance policy. The most that can be said about her testimony is that before preliminary hearing, she told law enforcement that Petitioner could not have left her house that night without her knowing about it, but after having had time to reflect, she testified she believed it would have been possible for Petitioner to leave their house without her hearing him (Tr. II 121, 140-41, 159, 164-66, 168-69). Because there is no evidence that Ms. Crouch knew anything about a non-existent video or insurance policy, Petitioner's claim as to Ms. Crouch is entirely without merit. Appellate counsel was not ineffective for failing to raise a claim on direct appeal that the State interfered with Ms. Crouch's testimony. *Smith*, 528 U.S. at 289; *Johnson*, 918 F.3d at 900; *Wood*, 907 F.3d at 1304. The claim as to Mr. Crouch requires further analysis, but reaches the same conclusion.

There is no evidence that Mr. Crouch's testimony that it was possible Petitioner may have left his house in the night without him knowing was influenced in any way by anything Ms. Reilly may have told him. Mr. Crouch's reasons for backtracking from his initial belief that Petitioner could not have left his house had nothing to do with Ms. Reilly. Mr. Crouch explained, "I don't think that he could have made it out the front door, but the back door to my house was a faux French door that had a pretty good gap in it and it opened very quietly. There wasn't any change in vacuum of the house when that door was opened because it leaked so badly." (Tr. II 200). When Mr. Crouch made his initial statement to the police that he did not think Petitioner left the house, "it was probably a combination of being protective [of Petitioner] and didn't really think about the back door." (Tr. II 200-01). While Mr. Crouch agreed on cross-examination that what he learned about a video and a life insurance policy could "[p]ossibly" "turn a friend against a friend," he testified on redirect examination that his testimony was truthful, and there was nothing that any

prosecutor could have said that would make him lie about his memory of the events of that night (Tr. II 209, 215-16). Even if Ms. Reilly made the misstatements to Mr. Crouch that she is alleged to have made, it is clear they had no effect on Mr. Crouch's testimony. Ms. Reilly did not interfere – substantially or otherwise – with the testimony of Ms. Crouch or Mr. Crouch. *Serrano*, 406 F.3d at 1216. Because Petitioner's claim to the contrary is without merit and would have been denied on direct appeal, appellate counsel was not ineffective for failing to raise it. *Smith*, 528 U.S. at 289; *Johnson*, 918 F.3d at 900; *Wood*, 907 F.3d at 1304.

Even if the OCCA might have found government interference, Petitioner's claim still would have been rejected on direct appeal as any such error was harmless because Petitioner can show neither that the testimony was material nor that Ms. Reilly acted in bad faith. *See United States v. Santtini*, 963 F.2d 585, 596-97 (3d Cir. 1992) (stating that even when a defendant can show government interference, "no remedy will lie for such infringement absent a showing that the government has caused the unavailability of material evidence and has done so in bad faith"). *See also Whitely v. Farris*, No. 18-6085, 793 Fed. Appx. 680, 701 (10th Cir. Oct. 23, 2019) (unpublished) (applying harmless error review to a *Webb* claim and finding the error harmless).

In this case, Petitioner's complaint charges that where Mr. Crouch and Ms. Crouch both initially stated to law enforcement that Petitioner could not have left their house on the night of the murder without them knowing it, their statements changed after the alleged interference by Ms. Reilly to concede it was possible he could have left without them hearing him. Had Mr. Crouch and Ms. Crouch maintained at trial that Petitioner could not have left their house in the night without their knowledge, their testimony would have been countered with their other testimony on that particular point: that Petitioner and Mr. Crouch had been friends since they were fourteen, and Petitioner was like a brother to Mr. Crouch; that Petitioner had previously come into their house

one day through the garage door when only the Crouches' daughters were there without the girls knowing; that on the night Beth was murdered, Mr. Crouch and Petitioner had been drinking; that Ms. Crouch and Mr. Crouch went to bed in their bedroom while Petitioner slept on their sofa; that while Ms. Crouch was a "pretty light sleeper," she was also "absolutely exhausted" that night; that Mr. Crouch had been working the night shift during that time period, and on the night in question, he had "been drinking a little bit and . . . was very tired;" and that while Petitioner's car had some "general rattles," it did not "have a particularly loud exhaust." (Tr. II 112-15, 134, 139, 172-73, 188-89, 191, 200-01).

As adamant as Ms. Crouch and Mr. Crouch might have initially been that Petitioner could not have left their house without them knowing, this evidence was not material in light of their remaining testimony which would have called such claims into doubt. Further, as set out in Respondent's Proposition I, the evidence against Petitioner was simply overwhelming and did not hinge on whether or not the Crouches believed Petitioner could have left their house that night. Further, there is no evidence that Ms. Reilly acted in bad faith when she purportedly told Mr. Crouch about the existence of the video and the insurance policy. In this regard, it appears the question concerning the video came up fairly early in the investigation – Mr. Crouch testified he heard about it after Petitioner had been arrested, and Petitioner was arrested on May 1, 2015, less than two months after the murder (Tr. II 207; O.R. I 1; State's Ex. 125). When Mr. Crouch went to Ms. Reilly with information about the video, Ms. Reilly may very well have believed such a video existed, especially if Petitioner said it did, but that it was just not in her possession yet, *i.e.*, she could not show it to him (Tr. II 207). And, as pointed out by the prosecutor in closing argument, when Ms. Reilly purportedly told Mr. Crouch that Petitioner had taken out a life insurance policy on him, Ms. Reilly may have mixed up "Dustin" Crouch with "David" Magness, who testified that

49

while he was at the Crouch home with Petitioner after Beth's murder, one of Petitioner's friends tried to sell life insurance to Mr. Magness (Tr. IV 225-26; Tr. VIII 99). Because the evidence in question was not material, and Ms. Reilly did not act in bad faith, any error the OCCA might have found was harmless, and relief would nevertheless have been denied. *Santtini*, 963 F.2d at 596-97. Because the OCCA would have denied relief, appellate counsel was not ineffective. *Smith*, 528 U.S. at 289; *Johnson*, 918 F.3d at 900; *Wood*, 907 F.3d at 1304.

Further reason that the OCCA would find any error harmless is that the subject of the alleged government interference was presented to the jury for its assessment of the testimony of Ms. Crouch and Mr. Crouch. *Cf. Wilcox v. Ford*, 813 F.2d 1140, 1148-49 (11th Cir. 1987) (rejecting the petitioner's claim that the admission of "improperly obtained statements" from two witnesses rendered his trial fundamentally unfair, noting that "the opportunity of cross-examination, admission of contradictory evidence, and the jury charges rendered by the trial court gave the jury adequate opportunity to assess the proper weight to be accorded to the challenged evidence"). *See also Bacon v. Klee*, No. 15-2491, 2016 WL 7009108, *2 (6th Cir. Nov. 30, 2016) (unpublished) (noting that the district court cited *Wilcox* in rejecting the petitioner's claim that the statements of two prosecution witnesses "were introduced at trial after being obtained through police intimidation" and concluding that "because Bacon was able to cross-examine the witnesses at trial regarding the police intimidation, his due process rights were not violated").

In Petitioner's case, the jury was instructed in relevant part as follows:

> It is your responsibility to determine the credibility of each witness and the weight to be given the testimony of each witness. In determining such weight or credibility, you may properly consider: the interest, if any, which the witness may have in the result of the trial; the relation of the witness to the parties; the bias or prejudice of the witness, if any has been apparent; the candor, fairness, intelligence, and demeanor of the witness; the ability of the witness to remember and relate past occurrences, the means of observation,

and the opportunity of knowing the matters about which the witness
has testified.

(O.R. V 775). Aiding the jurors in their assessment of the testimony of Ms. Crouch and Mr. Crouch
was the cross-examination of Mr. Crouch, during which he testified that after Petitioner told him
there was a video of him but it was not admissible, he asked Ms. Reilly about it, "and she confirmed
that there was a video but she could not show it to me." (Tr. II 207). Mr. Crouch also testified that
Ms. Reilly told him that Petitioner had taken out a life insurance policy on him, and agreed that
something like that might "[p]ossibly" "turn a friend against a friend[.]" (Tr. II 208-09). In closing
argument, defense counsel told the jury that "the State of Oklahoma got April and Dustin to admit
that it's possible, maybe he left without them knowing about it," and that "[a]t some point in time
Dustin and April change their story from there's absolutely no way to maybe there's a way." (Tr.
VIII 49, 52-53). Defense counsel argued that the story changed due to what Ms. Reilly had told
Mr. Crouch, and that the changed story "doesn't make sense without that lie told them by the DA's
office." (Tr. VIII 53, 93-94). Because the testimony of Ms. Crouch and Mr. Crouch was subject to
cross-examination, the evidence concerning what Ms. Reilly told Mr. Crouch was presented to the
jury, and the jury was instructed how to assess the credibility of Ms. Crouch and Mr. Crouch, the
OCCA would have found any error in Ms. Reilly's purported statements to Mr. Crouch to be
harmless. *Wilcox*, 813 F.2d at 1148-49; *Bacon*, 2016 WL 7009108, *2. Because the OCCA would
have denied relief on this basis as well, appellate counsel was not ineffective. *Smith*, 528 U.S. at
289; *Johnson*, 918 F.3d at 900; *Wood*, 907 F.3d at 1304.

As demonstrated above, Petitioner's claim of government interference with a defense
witness is entirely meritless, and the OCCA would have denied any such claim had it been raised
on direct appeal. Respondent has further shown that even if the OCCA might have found any error
in Ms. Reilly's purported statements to Mr. Crouch, any such error was harmless, and the OCCA

51

would still have denied relief. Appellate counsel was not ineffective for not raising this claim on direct appeal. *Smith*, 528 U.S. at 289; *Johnson*, 918 F.3d at 900; *Wood*, 907 F.3d at 1304.

### C. Ground Three

Petitioner next claims appellate counsel was ineffective for failing to raise a "Prosecutorial Misconduct" claim on direct appeal as set out in Petitioner's Ground Three. This claim is without merit. Any claim raised by appellate counsel in this regard would have been properly denied by the OCCA on direct appeal, and appellate counsel was not ineffective. *Smith*, 528 U.S. at 289; *Johnson*, 918 F.3d at 900; *Wood*, 907 F.3d at 1304.

In reviewing a claim of prosecutorial error, the OCCA uses the standard set out by the Supreme Court in *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974), and grants relief "only where the prosecutor committed misconduct that so infected the defendant's trial that it was rendered fundamentally unfair, such that the jury's verdicts should not be relied upon." *Roy v. State*, 152 P.3d 217, 227 & n.37 (Okla. Crim. App. 2006) (citing *Donnelly*, 416 U.S. at 645, and *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). "Such claims are evaluated within the context of the entire trial." *Roy*, 152 P.3d at 227 & n.38 (citing *Donnelly*, 416 U.S. at 639, and *Darden*, 477 U.S. at 179). Petitioner's allegations of prosecutorial misconduct can be grouped into three general categories: 1) the prosecutors' statements and elicitation of evidence during trial; 2) improper closing argument arguing that Petitioner murdered his wife; and 3) the prosecutors made misrepresentations, contradictions and/or lied about the evidence in closing argument. Doc. 1 at 12-15. None of these claims would have warranted relief on direct appeal, and appellate counsel was not ineffective for raising a prosecutorial misconduct claim.

### 1. The prosecutors' statements and elicitation of evidence during trial

In the first category of alleged prosecutorial error, Petitioner essentially claims the prosecutors introduced improper evidence or made improper statements during trial. None of the questions or arguments at issue in the first category would have resulted in relief had they been challenged on direct appeal, and appellate counsel was not ineffective for not raising them.

Petitioner first claims the State "explicitly stated that the murder weapon was proven to belong to [him] even though their own forensic expert stated no match could be made[.]" (Tr. II 18; Tr. V 157; Tr. VI 159; Tr. VIII 12, 14).[9] Doc. 1 at 12. There was no objection to any of the cited questions or arguments at trial, and the OCCA would have reviewed them for plain error. *See Mahdavi v. State*, 478 P.3d 449, 459-60 (Okla. Crim. App. 2020).[10] The OCCA, as well as the Tenth Circuit, holds that "[b]oth parties have wide latitude in closing argument to argue the evidence and reasonable inferences from it." *Lamar v. State*, 419 P.3d 283, 297 (Okla. Crim. App. 2018). *See also Thornburg*, 422 F.3d at 1131 ("A prosecutor may comment on and draw reasonable inferences from evidence presented at trial."). The evidence supported the prosecutor's questions and arguments that the firearm that killed Beth belonged to Petitioner.

Katelyn Millar, the firearm and tool mark examiner for the OSBI, determined that the .9mm shell casing found at the crime scene was likely fired from either a Glock or Smith & Wesson

---

[9] For all but a few instances, Petitioner fails to cite to the record to support his claims of prosecutorial misconduct in his petition. Doc. 1 at 11-15. However, in his original and amended post-conviction applications, Petitioner provided record citations (Exhibit 4 at 13-19; Exhibit 8 at 8-11).

