By_____
Deputy Clerk

BONNIE HACKLER
Clerk, U.S. District Court

MAY − 5 2023

**FILED**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

Michael Magness, Petitioner      )
                                 )
v.                               )     Case No: CIV-22-376-JFH-KEW
                                 )
Luke Pettigrew, Respondent       )

**FILED**

MAY − 5 2023

BONNIE HACKLER
Clerk, U.S. District Court

By_____ Deputy Clerk

### PETITIONER'S REPLY TO RESPONDENT'S RESPONSE IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS

Petitioner, Michael Magness, Pro Se, in Reply to the Respondent's RESPONSE IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS shows the following:

### PREAMBLE

1. First and foremost, Petitioner wishes to state that he admits his inability to adequately explain how to untangle the Gordian Knot of misinformation, misdirection, and claimed procedural bar which has been presented. Most, if not all, of which would have been properly addressed in the original application had the State made such a Response to the post-conviction proceedings. Petitioner will none-the-less attempt to do so throughout this Reply, but it is his true belief that at the end of the day, it will be up to this Court to cut that Knot. If the current record is not sharp enough, then Petitioner would ask it be honed via evidentiary hearings and appointed counsel.

2. The Response did not follow the ordering of the original Application's Grounds. This Reply will follow the original ordering but Petitioner wishes to reduce confusion where possible; below is a concordance of the three documents' sections as they relate to the specific grounds:

| Application [Doc 1] | Response [Doc 9] | Reply [This Doc] |
|---|---|---|
| Ground One | Proposition I & IV | Argument 1 |
| Ground Two | Proposition IV & IX | Argument 2 |
| Ground Three | Proposition IV & IX | Argument 3 |
| Ground Four | Proposition II, IV, & VII | Argument 4 |
| Ground Five | Proposition III & IV | Argument 5 |
| Ground Six | Proposition VIII | Argument 6 |
| Ground Seven | Proposition VIII | Argument 7 |
| Ground Eight | Proposition IV | Argument 8 |
| Ground Nine | Proposition VI | Argument 9 |
| Ground Ten | Proposition IV & V | Argument 10 |

3. Petitioner hereby incorporates all the arguments and authorities of his Amended Brief In Support of Application for Post-Conviction Relief [Doc 9, Exhibit 8] and Petition in Error [Doc 9, Exhibit 10]. Although both of these documents were written for the State Courts, they lay out the majority of Petitioner's claims and will be heavily referenced below.

4. Respondent correctly notes that the vast majority of the Grounds are completely interdependent with Ground Eight: Ineffective Assistance of Appellate Counsel since that Ground must be met before most of the underlying Grounds may be considered (if we ignore the §1086 Error as defined in Argument 9); however, this also presents a catch 22 as the only way to determine Ineffective Assistance of Counsel claims is to review said underlying claims and determine the reasonableness of the State Court's decisions [*Harrington v Richter*, 562 US 86, 131 S.Ct. 770; *Ellis v Raemisch*, 872 F.3d 1064; *Logan v State*, 293 P.3d].

5. Respondent claims throughout their Response that this Court should not hold evidentiary hearings and rely solely on the assumption

that the State Courts were correct in their decisions; however, Petitioner refutes that claim and asserts that there is simply an additional bar to pass. Petitioner must show the unreasonableness of the State Courts' decisions [*Schriro v Landrigan*, 550 US 465, 127 S.Ct. 1933]. A major component of Petitioner's claims involve the lack of evidentiary hearings connected to the Grounds not raised, or ineffectively raised, by Appellate Counsel. Therefore, to pass this additional bar (determining the unreasonableness of the State Courts' decisions) we must first adequately review the reasonableness, and probability of success, of the individual Grounds, which in turn is reliant upon reviewing the evidence and testimony which would have been brought to an evidentiary hearing had one been allowed. [*Beavers v Saffle*, 216 F.3d 918 (10th Cir 2000)]

6. Related to the above, Respondent claims Ground 9 is not properly before this Court; however, Petitioner contends that not only is it proper (See Argument 9), but that it serves as an additional gateway to the review of all other Grounds. It is Petitioner's true belief that the fundamental disregard for Due Process shown by both the District Court and the OCCA has by itself rendered any possible decisions unreasonable and therefore passes the bar for Habeas review of all underlying Grounds. Petitioner will be presenting other clear and convincing evidence as to why the underlying State Court decisions are unreasonable in the Arguments below, but wanted to mention this here in an effort to possibly save the Court time (admitting that perhaps Petitioner should have made this issue Ground One of the application).

7. An additional note on Argument 9, while Petitioner feels the Due Process violations of the post-conviction proceedings should serve as a gateway to Federal Habeas review of all other Grounds, Petitioner also recognizes it may instead render all other Arguments moot as this Court may wish to remand said proceeding back to the State Court in an

effort to cure those (post-conviction) Due Process violations before addressing the underlying issues. If so, Petitioner would request an equitable tolling of his AEDPA timeliness be explicitly granted to avoid future timeliness issues (at least 30 days from the end of the remanded post-conviction proceedings). Petitioner would also request whatever other protections this Court may offer as the State has already proven its eagerness to obtain and sustain this conviction at any cost (another reason Petitioner would prefer Federal review rather than State) and Petitioner fears such a remand would result in an coordinated effort to ensure any subsequent Habeas relief would be procedurally barred.

### REPLY TO PAGE 3 ¶7

**8.** Respondent claims Petitioner has failed to show a factual basis for his claims and that an evidentiary hearing to establish said facts would be inadmissible. However, Petitioner feels he has in fact made valid claims of fact and any lack of evidence is the fault of the State's refusal to hold evidentiary hearings on post-conviction (itself an issue in Ground 9). Petitioner will address this issue more directly within each Argument below.

### REPLY TO PAGE 3 ¶8

**9.** Respondent claims that transcripts of petitioner's Preliminary Hearing and Motion in Limine are available but not relevant. However, as the changing testimonies of Mr. and Mrs. Crouch at the preliminary hearing and the admissibility of "bad acts" are both central to Petitioner's claims (Grounds Two & Four Respectively) and should be made a part of this record. Petitioner filed a Motion for Discovery to acquire said documents, but was denied, and so must rely on this Court to acquire said documents.

### REPLY TO STANDARD OF REVIEW

10. Petitioner is aware of the steep burdens of proof set against both post-conviction and habeas review; however, he feels the below Facts and Arguments more than overcome these burdens. Petitioner also disputes Respondent's general claims regarding this Court's inability to examine and adjudicate on matters of "State" law when Petitioner is clearly making claims of Constitutional violations. As addressed below, the very definition of Due Process is a Court following the statutes and established procedures of their jurisdiction. Therefore, a question of a State Court's adjudicating on State law and procedure is certainly within the realm of Habeas review when the claim is one of Constitutional Due Process.

## REPLY TO STATEMENT OF FACTS

11. Petitioner very clearly disputes these facts, addresses them in greater detail in Argument 1 below, and again points to Argument 9 as to why the "facts" as determined by the State Courts cannot be relied upon.

## ARGUMENT 1: INSUFFICIENCY OF EVIDENCE
## REPLY TO PROPOSITION I ON GROUND 1

12. As mentioned in the Preamble, Petitioner is aware of the interdependency of his Grounds. He hereby incorporates all argument and authority as presented in his Application for Post-Conviction Relief [Doc 9, Exhibit 8, Prop 2, Pages 5-8], and this document's Argument 8, Section A.

13. Respondent correctly points out Appellate Counsel's utter failure to adequately raise this issue on Direct and Petitioner makes no attempt to claim the OCCA erred in its denial on *Direct*. In fact, Petitioner acknowledges the Respondent quite clearly makes the case for Ineffective Assistance of Appellate Counsel and hereby incorporates it into his Argument 8.

**14.** Respondent mischaracterizes Petitioner's claim in the first
paragraph of their Section B Post-Conviction [Doc 9, bottom of page
19] when they list out the below claims:

> A) "1) the State failed to present any non-circumstantial
> evidence;"

Petitioner does not claim that circumstantial evidence is in any way
invalid or of lesser weight. Petitioner's assertion is that when a
case relies solely upon circumstantial evidence (as the State has
admitted, and the Respondent has quoted) it is in the interest of
justice to pay particular attention to the reasonability of the
inferences made and the number of layers of such which a jurist must
rely upon to reach a verdict of guilt. The 10th Circuit has already
held:

> "On review for sufficient evidence, the Court of Appeals
> will reverse if the evidence does no more than raise a mere
> suspicion of guilt or requires piling inference upon
> inference to conclude the defendant is guilty." [US v
> Dewberry, 790 F.3d 1022, 1028 (10th Cir 2015)]

Petitioner feels he has passed both of the above tests ("mere
suspicion" and "inference upon inference") in general and asserts that
in addition to the general tests there should be additional scrutiny
of such suspicions and inferences when the verdict rests upon purely
circumstantial evidence.

> B) "2) the testimony of his 'alibi' witnesses changed after
> the prosecution told them there was video evidence showing
> Petitioner outside on the night of the murder, and even
> then, they only admitted it was possible he might have left
> their house;"

Petitioner does not claim that the change of testimony is in itself a
lacking of evidence (although he does claim other affects in his
Ground Two), but rather that it is unreasonable to infer Petitioner
did in fact leave the residence based upon a grudging "possibility" of
being able to do so. And even if the possibility is believed, it is
inherently unstable as a base for further layers of inference. (Once)

**15.** Further, in relation to **B)** above, while the Fruit of the Poisonous Tree Doctrine applies primarily to issues of improper police action, Petitioner contends that it should apply here as well. [See Argument 2] In the instant case, we can have no way of knowing how the Jury may have found had the Crouchs' testimony remained steadfast, but it is plain that the issue of Petitioner's ability to be outside of the Crouch residence was highly material and tainted by the illegal [21 Okl. St. Ann. §455], unethical [OK Title 5, Chapter 1, Appendix 3-A, Rules 4.1 & 8.4], and willful actions of the then leading District Attorney for the State, Mrs. Reilly. Additionally, the testimony of these claims having been made by the original DA in front of the Jury itself had a lasting impact which rang in sympathy with other manufactured suspicions.

**16.** Respondent continues this list with other issues of unreasonable inference and the overlapping layers thereof; however, they continue to mischaracterize Petitioner's claims in that Petitioner in no way wishes this Court to "reevaluate" or "reweigh" the testimony for the very reasons Respondent has stated. Again, Petitioner's claim is that the *inferences* made were *unreasonable*, and that even if the "light most favorable to the State" in each individual instance were to be deemed reasonable, then we must still look at the *unreasonableness* of stacking so many tenuous inferences one upon another. There is ample science and case law to demonstrate that even otherwise rational individuals can be lead to unreasonable decisions/actions based upon such stacking. An Evidentiary Hearing would allow experts on the matter to examine and remark upon the record.

**17.** Respondent misquotes OCCA's response to Petitioner's post-conviction claim when they make the statement below:

> "First, the OCCA acknowledged that "[t]he State presented its case through circumstantial evidence," and still rejected Petitioner's sufficiency of the evidence challenge after considering "the evidence in the light most favorable

> to the State, and determin[ing] whether any rational trier
> of fact could find the elements of the crime beyond a
> reasonable doubt." (Exhibit 3 at 6, 10 (citing Holtzclaw v.
> State, 448 P.3d 1134, 1142 (Okla. Crim. App. 2019)" [Doc 9,
> bottom of page 20]

Petitioner notes that the cited Exhibit 3 is the OCCA's Opinion of
Petitioner's Direct Appeal, which is obviously prior to the
Petitioner's post-conviction which the Respondent is addressing in
this section. Possibly a simple mistake, but misleading none-the-less.
Both the District Court and the OCCA barred this claim on post-
conviction as res judicata.

18. Respondent again mischaracterizes Petitioner's claim when they
say "Petitioner essentially asks this Court to reweigh the evidence
against him. Doc. 1 at 4-7." [Doc 9, bottom of page 21] Petitioner
points out they cite Doc 1 at 4-7 which contains the paragraph:

> "While circumstantial evidence is certainly valid and may be
> used to weigh other evidence or help determine the validity
> of testimony, it *becomes unreasonable* when there is no other
> supporting evidence *and* inferences must be made to support
> additional inferences which in turn generate still further
> inferences." (Emphasis Added)

Petitioner clearly admits the validity of circumstantial evidence and
directly states the claim of what he feels makes such evidence
unreasonable. (Twice) Neither the District Court nor the OCCA
addressed this issue on post-conviction.

19. Respondent again misstates Petitioner's claim in their
Conclusion to this Proposition when they state:

> "Petitioner's claim that the evidence was insufficient but
> is essentially nothing more than a request to reweigh the
> evidence, Petitioner's Ground One must be denied."

(Thrice) Petitioner feels his claim on this Ground has been straight
forward and clearly defined, but this is the third time that
Respondent has directly stated to the contrary. The adage "Once is bad
luck, Twice is coincidence, Thrice is mal intent." is common knowledge

for a reason, and Petitioner is hard-pressed to think of a reason other than intentionally attempting to mislead this Court for such insistence upon an obvious falsehood.

**20.** While Petitioner is unsure of the procedural bars to Habeas review presented by the Respondent he none-the-less addresses them below:

**a. Presumption of State Court's Findings:** As both Petitioner and Respondent admit the ineffective presentation of this Ground on Direct, Petitioner only addresses the post-conviction proceedings here. The Trial Court was the very same District Court as the post-conviction which in itself raises concerns of bias (the same judge ruling on the reasonableness of inferences leading to a verdict they originally supported and should have overruled), but we have the further issues of non-compliance with State statute and procedure (as outlined in Petitioner's Petition in Error [Doc 9, Exhibit 10, ¶2]) and this document's Argument 9. In addition to the above Due Process violation, at the District Court level, Petitioner asserts that the OCCA clearly failed to review the record when deciding the Petition in Error as any fair-minded jurist can plainly see the errors of the District Court.

**b. Cause for the Default:** Petitioner's claim is that this Ground was raised on Direct with such a fatal flaw as to render it dead-on-arrival. The deficient performance of Appellate Counsel is very well laid out by the Respondent [Doc 9, Pages 14-19] and Petitioner would actually point to this reasoning as additional proof of Appellate Counsel's ineffectiveness.

**c. Actual Prejudice:** The procedural bar, res judicata, of this Claim on post-conviction is clear prejudice. Because of the Ineffectiveness of Appellate Counsel on Direct Appeal, Petitioner was barred from properly raising the issue on post-conviction which would have plainly had a better chance than the argument presented on

Direct, and a better chance than not of succeeding had it been raised properly the first time.

      **d. Fundamental Miscarriage of Justice:** In addition to the issue of Due Process as raised in Ground/Argument 9, this bar is more specifically passed in that an innocent person has been condemned to Death by Time (LWOP) based solely upon the mere suspicion of guilt and a stack of unreasonable inferences drawn from purely circumstantial evidence. While all evidence is weighted the same by modern standards, Petitioner feels the instant case is a primary example of why our forefathers (and within the living memory of our honorable elders) so mistrusted circumstantial evidence and previously held it to a separate, stricter standard. Perhaps it is time we examine these standards which have led to the circumstance of this case.

