**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **MICHAEL D. MAGNESS,** | |
| **Petitioner,** | |
| **v.** | **Case No. 22-CV-376-JFH-DES** |
| **MICHAEL MILLER, Warden,**[1] | |
| **Respondent.** | |

**OPINION AND ORDER**

Petitioner Michael D. Magness ("Magness"), an Oklahoma prisoner appearing *pro se*, brings this action pursuant to 28 U.S.C. § 2254, seeking federal habeas relief from the judgment entered against him in the District Court of Okfuskee County, Case No. CF-2015-59. Dkt. No. 1. Magness raises ten (10) grounds for habeas relief. *See id.* The Court considered Magness' Petition for Writ of Habeas Corpus ("Petition") [Dkt. No. 1], Respondent's Response in Opposition to Petition for Writ of Habeas Corpus [Dkt. No. 9], Magness' Reply [Dkt. No. 21], the record of state-court proceedings provided by Respondent [Dkt. Nos. 10 and 11] and applicable law. For the reasons discussed below, the Petition is DENIED.

---

[1] Magness is presently incarcerated at Allen Gamble Correctional Center, and Michael Miller is the Warden of that facility. The Court therefore substitutes Michael Miller, Warden, in place of Luke Pettigrew as party Respondent. *See* Rule 2(a), *Rules Governing Section 2254 Cases in the United States District Courts*. The Clerk of Court shall note on the record this substitution.

## TABLE OF CONTENTS


**BACKGROUND** .......... 3

**DISCUSSION** .......... 7

- **I. Magness' Petition** .......... 7
- **II. Legal Standards Applicable to Exhausted Claims** .......... 7
- **III. Legal Standards Applicable to Procedurally Barred Claims** .......... 10
- **IV. Ground One: Sufficiency of the Evidence** .......... 12
  - **A. The OCCA's Decision** .......... 13
  - **B. Analysis** .......... 13
- **V. Ground Four: Abuse of Judicial Discretion** .......... 17
- **VI. Ground Five: Jurisdiction** .......... 19
  - **A. The OCCA's Decision** .......... 19
  - **B. Analysis** .......... 20
- **VII. Ground Eight: Ineffective Assistance of Appellate Counsel** .......... 21
  - **A. The OCCA's Decision** .......... 22
  - **B. Analysis** .......... 22
    - **1. Sub-Claim One: Insufficiency of the Evidence** .......... 24
    - **2. Sub-Claim Two: Mrs. Reilly's Conduct** .......... 24
    - **3. Sub-Claim Three: Prosecutorial Misconduct** .......... 27
    - **4. Sub-Claim Four: Abuse of Judicial Discretion** .......... 58
    - **5. Sub-Claim Five: Jurisdiction** .......... 60
    - **6. Sub-Claim Six: Cumulative Error** .......... 61
- **VIII. Ground Nine: Post-Conviction Proceedings** .......... 61
- **IX. Ground Ten: Cumulative Error** .......... 63
- **X. Procedurally Barred Claims** .......... 64
  - **A. Cause and Prejudice** .......... 66
    - **1. Ground Four** .......... 67
    - **2. Grounds Six and Seven** .......... 68
    - **3. Grounds Two and Three** .......... 70
  - **B. Fundamental Miscarriage of Justice** .......... 71

**CONCLUSION** .......... 72

## BACKGROUND

On November 7, 2018, an Okfuskee County jury found Magness guilty of one (1) count of murder in the first degree. Dkt. No. 10-9 at 111-112; Dkt. No. 10-18 at 53-55. On December 5, 2018, Magness was sentenced to life in prison without parole. Dkt. No. 10-18 at 53. The victim, Elizabeth Magness ("Elizabeth"), was Magness' wife and the mother of his children. Dkt. No. 10-3 at 25, 32-33, 44-45.

Elizabeth and Magness lived in Okemah, Oklahoma with their two young sons. *See* Dkt. No. 10-3 at 35-37. The family moved from Wisconsin, where Elizabeth obtained her master's degree, to Okemah in 2011. *Id.* at 36-37. They returned to Oklahoma for Magness to help his grandfather run the family's cattle ranch. *Id.* at 36.

On the evening in question, Magness stayed the night at the home of his friends', Dustin and April Crouch, along with the Magnesses' two (2) young boys. Dkt. No. 10-3 at 109-112. The Crouches' home was approximately twenty (20) minutes from the Magness family home. *Id.* at 103. Magness staying the night at the Crouches' with the oldest child, D.M., was not uncommon. *Id.* at 204. However, the youngest, B.M., was still breastfeeding and typically co-slept with his mother. *Id.* at 75; Dkt. No. 10-5 at 90. This was the first night B.M. stayed the night at the Crouches'. Dkt. No. 10-3 at 111. D.M. slept in a bedroom with the Crouches' other children. *Id.* at 112. B.M. slept in the living room with Magness. *Id.* at 112-113. April Crouch ("Mrs. Crouch") testified she went into her bedroom around midnight, heard B.M. crying around 12:30–12:45 a.m. and went out to the living room to check on him. Dkt. No. 10-3 at 112-113, 135. B.M. was in the recliner and Magness was on the couch. *Id.* at 112-113, 135. About fifteen (15) minutes later, B.M. fussed again; when she went to check on him, he was with Magness on the couch. *Id.* at. 113. Mrs. Crouch went to sleep around 1:00 a.m., and between 3:30-4:00 a.m. she awoke to B.M.

crying again. *Id.* at 113-114, 133, 136. When she checked on B.M., he was in the kitchen with Magness. *Id.* at 114.

Sometime between 1:30 a.m. and 3:00 a.m., on March 15, 2015, Elizabeth was shot in her left eye with Magness' .9mm Glock pistol. Dkt. No. 9-3 at 2.[2] A block away from the Magnesses' house, between 1:30 and 2:00 a.m., Rhonda Hill saw a dark, four-door sedan, driven by a man, back into a vacant driveway.[3] Dkt. No. 10-4 at 26, 32-33. Hill could not identify the man, "but her description is consistent with [Magness]." Dkt. No. 9-3 at 3; Dkt. No. 10-4 at 27. The man walked across the street and between two (2) houses, heading in the direction of the backyard of the Magnesses' home. *Id.* at 28. The car was gone within twenty (20) minutes. *Id.* Another neighbor, Jeanetta Coale, heard a single shot around the same time. Dkt. No. 10-4 at 19. The wet grass in the Magnesses' backyard held footprint impressions leading out the gate in the direction of Hill's house. *See* Dkt. No. 10-4 at 151-153, 157-158; *see also* Dkt. No. 10-20 at 8-9 (State's Exs. 30 and 31).

In the morning, everyone at the Crouch residence woke up, ate breakfast and went their separate ways. Dkt. No. 10-3 at 115-116. Magness and B.M. went by a restaurant he operated,

---

[2] The OCCA's factual findings are entitled to deference. 28 U.S.C. § 2254(e)(1). Further, a few days after Elizabeth was found dead, Magness told his father-in-law, George Wilson, he believed they would be able to have an open casket funeral because "a 9 millimeter gun doesn't leave much of an entry wound[.]" Dkt. No. 10-3 at 48. Magness then stated, "I don't know that it was a 9 millimeter gun, but I suspect that the police are going to find it was my own gun that was taken and used against her." *Id.* Testimony was presented that the .9 mm gun was typically with Magness but the day before Elizabeth's murder he put it in the gun cabinet in their home. Dkt. No. 10-7 at 161-162. The murder weapon was never recovered. *See* Dkt. No. 10-8 at 29. However, the cartridge case from the crime scene and the casings from the pasture, where Magness admitted to practicing shooting his .9 mm, were all fired from the same firearm. *See* Dkt. No. 10-6 at 151-152, 160; Dkt. No. 10-7 at 170-174, 176.

[3] Magness drove a dark green four-door sedan. Dkt. No. 10-4 at 45; *see also* Dkt. No. 10-19 at 18 (State's Ex. 5).

the K-Bar, to get lunch for Elizabeth and headed home. Dkt. No. 10-4 at 82; *see also* Dkt. No. 10-29 at 11 (State's Ex. 103). Dane Lyon, Magness' friend, met Magness at the family home to return a pickup truck he had borrowed. Dkt. No. 10-4 at 42, 46. Magness asked Lyon to wait in the living room while he went to the back of the house. *Id.* at 46. Magness returned to Lyon communicating to him that he found "[Elizabeth] on the floor." *Id.* Pictures of the crime scene show Elizabeth lying on the floor in a pool of blood. *See, e.g.,* Dkt. No. 10-19 at 3 (State's Ex. 9). Lyon went to check Elizabeth's pulse. Dkt. No. 10-4 at 48. Magness later told multiple people he knew she was dead because her eye was bulging out. *See, e.g.,* Dkt. No. 10-3 at 191-192 (Dustin Crouch), Dkt. No. 10-5 at 217 (David Magness), Dkt. No. 10-7 at 119 (Justin Scrimshire); *id.* at 180 (Agent Titsworth); Dkt. No. 10-29 at 11 (State's Ex. 103) (Magness' statement to this effect). "Neither Lyon, the responding officers, nor the medical examiner saw the bulging eye [Magness] described." Dkt. No. 9-3 at 4.

As noted, the original reason for the Magness family moving to Okemah was for Magness to help his grandfather with the family ranch. Dkt. No. 10-3 at 36, Dkt. No. 10-5 at 193. By the time of the murder, the land, fences and animals on the ranch were in poor condition, and Magness had sold most of the cattle. *See* Dkt. No. 10-5 at 146, 208-209, 216; Dkt. No. 10-7 at 201.

In early 2014, Magness began leasing a building to operate the K-Bar Restaurant in Okemah. *See* Dkt. No. 10-5 at 205; Dkt. No. 10-22 at 2-12 (State's Ex. 42). The restaurant never broke even. *See* Dkt. No. 10-5 at 136 (The K-Bar was "running a deficit, I'd say between 9,000 and 25,000 a month."), 146. Magness kept the restaurant afloat by infusing it with money from his own personal accounts, other outside sources, and cattle sales. *See* Dkt. No. 10-7 at 195-197. Magness took out an agricultural loan in March of 2014, but he used most of the loan money to

fund the restaurant. *Id.* at 198; *see also* Dkt. No. 10-24 at 10-18 and Dkt. No. 10-25 at 1-2 (State's Ex. 47).

In August of 2014, Magness planned to renovate his grandfather's farmhouse and lease it. *See* Dkt. No. 10-5 at 209-210. Magness took out an insurance policy on the farmhouse in late August, and it burned down in early September, 2014. *See id.* 10-5 at 212-213. The fire was discovered in early morning before the sun came up, but Magness had been at the house earlier that morning, around 3:00 -3:30 a.m. Dkt. No. 10-6 at 30-33. Magness used the insurance money from the fire to fund the restaurant for a few months. *See* Dkt. No. 10-7 at 197-198.

At the end of February 2015, a payment of approximately $16,600.00 was due on the $165,000.00 agricultural loan. Dkt. No. 10-7 at 199-200. "By the end of February 2015, there was almost no money in [Magness'] various accounts, the restaurant was in debt, he owed back taxes, and the first loan payment was due." Dkt. No. 9-3 at 5. Before Elizabeth's death, he unsuccessfully sought to borrow money from an acquaintance. Dkt. No. 10-6 at 37; Dkt. No. 10-7 at 205-206. At the time of Elizabeth's death, the $16,600.00 loan payment had not been paid. *Id.* at 200.

Magness was the designated beneficiary of a $250,000.00 life insurance policy on Elizabeth. Dkt. No. 10-27 at 13-14 (State's Exhibit 88). Magness quipped to friends prior to Elizabeth's death that he was a sociopath [Dkt. No. 10-3 at 107], he could get away with murder in Okemah [*Id.* at 121; Dkt. No. 10-5 at 17], and he had insurance policies to keep the K-Bar open [*Id.* at 117-118]. Magness told one witness, Kimberly Simmons, "that he had premeditated several different ways to murder his wife and murder his son and get away with it[.]" *Id.* at 17. Magness also told Simmons he and Elizabeth "have this contract and if by the end of that time frame it's still not working out then we'll end the marriage. And that year would have been 2015." *Id.* at

18. Magness told Mr. and Mrs. Crouch "Magnesses don't get divorced." Dkt. No. 10-3 at 108, 182.

Based on the evidence presented, the jury convicted Magness of one (1) count of first-degree murder for the death of Elizabeth. Dkt. No. 10-8 at 111-112.

## DISCUSSION

### I. Magness' Petition

After unsuccessfully completing a direct appeal before the Oklahoma Court of Criminal Appeals ("OCCA") and a round of post-conviction proceedings, Magness turned to this Court. Dkt. No. 1. Magness presents the following claims:

**Ground One:** Insufficiency of Evidence;

**Ground Two:** Pre-Trial Prosecutorial Witness Tampering;

**Ground Three:** Prosecutorial Misconduct;

**Ground Four:** Abuse of Judicial Discretion;

**Ground Five:** Jurisdiction;

**Ground Six:** Cruel and Unusual Punishment/ Equal Protection;

**Ground Seven:** Ineffective Assistance of Trial Counsel;

**Ground Eight:** Ineffective Assistance of Appellate Counsel;

**Ground Nine:** Post-Conviction Proceedings; and

**Ground Ten:** Cumulative Error.

Dkt. No. 1.

### II. Legal Standards Applicable to Exhausted Claims

A federal court has discretion to grant federal habeas relief to a prisoner who is in state custody pursuant to a final criminal judgment if the prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see Wilson v. Corcoran*,

562 U.S. 1, 5 (2010) ("[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts."). But the federal habeas statutes, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") and as interpreted by the United States Supreme Court, significantly limit a federal court's discretion to grant habeas relief to a state prisoner.

"A state prisoner generally must exhaust available state-court remedies before a federal court can consider a habeas corpus petition." *Bland v. Sirmons*, 459 F.3d 999, 1011 (10th Cir. 2006); *see* 28 U.S.C. § 2254(b)(1)(A). When a state prisoner fairly presents a federal claim in state court and the state court adjudicates that claim on the merits, a federal court cannot grant habeas relief as to that claim unless the prisoner first shows that the state court's decision as to that claim either: (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Douglas v. Workman*, 560 F.3d 1156, 1170 (10th Cir. 2009) (quoting 28 U.S.C. § 2254(d)(1)-(2)).

As used in § 2254(d)(1), the phrase "clearly established Federal law" means "the governing legal principle or principles" stated by "the holdings" of the Supreme Court's "decisions as of the time of the relevant state-court decision." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). Thus, when § 2254(d)(1)'s framework informs a federal court's analysis, the first question for the court is whether the petitioner's claim rests on law that was clearly established by Supreme Court precedent at the time of the relevant state-court decision. *House v. Hatch*, 527 F.3d 1010, 1015-18 (10th Cir. 2008). If such law exists, and the state court has correctly identified that law, the only question under § 2254(d)(1) is "whether the

decision 'unreasonably applies that principle to the facts of the prisoner's case.'" *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)). To establish that the state court's decision unreasonably applied the law, a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). In other words, "a petitioner must persuade a federal court that no 'fairminded juris[t]' could reach the state court's conclusion under [the Supreme] Court's precedents." *Brown v. Davenport*, 596 U.S. 118, 135 (2022) (quoting *Davis v. Ayala*, 576 U.S. 257, 269 (2015)).

Under § 2254(d)(2), a petitioner must show that the state court's decision rests on an unreasonable determination of the facts. But "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Instead, the reasonableness of a state court's factual determination also is measured by *Richter*'s fairminded-disagreement standard. *Dunn v. Madison*, 583 U.S. 10, 13-14 (2017). And "if [*Richter's*] rule means anything, it is that a federal court must carefully consider all the reasons and evidence supporting the state court's decision" and that the federal court may not disturb the state court's decision "without identifying—let alone rebutting—all of the justifications" that may support that decision. *Mays v. Hines*, 592 U.S. 385, 391-92 (2021) (per curiam). In addition, when § 2254(d) applies, the federal court's review is limited to the same record that was presented in state court unless and until the petitioner satisfies § 2254(d)'s demanding preconditions to relief, *Pinholster*, 563 U.S. at 185, and the federal court must presume the correctness of any state-court factual findings unless the

petitioner presents clear and convincing evidence to rebut that presumption, 28 U.S.C. § 2254(e)(1).