[10] The Tenth Circuit sees "'no practical distinction between the formulations of plain error [under Oklahoma law] and the federal due-process test, which requires reversal when error 'so infused the trial with unfairness as to deny due process of law[.]'" *Thornburg v. Mullin*, 422 F.3d 1113, 1125 (10th Cir. 2005) (quoting *Estelle*, 502 U.S. at 75)).

Sigma series, and was fired from the same firearm that fired the four shell casings found in the area where Petitioner told Agent Titsworth he had been shooting his Glock .9mm gun earlier in the week (Tr. III 143; Tr. V 151-52; Tr. VI 171-72, 175-76; State's Exs. 34, 71). There was not enough individual detail for Ms. Millar to determine if the .9mm projectile found at the crime scene was fired by the same gun that fired a .9mm projectile found in the area where Petitioner said he had been shooting his Glock .9mm pistol (Tr. III 134, 148-49; Tr. V 156-57; Tr. VI 171-72, 176-77; State's Exs. 38, 72). However, she was able to testify that both projectiles were consistent with .9mm Luger bullets (Tr. V 157). And in addition to their caliber being in agreement, "the rifling was [also] in agreement, meaning that both of them were fired by a firearm that had six lands and grooves with a right-hand twist and that the rifling was pulling it all . . . ." (Tr. V 157-58). The rifling present on both projectiles was consistent with a Glock (Tr. V 161-62). Contrary to Petitioner's current argument, a very reasonable inference based on this evidence is that the murder weapon was indeed the Glock that he owned. None of the questions or argument by the prosecutors making this reasonable inference were improper. *Lamar*, 419 P.3d at 297.

Petitioner next complains that the prosecutor "introduced a multitude of 'bad acts'" which are the subject of his Ground Four, and elicited testimony about Petitioner's live-action role-play hobby "in an effort to convict upon Petitioner's alleged character rather than evidence[.]" Doc. 1 at 12. In Petitioner's Ground Four, he complained about the trial court's admission of other crimes and bad acts evidence. Doc. 1 at 17-18. Respondent showed in its Proposition II that this evidence was properly admitted under state law and did not deny Petitioner a fair trial. Because the evidence was properly admitted, the prosecutor committed no misconduct in introducing it. *Roy*, 152 P.3d at 227 (granting relief on a prosecutorial error claim "only where the prosecutor committed misconduct that so infected the defendant's trial that it was rendered fundamentally unfair, such

that the jury's verdicts should not be relied upon"). When the prosecutor elicited testimony from Dustin Crouch about Petitioner's participation in live-action role-playing activities, defense counsel objected out of concern that Mr. Crouch was going to testify that Petitioner had invented or was involved in something "violent or crazy or villainous or something like that." (Tr. II 176-77). The prosecutor responded that her questions sought to "educate the jury on something that serves as a central role in . . . [Petitioner's] interest" which "indicates his abilities to be both crafty and imaginative and how he perceives the world." (Tr. II 177). None of the testimony about Petitioner's live-action role-play activities maligned his character (Tr. II 177-78). The questions were not improper and did not constitute misconduct. *Roy*, 152 P.3d at 227.

Petitioner next claims the prosecutor misstated timelines in opening statement, presumably with the statements that when Petitioner spent the night of the murder with April and Dustin Crouch, everyone went to bed around 11:30 p.m. or 12:30 a.m., and Ms. Crouch was awakened around 4:30 a.m. to cries from B.M., the baby son of Petitioner and Beth (Tr. II 14). There was no objection to these statements at trial, and the OCCA would have reviewed them for plain error. *Mahdavi*, 478 P.3d at 459-60. There was no error, plain or otherwise.

"The purpose of an opening statement is to inform the jury of the evidence the attorneys expect to present during the trial." *Young v. State*, 12 P.3d 20, 36 (Okla. Crim. App. 2000). The evidence showed that Ms. Crouch and Mr. Crouch went to bed around midnight (Tr. II 112). Shortly thereafter, Ms. Crouch heard B.M. crying so she went out to check on him and saw Petitioner was on the sofa (Tr. II 112-13). She heard B.M. again about fifteen minutes later, but saw Petitioner had taken care of him (Tr. II 113). On cross-examination, she testified it was closer to 1:00 a.m. that she went to sleep, and it was around 12:30 or 12:45 a.m. that she first heard B.M. crying (Tr. II 133-35). It was then around 3:30 or 4:00 a.m. that she awoke to B.M. screaming (Tr.

II 113, 136). Mr. Crouch testified he went to bed at about midnight and woke up about 5:00 a.m. (Tr. II 186, 203). The timeline stated by the prosecutor in opening statement was very close to the timeline established by the evidence. Even if there was any divergence, however, there is no evidence that the prosecutor acted in anything but good faith in his opening statement. "Statements by the attorneys are not evidence and [the OCCA has] in the past recognized that a prosecutor may in good faith tell the jury what he expects to prove, only to have that evidence evaporate during the case in chief." *Young*, 12 P.3d at 36. In this case, the jurors were instructed that "[e]vidence is the testimony received from the witnesses under oath, agreements as to fact made by the attorney, and the exhibits admitted into evidence during the trial," and that "[n]o statement or argument of the attorney is evidence." (O.R. IV 754-55). The OCCA presumes that jurors "follow their instructions." *Tryon v. State*, 423 P.3d 617, 653 (Okla. Crim. App. 2018). Petitioner has not countered this presumption. The prosecutor's opening statement was not improper. *Young*, 12 P.3d at 36.

Petitioner next claims the prosecutors lied about his not showing any emotion, while "intentionally edit[ing]" around such displays in the exhibits presented to the jury. Doc. 1 at 12. While Dale Lyon testified Petitioner "started to break down" and cry after calling 911 (Tr. III 65-66), and Dustin Crouch testified Petitioner "was in tears" at Petitioner's house (Tr. II 190), the fact remained that just an hour and a half after Beth's body was discovered, Petitioner was not emotional when he first spoke to Agent Titsworth, not shedding any tears and even laughing occasionally (Tr. VI 155-57; State's Ex. 101). Beth's father testified that at the funeral, Petitioner cried during a song he had chosen, but otherwise did not display very much emotion; he could even be heard laughing with his friends after the service (Tr. II 50-51). As for the editing, Petitioner's initial interview with Agent Titsworth on the day of the murder was over three hours

long, and the State therefore introduced portions of the interview separately to "reflect[] the point

that is at issue." (Tr. VI 140-41, 154-55). Defense counsel had no objection to the introduction of

the interview portions, but asked to be able to introduce a portion of the initial interview wherein

Petitioner showed emotion as he wrote out his statement (Tr. VI 141-43). The defense was able to

do just that, admitting Defendant's Exhibit 5 during the cross-examination of Agent Titsworth (Tr.

VII 42-43; Defendant's Ex. 5). Petitioner can show no prosecutorial misconduct with this claim.

*Roy*, 152 P.3d at 227.

Petitioner next claims the prosecutors elicited opinions from non-experts which they knew

an expert would refute. Doc. 1 at 12. The cited portions of the transcript show that the prosecutors'

questions eliciting the challenged testimony were improper (Tr. III 135; Tr. V. 60; Tr. VII 20-27).

*Roy*, 152 P.3d at 227.

Petitioner first cites to the record where the prosecutor asked OSBI Agent Janell Daggett

if she had an opinion as to how close the shooter would have been to Beth based on her

observations of the body, the trajectory, and the spent shell casing (Tr. III 135-36). Defense counsel

objected on the basis that the defense had received neither a report from Agent Daggett, nor

anything to show she was qualified to make such a determination (Tr. III 136). The court overruled

the objection, and Agent Daggett testified the shooter was "pretty close, just from where the casing

[was] as to where her feet [were]." (Tr. III 137). She also testified, over objection, that the victim

had what appeared to be powder burns on her face, which, based on her training and experience

indicated the shooter was "a little bit closer." (Tr. III 138-39). First, Petitioner makes no showing

that the testimony was inaccurate or would have been refuted by a so-called "true expert".[11] Doc.

---

[11] Indeed, Agent Daggett's testimony in this regard was confirmed by the testimony of the medical
examiner, who testified there was stippling on Beth's face, and "generally speaking, with a pistol,

1 at 12. Further, Agent Daggett's extensive training and experience – some 800 classroom hours of crime scene training, twenty-one years with the Sebastian County Sheriff's Office in Fort Smith, Arkansas, four years with the OSBI, having been specializing in crime scenes since 2003 – qualified her to give her opinions on these matters which were based on her observations of the scene and her training and experience (Tr. III 118-19, 136-39). *See Welch v. State*, 2 P.3d 356, 368 (Okla. Crim. App. 2000) (finding that while the prosecutor did not "formally qualify [the detective] as an expert by asking the trial court to recognize him as such," he did qualify him "to render certain opinions after asking him about his sixteen year career as a police officer and his specialized training in sexual asphyxiation deaths," and the detective's testimony that the victim's "death was not self-inflicted or the result of autoerotic behavior, that her death was not accidental but intentionally inflicted and that [her] wounds were not consistent with sexual asphyxiation" was proper opinion testimony).

The next challenged testimony in this section is from OSBI Agent Paulynda Stevens (Tr. V 60). With respect, Respondent can find nothing on this page that can even liberally[12] be read to state an expert opinion. The prosecutor asked Agent Stevens if it seemed unusual to her that Petitioner stated, "Oh, no," when she asked if he thought Beth might have committed suicide (Tr. V 60). She testified it did because Petitioner had just spent "a great deal of time" telling her about Beth's mental health issues, how bad they were, how they affected her parenting, how they would put her into a catatonic state, and how Beth was resistant to going to the doctor (Tr. V 60). Indeed,

---

the stippling pattern seen there can occur several inches from the surface up to about a foot and a half to two feet." (Tr. VI 104-05).

[12] *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) ("A pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers.").

during that same conversation, Petitioner told her he had left for the evening with the children to give Beth a break because she had been "stressed out" and had "a very low day." (Tr. V 50). He also told Agent Stevens that Beth had "pretty severe depression," and she would "have a lot of lows, sometimes three to four days at a time where she would be in a catatonic state. It was very severe depression." (Tr. V 52). Petitioner told her that he took antidepressants in part "to encourage Beth to take her medication, because she was resistant." (Tr. V 53). As with Agent Daggett's testimony, Petitioner makes no showing that Agent Stevens's testimony was inaccurate or would have been refuted by a so-called "true expert". Doc. 1 at 12. In addition, there was nothing improper in Agent Daggett's testimony or the question that elicited it. *Roy*, 152 P.3d at 227.

Finally, Petitioner cites to Agent Titsworth's testimony as improper non-expert testimony that would have been refuted by a "true expert" (Tr. VII 20-27). Respondent can only presume what Petitioner finds challengeable in these seven pages of testimony. Agent Titsworth testified that when he first confronted Petitioner with the belief that Petitioner was involved in his wife's murder, he understood Petitioner's body language to mean "[t]hat he was in agreement with what I was saying." (Tr. VII 21). The prosecutor then asked, "And what about his body language indicated to you he was acting in agreement?" (Tr. VII 21). Agent Titsworth answered, "With him nodding his head in agreement with what I said." (Tr. VII 21). The trial court properly overruled defense counsel's objection to this exchange, as the OCCA holds that "[n]odding one's head in response to a question or accusation is commonly understood to convey agreement and can be an adoptive admission." *Romano v. State*, 909 P.2d 92, 107 (Okla. Crim. App. 1995).

When the prosecutor asked Agent Titsworth if he found "anyone with a motive to kill Beth Magness," the agent answered yes, and that person was Petitioner (Tr. VII 23). Defense counsel objected to the exchange and the trial court sustained the objection (Tr. VII 24). The OCCA would

not have granted relief on this question and answer because the trial court cured any error by sustaining the objection. *See Mack v. State*, 188 P.3d 1284, 1288 (Okla. Crim. App. 2008) ("The trial court sustained the objection [to the prosecutor's comment] and thus cured any error."); *Woodruff v. State*, 846 P.2d 1124, 1140 (Okla. Crim. App. 1993) ("We have previously found that the trial court's sustaining of an objection was sufficient to cure any error which may have occurred."). The remainder of Agent Titsworth's testimony challenged in this section concerned his opinion as to why the crime scene was not consistent with a burglary or robbery committed by an intruder (Tr. VII 24-27). This testimony was entirely proper as it was based on the agent's extensive training and experience as a crime scene investigator and was based on his observations and investigation of the crime scene in this case (Tr. VI 147-48; Tr. VII 24-27). *Welch*, 2 P.3d at 368. As with the testimony of Agents Daggett and Stevens, Petitioner makes no showing that Agent Titsworth's testimony was inaccurate or would have been refuted by a so-called "true expert". Doc. 1 at 12. In addition, with the possible exception of the testimony that Petitioner had a motive to kill his wife – which error was cured by the trial court's sustaining of defense counsel's objection – there was nothing improper in Agent Titsworth's testimony or the questions that elicited it. *Roy*, 152 P.3d at 227.