**ARGUMENT 2: PRE-TRIAL PROSECUTORIAL WITNESS TAMPERING**
**REPLY TO PROPOSITION IX ON GROUND 2**

    **21.** As mentioned in the Preamble, Petitioner is aware of the interdependency of his Grounds. He hereby incorporates all argument and authority as presented in his Application for Post-Conviction Relief [Doc 9, Exhibit 8, Prop 2, Pages 5-8], Petition in Error [Doc 9, Exhibit 10, ¶3], and this document's Argument 8.

    **22.** Respondent claims:

> "The factual findings made by the OCCA in this matter are presumed correct and Petitioner has not rebutted those findings by clear and convincing evidence." [Doc 9, Top of Page 99]

Petitioner will address the issues of procedural bar below; however, he points out here that Ground 2 of the Habeas application clearly outlines the evidence already on the record in support of this claim as well as the issue of Ground/Argument 9. While Petitioner certainly agrees there is additional evidence which would have been introduced to the record had the District Court or OCCA conducted the evidentiary hearings required, he contends that is no fault of his own and asks

this Court to grant evidentiary hearings to expand the record on this point if it does in fact find the current record insufficient.

23. Respondent claims:

> "It is well established that Section 1086 of Oklahoma's Post-Conviction Relief Act provides an independent and adequate state procedural bar to claims not raised on direct appeal." [Doc 9, Middle of Page 99]

However, as shown in Petitioner's "§1086 Error" in Argument 9, this is itself a violation of Due Process and this issue should not have been barred on post-conviction. However, even if we ignore this violation, the Standard of Review cited by both the Respondent and the OCCA, *Logan v State,* shows:

> "¶5…claims of ineffective assistance of appellate may be raised for the first time on post-conviction, because it is usually a petitioner's first opportunity to allege and argue the issue." [*Logan v State*, 293, P.3d 969]

And since reviewing the issues not raised, or ineffectively raised, by Appellate Counsel is the only way to adjudicate such a claim, it is clearly proper for this Court to review those underlying issues as both the District Court and OCCA should have done.

24. Respondent accurately quotes the record where Mr. Crouch testifies that nothing could make him fabricate his testimony, and Petitioner agrees. In fact, Petitioner's lifelong friendship with Dustin 'Hoss' Crouch offers additional insight. Mr. Crouch comes from a law enforcement family and was himself a correctional officer prior to becoming a nurse. He *knows* that while an investigator can lie in order to acquire the truth, the district attorney, as legal representative of the State (i.e. the citizens of the State and therefore *his* representative) cannot, by law or professional code, lie about 'facts' of a case. In fact, in the early days of the investigation Mr. Crouch warned Petitioner about this. The fact that the Crouch family (Dustin, April, and K.C.) all three remained steadfast in support of Petitioner from the time Petitioner told them

about *investigator* Titsworth saying there was said video evidence (shortly after May 1, 2015) until Mr. Crouch directly asked the one person he knew could not lie to him, *district attorney* Reilly, (shortly before the preliminary hearing February, 2016) shows that her actions were clearly the catalyst for any "further reflection" which modified their memories. An evidentiary hearing would allow for evidence and testimony about the effects of misinformation from trusted authority figures on a person's memory. It is Petitioner's contention that all of the Crouch testimony was corrupted by Mrs. Reilly's actions. Not that the Crouchs lied, but that their very memories were altered by the psychology of being confronted with an *irrefutable* truth which did not fit with their *true* memory resulting in *false* memory. A phenomenon which is scientifically documented and accepted in limited circumstance. Petitioner is without means to research and cite said science from incarceration; however, an evidentiary hearing would provide this Court with the ability to hear expert testimony on the subject.

25. While the trial District Attorney attempted to explain Mrs. Reilly's actions, in relation to the claim of a life insurance policy, as a case of mistaken identity with David Magness, it fails on multiple points:

a. Petitioner's uncle, David Magness, and Mrs. Reilly did in fact know each other for years prior to the underlying criminal case. They were not close friends, but have friends in common and have interacted socially. Similarly, Mr. Crouch was well known in the law enforcement community, both through his family (many of which were/are in law enforcement) and as a correctional officer (working a facility in the same jurisdiction, six miles from Okemah), and was known professionally by Mrs. Reilly. The chances Mrs. Reilly would have made this mix up are very small and nowhere in the record does Mrs. Reilly herself ever make this claim.

**b.** There never was any such life insurance policy on Mr. Crouch or David Magness. There was only testimony that Michael Whaley (a mutual friend of Mr. Crouch and Petitioner) had attempted to sell insurance to David Magness (to David, not Petitioner) while David Magness and Petitioner were at the Crouch residence. An offer which David Magness refused. Also, as an experienced District Attorney, Mrs. Reilly would certainly have been aware that Petitioner could never have taken out such a policy on either person as without any insurable interest such a policy would be illegal.

**c.** Petitioner believes (but cannot cite without a copy of the transcript) Mr. Crouch testified that Mrs. Reilly informed him the life insurance was on both himself and his wife, April Crouch. If so, then Mrs. Reilly plainly knew exactly who she was talking to, and the fear she was instilling, because she knows that David Magness is openly gay and has no wife.

**26.** Despite Respondent's attempt to explain away Mrs. Reilly's actions in their Proposition IV [Doc 9] the facts on the record are:

**a.** Dustin Crouch's sworn testimony that Mrs. Reilly directly told him there existed in evidence a video of Petitioner in town on the night of the murder and a life insurance policy benefiting Petitioner in the event of Mr. Crouch's death.

**b.** None of the Crouch testimony (Dustin, April, or K.C.) changed when told an investigator claimed such a video existed, but all three changed soon after the district attorney (falsely) 'confirmed' the video and added that there was a legitimate reason to fear and mistrust Petitioner because of a (again, false) life insurance policy benefitting Petitioner in the event of their deaths.

**c.** Mr. Crouch's additional sworn testimony that the above information could "turn friend against friend".

**d.** No such video or insurance policy were in evidence nor did they ever exist.

     **e.** Petitioner's sworn testimony that there is no reasonable explanation for Mrs. Reilly's statements other than a purposeful attempt to make the Crouchs doubt their own memory and fear for their lives should Petitioner not be convicted.

     **f.** On post-conviction, the State chose to remain silent and thereby waived all argument against this claim.

    **27.** Additionally, Petitioner would also show it is common knowledge that evidence can often times be suppressed pre-trial for various reasons and, if it were, the jury would never get to see it. The mere mentioning of said false evidence rang a bell with the jury which reverberated and joined the carol of so many others. Thus it is certainly reasonable to see how talking about items not in evidence still has a lasting impact on the minds of the jury, and doubly so when the verdict relies completely upon said jury's judgement of inferences made upon purely circumstantial evidence.

    **28.** As shown by the above, it is clear that Mrs. Reilly's actions where not only unethical:

> "In the course of representing a client a lawyer shall not knowingly: a) make a false statement of material fact or law to a third person". [5 OS CH.1 App 3-A, Rule 4.1]

And:

> It is professional misconduct for a lawyer to:
> (a) Violate, or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
> (b) Commit a criminal act that reflects adversely on the lawyer's honesty;
> (c) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;
> (d) Engage in conduct that is prejudicial to the administration of justice;
> [5 OS CH.1 App 3-A, Rule 8.4]

But also criminal, according to 21 OS §455 (too long to quote) dealing with criminal witness tampering. Further, these State Ethical Standards are explicitly within the Federal powers to adjudicate based

upon 28 USC §530 B which requires attorneys in Federal Courts to adhere to the Ethical Standards of the States in which they practice. And while Petitioner plainly sees this fundamental miscarriage of justice as poisoning the very roots of Due Process and the Fair-Trial Doctrine, even if a fair-minded jurist could see otherwise, they would still have to admit that all appearance of judicial fairness and integrity was marred beyond recognition and would thus require a new trial, at the very least, to restore the dignity which the Courts deserve.

**29.** While Petitioner is unsure of the procedural bars to Habeas review presented by the Respondent he none-the-less addresses them below:

**a. Presumption of State Court's Findings:** As shown in Argument 9, the State Court's findings cannot be relied upon because of the severe Due Process violations. However, even if we ignore the issue of Ground 9 we are still confronted with the record. Given the facts above, no unbiased, reasonable jurist could have reviewed the post-conviction record and found as the District Court or OCCA found. It is Petitioner's claim that the District Court was explicitly defensive of its own Trial Court rulings and of its fellow/protégé Mrs. Reilly; therefore not unbiased. And it is clear the OCCA failed to review the record, as that must be the most likely explanation for their evident failures to follow Oklahoma statute and established procedure.

**b. Cause for the Default:** As shown in Argument 8, this claim is plainly evident as a "dead bang winner" which any effective counsel would have presented on Direct, especially in light of Petitioner pointing it out at the time.

**c. Actual Prejudice:** As Respondent specifically foregoes rebutting this component [Doc 9, Page 100], Petitioner stands on his previous arguments and the self-evidence of the prejudice caused by the procedural bars.

d. **Fundamental Miscarriage of Justice:** In addition to the Due Process claims raised in Ground/Argument 9, the multitude and severity of the laws and professional ethical standards protecting witness testimony plainly show it is a fundamental building block of our justice system. Any erosion of such must be examined with care, and there can be no doubt that based upon the arguments presented even the appearance of fairness has been shattered and there is no way to truly know how far the poison of Mrs. Reilly's actions spread.

### ARGUMENT 3: PROSECUTORIAL MISCONDUCT
### REPLY TO PROPOSITION IX ON GROUND 3

30. As mentioned in the Preamble, Petitioner is aware of the interdependency of his Grounds. He hereby incorporates all argument and authority as presented in his Application for Post-Conviction Relief [Doc 9, Exhibit 8, Prop 2, Pages 8-11], Petition in Error [Doc 9, Exhibit 10, ¶3], and this document's Argument 8.

31. As with Ground 2, Respondent claims this Ground should be procedurally barred. [Doc 9, top of page 98] However, also like Ground 2, Petitioner argues that the issue is not automatically barred, but must simply overcome an additional level of scrutiny.

32. The Respondent correctly quotes this scrutiny when they state:

> "In reviewing a claim of prosecutorial error, the OCCA uses the standard set out by the Supreme Court in Donnelly v. DeChristoforo, 416 U.S. 637 (1974), and grants relief 'only where the prosecutor committed misconduct that so infected the defendant's trial that it was rendered fundamentally unfair, *such that the jury's verdicts should not be relied upon.*' [Doc 9, middle of page 52, emphasis Petitioner's]

This is precisely what Petitioner believes he has shown in both his Application for Post-Conviction and this Application for Habeas Relief.

33. Respondent breaks Petitioner's claims into three broad categories. While Petitioner does not necessarily agree with the categorizations, he will attempt to address them in Respondent's

order, starting with the first grouping, improper statements and solicitations:

    **a.** Talking about the prosecutor's statements regarding Petitioner's gun the respondent states:

> "The evidence supported the prosecutor's questions and arguments that the firearm that killed Beth belonged to Petitioner." [Doc 9, bottom of page 53]

No direct evidence showed this connection, and while the Jury is certainly free (in fact obligated) to draw inference from the circumstantial evidence presented, this is not what the prosecutors stated. The referenced statements (and many more) were declarations of the inferences the State had made presented as concluded fact from forensic evidence. Without access to the transcripts, Petitioner can only rely upon memory and handwritten notes and so cannot make verbatim quotes, but it is Petitioner's true belief that these statements were conclusory such as "you know the evidence showed the murder weapon was the Petitioner's gun" rather than suggestive such as "since the casing found near the body matched the Petitioner's gun you can easily assume it was the murder weapon.". Both statements convey the State's theory but in the former, the jury is being told what to conclude, robbing them of their providence as fact finder, and in the latter, the jury is being told what the State sees as evident but leaves them with the final determination of fact. This is simply one example of several such instances throughout the trial and closing arguments, and Petitioner must rely upon this Court to take note since he cannot review the transcripts directly.

    **b.** Talking about the prosecutor's intentional use of character evidence the Respondent stated:

> "Respondent showed in its Proposition II that this evidence was properly admitted under state law and did not deny Petitioner a fair trial. Because the evidence was properly admitted, the prosecutor committed no misconduct in introducing it." [Doc 9, bottom of page 54]

Petitioner more directly addresses this issue in Argument 4; however, petitioner would show that just after the above statement the Respondent addresses one of defense counsel's objections (regarding testimony about Petitioner's LARP hobby) with the statement:

> "The prosecutor responded that her questions sought to "educate the jury on something that serves as a central role in . . . [Petitioner's] interest" which "indicates his abilities to be both crafty and imaginative and how he perceives the world." (Tr. II 177). None of the testimony about Petitioner's live-action role-play activities maligned his character (Tr. II 177-78)." [Doc 9, top of page 55]

Petitioner's understanding of Character Evidence is:

> Evidence regarding someone's general personality traits or propensities, of a praise worthy or blameworthy nature, evidence of a person's moral standing in a community. [Fed R. Evid, 404, 405, 608] Character evidence is usually, but not always prohibited if offered to show that the person acted in conformity with that character. [Black's Law Dictionary (11th ed. 2019)]

By the Respondent's own quoting of the trial prosecutor we can plainly see the sole purpose of the testimony was to show Petitioner as a "crafty and imaginative" person who "perceives the world" so differently from others. As for not maligning character, Petitioner is not sure how to explain this to folks outside of the small rural areas where this belief is still held, but role-playing games (especially live action ones) are still viewed with heavy suspicion left over from the 80's "D&D is Demonic" scare inspired by a series of murders linked to Satanic/Occult killing. Petitioner's own aunt wrote a letter to the Trial Court explaining that they should investigate the other "gamers" because she was sure it was all the fault of the demonic influences within that [gaming] community. The local prosecutors certainly knew of this superstition and clearly pressed it to their advantage. Petitioner feels this is a plainly evident instance of inadmissible character evidence.

c. In defending the prosecutors misstatement of facts regarding timelines the Respondent states:

> "…a prosecutor may in good faith tell the jury what he expects to prove, only to have that evidence evaporate during the case in chief. [Doc 9, top of page 56]

Petitioner does not dispute the above; however, that is not what the prosecutors were doing in the instant case. The prosecutors knew full-well the exact timelines involved and that minutes mattered. With the original testimony being that Petitioner was visually verified as asleep on the couch "sometime after 01:30", that "the baby woke us up several times" after that, and then "we finally gave up at 04:30" at which point Petitioner is again visually verified as being present in the kitchen. This leaves a three hour window, which was broken up "several" times by the baby, B.M., crying loudly enough to wake Mrs. Crouch before being settled back to sleep (by Petitioner as no one else in the house did so), for Petitioner to have possibly driven 20 minutes into town, commit the murder, drive 20 minutes back, thrown the guns over a river bridge which was close, but not between the two locations, and settle back into the Crouch residence all while hoping baby B.M. didn't wake while Petitioner was gone. (Note: Mrs. Hill's testimony was that she could see into the "dark colored, four-door sedan" and did not mention any child or car-seat.) By all definition, several is more than a few and any more than a few interruptions of a three hour window all but precludes the existence of the hour (minimum) which would have been required. Thus it is Petitioner's claim that the only reasonable explanation for the prosecutors to deliberately misstate the times as they did was cause confusion and allow as best they could for that possible solid hour.