## III. Legal Standards Applicable to Procedurally Barred Claims

Even when a habeas petitioner presents cognizable federal claims, the AEDPA and the United States Supreme Court's interpretation of those provisions tightly constrain a federal court's discretion to grant relief. Two (2) constraints are relevant here: exhaustion and procedural default. A habeas petitioner must exhaust available state remedies, before filing a federal habeas petition, by fairly presenting the substance of his federal claims to the highest state appellate court in accordance with applicable state procedural rules. 28 U.S.C. § 2254(b)(1)(A); *see O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) ("[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."); *Prendergast v. Clements*, 699 F.3d 1182, 1184 (10th Cir. 2012). Exhaustion gives "the state courts a 'full and fair opportunity' to correct alleged constitutional errors." *Selsor v. Workman*, 644 F.3d 984, 1026 (10th Cir. 2011) (quoting *O'Sullivan*, 526 U.S. at 845).

"[A] federal court should dismiss unexhausted claims without prejudice so that the petitioner can pursue available state-court remedies." *Bland*, 459 F.3d at 1012; *see* 28 U.S.C. § 2254(b)(1)(A). "However, dismissal without prejudice for failure to exhaust state remedies is not appropriate if the state court would now find the claims procedurally barred on independent and adequate state procedural grounds." *Smallwood v. Gibson*, 191 F.3d 1257, 1267 (10th Cir. 1999) (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)). "Where the relevant state courts 'would now find those claims procedurally barred, there is a procedural default for the purposes

of federal habeas review.'" *Grant v. Royal*, 886 F.3d at 874, 892 (10th Cir. 2018) (quoting *Bland*, 459 F.3d at 1012).

Second, "an important 'corollary' to the exhaustion requirement" is that "a federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule." *Davila*, 582 U.S. at 527 (quoting *Dretke v. Haley*, 541 U.S. 386, 392 (2004)). "A state procedural default is 'independent' if it relies on state law, rather than federal law," and is "'adequate' if it is firmly established and regularly followed." *Smith v. Workman*, 550 F.3d 1258, 1274 (10th Cir. 2008) (internal quotations omitted).

"A petitioner may overcome [a] procedural bar only if he can 'demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.'" *Grant*, 886 F.3d at 892 (quoting *Coleman*, 501 U.S. at 750); *see also McQuiggin v. Perkins*, 569 U.S. 383, 392-93 (2013) (discussing miscarriage of justice exception); *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (discussing cause and prejudice).

Applying the outlined legal standards, the Court first addresses Magness' exhausted claims and, subsequently, will address Magness' procedurally barred claims.[4]

---

[4] Magness did not request an evidentiary hearing in his Petition but only that the court "remand to the district court for evidentiary hearing[.]" Dkt. No. 1 at 43; *see also id., generally*. However, in his Reply, Magness repeatedly requests a hearing. *See* Dkt. No. 21. But when § 2254(d)'s framework applies, as it does in this case, a federal habeas court must consider whether the petitioner has satisfied § 2254(d)(1)'s precondition to relief only by looking to the record that was presented in state court proceedings. *Pinholster*, 563 U.S. at 181. In addition, "[i]f a prisoner has 'failed to develop the factual basis of a claim in State court proceedings,' a federal court 'shall not hold an evidentiary hearing on the claim' unless the prisoner satisfies one of two narrow exceptions, *see* 28 U.S.C. § 2254(e)(2)(A), and demonstrates that the new evidence will establish his innocence 'by clear and convincing evidence,' § 2254(e)(2)(B)." *Shinn v. Ramirez*, 596 U.S. 366, 371 (2022). "In all but these extraordinary cases, AEDPA 'bars evidentiary hearings in

## IV. Ground One: Sufficiency of the Evidence

For his first claim, Magness alleges the "State failed to provide a sufficiency of evidence to convict Petitioner of First Degree Murder. Only by adding layer upon layer of inference could any reasonable jury come to a finding of guilt, and by doing so, the Prosecution denied Petitioner the Constitutional Rights of Due Process, Equal Protection and Fair Trial." Dkt. No. 1 at 3-4. Magness continues, "the State failed to present a single piece of non-circumstantial evidence, focused their argument upon the mere possibility of guilt, and required the jury to rely upon layer after layer of inference to reach their guilty verdict as evidenced by their closing arguments." *Id.* at 4.

Magness presented a similar claim in his direct appeal. Dkt. 9-1 at 42-45. In his amended application for post-conviction relief, Magness re-urged a sufficiency of the evidence claim and stated he was "aware that appellant counsel raised the general issue of insufficiency of evidence in the direct appeal; however, they failed to raise the issue of compounding inference, as well as many of the points made below." Dkt. No. 9-8 at 2. Magness explained he did "not wish to reargue the insufficiency of the evidence as presented in direct appeal, but rather present a secondary set of issues which appellate counsel failed to raise." *Id.* Magness then presented generally the same claim he presents here. *Compare* Dkt. No. 1 at 3-7 *with* Dkt. No. 9-8 at 1-5. Accordingly, the Court will analyze the claim as it was presented in his state post-conviction proceedings.

---

federal habeas proceedings initiated by state prisoners.'" *Id.* (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 395 (2013)). For the reasons discussed herein, Magness has not demonstrated, as to any claim, that he can satisfy § 2254(d)'s preconditions to habeas relief. And Magness does not argue, much less demonstrate, that he can make the showings necessary to obtain an evidentiary hearing under § 2254(e)(2). *See* Dkt. No. 1. For these reasons, the Court denies Magness' belated request for an evidentiary hearing.

**A. The OCCA's Decision**

As noted by Respondent, the OCCA applied the doctrine of *res judicata* to Magness' insufficient evidence claim presented during post-conviction proceedings. *See* Dkt. No. 9-11 at 2. However, the direct appeal claim and the post-conviction claim were not identical. *Compare* Dkt. No. 9-1 at 3-4 *with* Dkt. No. 9-8 at 1-5. Therefore, to the extent Magness raised a different claim on post-conviction and the OCCA did not review the merits of it, this Court will review the claim *de novo*. *See Cone v. Bell*, 566 U.S. 449, 466 (2009); *Cuesta-Rodriguez v. Carpenter*, 916 F.3d 885, 898 (10th Cir. 2019).

**B. Analysis**

In support of his insufficiency of the evidence claim before this Court, Magness highlights the State's reliance on circumstantial evidence and argues that circumstantial evidence "becomes unreasonable when there is no other supporting evidence and inferences must be made to support additional inferences which in turn generate still further inferences." Dkt. No. 1 at 4. Magness emphasizes the following purported weaknesses in the evidence presented at trial: alibi witness testimony, the location where the gun and ammunition were found in the river and misleading statements from the State regarding matching the ammunition that killed Elizabeth to Magness. *See id.* at 4-6. Magness argues this evidence creates eight (8) unsupported inferences. *See id.* at 6-7. Magness further develops his arguments in his Reply. *See* Dkt. No. 21 at 5-10.

The Fourteenth Amendment's due process clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). When reviewing the sufficiency of the evidence supporting a criminal conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have

found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). When applying the *Jackson* standard, a federal court first looks to state law to determine the essential elements of the crime and then whether the evidence suffices to establish each element. *Hawes v. Pacheco*, 7 F.4th 1252, 1264 (10th Cir. 2021). Circumstantial evidence can be sufficient to support a guilty verdict. *Lucero v. Kerby*, 133 F.3d 1299, 1312 (10th Cir. 1998). A habeas court is "not to weigh conflicting evidence or consider witness credibility." *Wingfield v. Massie*, 122 F.3d 1329, 1332 (10th Cir. 1997) (citing *Messer v. Roberts*, 74 F.3d 1009, 1013 (10th Cir. 1996)). The habeas court is to "accept the jury's resolution of the evidence as long as it is within the bounds of reason." *Wingfield*, 122 F.3d at 1332 (quoting *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir. 1993)).

Notably, "*Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012).

> First, on direct appeal, it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. [...] And second, on habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."

*Id.* (internal quotations and citations omitted).

To obtain a conviction for first degree murder, the State had to prove Magness unlawfully caused the death of a human with malice aforethought. Okla. Stat. tit. 21, § 701.7(A). Having reviewed the record, a rational trier of fact could have found the essential elements of first-degree murder beyond a reasonable doubt.

The trial record contains sufficient evidence supporting the jury's finding that Magness murdered Elizabeth with malice aforethought. In adjudicating Magness' similar claim presented on direct appeal, the OCCA made the following factual findings:

> **The gun.** The victim was shot with [Magness'] .9mm Glock. The gun was not left at the scene and was never recovered. [Magness] told police that, the morning before the murder, he put the gun in the house, in a case, locked in a gun safe, in a closet. The wooden gun case was secured with a lock attached to a hasp. The hasp on the cabinet had always been broken and [Magness] used a wire or screw to fasten it. The night of the crime, the screw was removed. The cabinet door was hanging open, with the lock still attached. [Magness'] rifles, shotgun, and the Glock case (with fired cartridges) were gone. Fishermen found [Magness'] long guns and the Glock's case a few days later in the Deep Fork River which is near the home of the Crouch family.
>
> The Magness family owned ranch property nearby and [Magness] was familiar with the area. Particles consistent with gunshot residue were found on [Magness'] pants.
>
> **The scene.** Valuables including electronics and the victim's purse were found at the scene. There were several vehicles parked in the driveway with the keys in the ignition. Only the guns were missing; nothing else in the house was disturbed. There was no sign of forced entry. The victim lay in a large pool of blood on the floor near the back door, and evidence suggested she fell back immediately after being shot. A single line of shoeprints led through the back yard and out the gate, in the direction of a car which was briefly parked in the block behind [Magness'] house. The shoeprints were too indistinct to measure or identify.
>
> **Appellant's statements.** The victim was shot with a single .9mm round in her left eye. [Magness] told friends and police that, when he found her, her eye was bulging out. He insisted that this showed she had died as the result of blunt force trauma or a single shot; he said he recognized it from his own experiences putting down animals on the ranch. When Lyons (who saw the victim immediately after [Magness] found her), the responding officers, and the medical examiner saw [Elizabeth]'s body, her eye was in its socket. The medical examiner testified that, when a person is shot in the head, the eye may bulge out at the time of the shot, but that the eye will recede into its socket within minutes. The only time [Magness] could have seen the victim's eye as he described it was at the time she was shot. Before police told [Magness] what the weapon was, he told the victim's father that she had been shot with a .9mm, and that he believed police would find his gun had been used. He told friends and the police that there might be gunshot residue on his pants. While [Magness] claimed he had been at the Crouch home all night, both April and Dustin agreed that he could have left and returned while they were asleep.

> **Appellant's motive.** [Magness] was in severe financial trouble. At the time of the crime, he owed a large sum as an annual loan payment on the restaurant, and had no money to pay it. The restaurant itself was losing money. He had not paid the payroll taxes for the last quarter of 2014, and the first 2015 taxes were due. He had sold all but a few of the extended family's cattle, and the family ranching business was almost moribund. In the week preceding [Elizabeth]'s death, [Magness] tried and failed to borrow several thousand dollars from two different sources. [Magness] had a $250,000 life insurance policy for [Elizabeth]. He had already received insurance money from the burned family home, which he had used to prop up the failing restaurant several months before. [Magness] had talked intermittently to friends about the money he could get from [Elizabeth]'s life insurance since 2011. [Magness] contacted the insurance company shortly after her death. When the company refused to pay after he was arrested, he asked the secondary beneficiary, [Elizabeth]'s father, to accept the money and sign it over to him.
>
> [Magness] complained to friends that [Elizabeth], who was clinically depressed, did not have sex with him. He often slept on the couch. While [Elizabeth] helped at the restaurant, [Magness] was the sole source of income for the family. [Elizabeth] was often unable to engage in housework or childcare duties. In 2011, [Magness] had said that because he was an extrovert and [Elizabeth] was an introvert, they'd see how it went, but he considered the marriage to have an expiration date of 2015. At the same time, he told other friends that he would not leave [Elizabeth] because his family did not get divorced. In the months before the murder, [Magness] attempted unsuccessfully to begin an inappropriate relationship with a teenage girl.
>
> In summary, the victim was shot with [Magness'] gun. His description of [Elizabeth]'s physical condition matched the time she was shot, not her condition when she was found. Nothing in the house was taken except the guns. [Magness] had no alibi for the time of the crime. He had a significant financial motive, as well as a more personal one.

Dkt. No. 9-3 at 5-10. Even though the Court is reviewing this claim *de novo*, the OCCA's factual findings are presumed correct unless Magness rebuts them by clear and convincing evidence. *Sumpter v. Kansas*, 61 F.4th 729, 750 (10th Cir. 2023).

The evidence presented at trial supports the jury's finding that Magness murdered Elizabeth with malice aforethought. Magness possessed a motive, the jury reasonably could draw the

inference that Magness' gun was used to kill Elizabeth,[5] his theory of a robbery gone wrong is unsupported by the presence of other valuables in the home and the recovery of some of the guns, and his statements regarding Elizabeth's eye place him at the scene of the crime. Magness failed to rebut these relevant findings of fact by clear and convincing evidence. Thus, after viewing the evidence in the light most favorable to the prosecution, the Court concludes a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 442 U.S. at 319. No constitutional error occurred. Therefore, habeas relief as to this claim is denied.

## V. Ground Four: Abuse of Judicial Discretion

For his fourth claim, Magness alleges, "the trial court repeatedly abused their judicial discretion in favor of the State by the admission of improper evidence, directly prejudicing the defense via facial expression and comments, and failure to properly instruct the jury." Dkt. No. 1 at 17.

First, Magness challenges the trial court's "*Burks*[6] ruling" permitting testimony regarding Magness' prior arson and infidelity into evidence. *See id.* at 17-18. Respondent argues Magness' challenge to the admission of the arson and adultery evidence is merely a state law claim and is not cognizable as a federal habeas claim. Dkt. No. 9 at 42-43. Magness further challenges the *Burks* ruling in his Reply. *See* Dkt. No. 21 at 41-51.

---

[5] "*Jackson [v. Virginia*] leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (quoting *Jackson*, 442 U.S. at 319).

[6] *Burks v. State*, 594 P.2d 771 (Okla. Crim. App. 1979) (setting forth the procedure to be followed when the State intends to introduce evidence of other crimes), *overruled in part on other grounds by Jones v. State*, 772 P.3d 922 (Okla. Crim. App. 1989).

The admission of evidence at a state criminal trial is largely a matter of state law. Even if evidence is admitted in violation of state law, that state-law error ordinarily "is no part of a federal court's habeas review of a state conviction." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see also Lisenba v. California*, 314 U.S. 219, 228 (1941) (noting that federal habeas courts "do not sit to review state court action on questions of the propriety of the trial judge's action in the admission of evidence"); *Thornburg v. Mullin*, 422 F.3d 1113, 1124 (10th Cir. 2005) (noting that a federal habeas court's "concern is not whether state rules of evidence were violated" and the court "must confine [itself] to 'deciding whether a conviction violated the Constitution, laws, or treaties of the United States' " (quoting *McGuire*, 502 U.S. at 68)). Federal habeas courts "will not disturb a state court's admission of evidence of prior crimes, wrongs or acts unless the probative value of such evidence is so greatly outweighed by the prejudice flowing from its admission that the admission denies [the petitioner] due process of law." *Knighton v. Mullin*, 293 F.3d 1165, 1171 (10th Cir. 2002) (quoting *Duvall v. Reynolds*, 139 F.3d 768, 787 (10th Cir. 1998)).

The Court agrees with Respondent. Magness does not identify a single constitutional violation which allegedly flowed from the admission of this evidence. *See* Dkt. No. 1 at 17-23.[7] Critically, whether the trial court complied with state law is a question of state law that is not cognizable on federal habeas review. *McGuire*, 502 U.S. at 67-68; *Leatherwood v. Allbaugh*, 861 F.3d 1034, 1043 (10th Cir. 2017) (noting that a habeas petitioner "cannot transform a state law claim into a federal one merely by attaching a due process label"). Therefore, this contention, standing alone, is insufficient to provide Magness with habeas relief.

---

[7] In his Reply, Magness indicates this was a clerical error. Dkt. No. 21 at 45-46. This Court, however, is under no obligation to construct arguments for Magness and search the record. *Foster v. Smith*, 429 F. Supp. 3d 940, 961 (D.N.M. 2019) (quoting *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005)).