Petitioner next claims the prosecutor committed misconduct by claiming to the trial court that solicitation of a minor is not a crime, and by claiming that because Petitioner grew up in Okemah, he could not have grown up as a nudist. Doc. 1 at 12. Concerning the first claim, K.C. testified that when she was sixteen years old, she stayed with Petitioner and Beth (Tr. IV 86). During that time, she and Petitioner became close, and Petitioner told her he and Beth did not have sex very often, and he would be interested in having a relationship with her sometime in the future (Tr. IV 88-90). After Beth's murder, he suggested to her that she move into a new house where he

intended to move, "[n]ot necessarily to take care of the kids, no." (Tr. IV 90, 96). Petitioner made it clear to K.C. that "if [she] were interested in having sex with him, he would do that[.]" (Tr. IV 100). After K.C.'s testimony concluded, defense counsel objected, and asked for a mistrial as well as a limiting instruction on the basis that Petitioner's statement "that he's interested in having sex with a minor is a crime, it's indecent proposals." (Tr. IV 101). The prosecutor responded, "And, Judge, it's not a crime. She was at the age of legal consent, she testified that she was 16." (Tr. IV 101). As the prosecutor noted, the OCCA has held that "[t]he 'age of consent' in Oklahoma is statutorily defined. In the absence of mental illness or any other unsoundness of mind, the Legislature has set the age of consent for sexual activity at 16 years of age." *Arganbright v. State*, 328 P.3d 1212, 1218-19 (Okla. Crim. App. 2014) (citing Okla. Stat. tit. 21 §§ 888, 1111(A)(1), 1123). Indeed, Section 1123 of Title 21 in general proscribes acts committed against children under the age of sixteen, and, in particular, Section 1123(A)(1) makes it unlawful for any person to knowingly and intentionally make a "lewd or indecent proposal to any child under sixteen (16) years of age . . . ." Okla. Stat. tit. 21, § 1123(A)(1). The prosecutor correctly stated the law, "and no error occurred." *Hammon v. State*, 999 P.2d 1082, 1096 (Okla. Crim. App. 2000) (finding no prosecutorial error where the prosecutor correctly stated the law).

Concerning the second claim in this section, the prosecutor asked Agent Stevens if, at some point during their two-hour conversation, Petitioner made "any mention to you about growing up as a nudist?" (Tr. V 51). Agent Stevens answered in the affirmative, and when the prosecutor asked her to explain, defense counsel objected on relevance grounds (Tr. V 51). At a bench conference, the prosecutor told the trial court that Petitioner was not actually a nudist, rather his claim in that regard was another piece of "false fiction he creates for himself . . . It's just another false story that he's giving. He was not raised as a nudist; he was raised here in Okemah." (Tr. V 52). The trial

court informed the prosecutor it did not "need to hear about a nudist" and ordered her to move on (Tr. V 52). In his present claim, Petitioner appears to argue that the prosecutor was wrong, and that just because he grew up in Okemah did not mean he was a nudist, but then claims this was "another effort to admit character evidence . . . ." Doc. 1 at 12. Whether or not being a nudist and growing up in Okemah are mutually exclusive, the trial court refused to admit this evidence, and no error occurred. *Mack*, 188 P.3d at 1288; *Woodruff*, 846 P.2d at 1140. *See also Roy*, 152 P.3d at 227.

Petitioner next claims the prosecutor elicited "false and/or contradictory information" about identifying the murder weapon as Petitioner's gun, about alleged inconsistencies in Petitioner's statements, and about Petitioner's financial status. Doc. 1 at 12. Regarding the first allegation, Agent Titsworth testified he submitted the casings and projectile found at the site where Petitioner said he had been shooting his .9mm pistol to the laboratory for examination (Tr. VI 177). The prosecutor then asked if he learned the casings and projectile were fired from the same weapon, and whether he learned "they were fired from the same weapon that killed Elizabeth Magness;" Agent Titsworth answered both questions in the affirmative (Tr. VI 177). As set out above, it was determined that the .9mm shell casing found at the crime scene was likely fired from either a Glock or Smith & Wesson Sigma series, and was fired from the same firearm that fired the four shell casings found in the area where Petitioner had been shooting his Glock .9mm gun earlier in the week (Tr. III 143; Tr. V 151-52; Tr. VI 171-72, 175-76; State's Exs. 34, 71). Though there was not enough individual detail to determine if the .9mm projectile found at the crime scene was fired by the same gun that fired a .9mm projectile found in the area where Petitioner had been shooting his Glock .9mm pistol, they were both consistent with .9mm Luger bullets (Tr. III 134, 148-49; Tr. V 156-57; Tr. VI 171-72, 176-77; State's Exs. 38, 72). Further, "the rifling was [also]

in agreement, meaning that both of them were fired by a firearm that had six lands and grooves with a right-hand twist and that the rifling was pulling it all . . . ." (Tr. V 157-58). The rifling present on both projectiles was consistent with a Glock (Tr. V 161-62). Neither the prosecutor's questions nor the agent's answers were improper. *Lamar*, 419 P.3d at 297; *Roy*, 152 P.3d at 227.

Concerning the second allegation in this claim, the prosecutor elicited from Agent Titsworth that Petitioner made inconsistent statements about a gate outside the Magness home always being shut, and then a week later telling the agent that Beth had bought a lock for the gate because the children had been using it (Tr. VI 178-80). Agent Titsworth testified, "So the story changed from, you know, the kids keep the gate locked to . . . Beth . . . bought some locks and that's what we were going to do with that because the kids are getting out of the gate." (Tr. VI 179-80). Petitioner does not identify what is false or contradictory about this testimony. There was nothing improper in the prosecutor's question about Petitioner's changing statements. *Roy*, 152 P.3d at 227. Petitioner also does not identify what is false or contradictory about Agent Titsworth's testimony that Petitioner told him he wanted to know who killed his wife, and at the same time, did not want to know (Tr. VI 188-89). There was nothing improper in the prosecutor's questions that elicited this testimony. *Id.*

Concerning the third and final allegation in this claim, Petitioner claims the prosecutor elicited false and/or contradictory evidence about his financial status. On the page of the transcript cited by Petitioner, the prosecutor elicited testimony from Agent Titsworth that the Magnesses' utility bills and credit card payments were past due, that Petitioner owned a farm truck, and that Agent Titsworth had reviewed the mortgage Petitioner obtained for the restaurant (Tr. VI 195). When the prosecutor asked the agent what "was the actual purpose that the bank agreed to for that mortgage," defense counsel objected on speculation and lack of foundation grounds (Tr. VI 195).

63

The trial court sustained defense counsel's objection, stating that the mortgage, which was admitted into evidence, "speaks for itself." (Tr. VI 196). If Petitioner is complaining about the prosecutor's question about what the mortgage stated, no evidence was received on that point because the trial court sustained defense counsel's objection before Agent Titsworth answered. *See Brown v. State*, 871 P.2d 56, 66 (Okla. Crim. App. 1994) (where defense counsel objected and the objection was sustained before the witness answered, "[t]here was no evidence of a crime or even a bad act placed in evidence before the jury"). Petitioner does not identify anything that was false or contradictory about the remaining evidence elicited on this page. There was nothing improper in the prosecutor's question which elicited this testimony. *Roy*, 152 P.3d at 227.

Petitioner next claims the prosecutor elicited "a long series of conclusive statements from Agent Titsworth" that Petitioner was guilty, resulting in the trial court sustaining defense counsel's objections and threatening a mistrial. Doc. 1 at 12-13. As Petitioner does not identify where this exchange took place, Respondent can only presume that it was during the final questions to Agent Titsworth on direct examination. When the prosecutor asked Agent Titsworth if he found "anyone with a motive to kill Beth Magness," he answered yes, and that the person was Petitioner (Tr. VII 23). The trial court told the prosecutor at the bench that "you and I both know that he can't give an opinion to this jury on Mr. Magness's guilt," and sustained defense counsel's objection that the testimony invaded the province of the jury." (Tr. VII 23-24). When Agent Titsworth later testified, "I believed that Mr. Magness only went back to the home that night to - -," defense counsel objected that the witness was "invading the province of the jury." (Tr. VII 30). At the bench, the trial court again told the prosecutor that it would not "allow testimony from this witness that Mr. Magness killed Beth," and warned her to "be careful with [her] questions" or "we're going to mistry this case." (Tr. VII 30). The OCCA would not have granted relief on these questions and

answers because the trial court cured any error by sustaining the objections. *See Mack*, 188 P.3d at 1288 ("The trial court sustained the objection [to the prosecutor's comment] and thus cured any error."); *Woodruff*, 846 P.2d at 1140 ("We have previously found that the trial court's sustaining of an objection was sufficient to cure any error which may have occurred.").

Petitioner next claims the prosecutor submitted a "falsified" *Miranda* waiver form, claiming it was dated May 5, 2015, when "his arrest was well documented as occurring" on May 1, 2015. Doc. 1 at 13. Contrary to Petitioner's claim, the waiver form, admitted as State's Exhibit 125, is dated "5/1/15." (State's Ex. 125). However, when describing the exhibit, Agent Titsworth mistakenly stated it was dated "May 5th, '15, 13:17 hours." (Tr. VI 214-15). Petitioner failed to object to this testimony, and the OCCA would have reviewed this claim for plain error only. *Mahdavi*, 478 P.3d at 459-60. First, Agent Titsworth's mistake as to the date was not attributable to the prosecutor's question, and therefore, Petitioner cannot show prosecutorial error. In any event, however, the OCCA holds that "minor misstatements that cannot be found to have affected the trial will not warrant relief." *Newman v. State*, 466 P.3d 574, 584 (Okla. Crim. App. 2020) (citing *Bench v. State*, 431 P.3d 929, 966 (Okla. Crim. App. 2018)). The OCCA would not have granted any relief for this extremely minor misstatement of fact that had no effect on Petitioner's trial, especially on plain error review.

Petitioner's final claim in this section alleges the prosecutor "knowingly concealed [the] Medical Examiner's opinion of the timing for Victim's eye to have been bulged and that said timing was even an issue of importance for the State's case, making it impossible for the defense to offer explanation or counter testimony." Doc. 1 at 13. Dr. Eric Pfeifer, the Chief Medical Examiner of the Oklahoma Medical Examiner's Office, reviewed the victim's autopsy that was performed by Dr. Clay Nichols (Tr. VI 93, 95-97). Several months prior to trial, Dr. Nichols

suffered a stroke, and was permanently disabled and unable to testify (Tr. VI 96). When asked if

he had an opinion about what point, if ever, the victim's eye might have been bulging out, Dr.

Pfeifer answered:

> I - - I could see that eye bulging out at the moment of impact
> with that bullet. The - - the bullet creates a shockwave in front of it
> in what we call a temporary cavity, and so when it enters that orbital
> area, I think it's very plausible that the pressure in that orbit where
> that eye is could have forced that eye out momentarily.

(Tr. VI 107). He testified the eye would have returned "[i]mmediately or within a few seconds or

minutes." (Tr. VI 107). Defense counsel raised no objection to Dr. Pfeifer's testimony regarding

the timing of when the eye would have been bulging.

Respondent liberally construes Petitioner's claim to be one that the State did not disclose

in discovery that Dr. Pfeifer would testify to the timing that Beth's eye would have been bulging.

Reviewing for plain error, the OCCA would have found none. *Mahdavi*, 478 P.3d at 459-60. In its

Second Amended Witnesses and Exhibits List for the Count of Murder in the First Degree (O.R.

IV 648-60), the State gave notice that it would call Dr. Pfeifer, who would "testify to autopsy and

cause of death. See police reports and discovery." (O.R. IV 652). The Oklahoma Discovery Code

requires a summary of a witness's testimony, and "[a] summary, by definition, cannot be expected

to be a verbatim script of a witness's testimony." *Frederick v. State*, 37 P.3d 908, 923 (Okla. Crim.

App. 2001) (citing Okla. Stat. tit. 22, § 2002(A)(1)). As one of the purposes of the discovery code

is to "minimize surprises," and defense counsel expressed none at trial, the OCCA would have

rejected this claim of error on direct appeal. *See Davis v. State*, 103 P.3d 70, 76 (Okla. Crim.

App. 2004). *See also Clark v. State*, 625 P.2d 119, 120 (Okla. Crim. App. 1981) (rejecting the appellant's

claim that the State "failed to disclose reports of medical examinations of prosecutrix, despite a

66

pretrial disclosure order by the trial court," noting that the appellant "does not allege surprise at prosecutrix's testimony, which was unobjected to at trial").

Petitioner has not shown any error, much less plain error, in any of the prosecutors' arguments challenged in his first category. The OCCA would have denied relief had these arguments been challenged on direct appeal. Appellate counsel was not ineffective for not raising these claims on direct appeal. *Smith*, 528 U.S. at 289; *Johnson*, 918 F.3d at 900; *Wood*, 907 F.3d at 1304.