d. Talking about the prosecutor's intentional editing of exculpatory evidence regarding Petitioner's emotional display during his initial interview the Respondent states:

> "As for the editing, Petitioner's initial interview with
> Agent Titsworth on the day of the murder was over three
> hours long, and the State therefore introduced portions of
> the interview separately to "reflect[] the point that is at
> issue." (Tr. VI 140-41, 154-55)." [Doc 9, bottom of page 56]

Two of these portions were directly on either side of the emotional
display. When Agent Titsworth left the room while Petitioner wrote his
written statement, Petitioner was alone and unaware of the camera
hidden in the wall clock of the room. While writing the statement
Petitioner is clearly in emotional distress and even cries for a while
until he hears Agent Titsworth returning and resumes his stoic
countenance. It was actually more work for the prosecutors to edit
around the display than it would have been to leave it in.

   e. Respondent goes on to state:

> "Defense counsel had no objection to the introduction of the
> interview portions, but asked to be able to introduce a
> portion of the initial interview wherein Petitioner showed
> emotion as he wrote out his statement (Tr. VI 141-43)." [Doc
> 9, top of page 57]

It is Petitioner's true belief this statement is verifiably false
within the trial transcript. Petitioner remembers defense counsel
strongly objecting to the edited video (he believes it was on the day
before being submitted into evidence) and that the ability to add back
in the edited portion was a concession over objection which ultimately
met with technical difficulties and was not presented.

   f. In defending the use of Janell Daggett as an unqualified
expert witness the respondent states:

> "First, Petitioner makes no showing that the testimony was
> inaccurate or would have been refuted by a so-called 'true
> expert'." [Doc 9, bottom of page 57]

Since Appellate Counsel failed to raise the issue on Direct and the
State refused to hold evidentiary hearings on post-conviction,
Petitioner was never afforded an opportunity to make such a showing in

any form other than his own sworn testimony. The Respondent then goes on to claim Ms. Daggett was in fact qualified by stating:

> "Further, Agent Daggett's extensive training and experience – some 800 classroom hours of crime scene training, twenty-one years with the Sebastian County Sheriff's Office in Fort Smith, Arkansas, four years with the OSBI, having been specializing in crime scenes since 2003 – qualified her to give her opinions on these matters which were based on her observations of the scene and her training and experience (Tr. III 118-19, 136-39)." [Doc 9, top of page 58]

These credentials go to crime scene investigation and the cataloging of evidence for *others* to later analyze and make forensic determinations. She has no listed training in ballistics, tool markings, medical pathology, or any field other than the collecting and cataloging of physical evidence. The only exposure to forensic knowledge we can see above is what she undoubtedly heard second-hand in the course of her work, and unlike the detective in *Welch v. State* quoted by the Respondent who had "specialized training in sexual asphyxiation deaths" [Doc 9, middle of page 58], Ms. Daggett has no such specialized training. (Having grown up on a ranch, and then later running that ranch himself, Petitioner is well versed in recognizing the signs of sickness in animals, administering basic veterinary care, and knowing when to take an animal to the vet. This does not make him an expert on veterinary science.) Further, the defense was then robbed of the ability to cross-examine an actual expert who could have produced testimony about the height of the shooter (much shorter than Petitioner), a more precise estimate of distance between the shooter and the victim (giving a more exact height, ruling out Petitioner), and the likely hood of the casing found near the body being the murder casing.

g. Next, Respondent defends the use of Agent Paulynda Stevens' testimony. Petitioner admits this would most likely be harmless error, but is simply another ringing of the bell to indicate "something is

wrong" with the character of the Petitioner. An expert on depression
would know that not all forms run to suicide. In fact, Petitioner
himself suffers from severe depression, but has never been suicidal.
An expert would also have reviewed Beth's psychiatric record and
understood why Petitioner didn't consider suicide. By purposefully
eliciting the statements the prosecutor did, they planted within the
minds of the jury the thought that Petitioner didn't suspect suicide
because of his own alleged guilt. These statements would not have come
from an expert on the matter, but if even if they had, at least the
defense would have been able to cross-examine on the psychiatric
knowledge. Again, Petitioner apologizes for the lack of exact citation
of the transcript and must rely on the Court to verify these claims.

    h. Next, Respondent defends Agent Titsworth's testimony. Here
Petitioner is at his greatest disadvantage for not having access to
the transcripts. During the short time he did have access, volume XII
was taken and destroyed by a DOC employee. (who is longer employed by
the State in part for other offences against inmates) From memory
alone, it is Petitioner's true belief that Agent Titsworth repeatedly
made conclusory statements over defense's objections with the aid of
the prosecutors who took every opportunity they could to ring the
bells.

    i. Next, Respondent defends the introduction of alleged romantic
propositions with the minor K.C. and the prosecutor's insistence that
the testimony is proper because such propositions are "not a crime".
As addressed in Argument 2, the testimony of these alleged
propositions did not arise until after the poisonous fruit of Mrs.
Reilly's lies were injected into the Crouch family; however, here, the
issue at bar is the trial prosecutor's intentional misleading of the
Trial Court regarding Oklahoma law. The Trial Court had previously
ruled (incorrectly, as addressed in argument 4) that "bad acts"
evidence was allowed so long as it did not directly reference a

criminal term, or was itself not an actual crime. When Defense Counsel
objected, the prosecution pressed the point that the Age of Consent in
Oklahoma is 16 (which K.C. was 16 at the time); however, 16 is still
considered a minor [21 OS §1024.1] for anything other than sexual
consent and while a 16-year-old minor may consent to sex when they
approach an adult, it is still illegal for an adult to make such a
proposition to them. Also, is explicitly considered sexual battery if
such a physical relationship develops between a minor (under 19) and a
foster parent [21 OS §1123.B.4]. Further, the trial prosecutor
certainly knew this since at the time of trial there where additional
counts of Providing Alcohol to a *Minor* and Exhibition of Obscene
Material to a *Minor*, all of which were later dropped, but still
demonstrate the prosecutors knew K.C. was legally a minor in all
aspects other than consent. While the prosecutor could have argued
motive for the admission of the alleged bad act, they did not, nor did
they previously include such in their pre-trial "Burk's" notice as
required by Oklahoma law and established procedure. Petitioner also
notes that while the Respondent is quick to point out the Age of
Consent being 16, they are still careful to use only the initials K.C.
as legally required for minors.

j. Respondent then defends the prosecution's inquiry about
Petitioner having grown up as a nudist. Like LARPing, this is a
personal habit of the Petitioner which has zero probative value to the
underlying criminal case and is highly prejudicial in the conservative
rural area of Okfuskee County. Further, when defending against the
Defense Counsel's objection the prosecutor stated:

> "…false fiction he creates for himself . . . It's just
> another false story that he's giving. He was not raised as a
> nudist; he was raised here in Okemah." (Tr. V 52)." [Doc 9,
> bottom of page 61]

By her own admission, the prosecutor's purpose for this testimony was
an attempt to prove Petitioner's character as a liar, and further, she

was basing it off of the falsehood that being raised in Okemah somehow precluded being nudist. Petitioner never claimed he was raised in a nudist community; only that within the privacy of his parents' home and land, his immediate family seldom wore cloths. A practice which he continued with his own family, and only came up in the investigation because Agent Stevens asked why Petitioner was so often in a bath robe in the middle of the day. (Note, this is a habit Petitioner curbed during the time K.C. lived with them. Petitioner conceded by always keeping at least gym shorts on at all times; often the shorts and a bath robe.) While the Trial Court did sustain the objection after the question had been asked and answered, yet another bell had already joined the choir.

k. Next, Respondent defends the prosecutor's solicitation of conclusory statements about the murder weapon being positively identified as belonging to Petitioner. As detailed in section a. above, this is a conclusion which belongs solely to the jury. No matter how reasonable or unreasonable it may be to assume the casing next to the body was the killing casing (despite the presence of other spent casings scattered about the home), it is still improper to tell the jury it was a positive match. The jury looks to Agents of the States as authority figures and assume a certain level of expertise and integrity. In the instant case, that assumption worked to push otherwise rational triers of fact over the edge into unreasonable inference. (After all, with so much smoke, there must be fire somewhere, right? Pay no attention to that fog machine…)

l. Respondent goes on to defend the solicitation of false testimony from Agent Titsworth stating:

> "'So the story changed from, you know, the kids keep the gate locked to . . . Beth . . . bought some locks and that's what we were going to do with that because the kids are getting out of the gate.' (Tr. VI 179-80). Petitioner does

not identify what is false or contradictory about this testimony." [Doc 9, middle of page 63]

This is exactly the false statement Petitioner complains of. Never once did the Petitioner state his children kept the gate shut; just the opposite in fact. To the best of Petitioner's knowledge, every single conversation had with Agent Titsworth was recorded and thus the lie can be proven. The only reason to even include this statement is another attempt to portray Petitioner as a compulsive liar with no other probative value.

m. Respondent then defends the solicitation of false testimony from Agent Titsworth regarding Petitioner's financial status. Petitioner admits he was stretched to his finical limit, but he was not "in trouble" financially. The State's financial expert noted that while the restaurant had lost money in the first year, there was nothing out of the ordinary about it. Other than the back taxes owed on the restaurant (which was protected under an LLC, not even bankruptcy would have affected Petitioner's personal finance) Petitioner had no outstanding debts and ample ability to repay the others. The proof of this lies in the fact that every debt (other than the tax debt) was paid after Petitioner's conviction through the foreclosure and liquidation of his assets. Had Petitioner remained free, no foreclosure or liquidation would have been necessary and Petitioner maintains the restaurant would have been able to recover (but admits this is speculative). However, since the State's theory depended upon financial motive (which didn't actually exist) they doubled down on the falsehood to acquire conviction at any cost.

n. Respondent continues defending the solicitation of conclusive statements from Agent Titsworth complaining Petitioner lacks specific citation. Again, without access to the underlying transcripts, Petitioner has no way to make such cites and must rely upon this Court to see them on de novo review. However, the instances which Respondent

mentions (Doc 9, middle of page 64) are certainly two of them
(concluding Petitioner had motive and that Petitioner was in fact at
his home that night). Petitioner cannot say exactly how many times the
bell rope was pulled, but he does know the admonishments to ignore the
ringing is lost when it cannot be heard over the echoes of so many.

   o. Next, Respondent claims that the Miranda document did in fact
have a date of 5/1/15 and that the testimony of 5/5/15 was simply
mistaken. Petitioner does not have access to the underlying document
to verify, but trusts this Court to do so. If it was a simple
misstatement, then Petitioner agrees with Respondent that it would be
harmless and unimportant to the instant case. If however, the
Respondent is incorrect about the document, then this is yet another
case of the State doubling down on falsehood.

   p. Finally, Respondent defends the prosecutors' use of ambush
trial tactics and discovery violation regarding Dr. Pfeifer's
testimony, stating:

> "the State gave notice that it would call Dr. Pfeifer, who
> would 'testify to autopsy and cause of death. See police
> reports and discovery.' (O.R. IV 652). The Oklahoma
> Discovery Code requires a summary of a witness's testimony,
> and '[a] summary, by definition, cannot be expected to be a
> verbatim script of a witness's testimony.'" [Doc 9, bottom
> of page 66]

There is a huge difference between "testify to autopsy and cause of
death" and offering key expert opinion over arguably the State's most
damning piece of circumstantial evidence. And while Petitioner agrees
that the notice need not be verbatim, it is plainly evident that the
prosecutor knew well in advance she would be explicitly soliciting
this information as a major component of the State's theory.
Immediately following the above quote, Respondent continues with:

> "As one of the purposes of the discovery code is to
> "minimize surprises," and defense counsel expressed none at
> trial, the OCCA would have rejected this claim of error on
> direct appeal." [Doc 9, bottom of page 66]

Again, without access to the transcript Petitioner cannot cite the
location, but it is Petitioner's true belief that Defense Counsel did
in fact strongly object to the alternate M.E.'s testimony. Petitioner
believes it was at a time/day prior to the testimony in question, but
that Defense explicitly brought up the fact that the alternate must
stick to only the facts contained within the autopsy and original
M.E.'s notes. (Neither of which contained anything about the alleged
eye bulge.) Additionally, Petitioner spent a long time discussing this
surprise with his counsel and the fact that it had a "game changing"
impact on their overall trail strategy which involved Petitioner not
taking the stand. Petitioner knows of at least four issues which they
were explicitly unable to address:

   i. Petitioner does in fact have memory of the eye bulging;
however, in reviewing the crime scene photos (a task Petitioner had
avoided until that point), from the angle which Petitioner first saw
Beth's body, her brow ridge does appear swollen and bloody, which
would have given the instant impression of bulging.

   ii. Nowhere in the autopsy report does it indicate the eye was
ever bulged, and so unless we assume the original M.E. failed to
notice, we must assume there never was a bulge. However, as Dr.
Pfeifer was an alternate who had never examined the body, defense was
unable to cross-examine on this point. Which is precisely why such
alternates are explicitly only allowed to work from the underlying
records.

   iii. Had Defense known of this testimony in advance we could have
called an expert on the formation of traumatic memory and how the
memory of the swollen brow ridge could easily transform into the
memory of the actual eye, especially given Petitioner's experience
with putting down animals and Mr. Lyon's testimony that he told
Petitioner it looked like a small caliber gunshot wound.

iv. A defense expert on gun shots to the head would also have refuted Dr. Pfeifer's assertion that such a bulge could only have happened "[i]mmediately or within a few seconds or minutes". Petitioner knows firsthand that the eyes of animals put down often never recede and so the purpose of this misinformation can only be to assert that only the murderer could have seen such a bulge. It is clear that this testimony was specific and central to the State's theory, it was plainly not in Discovery, and if the record does not adequately show the shock and surprise it had on the Defense then Petitioner would ask this Court to hold evidentiary hearings so that Defense Counsel may themselves say on the record the tremendous impact this unexpected, improper testimony had.

34. In the second grouping Respondent defends the prosecutor's closing arguments.

a. First Respondent claims:

"There was no objection to any of these remarks at trial, and the OCCA would have reviewed them for plain error." [Doc 9, middle of page 67]

Petitioner was explicitly told by defense counsel that part of the Trial Court's order limiting closing arguments included an admonishment to not interrupt and save objections until the end. Petitioner believes this is what defense counsel did and so there should be objection somewhere within the record. (Again, without access, Petitioner cannot cite.) If this is incorrect, then Petitioner would ask this be made a point for ineffective assistance of trial counsel as the remarks were clearly objectionable.

b. Next, Respondent claims:

"Petitioner makes no attempt to explain to this Court why the prosecutors' arguments in this section were objectionable, and instead only refers to them as 'a litany of plain error, prejudicial statements . . . .' Doc. 1 at 13." [Doc 9, middle of page 67]

However, like the trial prosecutors going out of their way to edit around Petitioner's emotional display, the Respondent cuts off the above quote which continues:

> "...prejudicial statements such as 1) "you know that's not who Michael Magness is", 2) "you know that Michael Magness is someone who murdered his wife", 3) "it does factor into your decision as to why Mr. Magness would do what he did", 4) "the reason Mr. Magness did what he did", 5) "and will agree and know with confidence beyond a reasonable doubt that the murder was caused by this defendant", 6) "in this case the evidence takes you directly to Michael Magness", 7) "after he shot her in the face", 8) "and shoot her in the face", 9) "He's surprised because he killed her, ladies and gentlemen.", 10) "he shot her in the face" , and 11) "and it was Michael Magness who shot his wife with malice aforethought in the face".