To the extent Magness now wishes to raise a due process violation premised upon the admission of the arson and infidelity evidence, this claim was presented for the first time in his application for post-conviction relief. *See* Dkt. No. 9-4 at 19-23, Dkt. No. 9-8 at 11-14. The trial court and appellate court applied a procedural bar because this claim could have been raised, but was not raised, on direct appeal. Dkt. No. 9-9 at 3, Dkt. No. 9-11 at 2-3. Accordingly, the Court will address this portion of Ground Four, concerning the arson and infidelity evidence, below in the procedural default section.[8]

## VI. Ground Five: Jurisdiction

Next, Magness alleges the State lacked subject matter jurisdiction to convict him because the crime occurred within the boundaries of the Muskogee/Creek Nation thereby violating his due process and equal protection rights. Dkt. No. 1 at 23. Magness explicitly states, "[t]o the best of his knowledge, neither [he] nor his alleged victim are of Indian descent." *Id.* at 24.[9]

### A. The OCCA's Decision

Magness presented this claim in his application for post-conviction relief and the OCCA addressed it on the merits. The OCCA held:

> In Proposition Four Petitioner asserts that the District Court lacks subject matter jurisdiction because the alleged offense occurred within the boundaries of the

[8] The remaining portion of Ground Four, concerning judicial bias, will also be addressed below in the procedural default section. *See infra.*

[9] The Petition makes one passing statement, "[f]or the Court to uphold Equal Protection, it cannot discriminate upon the basis of Race, just as with other Federal jurisdictions . . . subject matter jurisdiction remains with the Federal government, not the State in which Federal lands resides." Dkt. No. 1 at 24-25. In his Reply, Magness states, "The Respondent, as the OCCA and District Court before them, fails to understand (or willfully ignores) that [Magness'] claim is one of jurisdiction based upon *racial discrimination*." Dkt. No. 21 at 51-52 (emphasis in original). Accepting Magness' current position, Magness fails to identify a clearly established Federal law, as determined by the Supreme Court of the United States, supporting his jurisdictional claim based on racial discrimination. *See* Dkt. No. 1 at 23-25; *see also* Dkt. No. 21 at 51-53. Therefore, Magness' discrimination claim is not entitled to habeas relief.

> Muskogee/Creek Nation. *See McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020). **This claim is without merit.** Petitioner concedes that he is not of Indian descent and nor is the victim. Federal jurisdiction over offenses committed within Indian country does not extend to crimes committed by non-Indians against non-Indians, which are subject to state jurisdiction. *Goforth v. State*, 1982 OK CR 48, ¶ 5, 644 P.2d 114, 116 (citing *United States v. McBratney*, 104 U.S. 621 (1882)). Therefore, fundamental to Petitioner's claim that state jurisdiction is preempted by federal statute is a determination of whether both the Petitioner and the victim are Indian. *See Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2499 (2022).
>
> The District Court determined that Petitioner failed to establish that he or the victim is Indian. The defendant has the "burden to prove his is an Indian by producing prima facie evidence that he has some Indian blood and that he was recognized as an Indian by a tribe or the federal government." *Parker v. State*, 2021 OK CR 17, ¶ 32, 495 P.3d 653, 654. We agree Petitioner failed to make this showing. Petitioner's unsupported assertions are not sufficient to warrant relief. *See Brown v. State*, 1997 OK CR 1, ¶ 33, 933 P.2d 316, 324-25.

Dkt. No. 9-11 at 3-4 (emphasis added).

**B. Analysis**

The Court agrees Magness' Ground Five is without merit. "The states possess exclusive jurisdiction over crimes occurring in Indian country if there is neither an Indian victim, nor an Indian perpetrator." *United States v. Langford*, 641 F.3d 1195, 1197 (10th Cir. 2011); *see also Oklahoma v. Castro-Huerta*, 597 U.S. 629, 656 (2022) ("[t]he Federal Government and the State have concurrent jurisdiction to prosecute crimes committed by non-Indians against Indians in Indian country."); *see also id.* at 651 ("If his victim were a non-Indian, Castro-Huerta [,a non-Indian,] could be prosecuted by the State, as he acknowledges."). Magness has presented nothing to suggest the OCCA's decision rejecting his jurisdiction claim was contrary to, or involved an unreasonable application of Supreme Court precedent or was an unreasonable determination of the facts. Therefore, habeas relief as to this claim is denied.

## VII. Ground Eight: Ineffective Assistance of Appellate Counsel

For his eighth claim, Magness states his appellate counsel was ineffective. Dkt. No. 1 at 35-37. Magness asserts six (6) instances of ineffective assistance of appellate counsel. *See id.*

Magness alleges appellate counsel did not:

1) Adequately raise the issue of insufficiency of the evidence as outlined in Ground One;

2) Raise the issue of Mrs. Reilly's misconduct as outlined in Ground Two;

3) Raise the issue of the Trial Prosecutor's misconducts as outlined in Ground Three;

4) Fully raise the issue of Trial Court's abuse of discretion (nothing beyond a few of the *Burk's* issues) as outlined in Ground Four;

5) Raise the issue of jurisdiction as outlined in Ground Five; and

6) Raise the issue of overall cumulative error as outlined in Ground Ten ([Magness] does not complain of Appellate Counsel's failure to claim ineffective assistance of Trial Counsel, as that would be improper for direct appeal, but the errors outlined in Ground 7 themselves should have gone to the issue of cumulative error).

Dkt. No. 1 at 35. Of these six (6) instances, five (5) were explicitly raised as ineffective assistance of counsel claims in his amended application for post-conviction relief. *See* Dkt. No. 9-8 at 22.[10] The state district court considered these five (5) claims and rejected them all. Dkt. No. 9-9 at 2-3. Magness appealed the state district court's denial of his application for post-conviction relief [Dkt. No. 9-10], and the OCCA affirmed the state district court's denial of the application [Dkt. No. 9-11].

---

[10] Magness did not raise an ineffective assistance of appellate counsel claim as it relates to his jurisdictional claim in his amended application for post-conviction relief. *See* Dkt. No. 9-8 at 22.

**A. The OCCA's Decision**

The OCCA reasoned as follows:

> We set forth in *Logan* that in reviewing a claim of ineffective assistance of appellate counsel under *Strickland*, a court must look to the merits of the issues that appellate counsel failed to raise. *Logan*, 2013 OK CR 2, ¶¶ 5-7, 293 P.3d at 973-74. Only an examination of the merits of any omitted issues will reveal whether appellate counsel's performance was deficient and also whether the failure to raise the omitted issue on appeal prejudiced the defendant; i.e., whether there is a reasonable probability that raising the omitted issue would have resulted in a different outcome in the defendant's direct appeal. *Id.* We find no merit in the claim that Petitioner was denied effective assistance of appellate counsel as alleged in his post-conviction application.

Dkt. No. 9-11 at 6.

**B. Analysis**

A habeas petitioner asserting a claim of ineffective assistance of appellate counsel must show both: "(1) constitutionally deficient performance, by demonstrating that his appellate counsel's conduct was objectively unreasonable, and (2) resulting prejudice, by demonstrating a reasonable probability that, but for counsel's unprofessional error(s), the result of the proceeding-in this case the appeal-would have been different." *Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003) (citing *Smith v. Robbins,* 528 U.S. 259, (2000)).

To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id.* at 689. With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693.

When a habeas petitioner alleges that his appellate counsel rendered ineffective assistance by failing to raise an issue on direct appeal, the Court first examines the merits of the omitted issue, generally in relation to the other arguments counsel did pursue. *Cargle*, 317 F.3d at 1202.

> If the omitted issue is so plainly meritorious that it would have been unreasonable to winnow it out even from an otherwise strong appeal, its omission may directly establish deficient performance; if the omitted issue has merit but is not so compelling, the case for deficient performance is more complicated, requiring an assessment of the issue relative to the rest of the appeal, and deferential consideration must be given to any professional judgment involved in its omission; of course, if the issue is meritless, its omission will not constitute deficient performance.

*Id.*

The OCCA correctly identified *Strickland*[11] as the controlling authority. *See Malicoat v. Mullin*, 426 F.3d 1241, 1248 (10th Cir. 2005). Thus, Magness must establish the OCCA unreasonably applied *Strickland*. *See Upchurch v. Bruce*, 333 F.3d 1158, 1167 (10th Cir. 2003).[12] As outlined below, after reviewing the record and the merits of the omitted claims, Magness cannot show the OCCA's determination of his ineffective assistance of appellate counsel claim was an unreasonable application of *Strickland* nor can Magness establish the OCCA's adjudication of his

---

[11] *Strickland v. Washington*, 466 U.S. 668 (1984).

[12] Magness contends the OCCA did not engage in the appropriate analysis dictated by *Logan v. State*, 293 P.3d 969 (Okla. Crim. App. 2013). Dkt. No. 21 at 57; *see also Logan*, 293 P.3d at 973 (noting "[p]ost-conviction claims of ineffective assistance of appellate counsel are reviewed under the standard for ineffective assistance of counsel set forth in *Strickland v. Washington*, 466 U.S. 668 (1984)."). The record reveals otherwise. The OCCA explicitly cited *Strickland* and concluded, "[w]e find no merit in the claim that [Magness] was denied effective assistance of appellate counsel as alleged in his post-conviction application." Dkt. No. 9-11 at 6. Despite Magness' contention that the OCCA "promptly ignored" *Logan* [Dkt. No. 21 at 57], "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief. This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a 'claim,' not a component of one, has been adjudicated." *Richter*, 562 U.S. at 98. As explained throughout, Magness fails to show there was no reasonable basis for the OCCA's rejection of his ineffective assistance of appellate counsel claim.

claim was an unreasonable determination of the facts. Habeas relief as to Magness' ineffective assistance of appellate counsel claim is unwarranted.

**1. Sub-Claim One: Insufficiency of the Evidence**

Magness complains of the prosecution's reliance on circumstantial evidence. Dkt. No. 1 at 35; *see also id.* at 3-8. The jury was permitted to rely on circumstantial evidence. *See Hill*, 786 F.3d at 1261. Additionally, as outlined above and recognized by the OCCA, there was sufficient evidence to convict Magness of first-degree murder. *See supra; see also* Dkt. No. 9-3 at 5-10. Magness possessed a motive, it was reasonable for the jury to infer his gun was used to kill Elizabeth, his theory of a robbery gone wrong is unsupported by the presence of other valuables in the home and the recovery of some of the guns, and his statements regarding Elizabeth's eye places him at the scene of the crime. In all, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 442 U.S. at 319. Thus, considering the record as a whole, the Court cannot conclude that had appellate counsel included this claim in Magness' direct appeal, as currently presented by Magness,[13] Magness would have received relief. Therefore, Magness cannot establish the prejudice prong of *Strickland* and cannot demonstrate the OCCA's determination was unreasonable. Magness' request for habeas corpus relief on this sub-claim is denied.

**2. Sub-Claim Two: Mrs. Reilly's Conduct**

Next, Magness contends his appellate counsel should have raised the alleged witness tampering claim that he raises as his Ground Two in the instant Petition. Dkt. No. 1 at 35; *see also id.* at 8-11; *see also* Dkt. No. 21 at 58-63. Magness' position is that Maxey Reilly, a prosecutor on

---

[13] As mentioned above, Magness' appellate counsel did present a sufficiency of the evidence claim to the OCCA on direct appeal. *See* Dkt. No. 9-1 at 42-45. Magness simply contends it was not adequately raised. Dkt. No. 1 at 3-7. 35.

the case during the investigation, informed Mr. Crouch there was a video of Magness on the night in question away from the Crouch residence and that Magness had a life insurance policy on Crouch. *Id.* at 9. Magness reasons Mrs. Reilly deceived Mr. Crouch to influence Mr. Crouch to alter his testimony. Dkt. No. 1 at 9. Magness claims prior to Mrs. Reilly's interference, Mr. Crouch and his wife told investigators that Magness could not have left their house on the night in question. *Id.* at 8-9. However, after Mrs. Reilly's purported interference, Mr. Crouch and Mrs. Crouch testified it was possible Magness left the residence thereby taking from Magness "his most solid defense." *Id.* at 9.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citations and internal quotation marks omitted). This includes "the right to present a defense by compelling the attendance, and presenting the testimony, of [the defendant's] own witnesses." *United States v. Serrano*, 406 F.3d 1208, 1215 (10th Cir. 2005). Accordingly, "the government cannot substantially interfere with a defense witness's decision to testify." *Id.* Witness interference must be determined on a case-by-case basis. *Id.* at 1216. "The dispositive question in each case is whether the government actor's interference with a witness's decision to testify was 'substantial.'" *Id.* (quotations omitted). "Interference is substantial when the government actor actively discourages a witness from testifying through threats of prosecution, intimidation, or coercive badgering." *Id.*

However, as Mr. Crouch testified, the State subpoenaed him to testify. Dkt. No. 10-3 at 215; *see also id.* at 3 (Mrs. Crouch and Mr. Crouch were both presented as State witnesses); *cf.* Dkt. No. 10-8 at 3 (Defendant did not call either Mrs. Crouch or Mr. Crouch to testify). Magness

does not identify any case law, let alone Supreme Court authority, providing that a defendant's right to present a defense can be violated by government interference with the *government's* own witness. *Contra Webb v. Texas*, 409 U.S. 95, 97-98 (1972) (per curiam) (holding that the defendant had been deprived due process of law under the Fourteenth Amendment when a trial judge's "lengthy and intimidating warning" and "threatening remarks, directed only at the single witness *for the defense*, effectively drove that witness off the stand." (emphasis added)); *see also Ponds v. Harding*, Case No. 21-CV-104-CVE-CDL, 2024 WL 1221169, at *10 (N.D. Okla. March 21, 2024) (unpublished)[14] (denying § 2254 petitioner's habeas claim that the State's investigator intimidated State's witness into not testifying at trial).

Even if the Court were to assume that clearly established law holds that the State can interfere with its own witness, the purported evidence of witness tampering Magness complains of was presented to the jury. On cross-examination, Magness' counsel elicited testimony from Mr. Crouch regarding the video and alleged life insurance policy. *See* Dkt. No. 10-3 at 207-208.[15] Furthermore, the jury was informed that Mr. Crouch changed his original statement that he did not believe Magness could have left his home on the night in question to testifying it was a possibility. *See id.* at 200-201, 203-204, 206, 216. The jury also was informed that Mr. Crouch and Magness were good friends and at times in the investigation Mr. Crouch was protective of Magness. *See id.* at 200-201, 215-216. Furthermore, defense counsel cross-examined Mrs. Crouch regarding her original statement to Agent Titsworth that she believes she would have heard it if Magness left her

---

[14] The Court cites all unpublished decisions herein as persuasive authority. Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

[15] Mr. Crouch testified Magness first informed him of the video. Dkt. No. 10-3 at 207. Mr. Crouch testified, "Michael had mentioned it first when I heard about it after he'd been arrested[.] I asked Maxey Reilly, and she confirmed that there was a video but she could not show it to me." *Id.*; *see also id.* at 217.

house on the night in question. Dkt. No. 10-3 at 140-141. However, Mrs. Crouch testified on direct examination that she believed it was possible for Magness to leave her home without her hearing that night. *Id.* at 121. And the jury was instructed regarding Magness' alibi defense. *See* Dkt. No. 10-18 at 30.

Therefore, the jury was permitted to evaluate Mr. and Mrs. Crouch's credibility, all of the evidence presented and render its verdict. Magness' appellate counsel's performance was not deficient because he did not present this sub-claim on appeal. The jury embraced the Crouches' direct examination testimony by way of its verdict. Therefore, omission of this claim was within the wide range of reasonable professional assistance. It follows, Magness cannot demonstrate the OCCA's adjudication of this claim was an unreasonable application of *Strickland*. Habeas relief as to this sub-claim is denied.

**3. Sub-Claim Three: Prosecutorial Misconduct**

Next, Magness alleges the prosecution: i) made statements of "fact" that were knowingly false; ii) made prejudicial statements in closing argument; and iii) misrepresented, contradicted and/or plainly lied about testimony. Dkt. No. 1 at 35; *see also id.* at 11-15; *see also* Dkt. No. 21 at 63-64.

Critically, a "prosecutor may comment on and draw reasonable inferences from evidence presented at trial." *Thornburg v. Mullin*, 422 F.3d 1113, 1131 (10th Cir. 2005). Generally, the Court will reverse a state conviction only if prosecutorial remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). "Inquiry into fundamental fairness requires examination of the entire proceedings, including the strength of the evidence against the petitioner[.]" *Le v. Mullin*, 311 F.3d 1002, 1013 (10th Cir. 2002). Counsel's failure to object to the comments, while not dispositive, is

also relevant. *Id.* (citing *Trice v. Ward*, 196 F.3d 1151, 1167 (10th Cir. 1999)). "[I]t is not enough that the prosecutor's remarks were undesirable or even universally condemned." *Id.* (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). Ultimately, the Court considers the jury's ability to judge the evidence fairly in light of the prosecutor's conduct. *Id.* (citing *Tillman v. Cook*, 215 F.3d 1116, 1129 (10th Cir. 2000)). Against this legal backdrop, the Court will consider each alleged instance of prosecutorial misconduct outlined in Magness' three (3) categories and whether Magness' appellate counsel was ineffective for failing to raise these instances.