### 2. Allegedly improper closing argument that Petitioner murdered his wife

In the second category of alleged prosecutorial misconduct, Petitioner claims the prosecutor made prejudicial closing argument pointing to Petitioner as the murderer of his wife (Tr. VIII 6, 10, 12, 17, 30, 32, 35). Doc. 1 at 13. There was no objection to any of these remarks at trial, and the OCCA would have reviewed them for plain error. *Mahdavi*, 478 P.3d at 459-60. Petitioner makes no attempt to explain to this Court why the prosecutors' arguments in this section were objectionable, and instead only refers to them as "a litany of plain error, prejudicial statements . . . ." Doc. 1 at 13. Giving Petitioner's claim a liberal construction, Respondent recognizes he might be claiming the prosecutors expressed their personal opinions of his guilt with the challenged statement, but such claim would have been denied by the OCCA.

The OCCA has stated that "[a]ny prosecutor is usually going to tell the jury what he thinks the evidence showed. If his argument is reasonably based on the evidence, there should be no error." *Williams v. State*, 188 P.3d 208, 228 (Okla. Crim. App. 2008). In *Williams*, the prosecutor told the jury, "[Y]our verdict is to speak the truth. What's true is this defendant is guilty of murder . . . They're guilty. He's guilty. And he's guilty beyond a reasonable doubt." *Id.* The OCCA found no error: "Here, the prosecutor is not telling the jury to abandon its duty and convict based on the

prosecutor's own opinion. He is simply telling them that the evidence supported a guilty verdict." *Id.*[13] The OCCA would have reached the same result in this case.

A review of the closing argument reveals that the prosecutor was simply arguing to the jury that the evidence pointed to Petitioner as the murderer of Beth Magness (Tr. VIII 6, 10, 12, 17, 30, 32, 35). Because the prosecutor did not ask the jury to "abandon its duty and convict based upon the prosecutor's own opinion," and instead simply argued that "the evidence supported a guilty verdict," the OCCA would have found no error, plain or otherwise, and would have denied relief. *Williams*, 188 P.3d at 228. Appellate counsel was not ineffective for not raising this claim on direct appeal. *Smith*, 528 U.S. at 289; *Johnson*, 918 F.3d at 900; *Wood*, 907 F.3d at 1304.

### 3. The prosecutors' alleged misrepresentations, contradictions or lies about evidence

In the third category of alleged prosecutorial misconduct, Petitioner argues the prosecutors "misrepresented, contradicted, and/or plainly lied" about certain evidence in closing argument (Tr. VIII 9, 14, 17, 18, 21, 24, 31, 32, 101, 103, 104, 108). Doc. 1 at 13-15. The only objection to any of these remarks raised at trial was that the prosecutor's argument about pinging and cell phone towers was an attempt to shift the burden of proof (Tr. VIII 101), which is different from the challenge he now raises – that it misrepresented the evidence. As such, the OCCA would have reviewed the allegations in this section for plain error. *See Mahdavi*, 478 P.3d at 459-60; *Myers v. State*, 133 P.3d 312, 324 (Okla. Crim. App. 2006) ("When a specific objection is made at trial, [the

---

[13] On habeas, the United States District Court for the Northern District of Oklahoma agreed with the OCCA that the prosecutor in *Williams* was only arguing that the evidence supported a verdict of guilt and did not render the trial fundamentally unfair. *See Williams v. Workman*, No. 09-CV-0164-JHP-TLW, 2012 WL 5197674 (N.D. Okla. Oct. 19, 2012) (unpublished). In his appeal to the Tenth Circuit from the denial of habeas relief, the Tenth Circuit "decline[d] to consider Williams's challenge to alleged prosecutorial misconduct because he inadequately briefed it." *Williams*, 782 F.3d at 1200.

OCCA] will not entertain a different objection on appeal."), *overruled in part on other grounds by Davis v. State*, 419 P.3d 271, 281 & n.6 (Okla. Crim. App. 2018).

"Both parties have wide latitude in closing argument to argue the evidence and reasonable inferences from it." *Lamar*, 419 P.3d at 297. *See also Thornburg*, 422 F.3d at 1131 ("A prosecutor may comment on and draw reasonable inferences from evidence presented at trial."). Because the arguments cited by Petitioner were supported by the evidence presented at trial, the OCCA would have denied relief had appellate counsel raised this claim on direct appeal.

The prosecutor's argument about the inconsistencies between Dane Lyon's testimony and Petitioner's statements to law enforcement was supported by the evidence (Tr. VIII 31). Mr. Lyon arrived at the Magness home between 11:30 a.m. and 12:00 p.m. on March 15, 2015, to return the truck he borrowed a few days before (Tr. III 43-44). Petitioner arrived about five minutes later (Tr. III 46). Mr. Lyon testified that when they went inside the house, Petitioner asked him to wait in the living room (Tr. III 47). Petitioner "went towards the back, towards the dining area. After which he came back very shortly, informed me that he has found Beth on the floor." (Tr. III 47). Petitioner had B.M. with him, both when he went toward the back and when he came back and told Mr. Lyon about Beth (Tr. III 47-49). Petitioner, on the other hand, told Agent Stevens that when he walked back and saw Beth, he put B.M. down in the room (Tr. V 58). Petitioner told Agent Titsworth that he saw Beth on the floor when he reached for the light switch, put B.M. and a bag in the children's room, and checked on her again before coming back out (State's Ex. 101 at 13:19:25-13:22:38). There was nothing improper in the prosecutor's argument pointing out these inconsistencies. *Lamar*, 419 P.3d at 297.

The prosecutor's argument concerning the dog in the crate was also proper (Tr. VIII 32). State's Exhibit 14 showed a dog in a crate in the Magness living room (State' Ex. 14). Agent

Daggett testified the dog was secured in the crate while she was there, and the dog never disturbed the crime scene (Tr. III 126-27). The inference the prosecutor drew that the dog was placed in the crate so it would not interfere with his "carefully orchestrated scene" was entirely reasonable, and proper (Tr. VIII 32). *Lamar*, 419 P.3d at 297.

Also supported by the evidence was the prosecutor's argument that Agent Titsworth was unable to tell if Petitioner's phone was traveling or not based on a single incoming text message at 2:00 a.m. (Tr. VIII 100-01). When asked on cross-examination if he was able to confirm that Petitioner's phone did not leave the Crouch residence on the night in question, Agent Titsworth answered, "Well, I'm not so sure about that." (Tr. VII 75-76). Agent Titsworth explained that the text message at 2:00 a.m. "hit off of a tower south of Castle, . . . which is about 15 or 16 miles south of Crouch, somewhere in that area." (Tr. VII 77). On redirect examination, Agent Titsworth testified he could not tell by the data in this case whether the phone was in one location or not the entire time because it was hitting off of different towers (Tr. VII 125). However, Agent Titsworth could not determine it the phone was hitting off of different towers because of tower activity or because of movement (Tr. VII 125-26). The prosecutor's argument, as well as the remark that evidence was neither helpful nor hurtful to either side, fell well within the wide latitude afforded counsel in closing argument. *Lamar*, 419 P.3d at 297.

Petitioner complains that the prosecutor's argument that the Glock case "got hung up" in "a lot of brush and debris" was improper because Eric York and Billy York testified the Glock case was floating in a back current (Tr. V 99-100, 114-15; Tr. VIII 103). The Glock case was found only about twenty feet from where the other guns were found, which were found in brush and debris near the river bank (Tr. V 94-95, 99, 113-16). All of the items – the guns and the case – looked as though they had been thrown over the bridge (Tr. V 116). The evidence showed the guns

and the case had been thrown over the bridge and became caught up not far from where they were thrown, whether in brush or in a back current, as opposed to floating down the river. The prosecutor's argument was proper. *Lamar*, 419 P.3d at 297.

Also supported by the evidence was the prosecutor's argument that a metal object submerged in water does not begin to rust until exposed to air (Tr. VIII 103-04). Eric York testified that when he found the 16-gauge shotgun on the river bank, it was out of the water (Tr. V 94-96). He assumed it had not been out of the water long because there "wasn't really any rust buildup starting," so he began cleaning it before that could happen (Tr. V 97). The prosecutor's argument was proper. *Lamar*, 419 P.3d at 297.

Next Petitioner complains about the prosecutor's argument that Beth was "a disabled person who was having some problems and suffering in her home," and that "it was that disability that kept her trapped in this marriage with" Petitioner (Tr. VIII 108). Beth's father testified that when Beth went away to college, he became concerned that she might have Asperger's Syndrome, which is "an element of autism." (Tr. II 29-31). When Beth and Petitioner moved to Okemah, her parents became concerned she was depressed, and Petitioner told them she was taking antidepressants (Tr. II 35-36). Her father also testified that he overheard some "quiet arguments" between Petitioner and Beth, and he and his wife would not have been surprised if Beth had decided to leave Petitioner (Tr. II 42-43). April Crouch testified that after B.M. was born, Beth did not really leave the house much; Ms. Crouch suspected she was "going through some serious postpartum depression." (Tr. II 104-05). Ms. Crouch knew Beth to take medication for her depression, Zoloft and Abilify (Tr. II 105, 124). She also knew Beth was struggling with parenting her children due to her depression because "all she ever did was sleep." (Tr. II 106-07). Petitioner also complained about his sex life with Beth, "that he wasn't getting any." (Tr. II 108). Ms. Crouch

encouraged Petitioner to divorce Beth so that Beth could get support from her parents, "because she wasn't getting a lot of support." (Tr. II 108). But according to Petitioner, "Magnesses don't get divorced." (Tr. II 108). Though according to Ms. Crouch, Petitioner wanted to stay with his wife and not give up on her, when asked if Beth indicated she wanted to stay with Petitioner, Ms. Crouch testified Beth would say, "'I'm okay.'" (Tr. II 125). Dustin Crouch testified Petitioner confided in him that he and Beth were having problems, including the fact that Beth would sometimes "lock herself in her room and not come out," would not do "any of the housework, she wouldn't help out with the kids. She was basically emotionally shut down." (Tr. II 181-82). Petitioner also complained to Mr. Crouch about the lack of sex he and his wife had (Tr. II 182). When Mr. Crouch urged Petitioner to divorce Beth, he heard the same response as Ms. Crouch: "Magnesses don't get divorces." (Tr. II 182). The prosecutor's argument was a reasonable inference based on the evidence presented at trial and was entirely proper. *Lamar*, 419 P.3d at 297.

Petitioner next claims the prosecutor improperly bolstered Agent Titsworth's testimony. The only mention of Agent Titsworth on the transcript page cited by Petitioner is the following statement: "But your common sense will tell you just what Agent Titsworth told you, this crime makes no sense that a[n] intruder would have done this." (Tr. VIII 9). Agent Titsworth testified the crime scene did not appear how he would expect it to if a stranger had broken in and committed the crime, and the evidence – the appearance that the house was occupied, the fact that other items of value apart from the guns, both inside and outside the house, had not been taken, and that the guns which were taken were found in the river – was such that robbery did not appear to be a motive in this case (Tr. VII 24-29). The prosecutor's argument was a proper summary of Agent Titsworth's testimony, and was entirely proper. *Lamar*, 419 P.3d at 297.

72

Petitioner next challenges the prosecutor's argument that April and Dustin Crouch "didn't have any reason to come in here and tell you anything other than what they actually remembered." (Tr. VIII 14). He claims this argument was improper because of Ms. Reilly's alleged interference. Doc. 1 at 14. However, both Ms. Crouch and Mr. Crouch testified that while they initially told law enforcement that Petitioner could not have left their house that night without their knowledge, they now believed upon reflection that it was possible Petitioner could have done so (Tr. II 121, 159, 168-69, 189, 200-01). While Mr. Crouch testified Ms. Reilly told him Petitioner had taken a life insurance policy out on him and confirmed to him that there was a video showing Petitioner out on the night of the murder – information given to him by Petitioner – there is no evidence this affected the Crouches' testimony whatsoever (Tr. II 207-09). Instead, Mr. Crouch testified there was nothing that any prosecutor – current or former – could have said that would make him lie about the events, and that what he told the jury was the truth about what he recalled (Tr. II 215-16). The prosecutor's argument was a reasonable inference based on the evidence, and was therefore proper. *Lamar*, 419 P.3d at 297.

Petitioner next claims the prosecutor misrepresented the DNA evidence. Doc. 1 at 14. The prosecutor argued that "[n]o other DNA was found inside the house indicating that a stranger had been there," and "no one else's DNA was found on the [gun cabinet] lock except for Beth and Michael Magness." (Tr. VIII 17). The evidence presented at trial showed that the DNA profile from the swab of the lock was a mixture, and that neither Petitioner nor Beth could be excluded as potential contributors (Tr. VI 20). The DNA profile from the swab of the fingernail clippings from Beth's left hand was a mixture with a major and minor component (Tr. VI 22-23). Beth's DNA matched the major component, but the DNA profile of the minor component was "insufficient for comparisons due to the limited genetic information available." (Tr. VI 23). There was no DNA

profile obtained from the hairs that were examined (Tr. VI 24). In short, the only DNA profiles found belonged to either Beth or Petitioner, and there were no unknown DNA profiles found in this case (Tr. VI 25). The prosecutor's argument was a reasonable inference based on the evidence and was entirely proper. *Lamar*, 419 P.3d at 297.