Petitioner believes the impropriety and plain error is self-evident in these statements, but to be more explicit, these statements go well beyond the bounds of accusation and evidence based theory. One would expect the prosecutor to believe in the guilt of any defendant they prosecute (to not do so would be an injustice in and of itself), and during closing it is certainly the prosecution's place to affirm their accusation just as it is the defense's place to refute it. However, there are accepted bounds between stating a claim and droning a mantra. Science supports the fact that when otherwise rational individuals are told what they "know" by authority figures it actually affects their memory and makes them believe that they have already decided issues which they were previously unsure about. The above section only goes to the times the prosecution directly told the jury what to conclude about Petitioner's guilt, but they did not stop there as addressed below.

35. In their third category, the Respondent addresses the prosecution's other misrepresentations, contradictions, and lies during closing arguments:

**a.** First, the Respondent complains defense counsel did not make timely objections. Petitioner refers to the above section and defense counsel's claim they were instructed to reserve objections until the end. If this was in error, it would instead go to ineffective assistance of trail counsel. In any event, Petitioner still believes the statements to be unsupported by the evidence and the errors to be plain.

**b.** Respondent defends the prosecutor's claim that Petitioner's statements were inconsistent with Mr. Lyon's testimony on page 69 (too large to quote here) by doubling down on the original lie. Mr. Lyon's testimony was that he was outside on the front porch when Petitioner went in to see if Beth was awake yet. Petitioner's statements were that he went inside, saw Beth, set down Beth's lunch and B.M. in the children's' room, returned to check on Beth, went back to the children's' room and picked up B.M. (but leaving the lunch), and went back outside. From outside, Mr. Lyon would not have seen any of the back and forth, and so the two stories are completely consistent with each other. And again, the precise timing of this series of events are unimportant to the underlying theory as Beth was clearly dead for hours, and so the only reason for the prosecutor to make such a statement is to portray Petitioner as a liar and "hiding something".

**c.** Next, Respondent defends the prosecutor's declaration about the dog being in its crate:

> "State's Exhibit 14 showed a dog in a crate in the Magness living room (State' Ex. 14). Agent Daggett testified the dog was secured in the crate while she was there, and the dog never disturbed the crime scene (Tr. III 126-27).The inference the prosecutor drew that the dog was placed in the crate so it would not interfere with his 'carefully orchestrated scene' was entirely reasonable, and proper (Tr. VIII 32). [Doc 9, top of page 70]

As the State went to great lengths to show, Petitioner is indeed an imaginative and creative person, but even he has a hard time seeing how anyone could make this leap of (il)logic:

   i. Agent Daggett only testified that the dog was in its crate while she was there. Not that it was put up all night. In fact, she would have absolutely no firsthand knowledge of if the dog was created all night, and stated no second hand knowledge that it wasn't put up by the first responders who secured the cats away from the scene.

   ii. As for the cats, Petitioner's two cats were in fact loose in the house all night (as commented upon by many individuals on the record). It would make no sense to secure the dog, but not lock the cats in some other room.

   iii. Going to making sense, what "carefully orchestrated scene" would intentionally include a loose casing from Petitioner's gun right next to the body?

   iv. In fact, it would make more sense to leave the dog out as a forensic countermeasure than to lock it away.
So the inference is neither based on actual evidence nor is it reasonable. Further, it was introduced, not by witness testimony, but directly, and solely, by the prosecutor during closing arguments without possible cross-examination and stated as a proven fact.

   d. Respondent next defends prosecutor's use of Agent Titsworth as an expert witness of cell tower data. This was another ambush by the prosecution as their witness list did in fact contain an actual expert in this field and the Defense intended to cross-examine them to prove the Petitioner's cell phone did not leave the Crouch residence that night. The fact that Defense Counsel failed to subpoena the same expert is a mark of ineffectiveness on their part, but none-the-less, the State intentionally chose not to call their own expert. Petitioner

will attempt to address Respondent's specific quotes below, but again, there are certainly more which Petitioner cannot address without the transcripts.

> I) "Agent Titsworth was unable to tell if Petitioner's phone was traveling or not based on a single incoming text message at 2:00 a.m. (Tr. VIII 100-01)." [Doc 9, top of page 70]

This was an intentionally misleading question. Yes, there was only a single text message through the night, and such a single ping cannot determine travel. However, this ignores the fact that several other apps on Petitioner's phone made regular data exchanges throughout the night which did in fact prove that it never left the Crouch residence. It is clear from the record that when the prosecution asked questions, Titsworth was quick to reply, but anytime the defense tried to cross-examine, he would profess his inability to determine.

> II) "On redirect examination, Agent Titsworth testified he could not tell by the data in this case whether the phone was in one location or not the entire time because it was hitting off of different towers (Tr. VII 125). [Doc 9, middle of page 70]

This is verifiably false. The tower data clearly shows Petitioner's cell phone was precisely where he claimed to have been at all times, and showed it was not in Okemah on the night in question. An evidentiary hearing on this issue would prove Titsworth perjured himself here and it is certainly reasonable to see that the prosecution knew their own actual expert (which they certainly interviewed beforehand) would have testified that the cell phone never left the Crouch residence that night.

> III) "The prosecutor's argument, as well as the remark that evidence was neither helpful nor hurtful to either side, fell well within the wide latitude afforded counsel in closing argument." [Doc 9, middle of page 70]

Again, it is for the Jury to decide what evidence is "helpful or hurtful", and when the person who represents the interest of the State

(and thereby its citizens, in part the members of the jury) tells them something, any rational trier of fact is going to listen.

> IV) "The evidence showed the guns and the case had been thrown over the bridge and became caught up not far from where they were thrown, whether in brush or in a back current, as opposed to floating down the river. The prosecutor's argument was proper." [Doc 9, bottom of page 70]

Again, the Respondent is doubling down on the prosecution's lie. While there certainly is brush in the general area and beneath the water, the York's testimony is clear that the first gun was found in the mud at the edge of the water, the others were found deeper in the channel, and the case was found freely floating in a back-current. There was no brush involved in the immediate area of the guns or the case, and any brush at the time of discovery will have been greatly changed from the night of the murder because the river had been in flood for two weeks between the murder and discovery of the guns. The prosecutor knew that absolutely no rational person would believe that the Petitioner had dumped the guns next to his alibi location two weeks after the murder and so intentionally fabricated the inference. An inference which again, was neither based upon the evidence nor reasonable.

e. Respondent then defends prosecutor's statement about the timing of rust on the discovered guns based upon York's testimony that there "wasn't really any rust buildup starting," [Doc 9, top of page 71]. However, this fails on two points A) Mr. York is not himself an expert on the matter of forensic timing based upon rusting patterns, and B) his testimony as originally stated actually worked in Petitioner's favor by stating that the gun had clearly not been exposed to the elements for very long. It is Petitioner's claim, based upon personal experience, that while metal certainly rusts faster when exposed to open air, the churning waters of the river have plenty of oxygen saturation to cause metal to rust. Again, the prosecution knew

the evidence pointed to the guns being dumped over the river bridge in the days prior to discovery, rather than the two weeks it had been since the murder. A problem they attempted to solve on closing with unsupported, unreasonable, and improper self-testimony. An evidentiary hearing on this matter would prove these allegations to this Court.

      f. Next, Respondent defends prosecutor's argument that Beth was:

> "a disabled person who was having some problems and
> suffering in her home," and that "it was that disability
> that kept her trapped in this marriage with" Petitioner (Tr.
> VIII 108). Beth's father testified that when Beth went away
> to college, he became concerned that she might have
> Asperger's Syndrome, which is "an element of autism." (Tr.
> II 29-31). [Doc 9, middle of page 71]

Petitioner would show that this showcases the prosecutor's willful use of misinformation. Asperger's is a well-known high-functioning form of Autism found in some of the most successful men and women in the world such as Bill Gates, Barbara McClintock, and even one of our Founding Fathers, Thomas Jefferson. Certainly, no one would see any of these people as "disabled" or "trapped". Respondent goes on to quote a multitude of comments which certainly do show the regular struggles of a person suffering from depression, but nothing to support that Beth was disabled or trapped. In fact, while Beth's parents said they wouldn't be surprised if we separated (something they have wished for since before we married) neither they nor anyone else ever said she actually wanted to separate, and Petitioner himself is shown to be a stanch supporter of sticking with his wife through thick and thin, "for better or for worse". How is it that a devotion to the love of his life and refusal to abandon the mother of his children is somehow a mark of ill intent? Again, the prosecution had a problem with their theory, and when the evidence wasn't in their favor, they covered it on closing with their own fabrications and unreasonable inferences.

      g. Respondent goes on to defending the prosecutor's bolstering of Agent Titsworth's opinion of the robbery being staged:

> "'But your common sense will tell you just what Agent
> Titsworth told you, this crime makes no sense that a[n]
> intruder would have done this.' (Tr. VIII 9)." [Doc 9,
> bottom of page 72]

Petitioner's understanding of Bolstering is:

> "To enhance evidence with additional evidence. This practice
> is often considered improper when lawyers seek to enhance
> the credibility of their own witnesses." [Black's Law
> Dictionary (11th ed. 2019)]

It seems clear to Petitioner the above statement fits the definition.
Further, Petitioner maintains Agent Titsworth was perjuring himself
here as well (with full knowledge of the prosecution), but defense
counsel chose not to pursue this attack and Petitioner understands
issues of trial strategy are not generally considered ineffective. If
it matters, Petitioner feels an independent criminology expert would
have countered Titsworth's testimony. Any person familiar with the
Magness family's regular patterns (and remember, this is a very small
town where most folks know each other) would have seen that both
Petitioner's main truck (the one borrowed by Mr. Lyon) and his primary
commuter (the G-6) were gone and the lights were out. Petitioner did
not generally lock his doors and so anyone approaching from the rear
would have found an unlocked back door. Once inside there is a short
hall with two doors, left and right. The right leads to the closet
which contained the gun cabinet, and the left to the master bedroom. A
50/50 chance puts the intruder in the closet, they make noise
disabling the hasp and gathering an armload of guns, as they exit with
said armload they are confronted by an awakened Beth who plainly sees
and could later identify them. Any experienced investigator would
surely know that for the vast majority of burglaries that get
interrupted, the perpetrators don't stick around to grab more things,
they run with what they have (or even drop what they have if it's too
heavy). This is doubly so for a home invasion that turns unexpectedly
deadly. After having shot Beth (possibly with Petitioner's own gun

which they may have had in hand), what intruder would stick around to
see if others heard the shot? The three long guns, handgun w/ case,
and several boxes of ammo were already a full armload, so they
couldn't carry much more anyway. And then once away from the scene,
they know they can't risk selling the guns which are now connected to
a murder, not just a theft. Then two weeks later, when the town is all
talking about how the police are looking at Petitioner and where
Petitioner was that night, dumps them in the river close to the alibi
location. The above postulation may not be proper here, and Petitioner
apologizes for wasting this bit of the Court's time if so, but he knew
of no other place to get it off his chest. Petitioner truly does
believe Agent Titsworth knowingly lied about the scene "not fitting"
with a burglary gone wrong, and that the prosecutors directly
conspired with him to introduce this false evidence.

　　h. Next, Respondent defends prosecution's bolstering of the
Crouchs' testimony when she stated the Crouchs:

> "…didn't have any reason to come in here and tell you
> anything other than what they actually remembered." [Doc 9,
> top of page 73]

This is inherently tied to Ground/Argument 2 as that Ground must be
held as true for this issue to be fully supported. However, once Mrs.
Reilly's interference is established, it is plain that not only did
the trial prosecutor know there was reason to doubt (through trial
testimony if nothing else) but that this statement was directly
targeted to bolster against that interference. And again, while the
Respondent points to the testimony that Mr. Crouch confirmed nothing
could make him lie about what he remembers, Petitioner's claim is that
Mrs. Reilly's actions actually altered said memory such that Mr.
Crouch truly believes the revision.

　　i. Respondent next defends the prosecutor's declaration that:

> "'[n]o other DNA was found inside the house indicating that
> a stranger had been there,' and 'no one else's DNA was found

> on the [gun cabinet] lock except for Beth and Michael
> Magness.' (Tr. VIII 17)." [Doc 9, bottom of page 73]

And:

> "In short, the only DNA profiles found belonged to either
> Beth or Petitioner, and there were no unknown DNA profiles
> found in this case (Tr. VI 25)" [Doc 9, top of page 74]

However, between these two quotes, even the Respondent shows that the DNA on the lock was a mixture from which "neither Petitioner nor Beth could be *excluded*" (emphasis Petitioner's) and that the lesser of the two DNA profiles from the fingernail clippings could not be determined (i.e. was unknown). The actual reports and testimony were even more explicit in stating they could not rule out the presence of a third party's DNA. DNA evidence is a highly technical field which the average person cannot be expected to understand; which is why we have experts to testify and counsel to question in terms the Jury will understand. Not only did the prosecutor make an improper, non-expert opinion of the DNA evidence presented, but the latter statement above is verifiably false. In a case such as this one, where the totality of the verdict is supported only by the inferences drawn from circumstance upon circumstance, every circumstance matters, and so it is clear that any reasonable jury could be swayed by the statement "there were no unknown DNA profiles" made by the People's sworn representative in the closing arguments of a week-long trial. Even if we ignore the psychology of "facts" presented by authority, we can still know for certain that this verifiably false information was in the Jury's much more recent memory than the actual expert's testimony and it is unreasonable to expect any member of the jury to have been proficient enough in DNA analysis to refute the prosecutor's claim.

j. Next, Respondent defends the prosecutor's misrepresentation of Ms. Hill's testimony. This is clear cut on the record. Ms. Hill's testimony stated 5'10", balding, kind of pudgy, and on the light side of the mid 200s in weight. While this description certainly fits a

large portion of the American population, it is not a match to Petitioner at the time of the murder. Ms. Hill even commented in her testimony that she was unsure of the height, but that she is really good at estimating weight, and at the time Petitioner was around 300 pounds in weight and obviously well beyond "kind of pudgy". And so again, we have an instance where the actually testimony doesn't fit the State's theory, but the prosecutor performs their misdirection to leave the Jury with a false impression more in favor of a conviction.

k. The next lie Respondent attempts to cover is in regard to the bridge loan Petitioner had secured for the restaurant. Respondent's claim that the prosecution was simply parroting the lie told by Titsworth fails on two fronts, A) there exists documented proof that this loan was approved and Petitioner was still "shopping around" for a better interest rate, and B) Titsworth again avoids actual perjury by sliding around "to the agent's knowledge, the loan 'did not go through.'" [Doc 9, bottom of page 74]; however, even that slippery statement is a far cry from the definitive "'and [the loan] didn't go through…'" (Tr. VIII 23-24)." [Doc 9, bottom of page 74] Yet another layer of inference which wasn't supported by the facts, and so had to be shoehorned into place during closing arguments where it was safe from cross-examination.

l. Next, Respondent addresses the misstatement that Petitioner solicited multiple loans to cover funeral expenses. Without the transcript, Petitioner cannot quote the exact testimony, but he is absolutely certain the loan from his Mother was always for the restaurant. If Petitioner's mother did misstate this on the record, and defense failed to correct it on cross-examination, then an evidentiary hearing would allow said witness to correct the record, but Petitioner admits that *if* it is the testimony that was incorrect, then this particular issue would be withdrawn. If not, it is simply

another instance of square evidence being pounded into the rounded inference.

m. And lastly, Respondent argues that the prosecutor did not actually attribute statements as having come directly from Petitioner on the stand, but rather as having come from statements made to investigators and other witnesses. [Doc 9, middle of page 79] Again, without a transcript Petitioner cannot point directly to them, but in his previous reading of the transcript, and his own memory of the closing arguments, it is Petitioner's true belief that these statements went well beyond the accepted norm and made assertions unsupported by other evidence.