**a. Category One: False Statements of Fact**

**First instance.** Magness alleges, the State "explicitly stated that the murder weapon was proven to belong to [Magness] even though their own forensic expert stated no match could be made." Dkt. No. 1 at 12, 35; *see also* Dkt. No. 9-8 at 8. Magness points to the following statement during the State's opening argument, "the evidence will be, ladies and gentleman, that Elizabeth Magness was shot and killed by the Glock that [Magness] just says that he just happened to take out of his truck that day and box up and put in that gun case." Dkt. No. 10-3 at 18. Magness further emphasizes the following exchange between the prosecution and Titsworth:

> **Q:** This – the crime itself, the – the idea that, as he's presenting it, someone's gone into the home and killed this woman with what we later learned would be their own weapon, is that an exceptionally rare case?
>
> **A:** Yes.

Dkt. No. 10-7 at 158. Magness also notes the following exchange between the prosecution and Katelyn Millar, an OSBI firearm and tool mark examiner:

> **Q:** And can you tell us in this case what conclusions were you able to make in regards to Items No. 7 and 9?
>
> **A:** Though they were consistent with 9 millimeter Luger bullets, meaning that when it was a cartridge it was in a cartridge case that said 9 millimeter Luger on it,

> there was not enough individual detail for me to say if they were fired by the same gun.

Dkt. No. 10-6 at 157. Lastly, Magness references the following statements during closing argument:

> And, ladies and gentleman, in this case, the evidence takes you directly to [Magness]. His gun is the gun that was used to kill her.

Dkt. 10-9 at 12.

> And he wants you to believe that, coincidentally again, he takes his baby that's breastfeeding and cosleeping, but for the first time ever on the same night his wife happened to get killed by his gun, they had a plan for him to spend the night and keep that baby.

*Id.* at 14.

Critically, the OCCA determined, "[t]he victim was shot with [Magness'] .9 mm Glock." Dkt. No. 9-3 at 5. Magness has not rebutted this finding by clear and convincing evidence. Further, the cartridge case from the crime scene and the casings from the pasture, where Magness admitted to practicing shooting his .9 mm, were all fired from the same firearm. *See* Dkt. No. 10-6 at 151-152, 160; Dkt. No. 10-7 at 170-174, 176. Magness admitted to owning a .9-millimeter pistol that was never recovered after the crime. Dkt. No. 10-7 at 159; Dkt. No. 10-8 at 29. Magness also told his father-in-law he suspected "that the police are going to find it was my own gun that was taken and used against her." Dkt. No. 10-3 at 48. There was sufficient testimony and evidence in the record to permit the prosecution to comment and draw the reasonable inference that Magness' missing .9-millimeter Glock was the weapon that fired the shot that killed Elizabeth. Therefore, appellate counsel's omission of this claim did not fall below an objective standard of reasonableness. And, it follows, Magness has not demonstrated the OCCA unreasonably applied *Strickland* when it rejected this instance.

**Second instance.** For his next assertion of prosecutorial misconduct, Magness alleges the State "introduced a multitude of 'bad acts' (as better outlined in Ground Four)[16] as well as solicited testimony of [Magness'] skill as a [live-action role player or] LARPer in an effort to convict upon [Magness'] alleged character rather than evidence." Dkt. No. 1 at 12, 35; *see also* Dkt. No. 9-8 at 8. Magness points to the following comment during opening argument:

> I anticipate that you will hear that the defendant, since he was just a child, has been involved in what we talked about yesterday, that live-action role-play, and that that was something that was very important and very central to his life. And I submit to you, ladies and gentlemen, that the evidence will be that he had really perfected his craft.

Dkt. No. 10-3 at 9. Magness also points to the following exchange between the prosecution and Mr. Crouch:

> **Q:** And did [Magness] often write those scripts?
>
> ***
>
> **Q:** I believe I was asking you if [Magness] wrote the scripts, and that – that may not be the right term, so correct me if I'm misstating what you would call –
>
> **A:** We call them scripts.
>
> **Q:** Okay. Is that something [Magness] would do for the group?
>
> **A:** He wrote a few of the games. [Elizabeth] wrote more of the games.

*Id.* at 177-178.

There was ample evidence presented at trial of Magness' involvement in LARP. *See* Dkt. No. 10-3 at 50 (Elizabeth's father, George Wilson, testified Magness participated in International Fantasy Gaming Society after Elizabeth's death), 173 (Mr. Crouch testified Magness introduced him to LARP in high school); Dkt. No. 10-4 at 39-40 (Dane Lyon testified he met Magness through a LARP organization in 2003). Further, Mrs. Crouch testified she "think's [Magness] is an

---

[16] Ground Four, as it relates to ineffective assistance of appellate counsel, is discussed in more detail *infra.*

excellent actor. That's why he does so well at IFGS stuff." Dkt. No. 10-3 at 163. The testimony regarding Magness' participation in LARP was not used to malign his character. This evidence of Magness' hobby was not impermissibly used to convict Magness. The Court cannot conclude the cited portions of the record constituted prosecutorial misconduct rendering this claim meritless. Therefore, appellate counsel was not ineffective for failing to raise these statements as prosecutorial misconduct on direct appeal. Nor has Magness demonstrated the OCCA unreasonably applied *Strickland* to this instance.

**Third instance.** Next, Magness alleges the state "intentionally misquoted timelines." Dkt. No. 1 at 12, 35; *see also* Dkt. No. 9-8 at 8. Magness supports his contention with the prosecutor's statement during opening argument that "[Magness] spends the night with the two children, and I believe you'll hear from April that they were trying to go to bed somewhere around 11:30, 12:30, and that the baby's fussing, having a hard time going down, crying for his mama." Dkt. No. 10-3 at 14. During direct examination, Mrs. Crouch testified she and Mr. Crouch went to bed around midnight, subsequently she heard B.M. fussing and she went out to check on him. *Id.* at 112-113. She testified she was awoken around 3:30 – 4:00 a.m. by B.M. screaming. *Id.* at 113. When she investigated, B.M. was in the kitchen with Magness. *Id.* at 114.

During cross-examination, Mrs. Crouch clarified she and Mr. Crouch went into their bedroom around midnight but did not fall asleep until "closer to 1:00." *Id.* at 133-134. She testified the first time B.M. was fussing was around 12:30 or 12:45. *Id*. at 135. And the next time she woke to B.M. was in the "3:30 to 4 o'clock range." *Id.* at 136.

Reviewing the entire proceedings, the Court, first, cannot conclude the prosecution provided an inaccurate timeline. The prosecution stated during opening Mrs. Crouch heard B.M. crying around 12:30 and that matched Mrs. Crouch's testimony. Second, the comment was made

during opening and the jury then heard the testimony and was able to "judge the evidence fairly in light of the prosecutor's conduct." *See Le*, 311 F.3d at 1013. In all, this claim of prosecutorial misconduct is meritless, appellate counsel was not ineffective for failing to raise this instance and Magness has not demonstrated the OCCA unreasonably applied *Strickland* to this instance.

**Fourth instance.** For his fourth instance of prosecutorial misconduct, Magness alleges the State "knowingly lied about [Magness] not showing emotion while they intentionally edited around such displays in evidence provided to the jury." Dkt. No. 1 at 12, 35; *see also* Dkt. No. 9-8 at 8. Magness cites the following:

> **Q:** What did you see when you got there?
>
> **A [Mr. Crouch]:** [Magness] was sitting on the north side of the porch, Dane was standing close by him. [Magness] was in tears.

Dkt. No. 10-3 at 190.

> **Q:** What was [Magness]' demeanor while you saw him outside?
>
> **A [Dane Lyon]:** He was starting to, I guess, come to the realization of what was going on. He started to break down.
>
> **Q:** None of us were there, so please tell me what you mean by breaking down?
>
> **A:** He began to cry. He was – I apologize, it's difficult to describe. He wasn't so much babbling is that he was trying to figure out what he was going to do, who was going to – that he knew that he would have to speak with the police and he was trying to figure out if he – what he was going to do with his – with his child.

Dkt. No. 10-4 at 64-65.

And to support his position that the prosecution lied, Magness references a conference that took place outside the presence of the jury wherein the prosecution and defense discussed the presentation of a video of Magness while talking to police and writing his statement. *See* Dkt. No. 10-7 at 138-145. During the conference, Magness' counsel stated, "the parts that [the State] ha[s] redacted is not really a bad – a good word, condensed, for lack of better word, is obviously the

things that they want the jury to hear, not necessarily the things that we would want the jury to hear or see." *Id.* at 140. Defense counsel noted the State's version did "not include a portion that we would think would be an appropriate playing, that my client shows emotion while Agent Titsworth's asking him to write down his statement. He expresses emotion when he's in the room by himself, which is consistent with our theory. *Id.* at 140-141. The trial court ultimately concluded, "I'm going to allow [the State] to play those, Ms. Farris, as you have requested, and I'll allow defense counsel to play what they want to play." *Id.* at 145. Magness did present additional portions of the video. *See* Dkt. No. 11 (Defense Ex. 5).

Further, there was testimony from witnesses that Magness did not display emotion after Elizabeth was found dead and that he did. For example, Elizabeth's father testified when he arrived in Okemah:

> [Magness] greeted us with a sort of shrug, which wasn't what I expected from a grieving husband whose wife had died violently. It was not in character with him, it was – it was just very surprising and unexpected and didn't – you know, marked it very, very significantly in my mind that it was just an odd behavior.

Dkt. No. 10-3 at 46; *see also id.* at 49 ("There was no, you no, no sign of strain, no – just no emotion or anxiety about missing her."). Carl Fletcher, the first officer responding to the crime scene, testified Magness "wasn't emotional." Dkt. No. 10-4 at 82. Steve Dominy, the family's pastor, testified when he met with Magness after the murder Magness displayed a "lack of emotion[.]" *Id.* at 104. Justin Scrimshire, a friend of Magness', testified he met Magness for lunch a few weeks after Elizabeth's death and Magness had "zero emotion, there was no quiver in his lip, that was no – he wasn't crying or anything," as he discussed Elizabeth's death. Dkt. No. 10-7 at 117, 120. Finally, Agent Titsworth testified when he first encountered Magness at the police station to interview Magness, Magness "didn't have much grief" and appeared "anxious, nervous." *Id.* at 153.

Conversely, other witnesses testified to observing Magness display emotion. Dane Lyon also testified that at the Okemah funeral Magness appeared "distraught" and was crying. Dkt. No. 10-4 at 67. Caleb Phillips, an employee at the K-Bar, testified he spoke to Magness on the phone the day after the murder and Magness was "emotional" and "sobbing[.]" Dkt. No. 10-7 at 82.

Therefore, the jury was presented with testimony indicating Magness did have emotion and did not have emotion after Elizabeth was discovered. However, any comment by the prosecution regarding Magness' lack of emotion[17] was a fair comment on the evidence. It cannot be said that the prosecution lied or that any such comment "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. Therefore, this claim is meritless, appellate counsel was not ineffective for failing to raise this statement as prosecutorial misconduct on direct appeal and Magness has not demonstrated the OCCA unreasonably applied *Strickland*.

**Fifth instance.** Magness alleges the prosecution engaged in misconduct when it "repeatedly solicited non-experts for opinions which they knew a true expert (often other State witnesses which were called) would refute." Dkt. No. 1 at 12, 35; *see also* Dkt. No. 9-8 at 8. To support this point, Magness first references a bench conference held outside the presence of the jury. *See* Dkt. No. 10-4 at 134-136. The Court overruled the defense's objection and permitted the witness, Janell Daggett, an OSBI crime scene agent, to testify regarding her opinion of how close the shooter was to Elizabeth when she was shot. *Id.* at 136.

First, Magness fails to articulate how Janell Daggett was not qualified to provide the opinion she did. Second, Dr. Pfeifer, a physician employed at the Oklahoma Medical Examiner's

[17] Beyond the reference to defense counsel's comment during the conference held outside of the jury, Magness does not direct the Court to any comment made by the prosecution wherein the prosecution purportedly lied to the jury.

Officer, also testified to his opinion that, based upon the stippling pattern on Elizabeth's face, the muzzle of the gun was "several inches from the surface up to about a foot and a half to two feet" from Elizabeth's face. Dkt. No. 10-7 at 104. Therefore, the Court cannot conclude the prosecution engaged in any misconduct by inquiring of Janell Daggett or that the information received from Janell Daggett "infected the trial with unfairness[.]" *Donnelly*, 416 U.S. at 643.

Next, Magness relies on the following exchange between the prosecution and Paulynda Stevens, an OSBI agent:

> **Q:** Did it leave any impression with you, ma'am, when he – when you inquired about, "Did you think it was a suicide," and he said "Oh, no," was that – did that seem unusual to you?
>
> **A:** It did.

Dkt. No. 10-6 at 60. Magness fails to articulate how this question even impermissibly seeks an expert opinion or was in anyway improper. Nevertheless, Paulynda Stevens went on to explain:

> [Magness] spent a – spent a great deal of time talking about her mental health and how bad it was and how she didn't take annual – she didn't go to the doctor, she was resistant with going, and he just spent a great deal talking about how bad it got and the catatonic state and how her – her mental health affected her parenting and just the ability to appropriately supervise her children. And, I mean, he just described it to be very bad.

*Id.* Therefore, the question seeking Paulynda Jones' impression based upon the information she gathered from Magness regarding Elizabeth was not improper.

Finally, Magness references Agent Titsworth's direct examination that was met with many objections. *See* Dkt. No. 10-8 at 20-28. Agent Titsworth, generally, offered his opinion that nighttime residential burglaries in Okemah were "rare," and factors that made it, in his opinion, unlikely that the crime was a burglary gone wrong. *See id.*

Magness does not elaborate on what credentials a "true expert" would need to provide the opinions Agent Titsworth provided. Agent Titsworth, at the time of the investigation and his

testimony, was a special agent with the OSBI. Dkt. No. 10-7 at 146. He testified prior to joining OSBI he "had over three years of investigative experience," he attended the OSBI agent's academy and had over 2,000 hours of annual training and education. *Id.* at 147. Agent Titsworth was tasked with investigating Elizabeth's murder. *See id.* at 147-148. Based on Agent Titsworth's training and experience, the Court cannot conclude Agent Titsworth offered an inappropriate opinion regarding the characteristics of the crime.

The trial court did sustain defense counsel's objection to the prosecution asking Agent Titsworth if he found "anyone with a motive to kill [Elizabeth] Magness?" Dkt. No. 10-8 at 23-24. Therefore, the trial court cured any error in this regard. *See Patton v. Mullin*, 425 F.3d 788, 800 (10th Cir. 2005).

In all, the Court cannot conclude appellate counsel's decision to omit this claim on direct appeal fell outside the wide range of reasonable professional assistance. Thus, Magness has failed to demonstrate the OCCA unreasonably applied *Strickland* to this instance of ineffective assistance of appellate counsel.

**Sixth instance.** Magness also alleges the State "knowingly misled the Trial Court by: A) claiming solicitation of a minor is 'not a crime' (in order to meet the Court's '*Burk's*' standard, admission of bad acts); and B) claiming having grown up in Okemah precludes [Magness] having grown up as a nudist (in another effort to admit character evidence)[.]" Dkt. No. 1 at 12, 35; *see also* Dkt. No. 9-8 at 8.

Regarding Magness' issue with the trial court's *Burks* ruling [Dkt. No. 10-5 at 99], the exchange Magness points to occurred during a bench conference. *Id.* Therefore, the Court cannot conclude a statement made outside the presence of the jury is grounds for a viable prosecutorial misconduct claim and this claim is meritless.

Second, Magness points to an exchange between the prosecution and OSBI agent, Paulynda Stevens. Dkt. No. 10-6 at 52. Once again, Magness points to a bench conference. *Id.* Nevertheless, before the bench conference, the prosecution asked Paulynda Stevens, "[a]t some point did [Magness] make any mention to you about growing up as a nudist?" Dkt. No. 10-6 at 51. Paulynda Stevens responded, "[y]es, he did." *Id.* The prosecution then asked, "[c]an you explain to the jury what he told you about that?" *Id.* This question was met with an objection and the trial court ultimately ruled, during the bench conference, "I don't need to hear about a nudist. Let's move on, counsel." *Id.* at 52. Examining this question and answer against the entire proceedings, the Court cannot conclude this question "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. Thus, appellate counsel did not provide deficient performance by omitting this claim of alleged prosecutorial misconduct on direct appeal. It follows, Magness has not established no fair-minded jurist could reach the same conclusion as the OCCA.