Petitioner also claims the prosecutor lied about his weight – which he states was 290-310 pounds at the time of the murder – with the argument that Rhonda Hill's description fit Petitioner: Ms. Hill's limited description "comports with what we know about [Petitioner's] description. He's balding, he's in his mid-200s weightwise is what she's guessing and about - - I believe she said 5'10"." (Tr. VIII 18). First, the prosecutor made no comment on Petitioner's actual weight, just that Ms. Hill's testimony that the man she saw was "maybe 240, 250, something like that," was consistent with Petitioner (Tr. III 29; Tr. VIII 18). In any event, the prosecutor went on to state: "I think it's hard to tell exactly what somebody weighs or exactly how tall they are." (Tr. VIII 18). The prosecutor's argument was not improper. *Lamar*, 419 P.3d at 297.

Petitioner next complains that the prosecutor lied about Petitioner being denied a loan: "He tried to get that, and I can't remember the name of the finance company but it's basically like a quick - - quick cash type loan situation, like a payday loan except it's for business, and that didn't go through . . . ." (Tr. VIII 23-24). Agent Titsworth testified that Petitioner tried to obtain a loan from Flash Advance, "a payday loan company for businesses," for renovations to the restaurant, but to the agent's knowledge, the loan "did not go through." (Tr. VII 16-17). The argument was supported by the evidence and was entirely proper. *Lamar*, 419 P.3d at 297.

Petitioner's next challenge is to the prosecutor's argument that Dale Rich "went to the funeral home himself and paid for that funeral, but then he gets the money from the funeral again off his own mother." (Tr. VIII 24). He claims this was improper because while the loan from Mr.

74

Rich was for the funeral, the loan from his mother was for the restaurant. Doc. 1 at 15. Petitioner is correct that his mother loaned him money in 2014 for the restaurant, which was paid back within a few months (Tr. VII 149-50). However, his mother also testified she gave him $20,000 for Beth's funeral expenses (Tr. VII 154). The argument was proper because it was supported by the evidence. *Lamar*, 419 P.3d at 297.

Finally, Petitioner complains that the prosecutor attributed various quotes to him in closing argument even though he did not testify (Tr. VIII 21, 24-25). Doc. 1 at 15. However, the prosecutor did not argue that Petitioner made any statements on the witness stand; rather, the prosecutor made clear that the referenced statements came from Petitioner throughout the case, in his interviews with Agent Titsworth, and remarks to April and Dustin Crouch (Tr. II 108, 182; Tr. VI 184). The arguments did not misstate the evidence, and they were proper. *Lamar*, 419 P.3d at 297.

Petitioner has not shown any error, much less plain error, in any of the prosecutors' arguments challenged in his third category. The OCCA would have denied relief had these arguments been challenged on direct appeal. Appellate counsel was not ineffective for not raising these claims on direct appeal. *Smith*, 528 U.S. at 289; *Johnson*, 918 F.3d at 900; *Wood*, 907 F.3d at 1304.

### 4. Conclusion

As demonstrated above, none of Petitioner's allegations of prosecutorial misconduct have any merit, and the OCCA would have denied a prosecutorial misconduct claim had it been raised on direct appeal. Appellate counsel was not ineffective. *Smith*, 528 U.S. at 289; *Johnson*, 918 F.3d at 900; *Wood*, 907 F.3d at 1304.

### D. Ground Four

Petitioner next claims appellate counsel was ineffective for failing to raise a claim on direct appeal concerning an "Abuse of Judicial Discretion" as set out in Petitioner's Ground Four. This claim is without merit. Any claim raised by appellate counsel in this regard would have been properly denied by the OCCA on direct appeal, and appellate counsel was not ineffective. *Smith*, 528 U.S. at 289; *Johnson*, 918 F.3d at 900; *Wood*, 907 F.3d at 1304.

"[A] fair trial in a fair tribunal is a basic requirement of due process." *Withrow v. Larkin*, 421 U.S 35, 46 (1975) (internal quotation marks omitted). It is also a requirement under the Oklahoma Constitution. *See also Fitzgerald v. State*, 972 P.2d 1157, 1163 (Okla. Crim. App. 1998) ("The Oklahoma Constitution guarantees a defendant a right to a fair, impartial trial not tainted by the personal bias or prejudice of the trial court."). "'To demonstrate a violation of due process because of judicial bias, a claimant must show either actual bias or an appearance of bias.'" *Bixler v. Foster*, 596 F.3d 751, 762 (10th Cir. 2010) (quoting *United States v. Nickl*, 427 F.3d 1286, 1298 (10th Cir. 2005)). "'The standard is purely objective, and [t]he inquiry is limited to outward manifestations and reasonable inferences drawn therefrom.'" *United States v. Gambino-Zavala*, 539 F.3d 1221, 1228 (10th Cir. 2008) (quoting *Nickl*. 427 F.3d at 1298). *See also Welch*, 2 P.3d at 372 ("A defendant asserting a claim that the trial judge was biased and abused her discretion must show the trial court harbored prejudice against him which materially affected his rights at trial and that he was prejudiced by the trial court's actions."). This inquiry begins with the presumption that "public officials have properly discharged their official duties," and it is the petitioner's burden to overcome this presumption. *Bracy v. Gramley*, 520 U.S. 899, 909 (1997) (citation and internal quotation marks omitted). *See also Carter v. State*, 879 P.2d 1234, 1242 (Okla. Crim. App. 1994) ("There is a general presumption of impartiality on the part of judges as to matters before them. In

making a claim of bias, a defendant must demonstrate some prejudice which denied him due process or fundamental fairness." (citations omitted)). Petitioner's claim that the trial court was biased against him is without merit, and any claim to that effect raised on direct appeal would have been properly denied.

Petitioner first complains about the trial court's rulings throughout trial, in particular the court's rulings on other crimes and bad acts evidence. Doc. 1 at 17-18. However, the Supreme Court instructs that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, 510 U.S. 540, 555 (1994). *See also United States v. Mendoza*, 468 F.3d 1256, 1262 (10th Cir. 2006) ("Unfavorable judicial rulings do not in themselves call into question the impartiality of a judge."); *Nickl*, 427 F.3d at 1298 ("Ordinarily, when a judge's words or actions are motivated by events originating within the context of judicial proceedings, they are insulated from charges of bias."). Judicial rulings "[a]lmost invariably . . . are proper grounds for appeal," but "not for recusal." *Liteky*, 510 U.S. at 555. Petitioner challenged the trial court's rulings to admit evidence of other crimes and bad acts on direct appeal (Exhibit 1 at 41-49; Exhibit 3 at 10-16), and Respondent has shown in its Proposition II that those rulings were proper and did not deny Petitioner a fundamentally fair trial. However, as for the remaining judicial rulings cited in his Ground Four,[14] Petitioner has never challenged them before any court, state or federal. While any trial court ruling adverse to Petitioner would have been a proper ground for appeal, it does not show bias. *Liteky*, 510 U.S. at 555. Any claim raised by appellate counsel that the trial court's judicial rulings demonstrated bias would have been properly denied by the

---

[14] For all but a few instances, Petitioner fails to cite to the record to support his claims of judicial bias in his petition. Doc. 1 at 17-21. However, in his original and amended post-conviction applications, Petitioner provided record citations (Exhibit 4 at 19-23; Exhibit 8 at 11-14).

OCCA on direct appeal. *Smith*, 528 U.S. at 289; *Johnson*, 918 F.3d at 900; *Wood*, 907 F.3d at 1304.

Petitioner then turns to the trial court's "facial expressions and general demeanor," which he claims "clearly indicated a bias and frustration against the defense, to which the Trial Court replied with hostility and refused to change." Doc. 1 at 19. Only a single instance in this regard is reflected in the record. During a bench conference concerning an objection raised by the defense, defense counsel asked the court to keep its facial expression neutral, stating, "I understand the Court desires to move this case along efficiently, but I think the Court's facial expressions when I make objections in this matter are being transmitted and the jury is seeing them just as I am." (Tr. V 35). After ruling on the objection, the trial court continued: "With regard to the Court's facial expressions, the Court is unable to sit up here and be totally expressionless, [defense counsel]. My expressions in no way reflect any irritation with you or [co-counsel] as far as your objections are concerned." (Tr. V 35-36). The record does not reflect that any facial expression by the trial court exhibited bias against Petitioner. *See Stacy v. State*, 155 P.2d 736, 739 (Okla. Crim. App. 1945) (rejecting the defendant's claim that "the tone of voice and facial expression of the judge showed bias and prejudice against the accused"). Even if the court had been making an expression, it would not have established bias. *See also Liteky*, 510 U.S. at 555-56 ("*Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display.").

Petitioner's remaining claims concerning the trial court's demeanor are unsupported by the record. Petitioner claims the court used a "belligerent tone" in sustaining a defense objection and instructing the jury to disregard the witness's answer (Tr. VI 203-06). Doc. 1 at 19, allegation No.

78

8. He further claims the court overruled other objections raised by the defense during the State's closing argument with "clear belligerence" (Tr. VIII 100, 101, 102, 106). Doc. 1 at 20, allegation No. 13. There is simply no indication on any of these transcript pages of the belligerence now alleged by Petitioner. But even if Petitioner could show the court exhibited "impatience, dissatisfaction, annoyance, [or] even anger" in its rulings, the same does establish bias or partiality. *Liteky*, 510 U.S. at 555-56. *See also Stouffer v. State*, 147 P.3d 245, 256 n.3 (Okla. Crim. App. 2006) (finding the trial court's statements to the defendant –"If I hear another complaint out of you, I will send you back to McAllister [sic]." – did "not show judicial bias, judicial frustration possibly, but no bias"). Instead, "[a] judge's ordinary efforts at courtroom administration – even a stern and short-tempered judge's ordinary efforts at courtroom administration – remain immune." *Liteky*, 510 U.S. at 556.

Petitioner makes two other claims of bias which he concedes are unsupported by the record. Doc. 1 at 20. In the first, he claims that the trial court was seen by members of the jury shaking hands with the victim's father and "commiserating" with him. Doc. 1 at 20, allegation No. 14. He claims this act was "witnessed by many". Doc. 1 at 20, allegation No. 14. He further claims the trial court was taking pain killers for back pain throughout his trial, which resulted in "a clear pattern of confusion and inattention, which may have been indicative of [the] Trial Court's unfitness to duty." Doc. 1 at 20. He claims the court's use of pain killers was discussed and known "among jail and court staff at the time of trial". Doc. 1 at 20. He makes the conclusory statement that medical records would support this claim, and pharmacy records would show the court's "rate of consumption" of the medication. Doc. 1 at 20. However, "[r]umor, speculation, beliefs, conclusions, innuendo, suspicion, opinion, and similar non-factual matters" are insufficient to establish judicial bias. *United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993). *See also*

*Leatherwood v. Allbaugh*, 861 F.3d 1034, 1050 (10th Cir. 2017) (quoting *Cooley*, 1 F.3d at 993); *Carter*, 879 P.2d at 1242 (rejecting the defendant's claim that the court's "openly hostile manner" could not be conveyed by "'[t]he cold print of the record," reasoning that "[t]he 'cold print of the record' is the evidence upon which this Court must base its decisions and not accusations lacking support in that record" (citation to the defendant's brief omitted)).

Petitioner attempts to support his claim by pointing to instances in the trial which he claims showed the trial court's "confused or distracted tone and/or demeanor". Doc. 1 at 20. Contrary to Petitioner's claim, simply none of the instances cited by Petitioner in this regard reflect any confusion or distraction by the trial court (Tr. I 207; Tr. II 195; Tr. IV 27, 49-52, 101, 121, 132; Tr. VI 203-06). In the single cited instance in which the trial court used the word "confused," the statement stemmed from the fact that the prosecutor gave the wrong name when requesting that a prospective juror be excused for cause, and the court reporter corrected the court when it purported to excuse the wrong prospective juror as requested by the prosecutor (Tr. I 206-07). Any claim raised by appellate counsel that the trial court demonstrated bias with its facial expressions or demeanor, or otherwise was unfit to preside over Petitioner's trial, would have been properly denied by the OCCA on direct appeal. *Smith*, 528 U.S. at 289; *Johnson*, 918 F.3d at 900; *Wood*, 907 F.3d at 1304.

In sum:

> "[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. An example of the latter (and perhaps of the former as well) is the statement that was alleged to have been made by the District Judge in *Berger v. United States*, 255 U.S. 22, 41 S. Ct. 230, 65 L. Ed. 481 (1921), a World War I espionage case against German-American

> defendants: "One must have a very judicial mind, indeed, not [to be] prejudiced against German Americans" because their "hearts are reeking with disloyalty." *Id.*, at 28 (internal quotation marks omitted). *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration – even a stern and short-tempered judge's ordinary efforts at courtroom administration – remain immune.