36. While Respondent has attempted to defend each individual inappropriate statement, they have failed to address the overall pattern which de novo review will reveal:

> "In assessing the propriety of prosecutor's statements, courts may consult codes of professional responsibility and consider prosecutor's intent." [United States v Christy, 916 F.3d 814]

Petitioner claims the prosecutors knew full well the inability of the evidence to support the State's theory and engaged in a well-planned and through campaign to mislead, misinform, and misdirect the Jury. Petitioner does not believe for a moment that all these statements were coincidence or simple mistakes, but even if they were, when one steps back to view their effect as a whole, the overall effect of fundamentally disrupting Fairness and Due Process is undeniable.

37. While Petitioner is unsure of the procedural bars to Habeas review presented by the Respondent he none-the-less addresses them below:

a. Presumption of State Court's Findings: As shown in Argument 9, the State Court's findings cannot be relied upon because of the severe Due Process violations. However, even if we ignore the issue of Ground 9 we are still confronted with the record. Given the facts above, no

unbiased, reasonable jurist could have reviewed the post-conviction record and found as the District Court or OCCA found. It is Petitioner's claim that the District Court was explicitly defensive of its own Trial Court rulings and the fact it allowed these abuses in the first place; therefore not unbiased. And it is clear the OCCA failed to review the record, as that must be the most likely explanation for their evident failures to follow Oklahoma statute and established procedure.

b. **Cause for the Default:** As shown in Argument 8, this claim is plainly evident as a "dead bang winner" which any effective counsel would have presented on Direct, especially in light of Petitioner pointing it out at the time.

c. **Actual Prejudice:** As Respondent specifically foregoes rebutting this component [Doc 9, Page 100], Petitioner stands on his previous arguments and the self-evidence of the prejudice caused by the procedural bars.

d. **Fundamental Miscarriage of Justice:** In addition to the Due Process claims raised in Ground/Argument 9, there is amble case law, both Federal and State, as well as accepted scientific evidence, which show any one of the above issues can directly result in false convictions. In the instant case, it is clear that most (if not all) of the inferences necessary to support a guilty verdict were at least in part based upon the errors above which so infected the overall trial as to deprive Petitioner the fundamental right of a Fair Trial and thereby of Due Process.

## ARGUMENT 4: ABUSE OF JUDICIAL DISCRETION
### REPLY TO PROPOSITIONS II & VII ON GROUND 4

38. As mentioned in the Preamble, Petitioner is aware of the interdependency of his Grounds. He hereby incorporates all argument and authority as presented in his Application for Post-Conviction

Relief [Doc 9, Exhibit 8, Prop 3, Pages 11-14], Petition in Error [Doc 9, Exhibit 10], and this document's Argument 8, Section D.

39. In their Proposition VII, Respondent argues the issue of judicial bias should be procedurally barred. Petitioner will more directly address this issue below, but wishes to point out that again we have a catch 22 and the §1086 Error. Petitioner's claim includes the post-conviction actions taken by the District Court (who is the same as the Trail Court) as further clear and convincing evidence of that Court's bias. Since Appellate Counsel obviously did not have this same level of evidence at the time of Direct, the reasonableness of their failure to pursue the issue then is different from the reasonableness it holds now. The same holds true for the post-conviction application which again was prior to this additional evidence. Therefore, because the District Court's actions on the Post-Conviction proceedings is new direct evidence of the Trial Court's bias this claim is properly before this Court and should not be procedurally barred.

40. Respondent first defends the admittance of evidence related to the charge of Arson by quoting OCCA's opinion on Direct:

> "Arson. The State argued that [Petitioner's] need for his wife's life insurance money was his primary motive for murder. To support this, the State presented extensive evidence of [Petitioner's] dire financial situation, with particular focus on the consistently unprofitable restaurant venture. [Petitioner] had used insurance proceeds to pay restaurant debts before. Evidence of past insurance claims may be relevant to show motive. Stemple v. State, 2000 OK CR 4, ¶ 50, 994 P.2d 61, 72." [Doc 9, top pf page 24]

The underlying statement of "[Petitioner's] dire financial situation" is itself a misrepresentation of the evidence as shown in Argument 3.m above and the OCCA failed to review this point as well the other "supporting" evidence below:

a. The local fire chief claimed Petitioner stated there was no insurance on the house. However, this story was not reflected in any documents from the time of the fire. In fact, the chief only made this claim when confronted with the fact that he had failed to follow protocol and needed an excuse for not having called in an investigator.

b. The witness who testified that Petitioner had made jokes about effective arson was a former, disgruntled employee who had been explicitly fired for rumormongering and causing a hostile work environment.

c. Ms. Simmons, who testified that Petitioner had made statements four years prior, about arson and murder for insurance money, was a scorned, would-be lover who Petitioner and his Wife had previously rejected. Agent Titsworth, who had been told of Ms. Simmons' infatuation with Petitioner and her attempts to disrupt Petitioner's marriage, explicitly gave Ms. Simmons information about what Petitioner had been charged with prior to her initial interview which then yielded her story. A story which is refuted by evidence not in the record such as emails between Beth Magness (Petitioner's wife and the murder victim) and mutual friends in Wisconsin where the alleged affair happened. An evidentiary hearing would allow for such evidence to be added to the record.

41. This issue is further mitigated by the fact that Petitioner himself immediately called his insurance provider to report the fire and have it investigated, the insurance investigator found absolutely no evidence of arson (as reflected in their report), and the claim was promptly paid. The issue here is not an argument that the jury should have considered the above claims differently, but that based upon the evidence, the Trial Court abused its Discretion for allowing it in the first place. And like their Insufficiency of Evidence claim, Appellate

Counsel completely failed to support this argument on Direct which led to a procedural bar prejudice on the post-conviction proceedings.

42. Next, Respondent defends the admittance of: "an inappropriate relationship with a teenage girl." [Doc 9, bottom of page 24]. Which, as mentioned above [Argument 2], only arose after the State's witness tampering and was further supported by the verifiably false information that "[K.C.] and [Petitioner] became close friends" during the time of the fostering. This completely discounts the life long, familial relationship shared between K.C., Petitioner, and Beth Magness (not to mention the overall close ties between the Magness and Crouch families); making it look like something sudden and sinister. Like the arson above, this "bad act" can only go to Motive if we make an assumption of guilt based upon flawed and tainted circumstance. The Trial Court made no attempt to weigh this evidence or make any judgement on its validity, and instead relied upon the Jury to decide its truthfulness which is exactly the opposite of what should be done with such character evidence and plainly erroneous.

43. Respondent moves on to quoting the State's defending of the admittance of Ms. Simmons' testimony. As mentioned in in Section c. above, Simmons' testimony was tainted by Agent Titsworth's divulging of case information prior to her interview. However, there are a great many other reasons as to why this testimony is unreliable and should have been inadmissible and there exist emails between Petitioner's wife and other Wisconsin friends which directly refute many of the claims made by Simmons:

a. Petitioner and his Wife were in fact at one point open to a "polygamous relationship" with Simmons, but there was never any level of secrecy. In fact, Beth's emails show that it was Beth who spoke to Simmons about the possibility of joining the Magness marriage as a second wife, but that when she and Petitioner moved back to Oklahoma,

Beth and Petitioner ended the relationship rather than bringing Simmons with them.

      **b.** Simmons's testimony claims the relationship became consensually sexual; however, Simmons' filed an allegation of rape nearly a year after Petitioner moved to Oklahoma. An allegation which was investigated and shown false.

      **c.** Simmons also attempted to use the Wisconsin Courts to block Petitioner from attending events through restraining orders which were again ruled against as unsupported.

It is clear from the evidence that Ms. Simmons can and has resorted to false legal accusation to enact revenge upon Petitioner and his Wife, a fact directly given to Agent Titsworth who then clearly abused it to his advantage. The Trial Court refused to weigh this evidence when defense counsel objected to its use, and again chose to allow the Jury to make the determination as to its allowance in direct violation of Due Process. An evidentiary hearing would allow this Court to view the additional evidence mentioned above which defense counsel chose not to raise in trial for fear of the prejudice such a polygamous relationship would create.

    **44.** Next, Respondent quotes the OCCA's upholding of the Trial Court's admissions based upon "the labels of the crimes" and that Petitioner "misunderstand[s] the trial court's rulings." [Doc 9, bottom of page 25]. However, yet again we can plainly see that the OCCA failed to review the underlying record. The Trial Court did not weigh the merits of these accusations during the hearing on the Motion in Limine or the "Burk's" hearing (again, stating from memory, without the benefit of the transcripts) and instead arbitrarily allowed any "bad act" evidence so long as it didn't use certain "terms of art" or was not itself a criminal act. This effectively shifted the responsibility of determining the *admissibility* of this evidence to the Jury who then heard it all under the impression that it had

already been ruled as admissible. An evidentiary hearing on this matter would present to the record the evidence which the Trial Court refused to hear and clearly show that not only was the evidence for more prejudicial, but that no fair-minded jurist could have found by clear and convincing evidence that Petitioner even committed these acts to begin with.

45. Respondent next argues that Petitioner has failed to exhaust his Constitutional claims on this issue by stating:

> "If Petitioner's claim in his petition to this Court alleged these rulings violated his federal constitutional rights, it would be unexhausted because Petitioner's state-law claim in state court would be insufficient to put the OCCA on notice of a federal constitutional claim." [Doc 9, bottom of page 26]

However, this is clearly false as Petitioner explicitly raises the Constitutional claims on post-conviction (see quote of [Doc 9, Exhibit 8, Page 11] below). Which even if we ignore the §1086 Error, this issue should have been reviewed as part of the Ineffective Assistance of Appellate Counsel claim on post-conviction. Both the District Court and the OCCA (if they actually read the Application) would have clearly seen Petitioner's Constitutional claims. Further, if either Court had conducted the *Logan* tests as required by Due Process they must have fully considered the merits of these claims to rule on the Ineffectiveness of Appellate Counsel. And so either **A)** the State Courts denied Petitioner post-conviction Due Process by failing to review the issues on the merits (thereby opening the issue to Habeas review, See Argument 9) or **B)** they did review the merits (unsupported by the record) and were thereby put "on notice of a federal constitutional claim."

46. Respondent also claims:

> "However, even in his petition to this Court, Petitioner claims only that the trial court abused its discretion in admitting the evidence; he again makes no claim that the

> admission of the evidence denied him any federal
> constitutional right. Doc. 1 at 17-23." [Doc 9, middle of
> page 27]

Petitioner sees and admits he made a copy-paste error when moving his

post-conviction argument to this Habeas Application. In Petitioner's

Post-Conviction Amended Brief the first paragraph reads:

> "The Trial Court repeatedly abused their Judicial Discretion
> in favor of the State by the admission of improper evidence,
> directly prejudicing the defense via facial expression and
> comments, and failure to properly instruct the jury. Thus,
> Petitioner was denied the Constitutional Rights of Due
> Process, Equal Protection, and a Fair Trial." [Doc 9,
> Exhibit 8, Page 11]

The second paragraph was not applicable to this Habeas Petition, and

when Petitioner copied over the language, he inadvertently omitted

both the first and second paragraphs rather than just the second. It

is clear from the record that the State was put on notice of these

violations, and Petitioner begs this Court to allow the admission of

the above quoted paragraph to this Habeas Proceeding as the omission

was clearly clerical in nature and the claim presented was clearly

Constitutionally based.

   47. Next, Respondent claims that:

> "Because the OCCA found the evidence admissible under state
> law, this should end this Court's inquiry" [Doc 9, bottom of
> page 27]

However, by this logic, no such claims could ever be brought to Habeas

review. As shown in Argument 9, the very essence of Due Process is a

Court following the established laws and procedures of its

jurisdiction. To claim that a Federal Habeas Court should simply "end

[their] inquiry" because the State says so is antithetical to the

concept of Federal protection. No matter how many times the Respondent

attempts to gaslight this Court into believing this Ground is a "state

court's interpretation of state law" [Doc 9, bottom of page 27] the

fact remains that Due Process is a Constitutional right and it is

therefore entirely proper for this Court to review the State Court's
actions as they relate to State law and procedure. In this Ground,
Federal Habeas review need make no judgement upon the underlying laws
and procedure (in fact, Petitioner makes no such attack), but rather
consider whether the State Courts followed those laws and procedures
to which they are bound in the interest of Petitioner's Federal rights
to Due Process and Fundamental Fairness.

48. Respondent goes on to defend the issue of evidence admittance in
general by quoting 12 OS §2404(B). [Doc 9, bottom of page 28]. While
this is the correct statute, Respondent incorrectly states that the
statue was followed. Specifically, as shown above, the Trail Court
failed to uphold "(d) proof of the evidence must be clear and
convincing;" [Doc 9, bottom of page 28] since they did not follow the
procedure of weighing the evidence of the alleged "bad acts" prior to
their admission. Petitioner's primary point on this subject is that 12
OS §2404(B)(d) clearly puts the burden of "clear and convincing"
evidence on the prosecution and gives the Trial Court direct
responsibility to weigh this evidence *before* the jury is allowed to
hear it. This is in statute precisely because of the prejudice caused
by the mere mention of certain "bad acts" and to protect citizens from
unfair, nebulous accusation. By abdicating this responsibility, the
Trial Court explicitly allowed the Jury to hear these *un*clear and *non*-
convincing accusations, and while most instances did receive the
instruction that the Jury should only use the evidence for Motive
there was absolutely no instruction that they should first consider if
the accusation itself is based upon clear and convincing evidence.
Thus, they assumed it had already been found to be admissible.
Compounding the issue, neither the District Court nor the OCCA
reviewed this issue on post-conviction. While Petitioner agrees with
the Respondent that Appellate Counsel failed to adequately raise the
issue on Direct (by failing to offer evidentiary support or call for

hearings on such), this does not excuse the post-conviction Courts from failing to review this issue on the merits as required by *Logan* (due to the Ineffective Assistance of Appellate Counsel claim). (Not to mention the §1086 Error.)