**Seventh instance.** Magness also alleges the prosecution engaged in misconduct by "knowingly solicit[ing] false, and/or contradictory information about: A) [Magness'] gun being positively identified as the murder weapon; B) alleged inconsistencies in Magness' statements; and C) [Magness'] financial status[.]" Dkt. No. 1 at 12, 35; *see also* Dkt. No. 9-8 at 8-9. The Court already addressed Magness' allegation that the State "explicitly stated that the murder weapon was proven to belong to [Magness] even though their own forensic expert stated no match could be made." *See supra.* The Court will not revisit this claim.

Regarding Magness' inconsistent statements, Magness points the Court to an exchange between Agent Titsworth and the prosecution wherein the prosecution asked, "[t]he story that he tells you about the gate, did that change over time?" Dkt. No. 10-7 at 178. Agent Titsworth

responded, "[y]es, it did." *Id.* This exchange referred to the gate in the backyard and, according to Agent Titsworth, Magness first told him the "kids always keep the gate shut," and Magness later told Agent Titsworth that Elizabeth had bought some locks and planned to lock the gate because the kids were getting out. *Compare id.* at 177-178 *with* 178-179. Magness also points to the prosecution's question "did he tell you that he could not see theft as being a motive in this case?" and Agent Titsworth responding, "[y]es." *Id.* at 187.

None of these instances were met with an objection. Further, they were fair questions from the prosecution based on what Magness told Agent Titsworth while Agent Titsworth was investigating the crime. Magness does not explain how the questions solicited knowingly false testimony. Therefore, the Court cannot conclude the OCCA unreasonably applied *Strickland* regarding this instance.

Next, regarding his financial status, Magness directs the Court to the prosecution's question, "did you see an electric bill with a large past due amount?" Dkt. No. 10-7 at 194. Agent Titsworth responded, "[t]here was utility bills that was, yeah, that was behind." *Id.* Magness does not articulate how this question solicited false testimony or how the answer was false. To the extent Magness challenges the notion that he was in a poor financial position, there was testimony beyond the utility bills to support this inference. *See* Dkt. No. 10-3 at 40 (George Wilson testified at Christmas 2014 "the family didn't have a lot of spending money."); Dkt. No. 10-7 at 199-200 (Agent Titsworth testified the annual payment due at end of February 2015 for a mortgage taken out by Magness had not been paid at the time of Elizabeth's death). Accordingly, Magness has failed to establish the prosecution solicited false testimony by way of this question regarding the utility bill. Once again, this is a meritless claim, appellate counsel was not deficient for failing to raise it and Magness did not establish the OCCA unreasonably applied *Strickland*.

**Eighth instance.** Magness also challenges the State's purposeful solicitation of "a long series of conclusive statements from Agent Titsworth (the lead investigator) in which he repeatedly and directly states [Magness] was guilty, many times doing so after defense objection had been sustained, and going so far that even the otherwise biased [[Magness'] Belief] Trial Court verbally reprimanded the State and threatened mistrial[.]" Dkt. No. 1 at 12-13, 35; *see also* Dkt. No. 9-8 at 9. Magness broadly references an entire volume of the trial transcript and states, "throughout Titsworth's testimony." Dkt. No. 9-8 at 9. Agent Titsworth testified on direct for approximately ninety-three (93) pages of the trial transcript. *See* Dkt. No. 10-7 at 146-216, Dkt. No. 10-8 at 8-32.[18]

At one point, in the course of sustaining a defense objection and during a bench trial, the trial court did caution the prosecution, "Ms. Farris, you and I both know that [Titsworth] can't give an opinion to this jury on [Magness]' guilt." Dkt. No. 10-8 at 24. Later, Agent Titsworth was testifying, "I believe that [Magness] only went back to the home that night to –[.]" Dkt. No. 10-8 at 30. Magness' counsel objected and a bench conference ensued. *See id.* The trial court cautioned the prosecution:

> **The trial court:** Again, I'm not going to allow from this witness that [Magness] killed [Elizabeth], so please be careful with your questions, Ms. Farris.
>
> **The prosecution:** I will.
>
> **The trial court:** Or we're going to mistry this case.
>
> **The prosecution:** I understand.

*Id.*

---

[18] This Court is under no obligation to search the record on Magness' behalf. *See Foster*, 429 F. Supp. 3d at 961.

First, during an earlier portion of Agent Titsworth's testimony the trial court instructed the jury, "you are ordered and directed to disregard the answer of the witness for the reason that that is your sole – not your sole job, that's one of the jobs that you have, his opinion is irrelevant to what you decide." Dkt. No. 10-7 at 204.

Second, the Court already addressed the propriety of the opinions Agent Titsworth formed while investigating the case. *See supra*. The trial court did caution the prosecution and sustain some of the defense's objections. However, the jury was presented with ample evidence to support its finding of guilt. *See supra.* Therefore, considering the jury's ability to judge the evidence fairly in light of the prosecutor's conduct and the trial court's instructions, the Court cannot conclude the prosecution's questioning of Agent Titsworth "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. Nor can the Court conclude appellate counsel's decision to omit this instance, in light of the evidence supporting the verdict, fell below an objective standard or reasonableness. Thus, it follows, a fair-minded jurist could agree with the OCCA's adjudication of this instance.

**Ninth instance.** For his ninth instance of prosecutorial misconduct, Magness asserts the State "submitted a falsified *Miranda* document" (Magness does not make any *Miranda* claim, he does point out that his arrest was well documented as occurring on May 1st, 2015, while the document submitted was labeled as May 5th, 2015, and is indicative of the State's overall efforts to achieve victory no matter the facts). Dkt. No. 1 at 13, 35; *see also* Dkt. No. 9-8 at 9. During direct examination, Agent Titsworth reviewed Magness' *Miranda* form and noted it read, "the Okemah police Department, May 5th, '15, 13:17 hours." Dkt. No. 10-7 at 213-214; . However, a review of the actual exhibit reveals it is dated May 1, 2015. Dkt. No. 10-33 at 5 (State's Ex. 125).

First, it appears Agent Titsworth simply misspoke. Second, Magness fails to articulate how Agent Titsworth's minor misstatement of the date can be attributed to the prosecution for "falsifying" a document. The actual document, by Magness' own allegation, is accurately dated May 1, 2015. This claim is meritless.

**Tenth instance.** For his tenth and final instance of prosecutorial misconduct within the first category, Magness states that the State "knowingly concealed Medical Examiner's opinion of the timing for Victim's eye to have been bulged and that said timing was even an issue of importance for the State's case, making it impossible for the defense to offer explanation or counter testimony." Dkt. No. 1 at 13, 35; *see also* Dkt. No. 9-8 at 9. During direct examination, the following exchange occurred:

> **Q:** There's been some discussion in the case about her eye bulging out, and I don't see that in this photograph. What – do you have an opinion as to what point, if ever, her eye would have been bulged out?
>
> **A [Dr. Pfeifer]:** I – I could see that eye bulging out at the moment of impact with that bullet. The – the bullet creates a shockwave in front of it in what we call a temporary cavity, and so when it enters that orbital area, I think it's very plausible that the pressure in that orbit where that eye is could have forced that eye out momentarily.
>
> **Q:** And then it immediately returns?
>
> **A:** Immediately or within a few seconds or minutes.

Dkt. No. 10-7 at 105-106. This testimony was not met with an objection. Defense counsel did not even cross-examine Dr. Pfeifer regarding his testimony about the timing of Elizabeth's eye bulging out. *See* Dkt. No. 10-7 at 107-108.

Magness does not articulate how this opinion was concealed. *See* Dkt. No. 1 at 13, 35. Multiple witnesses testified to Magness' comment about observing Elizabeth's eye bulging out when he found her. *See, e.g,* Dkt. No. 10-3 at 191-192 (Mr. Crouch), Dkt. No. 10-5 at 217 (David

Magness), Dkt. No. 10-7 at 119 (Justin Scrimshire); *id.* at 180 (Agent Titsworth). It was permissible for the prosecution to inquire of a medical examiner about this piece of evidence. In all, considering the entirety of the record and evidence supporting the jury's verdict, appellate counsel was not ineffective for failing to raise this claim.

**b. Category Two: Prejudicial Statements in Closing Argument**

Next, Magness alleges the prosecution made "a litany of plain error, prejudicial statements" during closing argument. Dkt. No. 1 at 13; *see also* Dkt. No. 9-8 at 9. Magness contends that his appellate counsel's failure to raise the following eleven (11) enumerated instances of prosecutorial misconduct rendered appellate counsel ineffective:

> 1) "you know that's not who [Magness] is;" 2) "you know that [Magness] is someone who murdered his wife;" 3) "it does factor into your decision as to why [Magness] would do what he did;" 4) "the reason [Magness] did what he did;" 5) "and will agree and know with confidence beyond a reasonable doubt that the murder was caused by this defendant;" 6) "in this case the evidence takes you directly to [Magness];" 7) "after he shot her in the face;" 8) "and shoot her in the face;" 9) "he's surprised because he killed her, ladies and gentlemen;" 10) "he shot her in the face;" and 11) "and it was [Magness] who shot his wife with malice aforethought in the face."

*Id.* at 13; *see also* Dkt. No. 10-9 at 6, 10, 12, 17, 30, 32 and 35.

"The prosecutor may properly comment on the circumstances of the crime made known to the jury during trial." *Hooper v. Mullin*, 314 F. 3d 1162, 1172 (10th Cir. 2002). "The prosecutor also possesses reasonable latitude in drawing inferences from the record." *Id.* Magness fails to articulate how any of the above eleven (11) statements were beyond the scope of proper commentary and inferences a prosecutor is permitted to make. The State's theory of the case was that Magness murdered his wife by shooting her in the face for insurance money and Magness tried to cover up the crime as a robbery gone wrong. *See* Dkt. No. 10-3 at 8-18. The State introduced sufficient evidence to support this theory. Therefore, the prosecution's closing

argument reiterating its theory and drawing reasonable inferences from the evidence presented to the jury was not improper. Thus, this claim lacks merit and Magness has not shown the OCCA unreasonably applied *Strickland* to this category.

**c. Category Three: The Prosecution Lied**

To support his final category of prosecutorial misconduct, Magness alleges "the State misrepresented, contradicted and/or plainly lied about additional testimony[.]" Dkt. No. 1 at 13. The Court will address each instance of alleged misrepresentation, contradiction and/or lie.

**First instance.** Magness alleges the State "fabricat[ed] contradictions between [Magness'] and Mr. Lyons' statements[.]" Dkt. No. 1 at 13-14; *see also* Dkt. No. 9-8 at 9. Magness references the prosecution's closing argument wherein she stated:

> Do you all remember Dane Lyon? He was the gentleman from Norman who brought – had borrowed the truck and he brought it back on that day and he met him there at the house. My memory is that Mr. Lyon says when they get there, they're going in together, and he specifically says that [Magness] tells him to wait right here and he's going to go on back around the house, and that [Magness] turns around and comes running right back out and that he's holding the baby, and tells him that [Elizabeth] is down, and he gives him – he tells him to call 911. That's my memory of what Mr. Lyons says. That is not what [Magness] says.
>
> [Magness] tells Agent Stevens and Agent Titsworth that when he goes in the house he tells Dane Lyon to wait, he goes on back, he gets into that dining room area and then he sees her down and he whirls around and he runs back in – which we know has to be the living room because that's where the bedroom door is, and he says he puts the baby and the food down in that bedroom. He goes back and checks on her again and then comes back to Mr. Lyon. Now, do you think Mr. Lyon would have noticed all the commotion with the baby and the food and he's going back again? But that's not what Mr. Lyon told you happened.

Dkt. No. 10-9 at 31. Dane Lyon testified as follows:

> **Q:** What happened after [Magness] arrived?
>
> **A:** We went in the house, he asked me to wait in the living room and he went towards the back, towards the dining room area. After which he came back out very shortly, informed me that he had found [Elizabeth] on the floor. He seemed to be in a state of shock, he was pale and very monotoned in his response, and I asked

him did she seem to be okay, was she unconscious and he didn't respond so I went to check myself and that's when I found her on the floor.

**Q:** . . . Where did you wait in the house?

**A:** In the living room.

**Q:** Living room, okay. And did [Magness] have the baby with him?

**A:** Yes.

Dkt. No. 10-4 at 46-47. Agent Stevens testified:

**Q:** And, ma'am, at one point in your lengthy conversation with him did he go into detail about the moments when he says he found [Elizabeth]'s body?

**A:** Yes.

[Portion of recording of Agent Stevens' conversation with Magness introduced as Exhibit 55]

**Q:** Okay. And we can hear him indicating about when he came in, "I got right –", where did he get – when he's talking to you, where did he indicate in the house – where did he get to look at [Elizabeth]?

**A:** H[e] walked through here, stopped right here and could see her head.

**Q:** Okay. And did he tell you then to get – that's when he goes back and puts the baby in the room?

**A:** He – he put B.M. down in the room.

**Q:** That's what he said? And then he comes back – where does he say that he goes? How far did he go into the room?

**A:** Walked to about right here.

**Q:** Okay. So sort of parallel to the dining room table?

**A:** Yes.

**Q:** Okay. And that's where he told you?

**A:** Yes.

Dkt. No. 10-6 at 54-58; *see also* Dkt. No. 10-21 at 9 (State's Ex. 39). "Petitioner told Agent Titsworth that he saw [Elizabeth] on the floor when he reached for the light switch, put B.M. and a bag in the children's room, and checked on her again before coming back out." Dkt. No. 9 at 85; *see also* Dkt. No. 11 (State's Ex. 101). Magness does not articulate how the prosecution's argument was false. The evidence presented at trial establishes it was not. It follows that the prosecution's statement during closing was permissible commentary from the evidence presented. Therefore, this instance of prosecutorial misconduct is meritless.

**Second instance.** Magness next alleges the State "add[ed] their own non-expert testimony about the dog being in its crate." Dkt. No. 1 at 14; *see also* Dkt. No. 9-8 at 9. Magness directs the Court to the following statement during the prosecution's closing argument:

> The other item that I think is interesting is if you look at the picture of the living room, this has always stood out to me, they have a dog and that dog is in a crate. Do you think [Magness] put that dog up so he wouldn't track through this carefully orchestrated scene? The police told you that dog was always in the crate when they were there. Doesn't that seem unusual that a woman who's home alone would have the dog stuck in the crate the whole time?

Dkt. No. 10-9 at 32; *see also* Dkt. No. 10-19 at 8 (State's Ex. 14).

The evidence presented during the State's case in chief is that the dog was in the crate the entire time the first responding officer, Carl Fletcher, was at the scene. *See* Dkt. No. 10-4 at 80-81. The prosecution's inference that the dog was purposefully placed in the kennel was appropriately drawn from the record. *Hooper*, 314 F. 3d at 1172. Magness fails to explain how the prosecutor's comment was a misrepresentation, contradiction or lie. Thus, this claim is meritless and its omission did not constitute deficient performance by appellate counsel. Thereby, the OCCA's adjudication of this instance was reasonable.

**Third instance.** Magness alleges the prosecution gave "their own non-expert (and incorrect) testimony about cell towers not being able to show travel off a single text, knowing full

well there were multiple pings throughout the time in question that did show 'travel' as having been static at the Crouch residence and going further to tell the jury to disregard it anyway because the data wasn't 'helpful in the case[.]'" Dkt. No. 1 at 14; *see also* Dkt. No. 9-8 at 9-10. Magness relies on the following statement during closing argument:

> **The prosecution:** And the other thing I want to address while it's fresh on your mind is this cell phone data – data sorry that he's trying to feed you. He says I'm trying to hide it from you and he has it all. He brought the maps over, and he's saying I'm trying to hide it? I produced all of that. You see, obviously, he has the same subpoena power that I do and can bring –
>
> **Defense counsel:** Judge, I'm going to object, that's burden shifting. I have no burden.
>
> **The trial court:** Overruled.
>
> **The prosecution:** He has the same ability that I do to bring any witness in here. If he thought that evidence exonerated his client, you better believe those witnesses would have been here and we would not be here today. That's not what happened here. You – he asked Agent Titsworth a question before we went to lunch and I think he got a surprise answer because I think that data is complicated and lawyers don't necessarily understand it.
>
> Agent Titsworth told you no – or told him, "No, I can't really say about his phone because after 2 o'clock it hits off a different tower, off the Castle tower. So I don't know whether it's moving or not." What you have to see to know if a phone is moving is not whether you're driving in a car, that's not how that works. It's as you – as the phone receives data it pings. So if you get a text in but you don't respond, there's no pinging back to show any travel.
>
> I didn't see how that evidence was helpful in this case. I don't think it hurts me, I don't think it helps me. I don't think it hurts him, I don't think it helps him. It just has limited use. We're in a small grouped area, our phones ping off various towers. And a lot of times it depends on traffic and if you're standing this way or standing that way, that's how I understand it. That's not helpful information, and yet he wants you to walk this murderer out of this courtroom because I didn't bring in a cell phone analyst that he has the ability to do himself.
>
> **Defense counsel:** Judge, again I'm going to object. This is burden shifting.
>
> **The trial court:** Overruled. You have subpoena power.
>
> **Defense counsel:** Judge, that doesn't matter, it's burden shifting.