*Liteky*, 510 U.S. at 555-56. Petitioner can point to nothing in the record evincing the "high degree of favoritism or antagonism as to make fair judgment impossible" required to establish a judicial bias claim. *Id.* at 555. Instead, the record reveals only "ordinary efforts at courtroom administration" overseen by a fair and impartial trial court. *Id.* at 556. In addition, the jury was instructed as follows:

> The Court has made rulings in the conduct of the trial and the admission of evidence. In doing so I have not expressed or intimated in any way the weight or credit to be given any evidence or testimony admitted during the trial. Nor have I indicated in any way the conclusions to be reached by you in this case.

(O.R. V 774). The OCCA presumes that jurors "follow their instructions." *Tryon*, 423 P.3d at 653. *See also Taylor*, 554 F.3d at 893 (citing *Zafiro*, 506 U.S. at 540-41). Petitioner cannot overcome the presumption that the jurors followed this instruction. The OCCA would have rightly rejected a claim on direct appeal that the trial court was biased against Petitioner, and appellate counsel was not ineffective for failing to raise this claim. *Smith*, 528 U.S. at 289; *Johnson*, 918 F.3d at 900; *Wood*, 907 F.3d at 1304.

### E.  Ground Five

Petitioner next claims appellate counsel was ineffective for failing to raise on direct appeal the prosecutorial authority claim he sets out in Ground Five. Though he did not raise this claim on direct appeal, and instead raised it for the first time on post-conviction, the OCCA nevertheless

denied it on the merits (Exhibit 11 at 3-4). Especially where the OCCA has denied the claim on the merits, Petitioner cannot show appellate counsel was ineffective for failing to raise it on direct appeal. *Cargle*, 317 F.3d at 1202 ("[I]f the issue is meritless, its omission will not constitute deficient performance.").

In denying his prosecutorial authority claim, the OCCA noted that "Petitioner concedes that he is not of Indian descent and nor is the victim," and observed that "fundamental to Petitioner's claim that state jurisdiction is preempted by federal statute is a determination of whether both Petitioner and the victim are Indian." (Exhibit 11 at 4 (citing *Castro-Huerta*, 142 S. Ct. at 2499)). Because Petitioner failed to establish that he is Indian, the OCCA denied relief (Exhibit 11 at 4). As the OCCA correctly found, because Petitioner makes no claim that he is an Indian, the State properly exercised its authority to prosecute him for his crime, regardless of where he committed it. *Castro-Huerta*, 142 S. Ct. at 2503-04. *See also McGirt*, 140 S. Ct. at 2460 ("nothing we might say today could unsettle Oklahoma's authority to try non-Indians for crimes against non-Indians" in Indian country); *Antelope*, 430 U.S. at 643 n.2 (1977) ("a non-Indian charged with committing crimes against other non-Indians in Indian country is subject to prosecution under state law").

Especially where the OCCA has already reviewed the claim on the merits and denied relief, Petitioner cannot show a reasonable probability of a different result had appellate counsel raised the claim on direct appeal, as the OCCA would have denied it on direct appeal as well. Appellate counsel was not ineffective. *Smith*, 528 U.S. at 289; *Johnson*, 918 F.3d at 900; *Wood*, 907 F.3d at 1304.

### F. Ground Ten

Finally, Petitioner claims appellate counsel was ineffective for failing to raise on direct appeal the cumulative error claim he sets out in Ground Ten. Though he did not raise this claim on direct appeal, and instead raised it for the first time on post-conviction, the OCCA nevertheless denied it on the merits (Exhibit 11 at 6). Especially where the OCCA has denied the claim on the merits, Petitioner cannot show appellate counsel was ineffective for failing to raise this claim on direct appeal. *Cargle*, 317 F.3d at 1202 ("[I]f the issue is meritless, its omission will not constitute deficient performance.").

In denying his cumulative error claim, the OCCA found that the claim was without merit because none of his other claims had merit (Exhibit 11 at 6 (citing *Zamarripa v. State*, 2022 OK CR 10, ¶ 32, 514 P.3d 470, 478)). This finding was correct. *See Cuesta-Rodriguez v. Carpenter*, 916 F.3d 885, 915 (10th Cir. 2019) ("The cumulative-error analysis applies where there are two or more actual errors.  It does not apply, however, to the cumulative effect of non-errors." (internal quotation marks and citation omitted)).

Especially where the OCCA has already reviewed the claim on the merits and denied relief, Petitioner cannot show a reasonable probability of a different result had appellate counsel raised the claim on direct appeal, as the OCCA would have denied it on direct appeal as well. Appellate counsel was not ineffective.  *Smith*, 528 U.S. at 289; *Johnson*, 918 F.3d at 900; *Wood*, 907 F.3d at 1304.

### G. Conclusion

The OCCA's ruling that Petitioner failed to demonstrate a constitutional violation of his right to the effective assistance of appellate counsel was not contrary to, or an unreasonable

application of, federal law, nor was it an unreasonable determination of the facts in light of the

state court record.  Petitioner is not entitled to habeas relief on his Ground Eight.

<u>**PROPOSITION V**</u>

**THE OCCA'S DETERMINATION THAT THERE WAS NO ACCUMULATION OF ERROR WAS NOT CONTRARY TO, OR AN UNREASONABLE APPLICATION OF, FEDERAL LAW, NOR WAS IT AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE STATE COURT RECORD.**

**(In response to Petitioner's Ground Ten.)**

In his Ground Ten, Petitioner claims that his "rights to Due Process, Equal Protection, and

Fair Trial were denied through the cumulative effect of multiple errors, which when viewed

collectively created a clear prejudice." Doc. 1 at 40-41. Though Petitioner raised this claim for the

first time in post-conviction proceedings, the OCCA denied it on the merits (Exhibit 4 at 7, 32-33;

Exhibit 8 at 23; Exhibit 10 at 6-7; Exhibit 11 at 6).  The OCCA's decision was neither contrary to,

nor an unreasonable application of, federal law, nor an unreasonable determination of the facts in

light of the state court record.

The OCCA rejected Petitioner's cumulative error claim as follows:

> We review the District Court's determination [denying post-conviction relief] for an abuse of discretion. *State ex rel. Smith v. Neuwirth*, 2014 OK CR 16, ¶ 12, 337 P.3d 763, 766. An abuse of discretion is any unreasonable or arbitrary action taken without proper consideration of the facts and law pertaining to the matter at issue or a clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented. *Neloms v. State*, 2012 OK CR 7, ¶ 35, 274 P.3d 161, 170. . . .

> In his final claim of error, [Petitioner] alleges the cumulative effect of the foregoing errors deprived him of a fair proceeding before the District Court. A cumulative error argument has no merit where, as here, this Court fails to sustain any of the other errors raised by [Petitioner]. *See Zamarripa v. State*, 2022 OK CR 10, ¶ 32, 514 P.3d 470, 478.

> As Petitioner has failed to establish that he is entitled to post-conviction relief, the order of the District Court of Okfuskee County in Case No. CF-2015-59, denying Petitioner's application for post-conviction relief is **AFFIRMED**.

(Exhibit 11 at 1-2, 6-7 (emphasis in original)). The factual findings made by the OCCA in this matter are presumed correct and Petitioner has not rebutted those findings by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Hooks*, 689 F.3d at 1163.

There is no clearly established Supreme Court precedent authorizing relief on habeas review of a cumulative error claim. *See Bush v. Carpenter*, 926 F.3d 644, 686 n.16 (10th Cir. 2019) ("[T]he Supreme Court has never recognized the concept of cumulative error. And, because there is no 'clearly established Federal law' on this issue, we question whether a state appellate court's rejection of a cumulative error argument can justify federal habeas relief under the standards outlined in § 2254(d)."). Therefore, the OCCA's decision rejecting Petitioner's cumulative error claim cannot be contrary to, or an unreasonable application of, such non-existent authority, and Petitioner's claim must fail. 28 U.S.C. § 2254(d); *House*, 527 F.3d at 1017 (the absence of clearly established federal law is dispositive of a claim); *Smith*, 510 F.3d at 1186 (recognizing that federal courts cannot look to circuit court decisions for clearly established federal law). However, recognizing that the Tenth Circuit has rejected this argument and reviewed habeas claims of cumulative error under due process principles, Respondent will address the merits of Petitioner's claim. *See Cuesta-Rodriguez*, 916 F.3d at 915 & n.33.

The Tenth Circuit holds:

> In the federal habeas context, a cumulative-error analysis aggregates all constitutional errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless. The cumulative-error analysis applies where there are two or more actual

> errors.  It does not apply, however, to the cumulative effect of non-
> errors.

*Cuesta-Rodriguez*, 916 F.3d at 915 (internal citations, quotations, and footnote omitted).  *See also*

*Parker v. Scott*, 394 F.3d 1302, 1327 (10th Cir. 2005) (if no single constitutional error is found,

any cumulative error argument must be rejected).

As previously demonstrated, the OCCA found no error, constitutional or otherwise,

occurred during Petitioner's trial (Exhibit 11 at 6). Therefore, the OCCA's decision that

cumulative error relief was unwarranted is not contrary to, or an unreasonable application of,

federal law, nor is it an unreasonable determination of the facts in light of the state court record.

This Court should deny Petitioner relief on his Ground Ten.

<u>**PROPOSITION VI**</u>

**PETITIONER'S GROUND NINE IS NOT COGNIZABLE IN
A HABEAS PROCEEDING.**

**(In response to Petitioner's Ground Nine.)**

In his Ground Nine, Petitioner claims his constitutional rights "were denied through the

State's failure to follow Oklahoma statute and established procedure" in his post-conviction

proceedings in both the state district court and the OCCA. Doc. 1 at 37-38.  Because Petitioner's

claim concerns the manner in which the state courts denied him post-conviction relief and does

not concern federal law, this Court should deny relief.

"[I]t is not the province of a federal habeas court to reexamine state court determinations

on state law questions.  In conducting habeas review, a federal court is limited to deciding whether

a conviction violated the Constitution, laws, or treaties of the United States." *Estelle*, 502 U.S. at

67-68. "The right to challenge a sentence in a post-conviction application is not constitutionally

based." *Beavers v. Saffle*, 216 F.3d 918, 922 (10th Cir. 2000).

Petitioner's ninth ground raises only a procedural question concerning state post-conviction proceedings; it raises no challenge to the judgment for which he is incarcerated. As such, it is not cognizable in this proceeding. *See Sellers v. Ward*, 135 F.3d 1333, 1339 (10th Cir. 1998) (observing that "no constitutional provision requires a state to grant post-conviction review" and finding that because the petitioner's claim "focus[ed] only on the State's post-conviction remedy and not the judgment which provides the basis for his incarceration, it states no cognizable federal habeas claim"); *See also Steele v. Young*, 11 F.3d 1518, 1524 (10th Cir. 1993) (finding that even if not procedurally barred, the petitioner's claim "challenging the Oklahoma post-conviction procedures on their face and as applied to him would fail to state a federal constitutional claim cognizable in a federal habeas proceeding"); *Benshoof v. Tavanello*, No. 10-6207, 398 Fed. Appx. 365, 368 (10th Cir. Oct. 13, 2010) (unpublished) (finding the petitioner's "remaining four claims – those challenging certain aspects of his postconviction action in state court – are not cognizable under § 2254" (citing *Steele*, 11 F.3d at 1524)). Petitioner's Ground Nine should be denied for the reason that it does not state a claim cognizable on federal habeas review.

## PROPOSITION VII

### PETITIONER'S CLAIM OF JUDICIAL BIAS AS RAISED IN HIS GROUND FOUR IS PROCEDURALLY BARRED.

**(In partial response to Petitioner's Ground Four.)**

In addition to challenging the trial court's rulings admitting evidence of other crimes and bad acts that he challenged on direct appeal, Petitioner claims in his Ground Four that the trial court was biased against him. Doc. 1 at 17-23. Petitioner raised this claim for the first time in his post-conviction proceedings and the OCCA found it procedurally barred from review (Exhibit 4 at 3-4, 19-23; Exhibit 8 at 1-5, 11-14; Exhibit 10 at 3, 4-5; Exhibit 11 at 2-3). This Court should

enforce the procedural bar applied by the OCCA and refuse to review the judicial bias claim raised in Petitioner's Ground Four.

In affirming the state district court's denial of post-conviction relief, the OCCA ruled as follows:

> In Proposition(s), One, Two, Three,[15] Five, and Six, consideration of Petitioner's claims for relief are procedurally barred. . . .
>
> In Propositions Two, Three, Five and Six we do not reach the merits of Petitioner's claims because the issues could have been raised in a direct appeal and are therefore waived. *Logan v. State*, 2013 OK CR 2, ¶ 3, 293 P.3d 969, 973; *Fowler v. State*, 1995 OK CR 29, ¶ 2, 896 P.2d 566, 569; *Walker v. State*, 1992 OK CR 10, ¶ 6, 826 P.2d 1002, 1004. All issues that could have been raised in a previous direct appeal proceeding but were not are waived and may not be the basis of a post-conviction application. *Fowler*, 1995 OK CR 29, ¶ 2, 896 P.2d at 569. The Post-Conviction Procedure Act is not a substitute for a direct appeal, nor is it intended as a means of providing a petitioner with a second direct appeal. *Id.* Petitioner has not established sufficient reason for not asserting or inadequately raising his current grounds for relief in direct appeal proceedings. *Id.* "Simply envisioning a new method of presenting an argument previously raised does not avoid the procedural bar." *McCarty v. State*, 1999 OK CR 24, ¶ 9, 989 P.2d 990, 995.