49. Respondent also claims:

> "the trial court was simply limiting the potential prejudicial impact of the evidence by preventing the use of terms like "arson" and "adultery". This demonstrates the trial court's careful guarding of the fairness of Petitioner's trial, not that it mistakenly believed only crimes could constitute bad acts" [Doc 9, middle of page 29]

Petitioner directly disputes this claim and believes the transcript record completely contradicts it. In fact, this ruling had just the opposite effect. Rather than saying "adultery" the prosecution was forced into much more lurid description of the same act. "Petitioner had a sexual affair with other women without his wife's knowledge." is certainly more impactful than "Petitioner committed adultery." especially when such long, evocative statements must be made every time. (Note: Petitioner maintains there was no adultery, but just uses this as an example in absence of the transcript to provide a direct quote.) Several heated discussions with Defense Counsel made it clear that the Trial Court's interpretation of "bad acts" was only in the legal terms and not the acts themselves. Without access to the transcripts, Petitioner cannot point to explicit examples and must rely on this Court to do so, or to hold evidentiary hearings.

50. Respondent then goes on to rehash their previous claims of the Arson and Infidelity being probative of motive. As addressed above, if these claims were true, then yes, they would have been probative; however, no consideration was given to the probability of their truthfulness. Petitioner is hesitant to invoke the fundamental fairness doctrine here as it carries a significant burden of proof which Petitioner does not fully understand at the writing of this

Reply. However, Petitioner certainly does feel that the whole reason evidence of such "bad acts" must be proven by clear and convincing evidence prior to being introduced to the Jury is to prevent the infection of prejudice caused by the mere suggestion of such acts. In the instant case, the primary defense against the State's claim of infidelity being a motive would have been to admit to the Jury that Petitioner and his wife were polygamous and not only open to having a second wife, but in fact looking for one. (Beth was bisexual but neither she nor Petitioner were into "swinging". They wanted a stable, faithful third partner.) This fact alone disproves the State's theory that Petitioner needed to "get rid of" his wife to pursue other women. To the contrary, it was Beth who usually pursued other women, but as an introvert, she appreciated it when Petitioner made efforts to approach the women she chose. However, offering this argument to the generally highly religious, conservative rural Oklahoma Jury members would only cement in their minds the "oddness" of the Petitioner, instill a high level incredulity, and cause another sorts of prejudice. The Prosecution certainly knew this and counted on it, but the Trail Court should have been the neutral party that heard, weighed, and denied the evidence thus sheltering Petitioner from the prejudicial impact it had with the Jury.

51. Another body of evidence which was unavailable to Appellate Counsel, and which Respondent has avoided addressing by their claims about Ground 9, are the District Court's actions on the post-conviction proceedings. Perhaps the most evident is the timing of the denial of the original application. A mere nine days after the filing of the original application, a news article came out in the local paper airing all the grievances Petitioner made against the (same) Trial Court. On the same day as the article, that same District Court Ordered an unsupported, blanket denial on an unspecified "fatal defect". There had been no scheduled hearing or docket appearance of

the application and so it is certainly a reasonable inference that the front-page newspaper article criticizing the Honorable Judge Parish is what drew the District Court's ire, resulting in a "manifestly unreasonable" [US v McCullough, 457 F.3d 1150 (10th Cur 2006)] decision. While one could argue that this "momentary lapse" was then cured by the original remand by the OCCA, Petitioner puts forth that as shown in Argument 9, the District Court still did not follow the proper *Logan* procedures nor did they recuse themselves as required by Oklahoma statute. Instead, they continued to defend their previous actions and put up just enough of a show to pass muster. And again, while one could argue this bias was only created on post-conviction by said news article (a point in favor of Argument 9), Petitioner claims it is simply an extension of the animosity and prosecutorial favoritism whose pattern can be seen all the way back to the preliminary hearing.

52. While Petitioner is unsure of the procedural bars to Habeas review presented by the Respondent he none-the-less addresses them below:

a. **Presumption of State Court's Findings:** As shown in Argument 9, the State Court's findings cannot be relied upon because of the severe Due Process violations. However, even if we ignore the issue of Ground 9 we are still confronted with the record. Given the facts above, no unbiased, reasonable jurist could have reviewed the post-conviction record and found as the District Court or OCCA found. It is Petitioner's claim that the District Court was explicitly defensive of its own Trial Court rulings and the fact it perpetrated these abuses in the first place; therefore, not unbiased. And it is clear the OCCA failed to review the record, as that must be the most likely explanation for their evident failures to enforce Oklahoma statute and established procedure.

**b. Cause for the Default:** As shown in Argument 8, this claim was already plainly evident at the time of Direct; however, with the additional evidence of the post-conviction proceedings (which were not available prior to this Habeas Application) it becomes yet another "dead bang winner" which clearly calls for relief.

**c. Actual Prejudice:** The admittance of improper character evidence alone drastically infected the inferences drawn from the purely circumstantial evidence and the Trial Courts obvious displeasure with the Defense throughout the trial went well beyond the accepted norms of human justices' everyday expressions to instill a prejudice against Petitioner; however, even if each individual instance were to be found harmless, it still shows an overall pattern of bias and opposition which is reinforced by the Court's continued actions on post-conviction.

**d. Fundamental Miscarriage of Justice:** In addition to the Due Process claims raised in Ground/Argument 9, there is the fundamental issue of the appearance of fairness. Petitioner has been condemned to die (LWOP) within the confines of the Oklahoma Department of Corrections and through the combination of AEDPA and 22 OS §1080.1 will never again be able to attack the unfairness which seems so apparent to him. Even if it is assumed the Jury ultimately came to the correct verdict (which Petitioner vehemently refutes), the path by which it was reached is so infected by the abuses of the Trial Court (in combination with the Grounds raised elsewhere) that the very institution of State Justice should be ashamed.

### ARGUMENT 5: JURISDICTION
### REPLY TO PROPOSITION III ON GROUND 5

53. Respondent points out that Petitioner fails to claim "Indian decent" and is correct. In fact, Petitioner specifically claims that neither he nor the victim of the underlying criminal case are "of Indian decent". The Respondent, as the OCCA and District Court before

them, fails to understand (or willfully ignores) that Petitioner's claim is one of jurisdiction based upon *racial discrimination*. Thus their continued argument regarding Petitioner's race only furthers Petitioner's claim.

54. Petitioner hereby includes all argument and authority as presented in his Amended Post-Conviction Brief [Doc 9, Exhibit 8, Proposition 4, Pages 14-17] and subsequent Petition In Error [Doc 9, Exhibit 10, Paragraph 5, Page 5]. The State chose not to respond to this claim in the Post-Conviction proceeding thereby waiving all argument. The District Court wholly failed to address the claim of racial discrimination by simply doubling down on the fact that Petitioner is not of "Indian decent". The OCCA then furthered this error by failing to review the record, or even the underlying claim, as evidenced by the fact that they too ignored the claim of racial discrimination and failed to note that the State had chosen not to reply, thereby waiving all argument.

55. Respondent claims:

> "In his fifth ground, Petitioner has failed to identify any Supreme Court law holding that the State of Oklahoma lacks authority to prosecute crimes committed by a non-Indian against a non-Indian within its borders." [Doc 9, Top of Page 35]

Again, Petitioner does not deny Oklahoma's jurisdiction over "non-Indian" races and acknowledges the recent SCOTUS rulings concerning Oklahoma's jurisdictional providence. However, the specific question of racial discrimination has not been adequately raised and Petitioner claims that the laws of the United States cannot discriminate on the basis of Race, and so if one racial class of citizen (i.e., those of certain Indian decent) enjoys the extra protections of Federal jurisdiction, then all citizens must have the option of that same enjoyment. So just as a person of Indian decent has the *option* of Federal jurisdiction, so too must all races enjoy that same *option*. In

the instant case, the higher standards of the Federal Courts and Public Defenders would certainly have prevented the vast majority of misconducts, ineffectiveness, and abuses of discretion (as outlined in the other Grounds) which all lead to a clear prejudice resulting in the wrongful conviction of an innocent person.

56. If granted an evidentiary hearing, Petitioner would present evidence / testimony concerning the general benefits of Federal over Oklahoma courts, specific benefits Petitioner would have enjoyed in the underlying case, and the resulting miscarriage of justice which convicted an innocent person. Once it is established that Federal jurisdiction would have been beneficial, it is then clear that denying this benefit to the Petitioner based upon his Race is in violation of Petitioner's Constitutional rights to Due Process and Non-Discrimination on the basis of Race.

### ARGUMENT 6: CRUEL AND UNUSUAL PUNISHMENT / EQUAL PROTECTION
### REPLY TO PROPOSITION VIII ON GROUND 6

57. Petitioner understands this Ground would be setting new case law; however, just as we no longer put the condemned to firing squad, hanging, or beheading, LWOP will in all likelihood join this list because a clean, painless death is infinitely more humane than the slow, seemly endless emotional torture of Death by Time without the possibility of Hope or Freedom. It is Petitioner's true belief that even if we as a nation have not yet reached the societal level attained by our World piers (Spain, Norway, Portugal, most of Central and South America, etc…) where LWOP is recognized as Cruel and Unusual (crueler than execution, and growing more unusual as other World Powers ban its use), it is still vital to entertain such ideals from time to time in the hope that the more noble among us will see what the masses may not.

58. The Respondent implores this Court to dismiss this claim based upon the State's procedural bar; however, in addition to the §1086

Error, the State chose not to respond to this, or any claim, in the Post-Conviction proceeding thereby waiving all argument. When the District Court ruled on this Proposition the only argument on the record was Petitioner's Amended Application and so it is clear that the District Court relied on argument and/or personal belief not within the record. The OCCA then furthered this error by failing to review the record as evidenced by the fact that they failed to note the District Court's clear departure from established law and procedure resulting in the District Court becoming the adversarial voice of the Prosecution rather than the impartial arbiter of the Courts.

59. Petitioner hereby includes all argument and authority as presented in his Amended Post-Conviction Brief [Doc 9, Exhibit 8, Proposition 5, Pages 17-19] and subsequent Petition In Error [Doc 9, Exhibit 10, Paragraph 5, Page 5]. While the District Court ruled, and OCCA upheld, this Proposition to be procedurally barred on post-conviction, even if we ignore the §1086 Error, the State was still afforded the opportunity to cure the Constitutional violation via *Logan* review of the Inefficiency of Appellate Counsel claim presented on post-conviction, thereby exhausting State remedy. By the logic presented in the Response [Doc 9, Pages 91-93] no Constitutional claim could ever be raised so long as State law and procedure were followed. This is clearly a false argument as the concepts of Cruel and Unusual and Due Process are clearly matters proper for Federal review, rely on more than just State law, and there are ample examples of "State Laws" being overturned by Habeas review.

60. An evidentiary hearing in the instant case would highlight the dangers of potentially irreversible (in the combination of ADEPA and 22 OS §1080.1) sentences which do not directly cause the death of an innocent human being, but none-the-less condemn them to die within the confines of imprisonment. Petitioner would show the same evidence and

testimony others have presented when fighting against the conventional death penalty (such as exoneration rates) plus a multitude of psychological and other scientific evidence which prove that such sentences inflict far more anguish and emotional suffering than even execution.

61. Petitioner would also show the above evidence and testimony to show that, in the interest of justice, one must at least equate LWOP with conventional death sentences and therefore afford the same extra protections enjoyed by those facing a sentence of execution to those facing LWOP in an effort to prevent the very same potential miscarriages of justice. A protection which is now doubly needed given the scant year afforded to State post-conviction efforts [Again, AEDPA & 22 OS §1080.1].

62. Previously, a person serving a sentence of LWOP could always have the hope of post-conviction relief; however, now even that glimmer has been snuffed out and the execution by time becomes irrevocable. Personally, if Habeas review ultimately fails, Petitioner would rather have had a conventional execution. At least then it would be known when the injustice would end.

### ARGUMENT 7: INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL
### REPLY TO PROPOSITION VIII ON GROUND 7

63. Again, the Respondent implores this Court to dismiss this claim based upon the State's procedural bar; however, the State chose not to respond to this, or any claim, in the Post-Conviction proceeding thereby waiving all argument. When the District Court ruled on this Proposition the only information on the record was Petitioner's Amended Application and so it is clear that the District Court relied on argument and/or personal feelings not within the record. The OCCA then furthered this error by failing to review the record as evidenced by the fact that they failed to note the District Court departed from statute and procedure, clearly acted as adversary rather than arbiter,

and what little justification was offered in the District Court's
"Findings of Fact" failed to adequately support the ultimate
"Conclusion of Law".

**64.** Petitioner hereby includes all argument and authority as
presented in his Amended Post-Conviction Brief [Doc 9, Exhibit 8,
Proposition 6, Pages 19-21] and subsequent Petition in Error [Doc 9,
Exhibit 10, Paragraph 6, Pages 5-6]. While the District Court ruled,
and OCCA upheld, this Proposition to be procedurally barred on post-
conviction, the State was still afforded the opportunity to cure the
Constitutional violation thereby exhausting State remedy. By the logic
presented in the Response [Doc 9, Pages 91-93] no Constitutional claim
could ever be raised so long as State law and procedure were followed.
This is clearly a false argument as the concept of Ineffective
Assistance of Counsel is clearly a matter proper for Federal review
and relies on more than just State law.

**65.** Further, Respondent complains Petitioner failed to make the
claim that Appellate Counsel was ineffective for not raising
Ineffectiveness of Trial Counsel [Doc. 9, Page 95]. In reviewing the
citation provided by the Respondent, Petitioner admits this may have
been in error; however, it was Appellate Counsel who informed
Petitioner that as an OIDS attorney she could not raise ineffective
claims against another OIDS attorney and that Petitioner would have to
do so on post-conviction. If the evidence presented by Respondent on
this matter is correct, then Petitioner asks this Court to consider it
in Ground/Argument 8 as another point for the Ineffectiveness of
Appellate Counsel. Had the State responded with such on post-
conviction, Petitioner would have addressed the issue previously.
Petitioner may have failed in his duty of due diligence to verify what
Appellate Counsel stated was accurate (and in retrospect, admits that
with so many other obvious failings, Petitioner should have checked on
this), but begs leniency due to his pro se, incarcerated status.

**66.** An evidentiary hearing in the instant case would allow Petitioner to introduce evidence and testimony in support of the above claims and give the Respondent an opportunity to refute the same. Because the underlying claims depend upon many issues not part of the record, such a hearing is certainly proper. In particular, Petitioner expects Defense Counsel would better be able to explain which things were trial strategy and which were not and/or what issues may have seemed Ineffective, but actually arose from the prosecutorial misconducts and abuses of judicial recreation raised in other Grounds.