**The trial court:** Overruled, Counsel.

Dkt. No. 10-9 at 100-101.

On cross-examination, defense counsel asked Agent Titsworth:

**Q:** Did [Magness]' cell phone ever leave the Tower 2 up by the Crouch's residence?

**A:** I can't say whether it did or not. I know that there was a text message around 2 o'clock and I believe that hit off of a tower south of Castle, which would be south of 62 Highway, which is about 15 or 16 miles south of Crouch, somewhere in that area.

**Q:** You learned that was an incoming text; correct?

**A:** I believe so, yes.

**Q:** From one of the employees at the K-Bar?

**A:** Yes.

**Q:** So my question is do you have any information that [Magness]' phone ever left the Crouch's residence?

**The prosecution:** Judge, I believe he has answered that he can't answer that particular question, other than the answer he's given.

**Defense counsel:** Judge, he has the reports. I'm asking him based on the reports that he has.

**The trial court:** He can answer if he can.

**Q:** Let me ask a more specific question. Let me ask a more specific question. AT&T gave you cell phone towers for the area; correct?

**A:** They did, yes.

**Q:** Tower 1 is in Okemah, correct?

**A:** I don't recall exactly where all the towers were at, there were several towers.

Dkt. No. 10-8 at 76-77.[19] On re-direct, Agent Titsworth testified:

---

[19] Subsequent to this exchange, the prosecution objected stating, "Agent Titsworth is not a cell phone expert and certainly not a tower data expert. . . . Asking him about AT&T's data and trying

**Q:** And in this case are you able to tell us by looking at the data what you understood as to whether or not someone is definitely traveling or the – not – I guess I should say whether the phone is in one location or not?

**A:** The entire time, no.

**Q:** Okay. Because it's hitting off different towers?

**A:** That's correct.

**Q:** But even though it's hitting off different towers, as you sit here today you would be unwilling to testify because you just don't know if that's because tower activity or of movement; is that right?

**A:** Yes.

**Q:** Okay. And so in cases like this that data has – at least does it in your mind have limited usefulness in a case like this? That's probably a bad question. Let me just say, are there limits to what we can tell with cell phone data?

**A:** Yes.

Dkt. No. 10-8 at 125-126.

Therefore, critically, Magness' counsel introduced the cell phone tower data topic to the jury and solicited Agent Titsworth's opinion. *See* Dkt. No. 10-8 at 76-79. Furthermore, the prosecution's commentary was a proper comment on the evidence presented at trial. Agent Titsworth testified he was unable to determine if Magness' cell phone moved that evening. The prosecution commented that the data was not helpful to either side. Magness does not articulate how the comment was beyond the scope of proper closing argument or a misrepresentation, contradiction or lie. Therefore, the OCCA did not unreasonably apply *Strickland* in rejecting this instance of alleged prosecutorial misconduct.

---

to introduce it through this agent would be hearsay and it lacks any foundation with him. He's not the appropriate witness." Dkt. No. 10-8 at 78. The trial court ultimately concluded, "[c]ounsel may pursue the questioning. If the witness can't answer the question, he can tell the jury he can't answer the question." *Id.* at 79.

**Fourth instance.** Next, Magness alleges the prosecution "added the testimony 'unfortunately, there's a lot of brush and debris for [Magness] so that Glock case, I'm sure he thought would float down the river, got hung up there.' Even though both Mr. York senior and Mr. York junior testified for the State that the case was freely floating in a back current (not caught in any brush), and no other testimony would suggest otherwise[.]" Dkt. No. 1 at 14; *see also* Dkt. No. 10-9 at 103 and Dkt. No. 9-8 at 10.

Magness does not articulate how this comment at closing is material. Magness' Glock case was recovered. Dkt. No. 10-7 at 211. It is unclear why it matters if the Glock case was recovered from brush and debris or freely floating in a back current. Nevertheless, Eric York testified the Glock case was floating in a back current approximately twenty (20) feet from where he found a 16-gauge shotgun. Dkt. No. 10-6 at 95-96, 100-101. Billy York testified they found a black powder rifle by "rak[ing] around[.]" *Id.* at 114. And the Glock case "was a little ways further down from where the rifles was." *Id.* at 115. Both York men testified based on the location of the items it appeared they had been tossed from the bridge. Dkt. No. 10-6 at 95, 116. The prosecution's statement amounts to fair commentary. Thus, this instance of purported prosecutorial misconduct is meritless.

**Fifth instance.** Magness also alleges the prosecution engaged in misconduct when the State's attorneys gave "their own non-expert (and incorrect) testimony about guns not rusting while in water." Dkt. No. 1 at 14; *see also* Dkt. No. 9-8 at 10. During closing, the prosecutor said:

> And counsel thinks that those guns would be rusted, and I disagree with the science on that. And first of all, I'd tell you Eric York said the one that he pulled out – or that was – he found in the mud first, he started working on it with chemicals and oils because it had started rusting. But you don't get rust on metal until you expose it to air, and that you can use from common knowledge and inference. You've probably seen things recovered from the sea, and when they bring it up, they keep it submerged in water so that it doesn't begin to rust. That's a false premise that the defendant is trying to -- to feed you.

Dkt. No. 10-9 at 103-104.

During direct examination, Eric York stated, when he found the 16-guage shotgun it was "setting right by the water" and "was actually out of the water." Dkt. No. 10-6 at 94-95. He assumed, "it wasn't out of the water long, just from the way it looked, wasn't really any rust buildup starting[.]" *Id.* at 97. Once again, Magness fails to articulate how the prosecution's comment was a misrepresentation, contradictory, or a lie. Eric York's testimony suggested that items in water do not rust. This instance of purported prosecutorial misconduct is likewise without merit.

**Sixth instance.** Magness next contends the prosecution improperly stated Elizabeth "was also a disabled person who was having some problems and suffering in her home. And it was that disability that kept her trapped in this marriage with [Magness]." Dkt. No. 1 at 14; *see also* Dkt. No. 10-9 at 108 and Dkt. No. 9-8 at 10. Magness alleges "no other testimony suggested [Elizabeth] was 'disabled' by her depression, nor was there any other testimony to suggest either of us wished to end our marriage." Dkt. No. 1 at 14.

Contrary to Magness' contention, there was testimony Elizabeth's daily life was hindered by her depression. Elizabeth's father, George Wilson, testified after Elizabeth and Magness moved to Okemah, Wilson was concerned his daughter was depressed, and Magness told Wilson that Elizabeth was taking anti-depressants. Dkt. No. 10-3 at 35-36. The last time Wilson saw Elizabeth he reached the conclusion "that we wouldn't be surprised if the next time we saw her wasn't her and the boys on the doorstep with suitcases telling us she had decided to leave [Magness]." *Id.* at 42.

Mrs. Crouch testified, Elizabeth "didn't come out of the house much. She didn't really do much after B.M. was born." *Id.* at 104. Mrs. Crouch also testified she believed Elizabeth was

depressed and "all she ever did was sleep." *Id.* at 105, 107. Mrs. Crouch further testified, "[u]sually that house is such a disaster you couldn't see much of anything." *Id.* at 147. Magness reported to Mr. Crouch that Elizabeth "would lock herself in her room and not come out. She wouldn't do any of the housework, she wouldn't help out with the kids. She was basically emotionally shut down." *Id.* at 182.

Regarding their marriage, Magness complained "he wasn't getting any." Dkt. No. 10-3 at 108. Mrs. Crouch encouraged Magness to divorce Elizabeth. *Id.* However, Magness told the Crouches that "Magnesses don't get divorced." *Id.*; *see also id.* at 182. There was evidence presented that Magness had an extra-marital affair with Kimberly Simmons. Dkt. No. 10-5 at 18-19. Magness talked to Simmons about ending his marriage and told her, "we'll have this contract and if by the end of that time frame it's still not working out then we'll end our marriage. And that year would have been 2015." *Id.* at 18. There was also evidence presented that Magness communicated to K.C., the Crouches' then sixteen-year-old daughter, that if she was interested in having sex with him, he would do that. Dkt. No. 10-5 at 98.

Therefore, the prosecution's commentary that Elizabeth was depressed, her depression interfered with her daily life and that the marriage was not thriving was all supported by the record. The prosecutor's inference that Elizabeth was trapped in the marriage was also supported by the evidence. Nothing about the prosecutor's closing statement was a misrepresentation, contradiction or lie. This instance is meritless.

**Seventh instance.** The next instance of alleged prosecutorial misconduct was when the state "bolster[ed] Agent Titsworth's testimony above even the State's own expert witnesses[.]" Dkt. No. 1 at 14; *see also* Dkt. No. 9-8 at 10. The prosecution argued, "your common sense will tell you just what Agent Titsworth told you, this crime makes no sense that a [*sic*] intruder would

have done this." Dkt. No. 10-9 at 9. Magness does not articulate how this statement somehow improperly elevated Agent Titsworth's testimony.

The evidence presented to the jury was that Agent Titsworth was an OSBI investigator with extensive training. Dkt. No. 10-7 at 146-147. Furthermore, left behind at the crime scene were cars with keys in the ignition and valuables in and outside the home. *See* Dkt. No. 10-8 at 25-27. Further, what was allegedly taken were the guns and most of them were later recovered from the river. *See id* at 29. Based on Agent Titsworth's experience, the murder did not appear to be a robbery. *Id.* at 28. Therefore, based on Agent's Titsworth's testimony, the prosecution's statements at closing were within the permissible bounds of commentary and inferences drawn from the evidence presented. Appellate counsel's decision to omit this instance was reasonable, in light of the record, and a fair-minded jurist could reach the same conclusion the OCCA did.

**Eighth instance.** For his eighth example of prosecutorial misconduct within category three, Magness alleges the State "claim[ed] that there was no reason for the Crouchs to have changed their testimony despite Mr. Crouch's testimony of Mrs. Reilly's tampering." Dkt. No. 1 at 14; *see also* Dkt. No. 9-8 at 10. Magness points to the following statement during closing: "[The Crouches] didn't have any reason to come in here and tell you anything other than what they actually remembered." Dkt. No. 10-9 at 14.

Placing it more in context, the prosecutor argued:

> And then we have this story of him going, and we know that he goes to April and Dustin Crouch's house. And he takes these two babies with him. Isn't it interesting that he just happens to be out of town when his wife gets murdered, just like he just happened to be out of town, driving to Wisconsin, when Grimmie's house burns down? Isn't that an interesting parallel? Think he thought that covered him in the fire and that would cover him here?
>
> And I submit to you, ladies and gentlemen, when Dustin and April are asked, when you went to bed was [Magness] there, yes, when you got up was [Magness] there, yes. Would you assume he had been there through the night? How many parents

> across the country, if I asked that question to them, was your teenager there all night last night in their bedroom, how many of them do you think would say yes, and how many times do you think those teenagers have snuck out of the house without their parents knowing? Again, use your common sense.
>
> Dustin and April had time to reflect on it and recalled that [Magness] has come into their home and startled the girls before and had told them how – he told them how easy it was to get in and out of their house. Dustin and April love this man. They treated him as though he was one of their family, he was like a brother. They were together all the time. He had free access to their house and their home and free access to their daughter. They didn't have any reason to come in here and tell you anything other than what they actually remembered.

Dkt. No. 10-9 at 13-14.

As outlined above, on cross-examination, the jury was informed that Mr. Crouch changed his original statement that he did not believe Magness left his home on the night in question to testifying it was a possibility. *See id.* at 200-201, 203-204, 206, 216. The jury also was informed that Mr. Crouch and Magness were good friends and, at times in the investigation, Mr. Crouch was protective of Magness. *See id.* at 200-201, 215-216. Furthermore, defense counsel cross-examined Mrs. Crouch regarding her original statement to Agent Titsworth that she did not believe Magness left her house on the night in question. Dkt. No. 10-3 at 140-141. However, Mrs. Crouch testified on direct examination that she believed it was possible for Magness to leave her home without her hearing it that night. *Id.* at 121.

The prosecution's commentary on Mr. and Mrs. Crouch's testimony was properly grounded in the evidence that the Crouches had changed their testimony. It was reasonable for the prosecution to comment on that and present an argument. The jury had this evidence and was permitted to weigh the Crouches' credibility. It was within an objective standard of reasonableness for appellate counsel to omit this claim.

**Ninth instance.** Magness also alleges the prosecution "misrepresent[ed] the DNA evidence." Dkt. No. 1 at 14; *see also* Dkt. No. 9-8 at 10. Magness takes issue with the prosecutor's

argument, "[t]hat's what you would first test, but no one else's DNA was found on that lock except for [Elizabeth] and [Magness]. That's it." Dkt. No. 10-9 at 17.

On direct examination, William Christensen, a forensic scientist in the OSBI DNA Lab in 2015, testified he analyzed the DNA from the "silver and gold padlock[.]" Dkt. No. 10-7 at 19. Through his analysis he concluded, "the DNA profiles obtained from the swabs from the silver and gold lock appears to be a mixture. The source of Item 10, which is the known buccal swabs from [Magness], and 15A, which is the known blood card from Elizabeth Magness could not be excluded as potential contributors for this mixture, and the probability of selecting an unrelated individual at random from the population who could be a contributor to this mixture is at least 1 in 26." *Id*.

The defense cross-examined Christensen about the lock:

> **Q:** And so for the lock, from – from the DNA science point of view, you don't know whether or not that's actually [Elizabeth] Magness' DNA or [Magness'] DNA on the lock; right?
>
> **A:** No, the alleles that are present in that mixture are also present in the known samples from both – both the knowns that I compared it to. It's just that when it's a mixture in it that's low level, it's – it brings the statistic down so. There are certain thresholds that you have in DNA analysis that you can indicate whether or not it's a low-level mixture versus not a low-level mixture, and that's kind of where this applies to, it's just a low-level mixture on this particular lock. But all the alleles present in the mixture are also present in both known samples.
>
> **Q:** Right. But all the alleles you found would also be present in 1 in 26 people randomly chosen; right?
>
> **A:** Right, there's a potential that if I was to also profile 26 people that at least one of them, on average, would also be included in this mixture.
>
> **Q:** Okay. So both [Magness] and [Elizabeth] are might be's for the lock?
>
> **A:** Right, they both cannot be excluded.

Dkt. No. 10-7 at 26-27.

The prosecutor's statement was accurate that, based upon the evidence presented to the jury, there was nobody else identified as having DNA on the lock. Once again, this was a fair argument at closing based on the evidence presented at trial. Any weaknesses with this argument were exploited on cross-examination and the jury was permitted to weigh the evidence. The jury possessed the ability to judge the evidence fairly in light of the prosecutor's conduct. *See Le*, 311 F.3d at 1013. The Court cannot conclude this instance amounts to prosecutorial misconduct or appellate counsel was deficient for failing to raise this instance.

**Tenth instance.** For his tenth instance of prosecutorial misconduct, Magness alleges the prosector "directly l[ied] about [Magness'] weight, which was in the 290 – 310 range at the time of the murder[.]" Dkt. No. 1 at 14; *see also* Dkt. No. 9-8 at 10. Magness takes issue with the following statement during closing, "he's in his mid-200s weight is what she's guessing and about – I believe she said 5'10"." Dkt. No. 10-9 at 18. The prosecutor was referring to Rhonda Hill's testimony. *See id.* at 17-18. On direct, Hill was asked how much she thought the man she observed on the night in question weighed and she answered, "[w]ith the pudginess, maybe 240, 250, something like that." Dkt. No. 10-4 at 28.

The prosecution's closing statement was an accurate summary of Hill's testimony. Simply because Magness believes Hill's testimony was inaccurate does not mean the prosecution's statement was a lie. Furthermore, Magness' counsel cross-examined Hill about the weight of the person she observed [Dkt. No. 10-4 at 33] and presented Magness' Booking Form from the Okfuskee County Jail dated May 1, 2015, indicating Magness weighed 270 pounds. Dkt. No. 10-35 at 4 (Defense Ex. 9). Therefore, the jury was able to fairly judge the evidence presented and the prosecutor's statement was not improper. This is another meritless claim.

**Eleventh instance.** Magness also alleges the prosecution "directly l[ied] about [Magness] being denied for a bridge loan (the record shows [Magness] has been approved, but was holding off while shopping for better rates[.])" Dkt. No. 1 at 14-15; *see also* Dkt. No. 9-8 at 10. During closing, the prosecution said,

> [h]e tried to get that, and I can't remember the name of the finance company but it's basically like a quick – quick cash type loan situation, like a payday loan except it's for business, and that didn't go through so he tries to get 50 grand out of Dale Rich, but Dale doesn't respond to him.