(Exhibit 11 at 2-3). The factual findings made by the OCCA in this matter are presumed correct and Petitioner has not rebutted those findings by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Hooks*, 689 F.3d at 1163.

"[A] federal court may not review federal claims that were procedurally defaulted in state court – that is, claims that the state court denied based on an adequate and independent state procedural rule." *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017). *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (holding the default of a state prisoner's federal claims in state court

---

[15] Petitioner's claim of judicial bias was raised as his Proposition Three in post-conviction proceedings (Exhibit 4 at 3, 19; Exhibit 8 at 11; Exhibit 10 at 4).

"pursuant to an independent and adequate state procedural rule" bars federal habeas review of the claims). "'A state court procedural default is 'independent' if it relies on state law, rather than federal law.'" *Fairchild v. Workman*, 579 F.3d 1134, 1141 (10th Cir. 2009) (citations omitted). "A state procedural default is 'adequate' if it is firmly established and regularly followed." *Smith v. Workman*, 550 F.3d 1258, 1274 (10th Cir. 2008) (citation omitted). It is well established that Section 1086 of Oklahoma's Post-Conviction Relief Act provides an independent and adequate state procedural bar. *Smith*, 550 F.3d at 1274. *See also Sherrill v. Hargett*, 184 F.3d 1172, 1175 (10th Cir. 1999); *Odum v. Boone*, 62 F.3d 327, 331 (10th Cir. 1995).

This Court should decline to review Petitioner's claim of judicial bias because he cannot overcome the procedural bar.

> A petitioner may overcome the procedural bar only if he can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750, 111 S. Ct. 2546.

*Grant*, 886 F.3d at 892.

Petitioner cannot satisfy the cause and prejudice exception to the procedural bar. Claiming he raised this issue on direct appeal, *see* Doc. 1 at 21, Petitioner does not acknowledge that the OCCA barred review of his claim. Therefore, he fails to allege any cause for his failure to present his judicial bias claim first to the state courts. *See Grant*, 886 F.3d at 902 (where the petitioner made "no effort to overcome [the anticipatory] bar by arguing cause and prejudice, or a fundamental miscarriage of justice," the Court was "precluded from considering [the petitioner's] procedural due process competency claim"). As Petitioner cannot demonstrate cause for his default, Respondent need not address the issue of prejudice. *See Steele*, 11 F.3d at 1522 n.7.

Petitioner also cannot show a fundamental miscarriage of justice would result if this Court does not hear his judicial bias claim. The "fundamental miscarriage of justice" exception "is a markedly narrow one, implicated only in extraordinary cases where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Magar v. Parker*, 490 F.3d 816, 820 (10th Cir. 2007) (quotation marks omitted and alteration adopted). Petitioner makes no attempt to demonstrate that this Court's refusal to review his claim of judicial bias will result in a fundamental miscarriage of justice, and as a result, this Court should refuse to review the same. Doc. 1 at 17-23. *See Grant*, 886 F.3d at 902 (where the petitioner made "no effort to overcome [the anticipatory] bar by arguing cause and prejudice, or a fundamental miscarriage of justice," the Court was "precluded from considering [the petitioner's] procedural due process competency claim"). Elsewhere in his petition, Petitioner claims the evidence was insufficient to prove he killed his wife (Ground One). Doc. 1 at 3-8. He also asserts actual innocence in his cumulative error claim (Ground Ten), claiming he had "nothing to do" with his wife's murder and is the victim of "a close-knit, small town court system . . . ." Doc. 1 at 40. Petitioner's claim is at most one of legal innocence, not factual innocence, and is insufficient to establish a fundamental miscarriage of justice. *See Lowery v. Bryant*, No. 18-6158, 760 Fed. Appx. 617, 619 (10th Cir. Jan. 15, 2019) (unpublished) (stating that an "actual innocence claim based on insufficiency of the evidence . . . would show only legal innocence," and not factual innocence). Nevertheless, Petitioner has presented this Court with nothing that was not presented at trial to support his claim that he is actually innocent of his wife's murder. *See Schlup v. Delo*, 513 U.S. 298, 324, 329 (1995) (holding that an actual innocence claim must be supported by "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial" and demonstrate that "in light of this new evidence, no juror, acting

90

reasonably, would have voted to find him guilty beyond a reasonable doubt"). Petitioner cannot show a fundamental miscarriage of justice.

Petitioner has failed to overcome the application of a procedural bar to his claim of judicial bias. Accordingly, Respondent respectfully requests that this Court enforce the procedural bar and deny Petitioner's request for habeas corpus relief as asserted in his Ground Four.

## **PROPOSITION VIII**

### **PETITIONER'S GROUNDS SIX AND SEVEN ARE PROCEDURALLY BARRED.**

#### **(In response to Petitioner's Grounds Six and Seven.)**

In Ground Six, Petitioner claims his sentence of life without parole constitutes cruel and unusual punishment, and violates his equal protection rights. Doc. 1 at 26-30. In his Ground Seven, Petitioner claims trial counsel was ineffective. Doc. 1 at 30-33. Petitioner raised these claims for the first time in his post-conviction proceedings and the OCCA found them procedurally barred from review (Exhibit 4 at 5-6, 26-30; Exhibit 8 at 17-19, 19-21; Exhibit 10 at 5-6; Exhibit 11 at 2-3). This Court should enforce the procedural bar applied by the OCCA and refuse to review Petitioner's ineffective assistance of counsel claim.

In affirming the state district court's denial of post-conviction relief, the OCCA ruled as follows:

> In Proposition(s), One, Two, Three, Five, and Six,[16] consideration of Petitioner's claims for relief are procedurally barred. . . .

> In Propositions Two, Three, Five and Six we do not reach the merits of Petitioner's claims because the issues could have been raised in a direct appeal and are therefore waived. *Logan v. State*,

---

[16] In post-conviction proceedings, Petitioner's claim regarding his sentence was raised as Proposition Five and his claim of ineffective assistance of trial counsel was raised as his Proposition Six (Exhibit 4 at 5, 26, 28; Exhibit 8 at 17, 19; Exhibit 10 at 5).

> 2013 OK CR 2, ¶ 3, 293 P.3d 969, 973; *Fowler v. State*, 1995 OK
> CR 29, ¶ 2, 896 P.2d 566, 569; *Walker v. State*, 1992 OK CR 10,
> ¶ 6, 826 P.2d 1002, 1004. All issues that could have been raised in
> a previous direct appeal proceeding but were not are waived and
> may not be the basis of a post-conviction application. *Fowler*, 1995
> OK CR 29, ¶ 2, 896 P.2d at 569. The Post-Conviction Procedure Act
> is not a substitute for a direct appeal, nor is it intended as a means
> of providing a petitioner with a second direct appeal. *Id.* Petitioner
> has not established sufficient reason for not asserting or
> inadequately raising his current grounds for relief in direct appeal
> proceedings. *Id.* "Simply envisioning a new method of presenting
> an argument previously raised does not avoid the procedural bar."
> *McCarty v. State*, 1999 OK CR 24, ¶ 9, 989 P.2d 990, 995.

(Exhibit 11 at 2-3). The factual findings made by the OCCA in this matter are presumed correct

and Petitioner has not rebutted those findings by clear and convincing evidence. *See* 28 U.S.C.

§ 2254(e)(1); *Hooks*, 689 F.3d at 1163.

"[A] federal court may not review federal claims that were procedurally defaulted in state

court – that is, claims that the state court denied based on an adequate and independent state

procedural rule." *Davila*, 137 S. Ct. at 2064. *See Coleman*, 501 U.S. at 750 (holding the default

of a state prisoner's federal claims in state court "pursuant to an independent and adequate state

procedural rule" bars federal habeas review of the claims). "'A state court procedural default is

'independent' if it relies on state law, rather than federal law.'" *Fairchild*, 579 F.3d at 1141

(citations omitted). "A state procedural default is 'adequate' if it is firmly established and regularly

followed." *Smith*, 550 F.3d at 1274 (citation omitted). It is well established that Section 1086 of

Oklahoma's Post-Conviction Relief Act provides an independent and adequate state procedural

bar to claims not raised on direct appeal. *Smith*, 550 F.3d at 1274. *See also Sherrill*, 184 F.3d at

1175; *Odum*, 62 F.3d at 331. Further, this Court applies the doctrine of procedural default to claims

of ineffective assistance of trial counsel where the petitioner had different trial and appellate

counsel, and the claim can either be resolved on the trial record alone, or at the time of direct

appeal a procedure existed to allow remand of specific claims to the district court for supplementation of the record. *See English v. Cody*, 146 F.3d 1257, 1263-64 (10th Cir. 1998).

Here, Petitioner was represented at trial by Curt Allen of the Oklahoma Indigent Defense System in Okmulgee, and Jarrod Heath Stevenson of the Stevenson Law Firm in Oklahoma City (Tr. I 2). Petitioner was represented on appeal by Maria Kolar of the Oklahoma Indigent Defense System in Norman (Exhibit 1). Petitioner was therefore represented by different attorneys at trial an on appeal. That Petitioner had two attorneys from the Oklahoma Indigent Defense System does not diminish this fact, especially where they were in two different offices. *See Cannon v. Mullin*, 383 F.3d 1152, 1173 (10th Cir. 2004) (stating that "whether trial and appellate attorneys from the same 'office' should be deemed 'separate' counsel will turn on the specific circumstances[;]" and that "[a] statewide public defender's office with independent local offices, and perhaps even a distinct appellate office, would not raise the same concerns as when trial and appellate counsel work in adjacent rooms"), *abrogated on other grounds by Simpson v. Carter*, 912 F.3d 542, 576 n.18 (10th Cir. 2018). Petitioner's trial and appellate counsel were different. *English*, 146 F.3d at 1264.

Likewise, most, if not all, of Petitioner's ineffective assistance of trial counsel claims can be resolved on the record. Doc. 1 at 31-33. For those that cannot, Petitioner had an adequate opportunity to expand the record, and the procedural bar is adequate. *English*, 146 F.3d at 1264. Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, Okla. Stat. Ann. tit. 22, Ch. 18, App. was firmly in place at the time of Petitioner's direct appeal and provides defendants with an adequate opportunity to raise extra-record claims. *See Fairchild v. Trammell*, 784 F.3d 702, 719-

23 (10th Cir. 2015) (holding that *Trevino*[1] does not apply in Oklahoma because Rule 3.11 provides adequate time for extra-record investigation and collecting cases which demonstrate "that [appellate] counsel could raise claims of ineffective assistance of trial counsel on direct appeal, including claims related to the failure to investigate and present mitigation evidence"). *See also e.g., Davis v. State*, 268 P.3d 86, 132 (Okla. Crim. App. 2011) (noting remand for 3.11 evidentiary hearing); *Fisher v. State*, 206 P.3d 607, 610 (Okla. Crim. App. 2009) (same); *Jiminez v. State*, 144 P.3d 903, 904 (Okla. Crim. App. 2006) (same); *Jones v. State*, 128 P.3d 521, 545 (Okla. Crim. App. 2006) (same). Petitioner had an adequate opportunity to present extra-record evidence. Accordingly, the OCCA's bar of his ineffective assistance of trial counsel claim is adequate.

This Court should decline to review Petitioner's Grounds Six and Seven because he cannot overcome the procedural bar.

> A petitioner may overcome the procedural bar only if he can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750, 111 S. Ct. 2546.

*Grant*, 886 F.3d at 892.

Petitioner cannot satisfy the cause and prejudice exception to the procedural bar of his Grounds Six and Seven. Petitioner asserts ineffective assistance of appellate counsel as cause for his failure to raise these two claims on direct appeal. Doc. 1 at 29, 33-34. The exhaustion doctrine requires that an ineffective assistance claim "be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." *Murray v. Carrier*, 529

---

[1] *Trevino v. Thaler*, 569 U.S. 413 (2013) (holding that habeas petitioners from Texas may allege ineffective assistance of post-conviction counsel as cause for defaulting an ineffective assistance of trial counsel claim because state court procedures do not provide an adequate opportunity for such claims to be raised on direct appeal).