### ARGUMENT 8: INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL
### REPLY TO PROPOSITION IV ON GROUND 8

**67.** Respondent claims the OCCA made a reasonable decision on the merits of this Proposition on post-conviction; however, as Petitioner outlines in his REPLY TO RESPONDENT'S OPPOSITION OF GROUND 9 below, OCCA's decision cannot possibly be considered reasonable without adherence to the statues and standards of review of the State of Oklahoma. Petitioner has shown (see Argument 9) that not only did the State Courts not follow their own *Logan* procedure, but that they violated several statutes and that *Logan* itself is in part in direct violation of statue (§1086 Error).

**68.** As Respondent spent fully half of their 100+ page Response on this Ground, it is clearly a major and complicated undertaking. However, Petitioner believes it can more easily be summated by ruling on each of the underlying issues. In fact, this is precisely the procedure laid out by the *Logan* standard of review which both the District Court and the OCCA acknowledged, and promptly ignored. The only way to truly adjudicate whether or not the State Courts' rulings are reasonable is for this Court to undertake this same standard. Petitioner may not like the "doubly strict" standard of *Richter*, as it makes even the strict *Strickland* standard even more so, but as Respondent has noted, this is the proper standard of review.

69. Petitioner hereby incorporates all of the arguments and authorities of his Amended Application for Post-Conviction Relief [Doc 9, Exhibit 8], Petition in Error [Doc 9, Exhibit 10], and this Reply, as they relate to the relevant Grounds with the additions / comments below:

## A) - Ground 1 - Insufficiency of Evidence

70. Petitioner hereby incorporates his Argument 1 above and would add the following. As stated in Argument 1, Respondent correctly identifies the fatal flaw in Appellate Counsel's argument on Direct. It wholly failed to present a claim under the *Jackson* standard which any member of the Oklahoma Bar (or any Bar) should have immediately understood. The question here then becomes, was the argument as presented by Petitioner on post-conviction sufficient to pass the *Jackson* standard? If so, that alone is enough to show prejudice against the Petitioner's claim, as it failed that test on Direct, became barred res judicata on Post-Conviction (see also §1086 Error), and was therefore never fully considered. It should also be noted that as with all the other post-conviction claims, the State stood silent and waived all argument. Based upon the post-conviction record, no fair-minded jurist could have found as the District Court or the OCCA ruled. Having first passed the *Richter* test we move on to the *Strickland* test. For this we must review the issue de novo and again note that the State never replied, based solely upon the post-conviction record and the sworn testimony of Petitioner's application for post-conviction relief (the only testimony on the post-conviction record) this claim would more probably than not have succeeded on Direct with effective counsel in front of a fair-minded panel of jurists.

## B) - Ground 2 - Pre-Trial Prosecutorial Witness Tampering

71. Petitioner hereby incorporates his Argument 2 above and would add the following. As noted in Argument 2, this error is so plainly

evident that any member of any State's bar should have readily taken note with any amount of due diligence. Petitioner is hard-pressed to think of a more "dead bang winner" [*Logan v State*, 293 P.3d at 975, OCCA adopting the language of the 10th Circuit in, *US v Cook*, 45 F.3d 388, 395] Ground than this one. 1) Appellate Counsel failed to raise this plainly evident error, 2) said failure led to the issue being procedurally barred on post-conviction (incorrectly, see §1086 Error), 3) both the District Court and the OCCA failed to apply the *Logan* test as clearly established by Oklahoma legal procedure, and 4) Witness testimony is a fundamental building block of our justice system; one which is heavily protected by the laws and codes of professional conduct of the United States and the State of Oklahoma, laws and codes which Mrs. Reilly broke (see Argument 2). It is clear the OCCA chose not to review the merits of this claim as no fair-minded jurist could possibly review the record and not see the fundamental miscarriage of justice brought about by Mrs. Reilly's actions and the poison which it introduced into the very roots of the underlying criminal proceeding. Both the *Richter* and *Strickland* tests are clearly evident.

72. Further, Petitioner addresses Respondent's specific arguments below:

> A) "As an initial matter, it was Petitioner, and not any government actor, who first told Mr. Crouch there was a video showing Petitioner out during the night of Beth's murder, but Petitioner told him the video was not admissible in court (Tr. II 207)." [Doc 9, bottom of page 46]

The underlying statement is correct, Petitioner told Mr. Crouch about Agent Titsworth making this claim shortly after Petitioner's arrest in May, 2015. Although Petitioner feels it is a dirty trick with a high likelihood of procuring false testimony, he admits it is an accepted investigatory practice and does not complain of Agent Titsworth's use of falsehood in an attempt to procure the truth of the matter. However, the fact that the issue of the video was created by the

State's Investigatory Agent and initially told to Mr. Crouch by an unwitting Petitioner ignorant of the law, does not excuse Mrs. Reilly's plainly illegal and unethical actions. (See Argument 2)

> B) "Further, it is clear on this record that any misstatement by Ms. Reilly to Mr. Crouch as to the existence of the video or the insurance policy did not substantially interfere with the testimony of either Mr. Crouch or Ms. Crouch." [Doc 9, bottom of page 46]

Petitioner argues nothing could be further from the truth. The record clearly shows the Crouchs' testimony remained adamant even after hearing of Agent Titsworth's claims about the video. It was only after District Attorney Reilly's irrefutable confirmation of the video's existence and complete fabrication of life insurance policies, which implied a direct threat on the lives of Mr. Crouch and his family, (nearly nine months later) that all three of the Crouchs' (Dustin, April, and K.C.) testimonies changed.

> C) "First, there is no evidence that Ms. Crouch had any knowledge that Ms. Reilly had told Mr. Crouch anything about a video or insurance policy. The most that can be said about her testimony is that before preliminary hearing, she told law enforcement that Petitioner could not have left her house that night without her knowing about it, but after having had time to reflect, she testified she believed it would have been possible for Petitioner to leave their house without her hearing him." [Doc 9, top of page 47]

Petitioner would just point out the irony of the Respondent spending so much time validating the equal weight of direct and circumstantial evidence (which Petitioner never refuted) and then here completely discounting it as "no evidence". The circumstantial evidence is that Mrs. Crouch's testimony remained strongly consistent (in support of Petitioner) until right after Mr. Crouch's encounter with Mrs. Reilly's falsehoods. As all three Crouchs (Dustin, April, and K.C.) live together and are deeply, emotionally connected to not only each other but to Petitioner and Beth Magness as well, it is certainly reasonable to infer that Mr. Crouch would have told his family of Mrs.

Reilly's dire warning and the fact that as the District Attorney, she could not legally lie to them. Petitioner himself aches at the thought of what this "irrefutable" betrayal must have felt like to the Crouchs, and can only imagine what doubt, second-guessing, and fear it must have caused in their minds.

> D) "While Mr. Crouch agreed on cross-examination that what he learned about a video and a life insurance policy could '[p]ossibly' 'turn a friend against a friend,' he testified on redirect examination that his testimony was truthful, and there was nothing that any prosecutor could have said that would make him lie about his memory of the events of that night (Tr. II 209, 215-16). Even if Ms. Reilly made the misstatements to Mr. Crouch that she is alleged to have made, it is clear they had no effect on Mr. Crouch's testimony." [Doc 9, bottom of page 47]

Again, Petitioner does not claim any of the Crouch's lied based upon their truly held beliefs at the time of the trial and in fact still loves them as family even though they have cut all ties. It is Petitioner's true belief that the falsehoods told to them by Mrs. Reilly explicitly caused the formation of false memory. A phenomena well documented within the psychological scientific community. Again, Petitioner is without means to research this documentation and must rely on this Court to know or review sources such as *Proof of Reliability of Eyewitness and Earwitness Testimony* [92 AMJUR POF 3d 379] Petitioner cites this article blindly as an example of the type of legitimate jurisprudence literature available on the matter; however, without an evidentiary hearing or legal counsel Petitioner cannot present a full reasoning.

> E) "Even if the OCCA might have found government interference, Petitioner's claim still would have been rejected on direct appeal as any such error was harmless because Petitioner can show neither that the testimony was material nor that Ms. Reilly acted in bad faith." [Doc 9, middle of page 48]

Petitioner's understanding of Material Fact is:

> "A fact that is significant or essential to the issue or
> matter at hand especially a fact that makes a difference in
> a result to be reached in a given case. – What constitutes a
> material fast is a matter of substantive law." [Black's Law
> Dictionary (11th ed. 2019)]

Petitioner's understanding of Bad Faith is:

> "Dishonesty of belief, purpose, or motive." [Black's Law
> Dictionary (11th ed. 2019)]

Petitioner is astounded that anyone could claim with a straight face
that the Crouch testimony was not material. First and foremost is the
issue of alibi. The State's theory of the crime was dead in the water
unless they could overcome this defense. So long as the Crouchs'
maintained there was "no way" Petitioner could have left that night
the theory failed. Additionally, the State went out of their way to
try and show an improper relationship between Petitioner and K.C., a
relationship which all of the Crouchs, including K.C., vehemently
denied until after Mrs. Reilly's falsehoods at which point K.C. (a
minor, and therefore extra susceptible to the impression of false
memory) began doubting the loving familial relationship she shared
with Petitioner and began seeing romantic interest where there was
none. Such romantic interest as the State presented as Motive, another
highly material issue. As for acting in Bad Faith, as presented in
Argument 2 of this document, Petitioner does not see any reasonable
theory where Mrs. Reilly acted with anything other than bad faith.
While Petitioner maintains Mrs. Reilly's actions were intentionally
malicious, even if we entertain the unsupported theory that she was
confused about who she was speaking to and what the actual evidence
was, as the legal representative of the State (and thereby its
citizens, such as the Crouchs) Mrs. Reilly had an obligation to apply
due diligence and faithfully verify the "facts" she presented.
Incompetence is not a defense for such gross negligence and abdication
of the most basic of ethical, professional standards.

**a.** Respondent then goes on to rehash many of the issues previously addressed [Doc 9, pages 47-51] (too large to quote here) and adds that Petitioner's ability to cross-examine the Crouchs somehow negates the ill effects Mrs. Reilly's actions had since the jury had the opportunity to weigh it all. However, this is precisely the issue which Petitioner raises. Respondent argues that if Mrs. Reilly's actions hadn't altered the Crouchs' testimony the jury would have simply disregarded their testimony due to a number of reason; however, we cannot know this. In fact, as previously argued, Petitioner claims the discussion of the false evidence actually worked to leave the jury with the false inference that the video probably did exist and was simply barred from trial. So we must assume that since the jury clearly found the Crouch testimony to be trustworthy (and Petitioner agrees was based upon their sincerely held beliefs at the time of trial), the jury would have found that same trustworthiness applied to the Crouchs' original testimony, no inappropriate relationship with K.C. and no way to leave on the night in question. With this critical inference removed, the remaining stack of inferences which led to conviction topples.

## C) - Ground 3 – Prosecutorial Misconduct

73. Respondent claims out the gate that this Ground would have been denied on Direct as meritless [Doc 9, top of page 52]. However, we cannot determine this from the record as nether the District Court nor the OCCA reviewed the merits or conducted the proper *Logan* tests on post-conviction. In fact, the State stood mute, waiving all argument on post-conviction and we cannot assume they would have done any different on Direct. As presented in Argument 3 above, Petitioner has shown a well-reasoned and methodical presentation for the observed misconducts, and hereby incorporates that Argument here. Had the District Court or OCCA reviewed the record as required by *Logan*, they certainly would have seen these same errors and in the absence of a

State's reply, would have adjudicated accordingly. Having established the arbitrary nature of the ruling (without review of the record) we move to the *Strickland* test. Had the record been reviewed, especially in light of the State's silence, it is much more probable than not that this Ground would have been granted relief by any fair-minded panel of jurists.

### D) - Ground 4 – Abuse of Judicial Discretion

**74.** As presented in Argument 4 above, Petitioner showed incident after incident of Abuse that when viewed not only in the light of the Trial record, but also in the continued pattern of abuse throughout the post-conviction process by the same Court, there can be no doubt that even if the Trial Court began as impartial it quickly became heavily invested in protecting not only its own reputation, but the reputation of its star protégé. (Mrs. Reilly worked for Judge Parish's law firm before becoming DA, has since been groomed to take the upper District seat upon Parish's retirement, and even now holds the lower seat.) As with the other Grounds, it is clear no record based review of the merits was made by the District Court or the OCCA which renders any decision fundamentally unfair and upon actual review of the record, it is more likely than not that fair-minded jurists would rule in favor of the Petitioner.

**75.** One concession Petitioner must make on this point is that, as pointed out in Argument 4 above, the District Court's continued actions on Post-Conviction are a major source of evidence towards proving the Trial Court's bias which were unavailable to Appellate Counsel at the time of Direct and to Petitioner at the time of the post-conviction filing. If the difference of this evidence sways the issue of Effectiveness on this point, then Petitioner would simply ask this Court more fully consider it on their ruling of Ground 4.

### E) - Ground 5 – Jurisdiction

**76.** As presented in Argument 5 above, Petitioner shows that the State failed to consider the actual question raised by Petitioner. The question of racial discrimination based upon race. While Petitioner claims Appellate Counsel should have been aware of these issues he must admit that so few other attorneys of the time were aware that the bar of deficient performance may not be passed in the instant case. However, as Petitioner did in fact make this claim as part of his Ineffective Assistance of Appellate Counsel claim on post-conviction, the State still should have reviewed the claim's merits and adjudicated upon its chance of success. Petitioner would also state that even if this issue fails under Ineffective Assistance of Counsel, it is still an independent, legitimate Constitutional claim of Equal Protection, Due Process, and Non-Discrimination.

**F) - Ground 7 – Ineffective Assistance of Trial Counsel**

**77.** While Respondent does not directly address this Ground here, Petitioner would note that he explicitly left out the Ineffective Assistance of Trial Counsel (Ground 7) as a basis for this Ground upon the direct information given by Appellate Counsel (see Argument 7), specifically, that because Appellate Counsel and Trial Counsel were both employed by OIDS, she could not raise the issue on Direct. Upon review of the Response, Petitioner now sees that this information may have been in error and would ask this Court to consider this obvious misinformation as a point towards the overall Ineffectiveness of Appellate Counsel.

**G) - Ground 10 – Cumulative Error**

**78.** As presented in Argument 10 below, Petitioner shows that both the District Court and the OCCA refused to consider the merits of the vast majority of the Grounds presented and subsequently failed to review or adjudicate upon the litany of errors within. So even though Respondent claims:

> "In denying [Petitioner's] cumulative error claim, the OCCA
> found that the claim was without merit because none of his
> other claims had merit" [Doc 9, middle of page 83]

We can see from the post-conviction record that this finding of the
OCCA cannot be relied upon since turning a blind eye upon the errors
(refusing to review the merits) does not mean they do not exist. Had
the District Court or OCCA actually reviewed the merits of these
claims, as required by *Logan* and *Strickland* to determine the
Ineffective Assistance of Appellate Counsel claim presented on post-
conviction, it is clear that well more than "two or more actual
errors" [Doc 9, middle of page 83] would have been found and
therefore, by failing to do so, the State Courts denied Petitioner's
Due Process and other Rights.