Dkt. No. 10-9 at 23-24.

Agent Titsworth testified he discovered during the investigation Magness was "trying to obtain some funds from Flash Advance, I believe, some sort of loan company." Dkt. No. 10-8 at 16. Agent Titsworth testified Flash Advance is "kind of like a payday loan company for businesses[.]" *Id.* The State asked Agent Titsworth, "[d]o you know whether or not the loan went through?" *Id.* at 17. Agent Titsworth answered, "[t]o my knowledge it did not go through." *Id.* Therefore, once again, the prosecution's statement accurately captured the substance of Agent Titsworth's testimony, this statement does not amount to prosecutorial misconduct, and this purported instance of ineffectiveness is meritless.

**Twelfth instance.** Magness alleges, the State "l[ied] about [Magness'] loans from his mother and Mr. Rich having been both for the funeral (the loan from Rich was for the funeral, the loan from Petitioner's mother was for the restaurant[.])" Dkt. No. 1 at 15; *see also* Dkt. No. 9-8 at 10. Magness takes issue with the following statement during closing, "[y]ou heard the testimony that Dale Rich went to the funeral home himself and paid for that funeral, but then he gets the money for the funeral again off his own mother." Dkt. No. 10-9 at 24.

During the State's case in chief, the following exchange occurred:

**Q:** Did he make any other requests of you?

> **A [Dale Rich]:** Later, right after – after his wife was deceased, he asked me for help with funeral expenses.
>
> **Q:** And did you help him with that?
>
> **A:** Yes, I did do that.
>
> **Q:** Do you remember how much that was for?
>
> **A:** Right at about 10,000.
>
> **Q:** Okay. And did you give the defendant a check for 10,000?
>
> **A:** No, I went straight to the funeral home and paid for the expenses there.

Dkt. No. 10-6 at 38. Magness' mother was asked during cross-examination, "did you help [Magness] with the funeral expenses?" Dkt. No. 10-8 at 154. Mrs. Magness answered:

> Yes, I did. Now, he hadn't asked me for money but I'd just been through my husband's, I knew how expensive it was. I think I gave him like 20,000 to help him out, and I came up with that number because I'd went with him to the funeral home here and kind of knew what it – you know, what a lot of it was going to cost.

*Id*. While Magness' mother testified Magness did not ask for the money from her, the prosecution's closing statement that Magness obtained money from two separate sources to fund Elizabeth's funeral is an accurate summary of the testimony presented. The Court discerns no misconduct by the prosecution or ineffectiveness on behalf of appellate counsel for omitting this claim.

**Thirteenth instance.** Finally, Magness alleges the prosecution impermissibly "attribut[ed] multiple quotes as having been directly from [Magness] even though [Magness] never took the stand." Dkt. No. 1 at 15; *see also* Dkt. No. 9-8 at 10. Magness points to the following statements: i) "[Magness] says you need a pair of pliers;" and ii) "he told you Magnesses don't get divorced." Dkt. No. 10-9 at 21, 24-25. A statement "offered against a party and [that] is the party's own statement, in either an individual or a representative capacity" is not hearsay and appropriately admitted into evidence. *See* Okla. Stat. tit. 12, § 2801(B)(2)(a). Throughout Magness' trial, many

statements made by him were admitted into evidence without objection. Agent Titsworth testified regarding accessing the gun cabinet in the Magness home, "[Magness] described to me that you could use a pair of pliers or a (inaudible) or something and just take that screw out." Dkt. No. 10-7 at 183. Magness also told both Mr. and Mrs. Crouch, "Magnesses don't get divorces." Dkt. No. 10-3 at 108, 182.

Both of the prosecutor's closing statements were accurate summaries of statements Magness told other witnesses and the witnesses relayed to the jury during trial. Therefore, Magness' final attempt to establish prosecutorial misconduct falls short.

After thoroughly evaluating each point of purported prosecutorial misconduct raised by Magness, the Court concludes the OCCA's rejection of Magness' ineffective assistance of appellate counsel claim as it relates to the noted instances of prosecutorial misconduct was not an unreasonable application of *Strickland* nor an unreasonable determination of the facts. For these reasons, habeas relief as to Sub-Claim Three is denied.

**4. Sub-Claim Four: Abuse of Judicial Discretion**

Next, Magness alleges his appellate counsel was ineffective for failing to raise the abuse of judicial discretion claim he presents in Ground Four. Dkt. No. 1 at 35; *see also id.* at 17-21; *see also* Dkt. No. 21 at 64. Magness challenges the trial court's *Burk's* ruling and the evidence that was admitted as a result of this ruling [*see* Dkt. No. 1 at 17-18] and the trial court's "procedural failures" [*id.* at 18]. However, "[u]nfavorable judicial rulings do not in themselves call into question the impartiality of a judge." *United States v. Mendoza*, 468 F.3d 1256, 1262 (10th Cir. 2006). Even where the trial court makes incorrect legal rulings, that, standing alone, is not enough to establish actual bias. *See Welch v. Sirmons*, 451 F.3d 675, 698–701 (10th Cir. 2006), *abrogated on other grounds by Wackerly v. Workman*, 580 F.3d 1171 (10th Cir.2009) (citing *Liteky v. United*

*States*, 510 U.S. 540, 555 (1994) (holding that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion.")). Generally, unfavorable or incorrect legal rulings constitute the basis for appeal, not for a bias challenge. *Liteky*, 510 U.S. at 555. Considering the whole record and evidence presented, the Court cannot conclude had appellate counsel included this particular point in Magness' direct appeal, Magness would have received relief. Therefore, Magness cannot establish the prejudice prong of *Strickland* and cannot demonstrate the OCCA's determination was unreasonable.

Next, Magness argues the trial court's facial expressions, general demeanor and body language demonstrate the trial court's bias against Magness. Dkt. No. 1 at 18-19. During a bench conference, defense counsel stated, "I think the Court's facial expressions when I make objections in this matter are being transmitted and the jury is seeing them just as I am. I'd request the Court keep its expression neutral[.]" Dkt. No. 10-6 at 35. The Court responded, "the Court is unable to sit up here and be totally expressionless, Mr. Allen. My expressions in no way reflect any irritation with you or Mr. Stevenson as far as your objections are concerned. But I'll continue to have the expressions I've had for 50 years probably, so you want to say anything else about my expressions?" *Id.* at 35-36. Defense counsel responded, "[n]o, sir." *Id.* at 36.

The United States Supreme Court has held,

> *[n]ot* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Liteky*, 510 U.S. at 555-56 (emphasis in original). Magness has not pointed to anything more than purported expressions of impatience, dissatisfaction, annoyance or anger. *See id.* The record does not support Magness' contention that the trial court's facial expression and general demeanor

indicated a bias and frustration against the defense that rose to the level of a constitutional violation. Omission of this claim did not fall outside the wide range of reasonable professional assistance.

Finally, to support his judicial bias claim Magness claims the trial court was unfit for duty and using prescription pain killers at the time of trial. Dkt. No. 1 at 20. Magness further alleges the trial court's alleged "commiserating and shaking hands with the victim's father, both giving the witness greater credibility and showing which 'side' the trial court was on." *Id*. Magness acknowledges the alleged exchange between the victim's father and the trial court is not captured by the record. *Id.* Further, as noted, there was sufficient evidence to support the jury's verdict. *See supra*. Therefore, the Court cannot conclude that, if appellate counsel raised this position in Magness' direct appeal, he would have received relief from the OCCA. In all, Magness cannot establish the prejudice prong and cannot demonstrate the OCCA's determination of this ineffective assistance of appellate counsel claim was unreasonable.

**5. Sub-Claim Five: Jurisdiction**

Concerning his ineffective assistance of appellate counsel claim, Magness contends his appellate counsel "failed to raise the issue of jurisdiction as outlined in Ground Five[.]" Dkt. No. 1 at 35. This sub-claim was not presented to the state district court in his application for post-conviction relief. *See* Dkt. No. 9-4 at 6; Dkt. No. 9-8 at 22. Nor was this sub-claim presented to the OCCA on appeal. *See* Dkt. No. 9-10 at 6. Therefore, this claim has not been fairly presented to the state court. *Fairchild*, 579 F.3d at 1151. Further, the OCCA would apply a procedural bar if Magness were to return to state court to exhaust this claim through an application for post-conviction relief because he could have, but did not, raise this claim in his initial application for post-conviction relief. *Smallwood*, 191 F.3d at 1267. Magness does not demonstrate why this

Court should review his procedurally barred claim. Therefore, Magness has not overcome the procedural bar, and habeas relief as to this sub-claim is denied.

#### 6. Sub-Claim Six: Cumulative Error

Magness also contends his appellate counsel was ineffective for failing to "raise the issue of overall cumulative error as outlined in Ground Ten.[.]" Dkt. No. 1 at 35; *see also* Dkt. No. 21 at 65-66. The "cumulative-error analysis applies where there are two or more actual errors. It does not apply, however, to the cumulative effect of non-errors." *Cuesta-Rodriguez v. Carpenter*, 916 F.3d 885, 915 (10th Cir. 2019). As explained thoroughly throughout this Opinion, Magness has failed to establish a single constitutional error, let alone two or more. Further, the OCCA reviewed this claim on the merits and rejected it. Dkt. No. 9-11 at 4-6. Magness cannot establish the result of his direct appeal would have been different had the OCCA reviewed the claim on direct appeal instead of during his post-conviction proceedings. Therefore, Magness has not established the prejudice prong of *Strickland*.

In all, Magness failed to establish, let alone even argue, the OCCA unreasonably applied *Strickland* or made an unreasonable determination of the facts. *See* Dkt. No. 1 at 35-37. Therefore, habeas relief as to this sub-claim is denied.

### VIII. Ground Nine: Post-Conviction Proceedings

Magness also alleges his "rights to due process, equal protection and fair trial were denied through the State's failure to follow Oklahoma statute and established procedure." Dkt. No. 1 at 37-38. Specifically, Magness alleges:

> The State of Oklahoma has a clear and well-defined process for Post-Conviction Relief codified in both statute and case law. The District Court (which was the same as the Trial Court) failed to follow this process by: 1) refusing to recuse themselves from a proceeding which directly called into question their own actions; 2) relying on personal knowledge of the original trial rather than the evidence and testimony entered into the record of the post-conviction proceeding; 3) taking a

> directly adversarial roll [sic.] by making arguments for the State (the District Attorney entered no Response); 4) failing to conduct *Logan* tests on the issues raised as evidence of ineffective assistance of appellate counsel; and 5) failing to conduct evidentiary hearings on issues of material fact.
>
> These issues were all raised in the subsequent appeal to the Oklahoma Court of Criminal Appeals (OCCA); however, the OCCA failed to remand and affirmed the District Court's decision despite the failings listed above. By not following state statu[t]e and the *Logan* procedure, both the District Court and the OCCA denied Petitioner his rights.

Dkt. No. 1 at 38; *see also* Dkt. No. 21 at 66-71.

Respondent argues this claim "concerns the manner in which the state courts denied him post-conviction relief and does not concern federal law," and is not a cognizable habeas claim. Dkt. No. 9 at 102-103.

Respondent is correct, "[h]abeas relief is available for a violation of the federal constitution, but not for a violation of state law." *Graham v. White*, 101 F. 4th 1199, 1204 (10th Cir. 2024). In *Graham*, the Tenth Circuit explained:

> The State points out that Ms. Graham alleges a misapplication of Oklahoma law. If Ms. Graham had stopped there, her claim wouldn't support habeas relief. But Ms. Graham also alleges a denial of due process from the misapplication of state law. These allegations involve a violation of not only state law but also the federal constitution.
>
> Granted, the theories involving state law and the federal constitution are intertwined. But "in rare circumstances, a determination of state law can be so arbitrary or capricious as to constitute an independent due process violation." *Cummings v. Sirmons*, 506 F.3d 1211, 1237 (10th Cir. 2007) (alterations and quotation marks omitted) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)).
>
> Ms. Graham not only labels her claim as constitutional, but also alleges that it was arbitrary for the state court to jettison the initial order (vacating the convictions). Though this allegation turns on an antecedent question of state law, an arbitrary application of state law could impinge on the right to due process. *See id.* So the claim isn't confined to a violation of state law.

*Id.* at 1204-05.

Here, Magness merely alleges a "misapplication of Oklahoma law" and labels his claim as constitutional. *Graham*, 101 F. 4th at 1204; *see also* Dkt. No. 1 at 38 (alleging the district court "failed to follow this [state] process" and the district court and OCCA did not follow "state statu[t]e and the *Logan* procedure[.]"). Therefore, the Court agrees with Respondent that Magness has not presented a cognizable habeas claim. *See Sellers v. Ward*, 135 F.3d 1333, 1335 (10th Cir. 1998) ("[B]ecause the constitutional error [petitioner] raises focuses only on the State's post-conviction remedy and not the judgment which provides the basis for his incarceration, it states no cognizable federal habeas claim."); *see also Lopez v. Trani*, 628 F.3d 1228, 1229 (10th Cir. 2010) ("Our precedent makes clear that the district court did not err in dismissing claims that related only alleged errors in the post-conviction proceedings."). Therefore, habeas relief as to Ground Nine is denied.

**IX. Ground Ten: Cumulative Error**

For his final claim, Magness alleges his "rights to due process, equal protection, and fair trial were denied through the cumulative effect of multiple errors, which when viewed collectively created a clear prejudice." Dkt. No. 1 at 39-40. During his post-conviction proceedings, the OCCA reviewed this claim on the merits and concluded, "[a] cumulative error argument has no merit where, as here, this Court fails to sustain any of the other errors raised by [Magness]. *See Zamarripa v. State*, 2022 OK CR 10, ¶ 32, 514 P.3d 470, 478." Dkt. No. 9-11 at 6.

In this Court, habeas petitioners "are entitled to 'relief under [the] cumulative error doctrine only when the constitutional errors committed in the state court trial so fatally infected the trial that they violated the trial's fundamental fairness.'" *Andrew v. White*, 62 F.4th 1299, 1351 (10th Cir. 2023) (quoting *Littlejohn v. Trammell*, 704 F.3d 817, 868 (10th Cir. 2013)), *cert. granted, judgment vacated on other grounds* 145 S. Ct. 75 (2025). To analyze a cumulative-error claim, a

reviewing court "aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Simpson v. Carpenter*, 912 F.3d 542, 602 (10th Cir. 2018) (quoting *United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002)). But "[o]nly actual constitutional errors are considered when reviewing a case for cumulative error." *Id*. As detailed above and below, Magness has not established the existence of any constitutional errors. Therefore, no reasonable jurist could conclude the OCCA's rejection of his cumulative error claim [Dkt. No. 9-11 at 1-2, 6-7] was contrary to or an unreasonable application of clearly established federal law. *See Wyatt v. Crow*, 812 F. App'x 764, 770 (10th Cir. 2020). Nor has Magness demonstrated the OCCA's decision rested on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). Habeas relief as to Ground Ten is denied.

**X. Procedurally Barred Claims (Grounds Two, Three, part of Four, Six and Seven)**

Magness' remaining claims are the following:

2. Pre-Trial Prosecutorial Witness Tampering. The State purposefully deceived Petitioner's alibi witness with the express intent of altering said witnesses' testimony, resulting in the witnesses' trial testimony being fundamentally altered from all previous statements. Thus, Petitioner was denied his Constitutional rights of due process, equal protection, and a fair trial;

3. Prosecutorial Misconduct. The State tried a case full of misconducts in an attempt to achieve a "victory" in spite of knowing the evidence did not support their theory and well established case law;

4. Abuse of Judicial Discretion. The trial court repeatedly abused their judicial discretion in favor of the State by . . . directly prejudicing the defense via facial expression and comments, and failure to properly instruct the jury;

6. Cruel and Unusual Punishment/ Equal Protection. The State of Oklahoma violated Petitioner's right to protection from cruel and unusual punishment under the United States Constitution by imposing a sentence of life without the possibility of parole; which in modern times has been found both cruel and unusual by multiple nations and the international community at large. Further,

the State failed to provide equal protection to Petitioner by denying him access to the resources available to any other citizen facing a death sentence; and

7. Ineffective Assistance of Trial Counsel. Petitioner was denied the right to effective assistance of trial counsel due to the attorney's deficient performance, the trial court's rulings, and the State's discovery violations which led to prejudice against Petitioner.

Dkt. No. 1 at 8-15, 17-21, 26-33. Respondent argues these Grounds are procedurally barred, and Magness cannot overcome the procedural default. Dkt. No. 9 at 107-117.