U.S. 446, 452 (2000). Although Petitioner raised an ineffective assistance of appellate counsel claim in his post-conviction appeal to the OCCA, he did not argue appellate counsel was ineffective for failing to raise a claim that his sentence constituted cruel and unusual punishment or a claim of ineffective assistance of trial counsel on direct appeal. Petitioner has never raised, to this Court or any state court, an independent claim that appellate counsel was ineffective for failing to raise these two claims on direct appeal (Exhibit 4 at 6-7, 30-32; Exhibit 8 at 22; Exhibit 10 at 6). Doc. 1 at 35. Indeed, in his claims of ineffective assistance of appellate counsel throughout post-conviction proceedings and in his petition to this Court, Petitioner has either not claimed appellate counsel was ineffective for failing to raise a claim of trial counsel ineffectiveness (Exhibit 8 at 22), or explicitly stated that he "does not complain of Appellate Counsel's failure to claim ineffective assistance of trial counsel, as that would be improper for direct appeal . . . ." (Exhibit 4 at 31). *See also* Doc. 1 at 35 (same). Petitioner's assertion of cause for the procedural default of his Grounds Six and Seven is therefore unexhausted. *See Smallwood v. Gibson*, 191 F.3d 1257, 1267 (10th Cir. 1999) ("Although petitioner raised an ineffective assistance of counsel claim . . . , he based it on different reasons than those expressed in his habeas petition[, and therefore] failed to exhaust his ineffective assistance of counsel claims."). *See also Jones v. Gibson*, 206 F.3d 946, 955 (10th Cir. 2000) (finding that "the merits of the ineffective assistance of appellate counsel claim are unexhausted because petitioner did not argue ineffective assistance of appellate counsel with respect to this claim in his second post-conviction application").

An assertion of cause "must itself be exhausted before it can provide 'cause' to excuse procedural default." *Davis v. Schnurr*, No. 19-3123, 785 Fed. Appx. 519, 525 (10th Cir. Aug. 20, 2019) (unpublished) (citing *Carrier*, 477 U.S. at 489, and *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000)). If Petitioner returned to state court to exhaust his assertion of appellate counsel

ineffectiveness as cause for the failure to raise the claims of cruel and unusual punishment and ineffective assistance of trial counsel, the OCCA would procedurally bar them in a second post-conviction application. *See Smith v. State*, 878 P.2d 375, 377 (Okla. Crim. App. 1994) ("issues which could have been raised on direct appeal or in the first post-conviction application, but were not, are waived" (citing Okla. Stat. tit. 22, § 1086)). *See also Medlock v. Ward*, 200 F.3d 1314, 1323 (10th Cir. 2000) ("Despite the especially vigilant scrutiny we apply in examining procedural bars to ineffective assistance claims, we have held that Oklahoma's procedural bar to claims not raised on initial post-conviction review is independent and adequate."). Because Petitioner's claim of ineffective assistance of appellate counsel would itself be procedurally defaulted if he returned to state court to exhaust it, it cannot serve as cause to overcome the procedural default of Petitioner's Grounds Six and Seven. *See Edwards*, 529 U.S. at 453 (ineffective assistance of counsel claim relied upon as cause to overcome procedural default must not itself be procedurally defaulted). As Petitioner cannot demonstrate cause for his default, Respondent need not address the issue of prejudice. *See Steele*, 11 F.3d at 1522 n.7.

Petitioner also cannot show a fundamental miscarriage of justice would result if this Court does not hear his claims of cruel and unusual punishment or ineffective assistance of trial counsel. The "fundamental miscarriage of justice" exception "is a markedly narrow one, implicated only in extraordinary cases where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Magar*, 490 F.3d at 820 (quotation marks omitted and alteration adopted). Petitioner makes no attempt to demonstrate that this Court's refusal to review these two claims will result in a fundamental miscarriage of justice, and as a result, this Court should refuse to review the same. Doc. 1 at 26-35. *See Grant*, 886 F.3d at 902 (where the petitioner made "no effort to overcome [the anticipatory] bar by arguing cause and prejudice, or a fundamental

miscarriage of justice," the Court was "precluded from considering [the petitioner's] procedural due process competency claim"). Elsewhere in his petition, Petitioner claims the evidence was insufficient to prove he killed his wife (Ground One). Doc. 1 at 3-8. He also asserts actual innocence in his cumulative error claim (Ground Ten), claiming he had "nothing to do" with his wife's murder and is the victim of "a close-knit, small town court system . . . ." Doc. 1 at 40. Petitioner's claim is at most one of legal innocence, not factual innocence, and is insufficient to establish a fundamental miscarriage of justice. *See Lowery*, 760 Fed. Appx. at 619 (stating that an "actual innocence claim based on insufficiency of the evidence . . . would show only legal innocence," and not factual innocence). Nevertheless, Petitioner has presented this Court with nothing that was not presented at trial to support his claim that he is actually innocent of his wife's murder. *See Schlup*, 513 U.S. at 324, 329 (holding that an actual innocence claim must be supported by "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial" and demonstrate that "in light of this new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt"). Petitioner cannot show a fundamental miscarriage of justice.

Petitioner has failed to overcome the application of a procedural bar to his claims of cruel and unusual punishment and ineffective assistance of trial counsel. Accordingly, Respondent respectfully requests that this Court enforce the procedural bar and deny Petitioner's request for habeas corpus relief as asserted in his Grounds Six and Seven.

## PROPOSITION IX

### PETITIONER'S GROUNDS TWO AND THREE ARE PROCEDURALLY BARRED.

**(In response to Petitioner's Grounds Two and Three.)**

In his Ground Two, Petitioner claims the prosecutor tampered with his alibi witnesses resulting in their changed testimony. Doc. 1 at 8-11. In his Ground Three, he claims prosecutorial misconduct denied him a fair trial. Doc. 1 at 11-16. Petitioner raised these claims for the first time in his post-conviction proceedings and the OCCA found them procedurally barred from review (Exhibit 4 at 2-3, 13-19; Exhibit 8 at 5-11, 17-19; Exhibit 10 at 3-6; Exhibit 11 at 2-3). This Court should enforce the procedural bar applied by the OCCA and refuse to review Petitioner's Grounds Two, Three, and Ten.

In affirming the state district court's denial of post-conviction relief, the OCCA ruled as follows:

> In Proposition(s), One, Two, [17] Three, Five, and Six, consideration of Petitioner's claims for relief are procedurally barred. . . .
>
> In Propositions Two, Three, Five and Six we do not reach the merits of Petitioner's claims because the issues could have been raised in a direct appeal and are therefore waived. *Logan v. State*, 2013 OK CR 2, ¶ 3, 293 P.3d 969, 973; *Fowler v. State*, 1995 OK CR 29, ¶ 2, 896 P.2d 566, 569; *Walker v. State*, 1992 OK CR 10, ¶ 6, 826 P.2d 1002, 1004. All issues that could have been raised in a previous direct appeal proceeding but were not are waived and may not be the basis of a post-conviction application. *Fowler*, 1995 OK CR 29, ¶ 2, 896 P.2d at 569. The Post-Conviction Procedure Act is not a substitute for a direct appeal, nor is it intended as a means of providing a petitioner with a second direct appeal. *Id.* Petitioner has not established sufficient reason for not asserting or inadequately raising his current grounds for relief in direct appeal proceedings. *Id.* "Simply envisioning a new method of presenting an argument previously raised does not avoid the procedural bar." *McCarty v. State*, 1999 OK CR 24, ¶ 9, 989 P.2d 990, 995.

---

[17] In his post-conviction proceedings, Petitioner's claims of witness tampering and prosecutorial misconduct were raised as Proposition Two (Exhibit 4 at 2, 13; Exhibit 8 at 5, 17; Exhibit 10 at 3-4).

(Exhibit 11 at 2-3). The factual findings made by the OCCA in this matter are presumed correct and Petitioner has not rebutted those findings by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Hooks*, 689 F.3d at 1163.

"[A] federal court may not review federal claims that were procedurally defaulted in state court – that is, claims that the state court denied based on an adequate and independent state procedural rule." *Davila*, 137 S. Ct. at 2064. *See Coleman*, 501 U.S. at 750 (holding the default of a state prisoner's federal claims in state court "pursuant to an independent and adequate state procedural rule" bars federal habeas review of the claims). "'A state court procedural default is 'independent' if it relies on state law, rather than federal law.'" *Fairchild*, 579 F.3d at 1141 (citations omitted). "A state procedural default is 'adequate' if it is firmly established and regularly followed." *Smith*, 550 F.3d at 1274 (citation omitted). It is well established that Section 1086 of Oklahoma's Post-Conviction Relief Act provides an independent and adequate state procedural bar to claims not raised on direct appeal. *Smith*, 550 F.3d at 1274. *See also Sherrill*, 184 F.3d at 1175; *Odum*, 62 F.3d at 331.

This Court should decline to review Petitioner's Grounds Two and Three because he cannot overcome the procedural bar.

> A petitioner may overcome the procedural bar only if he can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750, 111 S. Ct. 2546.

*Grant*, 886 F.3d at 892.

Petitioner cannot satisfy the cause and prejudice exception to the procedural bar. Petitioner asserts ineffective assistance of appellate counsel as cause for his failure to raise his Grounds Two and Three on direct appeal. Doc. 1 at 10, 15, 29, 40. "Attorney error amounting to constitutionally

ineffective assistance of counsel constitutes 'cause' for a procedural default." *Hickman v. Spears*, 160 F.3d 1269, 1272 (10th Cir. 1998). The legal standards which govern Petitioner's claim that ineffective assistance of appellate counsel was the cause of his procedural default of these claims in state court are the same as those which govern his independent claim of ineffective assistance of counsel. *See Hickman*, 160 F.3d at 1273 ("Because the same legal standards govern petitioner's underlying claim of ineffective assistance of counsel and his closely related burden to show cause for his state law procedural default, we must determine whether petitioner has shown cause concurrently with the merits of his ineffective assistance of counsel claim."). For the same reasons shown in Respondent's Proposition IV, that appellate counsel was not ineffective for failing to raise the claims in Petitioner's Grounds Two and Three on direct appeal, Petitioner has also failed to demonstrate ineffective assistance of appellate counsel as cause to overcome the procedural default of these claims in state court. *Id.* As Petitioner cannot demonstrate cause for his default, Respondent need not address the issue of prejudice. *See Steele*, 11 F.3d at 1522 n.7.

Petitioner also cannot show a fundamental miscarriage of justice would result if this Court does not hear his Grounds Two and Three. The "fundamental miscarriage of justice" exception "is a markedly narrow one, implicated only in extraordinary cases where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Magar*, 490 F.3d at 820 (quotation marks omitted and alteration adopted). Petitioner makes no attempt to demonstrate that this Court's refusal to review his Grounds Two and Three will result in a fundamental miscarriage of justice, and as a result, this Court should refuse to review the same. Doc. 1 at 30-35. *See Grant*, 886 F.3d at 902 (where the petitioner made "no effort to overcome [the anticipatory] bar by arguing cause and prejudice, or a fundamental miscarriage of justice," the Court was "precluded from considering [the petitioner's] procedural due process competency claim"). Elsewhere in his

petition, Petitioner claims the evidence was insufficient to prove he killed his wife (Ground One). Doc. 1 at 3-8. He also asserts actual innocence in his cumulative error claim (Ground Ten), claiming he had "nothing to do" with his wife's murder and is the victim of "a close-knit, small town court system . . . ." Doc. 1 at 40. Petitioner's claim is at most one of legal innocence, not factual innocence, and is insufficient to establish a fundamental miscarriage of justice. *See Lowery*, 760 Fed. Appx. at 619 (stating that an "actual innocence claim based on insufficiency of the evidence . . . would show only legal innocence," and not factual innocence). Nevertheless, Petitioner has presented this Court with nothing that was not presented at trial to support his claim that he is actually innocent of his wife's murder. *See Schlup*, 513 U.S. at 324, 329 (holding that an actual innocence claim must be supported by "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial" and demonstrate that "in light of this new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt"). Petitioner cannot show a fundamental miscarriage of justice.

Petitioner has failed to overcome the application of a procedural bar to the claims he raises in Grounds Two and Three. Accordingly, Respondent respectfully requests that this Court enforce the procedural bar and deny Petitioner's request for habeas corpus relief as asserted in his Grounds Two and Three.

## **<u>CONCLUSION</u>**

Based upon all of the above argument and authority, Petitioner has failed to meet his burden to show that he is entitled to federal habeas relief. The petition must be denied.

Respectfully submitted,

**GENTNER F. DRUMMOND**
**ATTORNEY GENERAL OF OKLAHOMA**

s/ **KEELEY L. MILLER**
**KEELEY L. MILLER, OBA # 18389**
**ASSISTANT ATTORNEY GENERAL**
313 N.E. 21st Street
Oklahoma City, Oklahoma 73105
(405) 521-3921          FAX (405) 522-4534
Service email: fhc.docket@oag.ok.gov
**ATTORNEYS FOR RESPONDENT**


## CERTIFICATE OF SERVICE

X I hereby certify that on March 3, 2023, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.

X I hereby certify that on March 3, 2023, I served the attached document by mail on the following, who is not a registered participant of the ECF System:

Michael D. Magness, # 765965
Joseph Harp Correctional Center
P.O. Box 548
Lexington, OK  73051-0548


s/ Keeley L. Miller

102