### ARGUMENT 9: POST-CONVICTION PROCEEDINGS
### REPLY TO PROPOSITION VI ON GROUND 9

**79.** Respondent begins their argument with the statement:

> "In his Ground Nine, Petitioner claims his constitutional
> rights 'were denied through the State's failure to follow
> Oklahoma statute and established procedure' in his post-
> conviction proceedings in both the state district court and
> the OCCA. Doc. 1 at 37-38. Because Petitioner's claim
> concerns the manner in which the state courts denied him
> post-conviction relief and does not concern federal law,
> this Court should deny relief."

Petitioner's understanding of Due Process is:

> "The conduct of legal proceedings according to established
> rules and principles for the protection and enforcement of
> private rights, including notice and the right to a fair
> hearing before a tribunal with the power to decide the
> case." [Black's Law Dictionary (11th ed. 2019)]

Our Founding Father Alexander Hamilton stated:

> "The Words '*due process*' have a precise technical import,
> and are only applicable to the process and proceedings of
> the courts of justice; they can never be referred to an act
> of legislature." [4 Papers of Alexander Hamilton 34, 35
> (Harold C. Syrett, 1962)]

By both the modern and original definitions, Petitioner has clearly
made a claim of Due Process violation, not an attack on the procedure
itself. In fact, Petitioner fully acknowledges the State's right to
create whatever procedure they so choose, or even no procedure at all,
in relation to post-conviction. Petitioner is somewhat dumbfounded by
the Response to this Ground as it seems to prop up, and then argue
with, a straw-man, and can at best be considered silent on the actual
claim.

80. Respondent also states Petitioner's claim "…raises no challenge
to the judgment for which he is incarcerated." [Doc 9, Top pf Page
87]. However, as pointed out by both parties, the vast majority of the
Grounds presented are interconnected. Petitioner feels the connection
between the injustices of the underlying criminal trail and the
subsequent Due Process violations of the post-conviction proceedings
are self-evident. The only possible reason the State would have for
creating a post-conviction procedure is to establish a legal
protection against abuses of the underlying criminal proceedings.
Therefore, the post-conviction proceeding itself is inherently a
"challenge to the judgment for which [Petitioner] is incarcerated."
and a violation of the Due Process in the post-conviction proceeding
is a violation in the overall process which continues to incarcerate
Petitioner. Further, as the Due Process claims against the post-
conviction proceeding arise in the final stages of State remedy, there
is no other Court than this one to cure said claims.

81. Petitioner hereby includes all argument and authority as
presented in his Petition in Error [Doc 9, Exhibit 10], and would add
the following:

82. In addition to the District Court's refusal to hear the Motion
for Recusal, the OCCA stated:

"Petitioner argues that the District Court failed to rule on
Petitioner's Motion for Recusal. This Court will only

> entertain applications for post-conviction relief if
> Petitioner has sought and been denied relief in District
> Court. Rule 5.1 and 5.2(A), Rules of the Oklahoma Court of
> Criminal Appeals, Title 22, Ch. 18, App. (2022).
> Petitioner's pleading requesting post-conviction relief does
> not raise the issue of recusal and is not properly before
> this Court." [Doc. 9, Exhibit 11, Page 2]

It seems clear that the OCCA misconstrued Petitioner's claim. They
appear to have been under the assumption that Petitioner was
complaining of the District Court's refusal to recuse themselves from
the original Trial. This simply underlines the fact that the OCCA
wholly failed to review the underlying record which, as pointed out by
Petitioner, clearly shows the filing of the Motion for Recusal in the
*post-conviction* proceeding and the lack of a ruling thereon. Further,
the reasoning that the post-conviction pleading did not raise the
issue of recusal also hammers home the fact that the claim was utterly
misunderstood rendering any possible decision unreasonable.

   83. In the Order Affirming Denial of Post-Conviction Relief [Doc. 9,
Exhibit 11], the OCCA wholly fails to address any of the issues raised
concerning the Due Process violations regarding State statutes and
established case law. Even if Petitioner is in error about the
statues' applicability, by refusing to review/address these issues the
OCCA's decision still appears unreasonable, and if Petitioner is
correct, then the denial is undoubtedly unreasonable. The fact that
the OCCA quotes *Logan v. State* as the standard of review for post-
conviction proves that it is the recognized standard (despite the
§1086 Error), and the complete failure to uphold the standards therein
proves the violation of Due Process. Given that Petitioner quoted this
same standard of review (*Logan v State*) in his Petition in Error
pointing out the *Logan* violations as he outlined the issues, it is
hard to believe that any panel of jurists could have actually reviewed
the record and found it to be in conformity with the statues and
procedures of the State of Oklahoma.

**84.** Respondent also complains multiple times throughout the Response that the majority of the issues raised on post-conviction were procedurally barred due to 22 OS §1086; however, upon reviewing the State's argument Petitioner has discovered that the OCCA's interpretation of 22 OS §1086 is itself flawed:

> "Post-Conviction review provides petitioners with very limited grounds upon which to base a collateral attack on their judgements. 22 OS §1086, issues that were previously raised and ruled upon by this Court are procedurally barred from further review under the doctrine of res judicata, and issues that were not raised previously on direct appeal, but which could have been raised, are waived for further review." [Logan v State, 293, P.3d 969]

However, 22 OS §1086 of Oklahoma's Post-Conviction Relief Act reads as follows:

> "All grounds for relief available to an applicant under the Post-Conviction Procedure Act, including claims challenging the jurisdiction of the trial court, must be raised in his or her original, supplemental, or amended application. Any grounds finally adjudicated or not so raised, or knowingly, voluntarily, and intelligently waived in the proceeding that resulted in the conviction or sentence or in any other proceeding the applicant has taken to secure relief may not be the basis for a subsequent application, unless the court finds a ground for relief asserted which for sufficient reason was not asserted or was inadequately raised in the prior application." [22 OS §1086]

The first sentence states that a petitioner must raise all eligible claims on their "original, supplemental, or amended application" with "application" clearly referring to the post-conviction application (which Petitioner did), and the second sentence limits what may be brought on "a subsequent application", clearly meaning a second Post-Conviction Application. This is clear because **A)** the language of the Direct Appeal process in 22 OS Ch.18 does not use the term "Application" (only sections dealing with Post-Convection do so), **B)** the rest of the Post-Conviction Procedures Act (§1080 - §1089) follows a concise procedural flow starting with initiation of the proceedings,

going through limitations and District level procedures, and ending on the appeal process and exceptions for capital crimes, C) the final words of §1086 state *subsequent* post-conviction filings are allowed if the District Court finds "sufficient reason [the claim] was not asserted or was *inadequately raised* in the prior application" [emphasis Petitioner's], and D) the post-conviction Appeal process isn't mentioned until §1087 indicating that §1086 is still talking about action at the District Court level which again only makes since for subsequent *post-conviction* applications since §1080 - §1085 define the entire District Court level process for an original application. While Respondent has repeatedly sounded the horn of "State Courts Ruling on State Matters", it is the Petitioner's claim that this is a matter of Due Process. The Constitutional protections of Due Process (as defined at the beginning of this Argument) are explicitly in place to safeguard citizens against "State Courts Ruling" *Incorrectly* "on State Matters" For the reasons above, it is clear that the OCCA has overstepped the bounds of interpretation and deprived not only the Petitioner, but unknown hundreds if not thousands of citizens, of Due Process in the Post-Conviction protections legislated by the Oklahoma Congress. Protections put in place to shelter the citizens of Oklahoma from the very Court system which now overrides said protections and can only be reinstated by the Federal Courts' upholding of Constitutional Due Process. Again, Petitioner does not attack the post-conviction process itself, but rather the State Courts' clearly flawed interpretation which denies him Due Process under the properly legislated post-conviction procedure. For ease of reference, Petitioner will be citing this particular argument as the "§1086 Error" elsewhere in this document.

85. For the above reasons, the Order Affirming Denial of Post-Conviction Relief was clearly unreasonable and the District Court's decision was arbitrary at best. Petitioner would be satisfied standing

on the record for this Ground; however, an evidentiary hearing would afford this Court an opportunity to expand the record for the State's seemingly willful (non)application of law and procedure.

### ARGUMENT 10: CUMULATIVE ERROR
### REPLY TO PROPOSITION V ON GROUND 10

86. Respondent complains that the Cumulative Error Doctrine is a "non-existent authority" [Doc. 9, Page 101]; however, Petitioner would point out that in addition to the 10th Circuit's rulings on the matter, the OCCA's Order Affirming Denial of Post-Conviction Relief [Doc. 9, Exhibit 11] explicitly addresses cumulative error and goes so far as to cite State case law (*Zamarippa v. State*) which affirms this doctrine has been adopted by the OCCA, and so the question at bar is whether the OCCA made a reasonable decision *after reviewing the record as a whole* (emphasis added).

87. As outlined above in Argument 9, Petitioner would show that the OCCA's decision was both unreasonable and clearly lacking in review of the record, whole or otherwise. Additionally, in the OCCA's Order Affirming Denial of Post-Conviction Relief [Doc. 9, Exhibit 11] they explicitly state that they have not reached (and therefore have not reviewed) the merits of Propositions 1, 2, 3, 5, & 6 because they were procedurally barred (through res judicata or the §1086 Error), they fail to address the actual issue of racially based jurisdictional discrimination raised in Proposition 4, and rule against Proposition 7 without any of the *Logan* tests having ever been conducted.

88. By systematically refusing to review, misconstruing, and/or discarding established law and procedure for every single other Proposition of the post-conviction, of course the OCCA "found no error"; however, willfully looking the other way does not mean the errors do not exist. Only through the gross Due Process violations (as outlined in Ground/Argument 9) of the post-conviction proceeding could such a ruling be conceived. An evidentiary hearing would allow this

Court to open the record and expose the plainly evident errors which
the District Court sought to sweep under the rug and the OCCA
deliberately chose to turn a blind eye upon, or at least give the
State the opportunity to prove otherwise when the appearance of
Justice is so greatly defaced.

## CONCLUSION

89. Throughout their Response the Respondent has begged this Court
to not look under the rug, in the closets, or even at the elephant in
the middle of the room because they know Petitioner's significant
Constitutional rights have been violated from the beginning. The
original Trial Court allowed and perpetrated a litany of gross
violations, that same Trial Court then presided over the post-
conviction proceeding doubling down on their own and the Prosecution's
violations, and the OCCA turned a blind eye rather than admit such
wanton violations where even possible in the modern day and age.

90. Petitioner is a simple layman of the law with no previous
experience, but he does understand this is his one and only shot at
being heard by a Court outside of the State's influence. He has done
his best to learn and apply due diligence in the short time afforded
by AEDPA and 22 OS §1080.1, but knows he is well short of competency
in this arena and will have failed in places. The State's decision to
stand silent on post-conviction has further impacted Petitioner's
ability to raise to the occasion since it means he has never before
seen argument against the claims of his post-conviction prior to this
Habeas proceeding, and while this Court has been gracious in its
allotment of time to Reply, the 100+ pages of legal argument in the
Response is more than overwhelming. Further, the documents (primarily
transcripts) which the State enjoyed but Petitioner did not, has left
several holes in the above Arguments which Petitioner must now rely
upon this Court to fill.

91. While it may not be proper to bring up here, Petitioner also wishes to state that in the years since his wife's murder and subsequent incarceration he has struggled greatly with depression induced apathy which provides yet another barrier to his ability to rationally address the injustices against him. Practically every line he has written from post-conviction on, summons memories, mental distress, and emotional pain. Petitioner understands the strictures of the AEDPA's time limitations (and the fact that he has met them) but cannot restrain himself from crying out against them here. The persons in the greatest need of Federal protection are those who are truly innocent and condemned to death, by execution or time (LWOP). And it is that very same group of persons who are most likely (almost guaranteed) to experience an extreme mental health crisis, for they (and they alone) know they are innocent and being held unjustly. Petitioner himself very nearly missed this deadline (only 10 days remained) and would have done so if not for the stanch support and firm reprimands of a close friend and "jail house lawyer".

92. Petitioner feels he could spend several more years of diligent study and still not fully grasp or present what a trained and experienced lawyer could, and he supposes this is precisely why pro se litigants are to be "construed liberally"; however, no matter how liberally an argument is construed this Court cannot make the arguments themselves. For that reason, if this Court should find against the Petitioner on the basis of the record alone, he begs this Court to grant evidentiary hearings so that the record may be expanded and that he may apply for appointment of counsel to properly argue what Petitioner cannot.

93. Finally, Petitioner would like to requote something from his post-conviction brief which he feels is at the heart of his entire prosecution:

"A government prosecutor is the representative not of an
ordinary party to a controversy, but of a sovereignty whose
obligation to govern impartially is as compelling as its
obligation to govern at all; and whose interest, therefore,
in a criminal prosecution is not that it shall win a case,
but that justice shall be done. As such, he is in a peculiar
and very definite sense the servant of the law, the twofold
aim of which is that guilt shall not escape or innocence
suffer. He may prosecute with earnestness and vigor -
indeed, he should do so. But while he may strike hard blows,
he is not at liberty to strike foul ones. It is as much his
duty to refrain from improper methods calculated to produce
a wrongful conviction, as it is to use every legitimate
means to bring about a just one." [Berger v US, 295 US 78,
88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), overruled on other
grounds by Stirone v US, 361 us 212, 80 S.Ct. 270, 4 L.Ed.2d
252 (1960)]

Like the prosecutor's duty to strike justly and the State's obligation
to govern impartially, so too does this Court have an imperative to
mark the path between the letter and the spirit of the law such that
everyday citizens do not fall victim to the all too human failures of
ambition and callousness. And so the Petitioner ends as he began, by
stating that the Gordian Knot of misinformation, misdirection, and
claimed procedural bar which has been presented by the State of
Oklahoma at every turn can only be cut by the Sword of Justice which
the Federal Courts wield in defense of the citizens of the United
States.


Respectfully Submitted,



Michael Magness, 765965                    5/1/23

Michael Magness, 765965                    Date
JHCC, C-1-213
PO Box 548
Lexington, OK 73051

## VERIFICATION

State of Oklahoma,      )
                        ) ss.
County of Cleveland     )

    I, Michael Magness, do swear, by penalty of perjury, that I have read the foregoing PETITIONER'S REPLY TO RESPONDENT'S RESPONSE IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS in, Case No. CIV-22-376-JFH-KEW, and that the statements therein are true to the best of my knowledge and belief.


_____          ___5/1/23_____
Michael Magness                           Date
Petitioner, Pro Se



## CERTIFICATE OF MAILING

    I, Michael Magness, do hereby affirm that on ___5/1/23___ a true and complete copy of the above document(s) in the above styled Case was delivered to the Joseph Harp Correctional Center's Law Library, preaddressed and postage prepaid, to be mailed to the address(es) below:


Office of Attorney General          United States Eastern District
State of Oklahoma                   Court Clerk's Office
313 N.E. 21                         PO Box 607
Oklahoma City, OK 73105             Muskogee, OK 74402


_____          ___5/1/23_____
Michael Magness, 765065                   Date
JHCC, C-1-213
PO Box 548
Lexington, OK 73051