The Court agrees Magness raised these Grounds for the first time in his post-conviction proceedings.[20] *Compare* Dkt. No. 9-1 *with* Dkt. No. 9-4 at 13-19, 26-30; Dkt. No. 9-8 at 5-11, 17-21 and Dkt. No. 9-10 at 3-6. The OCCA applied the procedural rule of waiver and denied Magness' claims. Dkt. No. 9-11 at 3. Specifically, on appeal, the OCCA concluded,

> In Propositions Two[21], Three[22], Five[23] and Six[24] we do not reach the merits of Petitioner's claims because the issues could have been raised in a direct appeal and are therefore waived. *Logan v. State*, 2013 OK CR 2, ¶ 3, 293 P.3d 969, 973; *Fowler v. State*, 1995 OK CR 29, ¶ 2, 896 P.2d 566, 569; *Walker v. State*, 1992 OK CR 10, ¶ 6, 826 P.2d 1002, 1004. All issues that could have been raised in a previous direct appeal proceeding but were not are waived and may not be the basis of a post-conviction application. *Fowler*, 1995 OK CR 29, ¶ 2, 896 P.2d at 569. The Post-

---

[20] While Magness did not set forth a standalone "witness tampering" claim in his application for post-conviction relief, he couched it within his claim of prosecutorial misconduct. *See* Dkt. No. 9-4 at 14 and Dkt. No. 9-8 at 6.

[21] Magness raised the prosecutorial misconduct claim (Ground Two) as proposition two in his post-conviction proceedings. *See* Dkt. No. 9-4 at 13-19; *see also* Dkt. No. 9-8 at 5-11 and Dkt. No. 9-10 at 3-6.

[22] Magness raised the judicial bias claim (Ground Four) as proposition three in his post-conviction proceedings. *See* Dkt. No. 9-4 at 3-4; *see also* Dkt. No. 9-8 at 11 and Dkt. No. 9-10 at 5.

[23] Magness raised his cruel and unusual punishment/equal protection claim (Ground Six) as proposition five in his post-conviction proceedings. *See* Dkt. No. 9-4 at 5, 26-28; *see also* Dkt. No. 9-8 at 17-19 and Dkt. No. 9-10 at 5-6.

[24] Magness raised his ineffective assistance of trial counsel claim (Ground Seven) as proposition six in his post-conviction proceedings. *See* Dkt. No. 9-4 at 5-6, 28-30; *see also* Dkt. No. 9-8 at 19-21 and Dkt. No. 9-10 at 6.

> Conviction Procedure Act is not a substitute for a direct appeal, nor is it intended as a means of providing a petitioner with a second direct appeal. *Id*. Petitioner has not established sufficient reason for not asserting or inadequately raising his current grounds for relief in direct appeal proceedings. *Id*. "Simply envisioning a new method of presenting an argument previously raised does not avoid the procedural bar." *McCarty v. State*, 1999 OK CR 24, ¶ 9, 989 P.2d 990, 995.

Dkt. No. 9-11 at 3. Therefore, to avail himself to federal habeas review of these claims, Magness must demonstrate the OCCA's decision did not rest on an independent and adequate state law ground. *See Coleman*, 501 U.S. at 729.

OCCA's application of the waiver doctrine is routinely deemed independent and adequate. *See Smith*, 550 F.3d at 1274 (noting the Tenth Circuit "has found Oklahoma's bar of claims not raised on direct appeal to be independent and adequate"). It is clear Oklahoma's waiver rule, as codified in Okla. Stat. tit. 22, § 1086, is based solely on state law, and Magness provides no argument suggesting it is not regularly followed and evenhandedly applied. *See Cole v. Trammell*, 755 F.3d at 1142, 1159 (2014); *see also* Dkt. No. 1.

**A. Cause and Prejudice**

Because each of these claims were defaulted in state court on an independent and adequate state procedural ground, the Court's review of these claims is foreclosed unless Magness can find a way around the procedural bar. There are two ways to do this: Magness can "demonstrate cause and prejudice or a fundamental miscarriage of justice." *McCracken*, 268 F.3d at 976 (internal quotations omitted).

To establish the cause prong of the cause and prejudice exception, a petitioner must "show that some objective factor external to the defense impeded . . . efforts to comply with the state procedural rules." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Examples of such external factors include the discovery of new evidence, a change in the law, and interference by state officials. *Id*.

As for prejudice, Magness must show "'actual prejudice' resulting from the errors of which he complains." *United States v. Frady*, 456 U.S. 152, 168 (1982).

**1. Ground Four**

The Court first addresses the remaining portion of Magness' judicial bias claim, Ground Four.

As noted above, Magness now clarifies he challenges the admission of arson and infidelity evidence as violating his due process rights. *See* Dkt. No. 21 at 45-47. However, a due process claim premised upon the admission of this evidence was not presented until Magness' application for post-conviction relief. *See* Dkt. No. 9-4 at 19-23, Dkt. No. 9-8 at 11-14. Similarly, Magness alleges, "the Trial Court repeatedly abused their judicial discretion in favor of the State by . . . directly prejudicing the defense via facial expression and comments, and failure to properly instruct the jury." Dkt. No. 1 at 17. Magness outlines fourteen (14) instances he alleges demonstrate a pattern of bias. *Id.* at 19-20. *Id.* at 18. Magness also challenges the trial court's fitness and failure to recuse from the post-conviction proceedings. *Id.* at 20-21. However, like the arson and infidelity evidence, Magness raised this claim for the first time in his application for post-conviction relief [Dkt. No. 9-4 at 3-4, Dkt. No. 9-8 at 11 and Dkt. No. 9-10 at 4-7], and the OCCA denied relief due to a procedural bar. Dkt. No. 9-11 at 3. Therefore, to have these portions of Ground Four reviewed by this Court, Magness must overcome the applicable procedural bars.

Fatally, Magness does not adequately address either exception to the procedural bar. *See* Dkt. No. 1 at 21-22. He contends he raised judicial bias on direct appeal. *Id.* at 21. However, on direct appeal, he raised the claim that "the trial court abused its discretion by allowing the State to present irrelevant and unfairly prejudicial 'bad acts' character evidence of arson and infidelity at trial." *See* Dkt. No. 9-1 at 3, 46-54. It is clear on direct appeal Magness did not raise a due process

claim. *See id.* He further alleges that he raised the issue in post-conviction, which is true. *See* Dkt. No. 1 at 22, Dkt. No. 9-4 at 3-4, Dkt. No. 9-8 at 11 and Dkt. No. 9-10 at 4-7. But he fails to adequately address cause or prejudice to excuse his failure to raise the remaining portion of Ground Four on direct appeal. *See* Dkt. No. 1 at 21-23; *see also* Dkt. No. 21 at 51.[25] Therefore, Magness failed to overcome the applicable procedural bar, and habeas relief is denied concerning the remaining portion of Ground Four.

**2. Grounds Six and Seven**

The Court next turns to Grounds Six and Seven. In his Petition, Magness contends these Grounds were not raised on direct appeal because of "ineffectiveness of appellate counsel[.]" Dkt. No. 1 at 29 and 34. In certain circumstances, counsel's ineffectiveness can constitute "cause" sufficient to excuse a state prisoner's procedural default. *Carrier*, 477 U.S. at 488-89. However, "a claim of ineffective assistance [must] be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." *Id.* at 489. An ineffective assistance of counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted. *Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000). Unless a petitioner can satisfy the "cause and prejudice" standard for the procedurally defaulted ineffective

---

[25] Magness argues in his Reply that "with the additional evidence of the post-conviction proceedings (which were not available prior to this Habeas Application) it becomes yet another 'dead bang winner' which clearly calls for relief[.]" Dkt. No. 21 at 51. Thus, the Court understands Magness' position to be that the issue of judicial bias, as evidenced by the state district court's failure to recuse, was unknown until the district court level post-conviction proceedings and this establishes cause excusing the procedural default. *See id.* at 68. Even if the Court accepts this premise as cause, Magness cannot demonstrate prejudice with respect to the district court's failure to recuse from Magness' post-conviction proceedings. The district court, and the OCCA, denied the judicial bias claim on procedural grounds because it "could have been raised on appeal and [was] not." Dkt. No. 9-9 at 3; *see also* Dkt. No. 9-11 at 3. Magness cannot establish a different state district judge would not have likewise denied the claim on the same procedural ground.

assistance of counsel claim, that claim cannot serve as cause for another procedurally defaulted claim. *Id.*; *see also Mondier v. Franklin*, 04-CV-0629-CVE-FHM, 2008 WL 554995, at *11 (N.D. Okla. Feb. 27, 2008) (unpublished). The Court, thus, evaluates Magness' ineffective assistance of appellate counsel claim as "cause" for Grounds Six and Seven.

As noted, the ineffective assistance of appellate counsel claim must "be presented to the state courts as an independent claim before it may be used to establish cause for procedural default." *Carrier*, 529 U.S. at 452. Magness did present an ineffective assistance of appellate counsel claim in his post-conviction appeal to the OCCA. *See* Dkt. No. 9-10 at 6; *see also* Dkt. No. 9-8 at 22. In his application for post-conviction relief, Magness presented the following bases of ineffectiveness: 1) failed to raise compounding inference issue; 2) failed to raise witness tampering; 3) failed to raise prosecutorial misconduct; 4) failed to raise trial court's abuse of discretion; and 5) failed to raise cumulative error. Dkt. No. 9-8 at 22; *see also* Dkt. No. 9-10 at 6. Fatally, Magness never argued his appellate counsel was ineffective for failing to raise the cruel and unusual punishment/equal protection claim or the ineffective assistance of trial counsel claim.[26] *See id.*

Accordingly, Magness' "cause" for Grounds Six and Seven is unexhausted. If Magness returned to state court to exhaust these claims, they would be procedurally barred in a second post-conviction application. *See Smith v. State*, 878 P.2d 375, 377 (Okla. Crim. App. 1994) ("issues which could have been raised on direct appeal or in the first post-conviction application, but were not, are waived" (citing Okla. Stat. tit. 22, § 1086)); *see also Medlock v. Ward*, 200 F.3d 1314, 1323 (10th Cir. 2000) ("Despite the especially vigilant scrutiny we apply in examining procedural

---

[26] Critically, Magness alleges he "does not complain of appellate counsel's failure to claim ineffective assistance of trial counsel[.]" Dkt. No. 1 at 35.

bars to ineffective assistance claims, we have held that Oklahoma's procedural bar to claims not raised on initial post-conviction review is independent and adequate."). Therefore, as outlined, Magness' "cause" is procedurally barred and cannot be relied upon to overcome the OCCA's procedural bar as it relates to Grounds Six and Seven. Having failed to establish cause, the Court need not evaluate prejudice, and habeas relief as to Grounds Six and Seven is denied.

**3. Grounds Two and Three**

Magness also alleges Grounds Two and Three were not raised on direct appeal because of "ineffectiveness of appellate counsel[.]" Dkt. No. 1 at 10 and 15. And, as noted, Magness did raise an ineffective assistance of counsel claim as it relates to appellate counsel's failure to raise witness tampering and prosecutorial misconduct in his post-conviction proceedings. Dkt. No. 9-8 at 22; *see also* Dkt. No. 9-10 at 6. Therefore, liberally construing Magness' Petition, the Court will assume without deciding Magness has established cause to overcome the procedural bar with respect to Grounds Two and Three, and the Court will turn to the prejudice prong.

As outlined above, in the context of Magness' ineffective assistance of appellate counsel claim, Magness cannot establish "actual prejudice." *United States v. Frady*, 456 U.S. 152, 168 (1982). Concerning Ground Two, witness tampering, Magness failed to establish a constitutional claim arises by the State allegedly "tampering" with its *own* witness. *See Harding*, 2024 WL 1221169, at *10. Further, as outlined, the jury was permitted to evaluate Mr. and Mrs. Crouch's credibility and changed testimony. *See* Dkt. No. 10-3 at 140-141, 200-201, 203-204, 206-208, 215-217. The jury was informed these witnesses changed their testimony and still returned a guilty verdict. Therefore, Magness cannot establish that if the jury been further educated on this theory, the outcome of his trial would have changed. Accordingly, Magness cannot establish prejudice to

overcome the procedural bar applicable to Ground Two, and habeas relief as to Ground Two is denied.

Concerning Ground Three, prosecutorial misconduct, the Court already considered the merits of this claim in the context of Magness' ineffective assistance of appellate counsel claim. *See supra.* When examining the entire proceedings, the strength of the evidence against Magness and the jury's ability to judge the evidence fairly in light of the prosecutor's conduct, the outcome of Magness' trial would not have changed. The jury was presented with evidence sufficient to support the guilty verdict, including, but not limited to: Magness possessed a motive, the jury could reasonably infer his gun was used to kill Elizabeth, his theory of a robbery gone wrong is unsupported by the presence of other valuables in the home and his statements regarding Elizabeth's eye place him at the scene of the crime. *See* Dkt. No. 9-3 at 5-10. Further, as explained *supra*, many of the purported instances of prosecutorial misconduct are meritless. The prosector's questions and arguments did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. Accordingly, Magness cannot establish prejudice to overcome the procedural bar applicable to Ground Three, and habeas relief as to Ground Three is denied.

**B. Fundamental Miscarriage of Justice**

Magness' only other means of gaining federal habeas review of his defaulted claims is the fundamental miscarriage of justice exception. *Herrera v. Collins*, 506 U.S. 390, 403-404 (1993); *Sawyer v. Whitley*, 505 U.S. 333, 339-341 (1992); *see also Schlup v. Delo*, 513 U.S. 298 (1995). To "demonstrate that a fundamental miscarriage of justice would occur if his claim is procedurally barred[,] . . . a criminal defendant must make a colorable showing of factual innocence." *Beavers v. Saffle*, 216 F.3d at 918, 923 (10th Cir. 2000). Successful actual innocence claims are rare due to

the demanding evidentiary requirements for such claims. *McQuiggin v. Perkins*, 569 U.S. 383, 386 and 401 (2013); *House v. Bell*, 547 U.S. 518, 538 (2006). "[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House*, 547 U.S. at 536-37 (quoting *Schlup*, 513 U.S. at 327). "To be credible, a claim of actual innocence requires a petitioner to present 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" *Fontenot v. Crow*, 4 F.4th 982, 1031 (10th Cir. 982) (quoting *Schlup*, 513 U.S. at 324).

Within Ground Ten (cumulative error), Magness alleges, "Plaintiff's claim is one of actual innocence." Dkt. No. 1 at 40. "I loved my wife (still do) and had absolutely nothing to do with her murder. I have been unjustly accused for this crime, prosecuted by a close-knit, small town court system and will spend the rest of my life in prison while the real murdered walks free." *Id.* "[A]ll I really need is a fair trial to prove my innocence." *Id.*

Beyond this self-serving statement and argument concerning the miscarriage of justice in his Reply [*see* Dkt. No. 21 at 10, 15, 16, 40, 51, 59], Magness presents no evidence to support his claim. His allegations and arguments alone are insufficient to meet the demanding evidentiary requirements of an actual innocence claim. *Fontenot*, 4 F.4th at 1031. Thus, the fundamental miscarriage of justice exception is inapplicable and cannot be used to access habeas review of Grounds Two, Three, part of Four, Six or Seven.

## CONCLUSION

The Court finds and concludes Magness cannot obtain federal habeas relief under 28 U.S.C. § 2254. As to Magness' claims that are not procedurally defaulted, Grounds One, part of Four, Five, Eight, Nine and Ten, Magness has not made the necessary showings to obtain federal

habeas relief under 28 U.S.C. § 2254. The Court, therefore, denies the Petition as to Grounds One, part of Four, Five, Eight, Nine and Ten.

Magness' remaining claims, Grounds Two, Three, part of Four, Six and Seven, are procedurally defaulted, and Magness has not demonstrated cause and prejudice sufficient to allow this Court to consider his claims. Nor can Magness avail himself of the fundamental miscarriage of justice exception. Accordingly, the Court denies Grounds Two, Three, part of Four, Six and Seven as procedurally barred.

The Court further concludes no certificate of appealability shall issue because reasonable jurists would not debate the correctness of this Court's assessment of Magness' constitutional claims or its determination that some claims, in whole or in part, are procedurally barred. 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

IT IS THEREFORE ORDERED that the Petition [Dkt. No. 1] is DENIED; a certificate of appealability is DENIED; and a separate judgment shall be entered in this matter.

IT IS FURTHER ORDERED that the Clerk of Court shall note on the record the substitution of Michael Miller, Warden, in place of Luke Pettigrew as party Respondent.

Dated this 9th day of October, 2026.

JOHN F. HEIL, III
CHIEF UNITED STATES DISTRICT JUDGE